1   Rob Bonta
    Attorney General of California
2   Donna M. Dean
    Supervising Deputy Attorney General
3   David Klehm
    Deputy Attorney General
4   State Bar No. 165302
    Emily Williams
5   Deputy Attorney General
    State Bar No. 316724
6     600 W Broadway, Ste 1800
      San Diego, CA 92101-3375
7     Ph: (619) 738-9733
      Fax: (916) 731-2120
8     E-mail: David.Klehm@doj.ca.gov
    *Attorneys for Defendants*
9   *State of California and Andrew Ornelas*

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE CENTRAL DISTRICT OF CALIFORNIA

12

13  | **CANDIDO SESMA AND CECILIA SESMA, INDIVIDUALLY AND AS SUCCESSORS IN INTEREST TO CHARLES SESMA, DECEASED,** | 5:21-cv-1694-JWH (KKx) |
    |---|---|
14  | | **DEFENDANTS' NOTICE OF MOTION AND MOTION IN LIMINE NO. 3 TO EXCLUDE IMPROPER EXPERT TESTIMONY; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF DAVID KLEHM IN SUPPORT THEREOF** |
15  | Plaintiffs, | |
16  | | |
17  | v. | |
18  | **STATE OF CALIFORNIA; AND DOES 1-20, INCLUSIVE,** | |
19  | | Date:       May 24, 2024 |
20  | Defendants. | Time:       9:00 a.m. |
    | | Courtroom:  9D |
21  | | Judge:      The Honorable John W. Holcomb |
22  | | |
23  | | Trial Date: July 1, 2024 |
    | | Action Filed: July 30, 2021 |

24

25      **TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD**

26  **HEREIN:**        **PLEASE TAKE NOTICE THAT** on May 24, 2024, at 9:00 a.m.

27  or as soon thereafter as counsel may be heard in in Courtroom 9D of the United

28

States District Court located at 411 W. 4th Street, Santa Ana, California, Defendants State of California and Andrew Ornelas will and hereby do move the Court for an order in limine excluding improper testimony of Roger Clark, who is designated by plaintiffs as an expert witness.  In addition, defendants request a limiting instructions explaining to the jury that Mr. Clark's opinions regarding police procedures and practices are not applicable to plaintiffs' Fourth Amendment and battery claims.

This motion is based on Federal Rules of Evidence 702, 703, and 704, on the following grounds: Roger Clark: (a) improperly states opinions that he is not qualified to make, (b) seeks to provide testimony that will not assist the jury, and (c) improperly provides legal opinions about ultimate issues of law.

This motion is based upon this notice of motion, the attached memorandum of points and authorities, the attached declaration of David Klehm, all pleadings and records on file in this action, and on such further authority, evidence, or argument as may be presented at or before the time of any hearing on this motion.

This Motion is made following a conference of counsel pursuant to L.R. 7-3 and L.R. 16-2.6, which took place on April 26, 2024.

Dated:  April 26, 2024

Respectfully submitted,

ROB BONTA
Attorney General of California
DONNA M. DEAN
Supervising Deputy Attorney General

/s/ David Klehm

DAVID KLEHM
EMILY WILLIAMS
Deputy Attorney General
*Attorneys for Defendants*
*State of California and Andrew*
*Ornelas*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

This lawsuit arises out of the shooting of Decedent Charles Sesma by California Highway Patrol (CHP) Officer Andrew Ornelas. The central issue in this case is whether Officer Ornelas was justified in using deadly force when decedent ran at Officer Ornelas while armed with a pipe.  Plaintiffs seek to introduce improper and unsupported expert opinion testimony of Roger Clark at trial. Defendants request that such evidence be excluded.  In addition, defendants request a limiting instruction explaining to the jury that Mr. Clark's opinions regarding police procedures and practices are not applicable to plaintiffs' Fourth Amendment and battery claims.

### ARGUMENT

### I.     THE IMPROPER OPINIONS OF PLAINTIFFS' EXPERT SHOULD BE EXCLUDED

Federal Rule of Evidence 702 authorizes a witness qualified as an expert by "knowledge, skill, experience, training, or education" to testify, so long as the testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue."  Rule 702 imposes an obligation on a trial judge "to ensure that any and all scientific testimony . . . is not only relevant, but reliable."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  This basic gatekeeping obligation applies to all expert testimony.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, (1999).  The proponent of the expert witness bears the burden of proving the admissibility of the expert witness's testimony.  *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010); *United States v. 87.98 Acres of Land*, 530 F.3d 899, 904 (9th Cir. 2008).

//
//
//

### A.    Mr. Clark's Opinions Are Unsupported by the Facts in This Case and Should Therefore Be Excluded

Case law is clear that an expert may not base his or her opinion on speculation or conjecture. *Riegel v. Medtronic, Inc*., 451 F.3d 104 (2d Cir. 2006), aff'd, 128 S. Ct. 999, 169 L. Ed. 2d 892 (2008) (expert's opinion was properly excluded as speculative and unreliable); *Tunnell v. Ford Motor Co*., 245 Fed. Appx. 283, 285-287 (4th Cir. 2007), cert. denied, 128 S. Ct. 1447, 170 L. Ed. 2d 276 (2008) (unpublished decision) (trial court properly struck an expert opinion which was speculative, based upon untested methodology, and insufficiently certain); *Hathaway v. Bazany*, 507 F.3d 312, 317-319 (5th Cir. 2007) (proposed expert's testimony was speculative and unreliable under *Daubert* and thus, it was properly excluded); *Johnson v. Manitowoc Boom Trucks, Inc*., 484 F.3d 426, 429-436 (6th Cir. 2007) (expert opinion was properly excluded because the expert was not sufficiently qualified to provide an opinion on the subject matter at issue and the opinion was based upon speculative and unreliable methodology); and *Smith v. Sears Roebuck and Co*., 232 Fed. Appx. 780, 783 (10th Cir. 2007) (unpublished decision) (expert's opinion was speculative and unreliable because: he did not support his theories with studies; he did not account for contradictory facts that were in evidence; and he failed to rule out possible alternative theories).

In addition, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  "'An expert's opinions that are without factual basis and are based on speculation or conjecture' are inadmissible at trial … .'" *California ex rel. Brown v. Safeway, Inc.*, 615 F.3d 1171, 1181 n. 4 (9th Cir. 2010) (quoting *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2nd Cir. 2008)); *see also Guidroz-Brault v. Missouri Pacific R.R. Co.*,

1    254 F.3d 825, 829 (9th Cir. 2001) (declaring that 'unsupported speculation and

2    subjective beliefs" cannot be a basis for expert testimony).  Moreover, an expert

3    who offers no more than "a bottom line conclusion" does not assist the trier of fact.

4    *See Baldauf*, 2006 WL 3743819, at *3; *Coachmen Indus. v. Kemlite*, 2008 WL

5    4858385, at *3 (N.D. Ind. Nov. 10, 2008).

6          Mr. Clark erroneously bases his opinions on measurements in yards, rather

7    than feet, and an incorrect assumption that Decedent was not armed with the pipe

8    when he ran at Officer Ornelas.  Plaintiffs seize on a misstatement by Officer

9    Ornelas in his initial interview during which he used "yards" instead of "feet" to

10   describe certain distances.  Plaintiffs use this mistake to argue that Officer Ornelas

11   was in no danger at the time he fired his weapon.  Officer Ornelas corrected this

12   misstatement during his interview and deposition.  Dkt. 48-1 (Supp. Dean Decl., ¶ 2

13   Ex. 7 [Excerpts from Ornelas Interview]); Dkt. 38-9 (Dean Decl., ¶ 2, Ex. 1

14   [Ornelas Depo., pp. 52:25-53:10, 56:16-57:3]).  Moreover, the videos and

15   photographs provided in support of defendants' motion confirm that measurements

16   in yards are clearly erroneous.  See Dkt. 38-2, 38-3, and 38-5.  Where record

17   evidence exists that blatantly contradicts the opposing party's version of the story

18   such that no reasonable jury could believe it, "a court should not adopt that version

19   of facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*

20   550 U.S. 372, 380-381 (2007).  In addition, plaintiffs' forensic video analyst expert,

21   Scott Holdaway acknowledged that, given the poor quality of the MVARS videos,

22   it would be "presumptuous" to claim that the video enlargements can definitively

23   demonstrate whether or not Decedent was holding a pipe in his hand.  Dkt 48-1

24   (Supp. Dean Decl., ¶ 3, Ex. 8 [Holdaway Depo., pp. 13:5-15:3, 39:20-40:4, 40:12-

25   41:1, 45:6-12, 50:25-51:8, 52:12-53:4]; Dkt. 38-8 [Ward Decl., ¶ 7(a) and (b), Ex.

26   2, pp. 2-7]).  Therefore, Clark's opinions, which are based on erroneous

27   assumptions, are invalid and unsupported by the evidence in this case.  As such,

28   they should be excluded.

1
2

**B.     Mr. Clark's Opinions in Areas in Which He Is Unqualified to Testify Should Be Excluded**

3      Proposed expert testimony should be excluded when the witness is not

4   qualified to provide an opinion regarding the subject at issue. *Graff v. Baja Marine*

5   *Corp.*, 310 Fed. Appx. 298 (11th Cir. 2009) (unpublished) (trial court had

6   discretion to exclude expert testimony on the basis that the expert was unqualified

7   in the subject matter and because the opinion of the expert was unreliable);

8   *Bogosian v. Mercedes-Benz of North America, Inc*., 104 F.3d 472, 476-477 (1st Cir.

9   1997) (trial court properly found that a proffered expert lacked the requisite

10   education and training to provide an opinion related to the subject matter); *United*

11   *States ex rel. Davis v. U.S. Training Center Inc.,* 498 Fed.Appx. 308, 320-321 (4th

12   Cir. 2012) (unpublished decision) (it was within the trial court's discretion to

13   exclude a portion of an expert's opinion after determining that it was outside of the

14   area of expertise of the witness).

15      Mr. Clark offers opinions regarding his interpretation of what the videos of

16   the incident in this case depict.  Klehm Decl., ¶¶ 4, 5 and Ex. 3 (Clark Report at pp.

17   6, 14 [Opinion 1], 16 [Opinion 7]) and Ex. 4 (Clark Decl. at ¶¶ 10, 12(a), 12(c)(1),

18   12(d)).  Mr. Clark also offers opinions regarding the ballistics evidence as to the

19   order of the shots fired by Officer Ornelas. *Id*., ¶¶ 4, 5 and Ex. 3 (Clark Report at

20   pp. 14 [Opinion 1] and Ex. 4 (Clark Decl. at ¶ 12(d)).  In addition, Mr. Clark opines

21   that Decedent "may have been experiencing mental health crisis [sic]." *Id*., ¶ 4 and

22   Ex. 3 (Clark Report at pp. 16 [Opinion 9].  Mr. Clark is not qualified as a forensics

23   video analyst, a ballistics expert, or mental health professional. *Id*., ¶ 3, Ex. 2

24   (Clark curriculum vitae).  Moreover, plaintiffs designated a forensic video analyst

25   to testify in this matter. *Id*., ¶ 6, Ex. 5 (Holdaway curriculum vitae).  Accordingly,

26   Mr. Clark's opinions in areas in which he has no expertise should be excluded.

27   //

28   //

6

### C.     Mr. Clark's Legal Opinions and Conclusions Should Be Excluded

It is well established that an expert cannot testify about ultimate issues of law or, in other words, provide legal opinions or conclusions.  *See Mukhtar v. Cal. State Univ. Hayward*, 299 F.3d 1053, 1066 n. 10 (9th Cir. 2002).  "[A]n expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law." *Nationwide Transp. Fin. v. Cass Info. Sys.,* 523 F.3d 1051, 1059-1060 (9th Cir. 2008) (excluding expert opinion that party's conduct was "wrongful"); *Aguilar v. Int'l Longshoremen's Union Local #10*, 966 F.2d 443, 447 (9th Cir. 1992) (affirming exclusion of legal opinions by expert in declaration); *Burkhart v. Washington Metropolitan Area Transit Auth.,* 112 F.3d 1207, 1213 (D.C. Cir. 1997) ("Each courtroom comes equipped with a 'legal expert' called a judge . . . .").  Accordingly, a purported expert's opinion in a 42 U.S.C. section 1983 case that a police officer's conduct was unreasonable, not "justified under the circumstances," not "warranted under the circumstances," and "totally improper" is inadmissible.  *Hygh v. Jacobs,* 961 F.2d 359, 365 (2nd Cir. 1992); *see also, e.g.*, *Lal v. State of California*, No. C 06–5158 PJH, 2012 WL 78674, at *8 (N.D. Cal. Jan. 10, 2012) (excluding Mr.  Clark's testimony that officers acted unreasonable); *Engman v. City of Ontario*, No. EDCV 10–284 CAS (PLAx), 2011 WL 2463178, at *8 (C.D. Cal. Jun. 20, 2011) (rejecting many of Mr. Clark's opinions as constituting "impermissible legal conclusions"); *Barber v. City of Santa Rosa*, No. C–08–5649 MMC, 2010 WL 5069868, at *6, n. 9 (N.D. Cal. Dec. 7, 2010) (rejecting Mr. Clark's opinion on whether the officers' actions were "objectively reasonable"); *Dean v. City of Fresno*, 546 F. Supp. 2d 798, 817, n. 23 (E.D. Cal. 2008) (rejecting Mr. Clark's opinion about reasonableness as "an improper legal conclusion"); *Day v. County of Contra Costa*, No. CV-00-6589-00, 2008 WL 485472, at *22-23 (N.D. Cal. Nov. 10, 2008) (sustaining objections to Mr. Clark's testimony as improper legal conclusions).

1        Mr. Clark offers several legal conclusions regarding the reasonableness or

2    unreasonableness of Officer Ornelas's and Officer Nichols's actions.  Klehm Decl.,

3    ¶¶ 4, 5 and Ex. 3 (Clark Report at pp. 14 [Opinions 1 and 2], 15 [Opinion 4]) and

4    Ex. 4 (Clark Decl. at ¶¶ 8, 10, 12).  In addition, Clark's opinions on some of these

5    legal issues is contrary to law.  For example, compare Clark Decl. ¶ 8(h) (officers

6    required to justify every shot) with *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014)

7    ("officers need not stop shooting until the threat has ended").  Also compare Clark

8    Decl., ¶ 8(e) and 8(f) (deadly force should only be used as a last resort) with

9    Comment to Ninth Circuit Manual of Model Jury Instruction, No. 9.25 ("Although

10    officers must consider the availability of other, less intrusive means, officers "need

11    not avail themselves of the least intrusive means of responding to an exigent

12    situation; they need only act within that range of conduct we identify as

13    reasonable." [citations omitted]).

14        Mr. Clark's legal opinions are improper and impermissible and should be

15    excluded.

16        **D.**    **A Limiting Instruction Should Be Given With Respect to Mr.**

17                **Clark's Opinions Regarding Alleged Violations of Policies**
                      **and Procedures**

18        Mr. Clark opines that Officer Ornelas's conduct violated various policies and

19    police training standards.  Klehm Decl., ¶¶ 4, 5 and Ex. 3 (Clark Report at pp. 14

20    [Opinions 1, 2 and 3], 15 [Opinions 4 and 5], 16 [Opinion 6]) and Ex. 4 (Clark

21    Decl. at ¶¶ 9, 10, 12, 13.  Defendants request a limiting instruction be given to

22    advise the jury that such evidence is not applicable to plaintiffs' Fourth Amendment

23    and battery claims.  A Fourth Amendment excessive force claim cannot be based

24    upon violation of police department policy; the pertinent issue is whether the

25    officer's use of force was in accord with the Fourth Amendment objective

26    reasonableness test, not whether it violated police department rules, regulations, or

27    guidelines.  *See Whren v. United States*, 517 U.S. 806, 815 (1996); *City and County*

28    *of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1777 (2015) (fact officer acted

1    contrary to her training will not negate officer's qualified immunity); *Medina v.*

2    *Cram*, 252 F.3d 1124 (10th Cir. 2001) (Fourth Amendment excessive force claim

3    cannot be based on violations of police guidelines and practices); *Smith v. Freland*,

4    954 F.2d 347 (6th Cir.) (pertinent issue is whether officer violated Fourth

5    Amendment, not whether he violated city policy), *cert. denied*, 504 U.S. 915

6    (1992); *Pasco v. Knoblauch*, 566 F.3d 572, 579 (5th Cir. 2009) (fact officer failed

7    to follow police department protocol "is constitutionally irrelevant.")  In addition,

8    an expert's opinion cannot establish the reasonableness of the use of force as a

9    matter of law. *Gutierrez v. San Antonio*, 139 F.3d 441 (5th Cir. 1998); *Reynolds v.*

10   *San Diego*, 84 F.3d 1162 (9th Cir. 1996).  Finally, several of the alleged policy

11   violations are not pertinent to the issues in this case.  *Scott v. Henrich*, 39 F.3d 912,

12   915 (9th Cir. 1994), *cert. denied*, 515 U.S. 1159 (1995) ("[a]ssuming internal police

13   guidelines are relevant in determining whether use of force is objectively

14   reasonable, they are relevant only when one of their purposes is to protect the

15   individual against whom force is used.")  Accordingly, the jury should not be

16   misled to believe that Mr. Clark's testimony regarding police procedures and

17   practices is applicable to plaintiffs' Fourth Amendment and battery claims;

18   therefore, defendants request a limiting instruction in this regard.

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

Based on the foregoing, defendants respectfully request that the court exclude the improper opinions of plaintiffs' expert as identified herein and give a limiting instruction regarding opinions related to alleged violations of policies and procedures.

Dated: April 26, 2024                              Respectfully submitted,

                                                   ROB BONTA
                                                   Attorney General of California
                                                   DONNA M. DEAN
                                                   Supervising Deputy Attorney General

                                                   /s/ David Klehm

                                                   DAVID KLEHM
                                                   EMILY WILLIAMS
                                                   Deputy Attorney General
                                                   *Attorneys for Defendants*
                                                   *State of California and Andrew*
                                                   *Ornelas*

# DECLARATION OF DAVID KLEHM

I, David Klehm, declare as follows:

1.     I am a duly appointed Deputy Attorney General and am assigned to represent defendants in the above-captioned action.  I make this declaration in support of the attached motion.  The facts set forth herein are within my personal knowledge.

2.     Attached hereto as Exhibit 1 is a true and correct copy of Plaintiffs' Initial Expert Disclosures (without exhibits).

3.     Attached hereto as Exhibit 2 is a true and correct copy of Roger Clark's curriculum vitae that was attached to Plaintiffs' Initial Expert Disclosures.

4.     Attached hereto as Exhibit 3 is a true and correct copy of Roger Clark's Rule 26 Report in this matter that was attached to Plaintiffs' Initial Expert Disclosures.

5.     Attached hereto as Exhibit 4 is a true and correct copy of the declaration of Roger Clark filed in this action (Dkt. 43-7).

6.     Attached hereto as Exhibit 5 is a true and correct copy of Scott Holdaway's curriculum vitae that was attached to Plaintiffs' Initial Expert Disclosures.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 26, 2024, at San Diego, California.

/s/ David Klehm
David Klehm

LA2021603706

11

EXHIBIT 1

**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Ranhee Lee (SBN 330979)
rlee@galipolaw.com
21800 Burbank Blvd., Suite 310
Woodland Hills, CA 91367
Tel: (818) 347-3333
Fax: (818) 347-4118

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Candido Sesma and Cecilia Sesma, individually and as successors in interest to CHARLES SESMA, deceased, | Case No. 5:21−cv−1694−JWH−KKx |
| Plaintiffs, | [*Hon. John W. Holcomb*] |
| vs. | **PLAINTIFFS' INITIAL EXPERT DISCLOSURES** |
| STATE OF CALIFORNIA, ANDREW ORNELAS, and DOES 2-20, inclusive, | |
| Defendants. | |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

Plaintiffs Candido Sesma and Cecilia Sesma, individually and as successors in interest to Decedent Charles Sesma hereby designate the following retained and non-retained expert witnesses who may be called upon to give expert testimony at trial pursuant to Rule 26(a)(2)(A) of the Federal Rules of Civil Procedure. Plaintiffs reserve their right to supplement and/or amend this disclosure.

## **RETAINED EXPERTS**

1. **Roger A. Clark**
   Police Procedures Consultant, Inc.
   10207 Molino Road
   Santee, CA 92071
   (208) 351-2458

Mr. Clark's Rule 26 report, C.V., fee schedule, and list of prior sworn testimony are collectively attached hereto as **Exhibit 1**.

2. **Scott Holdaway**
   CVisualEvidence, LLC.
   2441 W 205th Street, Suite C102
   Torrence, CA 90501
   (310) 831-8900

Mr. Holdaway's Rule 26 report, C.V., and fee Schedule are collectively attached hereto as **Exhibit 2**.

## **NON-RETAINED EXPERTS**

1. **Julie Huss-Bawab, M.D.**
   Department of Medical Examiner-Coroner
   County of Los Angeles

Dr. Huss-Bawab is a Deputy Medical Examiner at the Department of Medical Examiner-Coroner, County of Los Angeles. Dr. Huss-Bawab performed the autopsy of Mr. Sesma and is expected to testify as to the nature of the injuries Mr. Sesma sustained, the cause and manner of Mr. Sesma's death, and the general trajectory of the gunshot wounds in the body which are included in the autopsy report that is previously disclosed, pre-death pain and suffering and related body positions at the time of the shooting based on hypothetical questions.

**2. Kyle Bumanlag**
American Medical Response
7925 Center Avenue
Rancho Cucamonga, CA 91730
(909) 477-5000

Kyle Bumanlag is a Paramedic at American Medical Response who responded to the scene of the incident after the shooting. Mr. Bumanlag made observations regarding the condition of Mr. Sesma after he was shot as well as nature and extent of injuries. Mr. Bumanlag examined and evaluated Mr. Sesma at the scene, and provided medical treatments.

**3. Keimari Evans**
American Medical Response
7925 Center Avenue
Rancho Cucamonga, CA 91730
(909) 477-5000

Keimari Evans is an emergency medical technician at American Medical Response who responded to the scene of the incident after the shooting. Keimari Evans made observations regarding the condition of Mr. Sesma after he was shot as well as nature and extent of injuries. Keimari Evans examined and evaluated Mr. Sesma at the scene, and provided medical treatments.

**4. Brian Allenbaugh**

Ontario Fire Department Station No. 8/ Medic Engine 138
3429 E. Shelby Street
Ontario, CA 91764
(909) 395-2002

Brian Allenbaugh is a Firefighter at Ontario Fire Department Station No. 8/ Medic Engine 138 who responded to the scene of the incident after the shooting. Mr. Allenbaugh made observations regarding the condition of Mr. Sesma after he was shot as well as nature and extent of injuries. Mr. Allenbaugh examined and evaluated Mr. Sesma at the scene, and provided medical treatments.

**5. Nicholas White**

Ontario Fire Department Station No. 8/ Medic Engine 138
3429 E. Shelby Street
Ontario, CA 91764
(909) 395-2002

Nicholas White is a Firefighter at Ontario Fire Department Station No. 8/ Medic Engine 138 who responded to the scene of the incident after the shooting. Mr. White made observations regarding the condition of Mr. Sesma after he was shot as well as nature and extent of injuries. Mr. White examined and evaluated Mr. Sesma at the scene, and provided medical treatments.

Dated: July 8, 2022               LAW OFFICES OF DALE K. GALIPO

                                  By:  _/s/ Dale K. Galipo_____
                                       Dale K. Galipo
                                       Ranhee Lee
                                       Attorneys for Plaintiffs

<u>PROOF OF SERVICE</u>

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California and am over the age of eighteen years and not a party to the within action. My business address is 21800 Burbank Boulevard, Suite 310, Woodland Hills, California 91367.

On July 8, 2022, I served the foregoing document described as: **PLAINTIFF'S INITIAL EXPERT DISCLOSURES** on all interested parties, through their respective attorneys of record in this action by placing a true copy thereof enclosed in a sealed envelope addressed as indicated on the attached service list.

<u>METHOD OF SERVICE</u>

☐ (BY MAIL) I enclosed the documents in a sealed envelope or package and addressed to the parties at the addresses as indicated on the attached service list.

    ☐ I deposited the sealed envelope or package with the United States Postal Service, with the postage fully prepaid thereon.

    ☐ I placed the envelope or package for collection and mailing, following our ordinary business practices. I am readily familiar with the practice of this office for the collection, processing and mailing of documents. On the same day that documents are placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

☒ (BY ELECTRONIC SERVICE) I caused the foregoing document(s) to be sent via electronic transmittal to the notification addresses listed below as registered with this court's case management/electronic court filing system.

☐ (BY FEDERAL EXPRESS) I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses as indicated on the attached service list. I placed the envelope or package for collection and overnight delivery at an office or regularly utilized drop box of the overnight delivery carrier.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on July 8, 2022, at Woodland Hills, California.

Karen Slyapich

# SERVICE LIST

ROBBONTA
Attorney General of California
MARKT. CUMBA
Supervising Deputy Attorney General
DONNA M. DEAN
Deputy Attorney General
State Bar No. 187104
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
Telephone: (213) 269-6509
Fax: (916) 731-1120
E-mail: Donna.Dean@doj.ca.gov
*Attorneys for Defendants*

EXHIBIT 2

**ROGER A. CLARK**

*10207 Molino Road • Santee CA 92071 • Telephone: (208) 351-2458.  Fax: (619) 258-0045.*

EXPERIENCE

**Police Procedures Consultant (self employed)**
April 1, 1993 to Present................................................................. **28 years**

I have been certified by Federal and State courts as expert in jail and police procedures in Federal and State Courts.  I select my cases carefully and have consulted in approximately 2300 cases thus far since my retirement from the Los Angeles County Sheriff's Department.

**Substitute Teacher, Madison School District**
August 1994 to 2003........................................................................ **9 years**

I substitute teach at all levels in the school district (elementary to high school).  As a volunteer, I wrote and managed a $85,000.00 federal grant for our Central High School.  This grant is in its sixth year and has generated $510,000.00 for the school.

**District Liaison, State of Idaho Department of Juvenile Corrections**
August 1, 1995 to March 1, 1997.........................................**1 year, 7 months**

I represented the new Department of Juvenile Corrections to the ten counties in the Seventh Judicial District.  As such, I worked closely with Probation Officers, County Commissioners, Judges, other state agencies, private care providers, etc. in the implementation of the new Idaho Juvenile Corrections Act of 1995.  I wrote or participated in the writing of several federal grants for the District.  I conducted training - both formal and informal - and developed a series of new therapy programs for juveniles with private care providers.  I also served as the Director of the Detention Center and the State Placement Coordinator during this time.

-1-

**Los Angeles County Sheriff's Department**
December 1, 1965 to March 31, 1993................................**27 years 4 months**

**Note:**  In 1993 the Los Angeles County Sheriff's Department had 7,000 sworn and 3,000 civilian personnel and a daily County Jail inmate population of 23,000.

**Service as a Lieutenant (15 Years, 0 Months):**

1.  **Field Operations Region I**
    **NORSAT**                 11/15/87 to 3/31/93   **64 months**

I commanded a specialized unit created to investigate, locate, observe and arrest major (career) criminal offenders.  This unit was designed as a multijurisdictional effort for the cities in the northern region of Los Angeles County.  The command consisted of four (4) Sergeants, seventeen (17) Deputies, four (4) Police Officers, twenty five (25) Reserves, and three (3) civilian employees.  The 1992 budget set at $1.5 million.  The arrest rate averaged 500 career criminal arrests per year with a 97% conviction rate and no shots fired (on either side) for 61 consecutive months.

Significant contributions while assigned at this Bureau were:

*       Increase in participating police agencies.
*       Direct participation with corporate (private) agencies.
*       Formation of a reserve and volunteer unit.
*       Establishment of NORSAT Foundation private funding.
*       Computerization of the unit.
*       Promotion of fourteen personnel.
*       Fleet expansion from 13 to 28 vehicles (donated).
*       Formation of the DEA Valley Task Force.
*       Field Operations Directive 89-3.

2.      **Executive Offices**
        **Reserve Forces Bureau**       05/01/84 to 11/15/87 **42 months**

I was the administrative officer to a specialized bureau responsible for coordinating the activities of 1,000 sworn reserve personnel, 900 civilian

volunteers, and 450 law enforcement explorer scouts.  The Bureau identifies programs for their effective utilization throughout the Department; develops and tracks training programs; sponsors activities designed to promote growth and keep morale at high levels.

Significant contributions while assigned at this bureau are:

• Total restructure of the Academy training process for reserve Deputies.
• Implementation of upgrade programs to move lower level reserves to level I status.
• Departmental Reserve Certification procedures.
• Annual leadership seminar.
• The Reserve News, a nationally recognized police magazine.
• Computerization of the Bureau.


**3.     Field Operations Region I**
        **Crescenta Valley Station**     04/01/80 to 05/01/84  **49 months**

Crescenta Valley Station is a full service police facility of 100 personnel serving a population of 50,000 (including the Contract City of La Canada-Flintridge) and a total area of 250 square miles. During my four years service at this facility I served in every management role:

• **Nine months** as the Station Commander during an extended absence by the Captain (08/01/83 TO 05/01/84).
• **Sixteen months** as the Operations Lieutenant (03/01/82 TO 08/01/83).
• **Twelve months** as the station Detective Bureau Commander (03/01/81 to 01/01/82).
• **Twelve months** as a Watch Commander (04/01/80 to 03/01/81).

Significant contributions while assigned at this command are:

• Negotiation of an enhanced city contract (at a savings to the City).
• Formation of a volunteer community support group.
• Development and implementation of an integrated community emergency response plan.
• High School undercover narcotics operation.
• Restructure of the Station Detective Bureau.
• The annual station picnic, which was effective in boosting station morale.

4.      **Custody Division**
        **Central Jail**                04/01/78 to 04/01/80  **24 months**

The Los Angeles County Central Jail is the largest jail facility in the State of
California, with a daily inmate population of seven thousand (7,000), an
assigned staff of six hundred (600), and two hundred (200) civilian personnel.
My service at this command was equally divided into two major assignments:

•        Training and Logistics Lieutenant (04/01/79 to 04/01/8).
•        Watch Commander (04/01/78 to 04/01/79).

Significant contributions while assigned at this command are:

•        "Hot Fire" Training program, which is now a State (POST) mandated
         training module for all custody personnel throughout California.
•        The "Defend in Place" fire safety operational plan for jail facilities.
•        New fire safety specifications for jail bedding and mattresses.
•        The development of fire safe jail mattress material.
•        The development of a facility emergency response plan.
•        The computerization of training, timekeeping, and scheduling for the
         facility (800 sworn and 200 civilian personnel).
•        "Spouse day at CJ"--A program for spouses of employees.


**Service as a Sergeant (6 Years, 4 Months):**


5.      **Administrative Division**
        **Federal Surplus Property**    01/12/76 to 04/01/78  **27 months**

This program was entirely my idea and developed while I was assigned at my
previous assignment (Emergency Operations Bureau).  The unit provides
millions of dollars in free federal excess and surplus food and property from
clothing to heavy equipment and aircraft to the department each year.  I am
very proud of this contribution to the Department.


6.      **Patrol Division**
        **Emergency Operations**        02/01/74 to 01/12/76  **23 months**

I was among the original personnel that formed this unit which blended the
activities of the Department's planning    unit with emergency operations
planning and preparation.  I was assigned as the Personnel and Logistics
Sergeant.

-4-

Significant contributions while assigned at this command are:

- •       Formation of a new County Emergency Operations Center.
- •       Participation in the 1974 Federal earthquake studies of Los Angeles County.
- •       Development of the Department's specialized Field Command Post equipment.
- •       Development of the Department's Field Booking Team.

**7.      Patrol Division**
**Civil Defense Bureau**      12/01/73 to 02/01/74  **02 months**

I was assigned to this unit to facilitate the orderly transition into the new Emergency Operations Bureau.

**8.      Patrol Division**
**San Dimas Station**      12/12/72 to 12/01/73  **12 months**

I performed all the duties of a Watch and Patrol Sergeant.  I also frequently served as the Watch Commander.

**9.      Technical Serviced Division**
**Communications Bureau**      12/01/71 to 12/12/72  **12 months**

I served as the Watch Commander in The Sheriff's Department's old radio room located at the Hall of Justice, and assisted in the transition to the existing communications facility.

**Service as a Deputy (6 Years, 0 Months):**

**10.      Patrol Division**
**San Dimas Station**
**Detective Bureau**      01/01/70 to 12/01/71  **23 months**

I served as a Station Detective assigned to the evening watch.  I handled the first response to all crimes requiring investigations.  I processed all evening juvenile matters, prepared criminal complaints and juvenile petitions.

11.     **Patrol Division**
        **San Dimas Station Patrol**     01/29/68 to 01/01/70 **24 months**

I performed all duties assigned to Station Patrol:  Jailer, Desk, Watch Deputy, Patrol, and Traffic.


12.     **Technical Services Division**
        **Transportation Bureau**     11/01/67 to 01/29/68 **02 months**

I was temporarily assigned to the Beverly Hills Municipal Court pending my assignment to a Patrol Station.


13.     **Custody Division**
        **Central Jail**                 05/06/66 to 11/01/67 **18 months**

I returned to my previous assignment at the Central Jail after graduation from the Academy.  I performed all aspects of a Custody Deputy i.e. Module Officer, Prowler, Control Booth, High Power, etc.


14.     **Administrative Division**
        **Academy**                 01/17/66 to 05/06/66 **04 months**

I was a Sheriff's trainee assigned to Class #110.


15.     **Custody Division**
        **Central Jail**                 12/01/65 to 01/17/66 **01 month**

I was a pre-academy Custody Deputy assigned to the Central Jail as an "off the street" Deputy Sheriff.


## DEGREES AND CERTIFICATION

| | | |
|---|---|---|
| P.O.S.T. Command College (Class #5) | POST | 1988 |
| Management Certification | POST | 1980 |
| Advanced Certification | POST | 1975 |
| Associate of Science Degree | Chaffey College | 1971 |

EXHIBIT 3

# Roger Clark

## Police Procedures Consultant, Inc.

10207 Molino Road.  Santee, CA 92071
Phone: (208) 351-2458,  Fax: (619) 258-0045
rclark9314@aol.com

July 8, 2022

Dale K. Galipo, Esq.
Ranhee Lee, Esq.
Law Offices of Dale K. Galipo
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367

**Re:   *Candido Sesma, et al. v. State of California, et al.*, Case No. 5:21-cv-01694-
JWH-KK.**

Dear Counsel:

Thank you for retaining me to analyze and render opinions regarding incidents stemming from an event on August 6, 2020 between Mr. Charles Sesma (Mr. Sesma) and California Highway Patrol (CHP) Officer Andrew Ornelas (Officer Ornelas).  In my review of this matter, I have studied the interview transcripts, deposition transcripts, photographs, and other materials provided to me thus far (as listed below) regarding this case.  Please be advised that if/when any additional information is submitted, a supplemental report may be necessary.

## **Materials Provided and Reviewed Thus Far:**

1.      Complaint for Damages.

2.      Protective Order (Docket No.15)

3.      Interview Transcripts/ Audio recordings:
        a.      Andrew Ornelas.
        b.      Jason Nichols.
        c.      Jason Steen.

4.      Photographs and diagrams:

a.    Scene photos and maps.

6.    Incident Detail Report.

7.    CHP reports on scene and evidence.

8.    Employee training records.

9.    Deposition Transcripts:
    a.    Andrew Ornelas.
    b.    Jason Nichols.

10.   Dash cam videos and dispatch audio recordings.

11.   CHP Policies.

12.   Charles Sesma's Autopsy Report and photos.

13.   POST Basic Learning Domains:
    a.    #1: "Leadership, Professionalism & Ethics."
    b.    #2: "Criminal Justice System."
    c.    #3: "Policing in the Community."
    d.    #5: "Introduction to Criminal Law."
    e.    #15: "Laws of Arrest."
    f.    #16: "Search and Seizure."
    g.    #20: "Use of Force/De-escalation."
    h.    #21: "Patrol Techniques."
    i.    #23: "Crimes in Progress."
    j.    #33: "Arrest Methods/Defensive Tactics."
    k.    #35: "Firearms/Chemical Agents."
    l.    #36: "Information Systems."
    m.    #37: "Persons with Disabilities."

14.   Expert Report and video footage from CVisual

15.   Ornelas training documents

**Brief Overview of Events and Commentary:**

On August 6, 2020, Officer Ornelas (solo patrol unit) received a call for a property damage only vehicle collision.  While he was responding to the call, he received an update that it became a hit-and-run incident.  Officer Ornelas and other CHP officers spotted Mr. Sesma walking west along the train tracks and approached him.  When Officer Ornelas yelled "Hey! Get over here!" to Mr. Sesma, Mr. Sesma took two to three steps closer to Officer Ornelas, bent over and allegedly picked up a small (12") pipe in a non-threatening manner with his arms down to his side.  A moment later, Mr. Sesma turned to his right side and kept slowly walking west alongside the train track and away from Officer Ornelas.

As Mr. Sesma was getting farther away, Officer Ornelas went back to his patrol vehicle and drove west where an overhead train track was located.  There was no one on the track or near the track at this point.  Mr. Sesma never showed any violence against anyone.  In fact, Mr. Sesma remained silent and walked slowly while Officer Ornelas was yelling at him during the initial contact.

Then, Officer Ornelas parked his patrol vehicle facing an overhead train track and began walking up the embankment.  After Officer Ornelas reached the train track and started communicating with another officer who just arrived near Officer Ornelas' patrol vehicle, Mr. Sesma stood up and showed himself to be positioned west of Officer Ornelas.  Officer Ornelas yelled, "don't move!" as Mr. Sesma started jogging in an easterly direction with his arms in a slight "pumping action."  At this time, Officer Ornelas fired approximately four to five shots at Mr. Sesma as he was going down to the ground.  Then 6-7 seconds passed, Officer Ornelas fired two more shots.  Officer Ornelas was 6'3" tall and weighed 220 pounds at the time of the shooting. Mr. Sesma was 5'9" tall and weighed 201 pounds.

Mr. Sesma was struck with a total of eight shots.  Two of these shots struck his face.  Mr. Sesma was subsequently pronounced dead at a hospital as a result of those gunshot wounds.  In my opinion, per his training and professional standards, Officer Ornelas failed to follow a contact-cover tactic and also failed to de-escalate the situation.

The following pages are a brief overview of the incident, and commentary regarding Officer Ornelas' use of deadly force, and opinions regarding his decisions and actions.


**Incident:**

On August 6, 2020, Mr. Sesma was driving his vehicle and got into a vehicle collision

which resulted in damages only to vehicles.  After his vehicle came to a stop, he was found slowly walking along the train track next to the parking lot at 3680 E. Guasti Road, Ontario, CA 91760.

Officer Ornelas was driving alone when he responded to the scene (Deposition of Ornelas p. 16 line 12-15).  Officer Ornelas responded to a dispatch call about property damage only vehicle collision incident on a freeway but while Officer Ornelas was responding he received further information that an individual had moved on foot in a southerly direction from the scene.  (Deposition p. 17)

Officer Ornelas stated during his deposition that he was able to see what eneded up being determined as the first collision which seemed to be minor to moderate collision damage and the second one which he was not able to determine how much damage was done to the cars.  Officer Ornelas further received an information that the person who moved on from the scene on foot was sitting in a field just south of the collision location which was near an Embassy Suites hotel.

Officer Ornelas then saw the individual walking on the train track adjacent to the Costco parking lot and puts out on the radio that he "got him."  Then, Officer Ornelas drove closer to the individual and got out from his patrol vehicle.  At that point, Ornelas was alone but still made contact with Mr. Sesma.

Based on the review of the dash camera video, Officer Ornelas called out, "Hey! Get over here!" to Mr. Sesma at that point.  To that command, Mr. Sesma slowly walked toward Officer Ornelas and stopped walking.  Mr. Sesma then bent over and allegedly picked up something which Officer Ornelas considered to be a metal pipe and kept standing still.

However, the quality of the dash camera video prevents viewers from making out whether Mr. Sesma picked up anything or what he picked up at that time if he did pick up anything.  Instead of ordering Mr. Sesma to drop anything that Mr. Sesma allegedly had in his hand, Officer Ornelas then says "don't you pick that up" to Mr. Sesma who was already standing still.  During his interview, Officer Ornelas stated that seeing Mr. Sesma picking up the metal object was not something that "put him on edge yet" but it was more of an awareness that he picked it up.  (See Officer Ornelas interview p. 46).

Officer Ornelas then walked closer to Mr. Sesma who kept standing still with his hands by his side.  The video system then records Officer Ornelas telling Mr. Sesma to "come over here!"  Mr. Sesma slowly walks towards Officer Ornelas with his hands by his sides following Officer Ornelas's command.  Thereafter, Mr. Sesma changes his direction away from Officer Ornelas and slowly walked to his right, perpendicular to the train track.

Officer Ornelas then said, "stop walking" and immediately thereafter radioed to Officer Nichols to go to Haven where the railroad track was because Mr. Sesma was slowly walking and heading that way.  As Officer Ornelas got back into his patrol vehicle, he told Officer Jason Steen to "keep eye on him" and drove out of the parking lot.

As Officer Ornelas started driving, he broadcast on the radio that Mr. Sesma picked up a metal object and was heading toward Haven.  To that, a person on the other side of the radio repeats back what Officer Ornelas said.  Notably, Officer Ornelas stated during his deposition that Officer Jason Steen was with him in the parking lot and that Officer Steen remained within the parking lot at this point.

When Officer Ornelas arrived at Haven Avenue where the overpass railroad track was, he did not wait for the backup officers to arrive or wait until Officer Nichols to arrive even though he was informed by other officers or on radio that other units were responding and that Mr. Sesma was on the bridge on Haven Avenue "right above" where Officer Ornelas's patrol vehicle was parked. (See Dash Camera Video).  Instead, the dash camera video shows Officer Ornelas walking briskly up towards the overpass railroad track without any back up officers and without informing other officers that he was going up to the embankment.  Then, Officer Ornelas stated that he saw Mr. Sesma seated down directly above Haven Avenue up on the embankment in the railroad track which was to Officer Ornelas's left and around the fence on the bridge.  Ornelas stated that at that point, Mr. Sesma was less than 25 yards. (See Ornelas Interview p. 69).

Later during his interview, Officer Ornelas was asked why he approached the railroad tracks on foot on Haven Avenue.  To that question, Officer Ornelas stated that he did not hear anything as to where Mr. Sesma was and that as far as he knew, Mr. Sesma was still basically right in front of Officer Steen. (See Officer Ornelas interview p. 51).  However, the Dash Cam Video footage captured Officer Ornelas stating that he "copied" the information given to him which included the fact that Mr. Sesma was "right above you."

Then Officer Ornelas broadcast a radio communication that he was on the bridge before he went up the embankment.  Then, as Officer Ornelas sees Officer Nichols, he asked Officer Nichols to stay at below the embankment when Officer Nichols was about to go up the embankment as well.  Thereafter, Mr. Sesma stood up from where he was and started going easterly direction from Officer Nichols' point of view.  Mr. Sesma's hands or arms were in "pumping" motion.

Officer Ornelas stated during his interview and his deposition that when he saw Mr. Sesma, Mr. Sesma first stood up, held the pipe directly over his head and made a stabbing motion.  (See Officer Ornelas Deposition pp. 33-34).  In his interview, Officer Ornelas

Page 5 of  24

further stated that he believed Mr. Sesma was holding the pipe in his right hand. However, the dash camera video footage and the CVisual's video footage show that Mr. Sesma never raised his hands above his head. After reviewing the CVisual's video footage, it does not even appear that Mr. Sesma had anything in his hand.

Officer Ornelas fired approximately 4 to 5 shots in the first volley of shots at Mr. Sesma. Towards the end of the last shot in that volley, Mr. Sesma went to the ground.  Then, 6-7 seconds later, Officer Ornelas fired additional two shots.  Mr. Sesma sustained a total of eight gunshot wounds including two gunshot wounds to his face.  Officer Ornelas stated that he was less than 20 yards away from Mr. Sesma when the second volley of shots were fired.

After the second volley of shots were fired, Officer Ornelas stated in his deposition that Mr. Sesma still had the pipe with him and that Mr. Sesma fell on top of it, but it ended up being somewhere near his location slightly in front of him even though Mr. Sesma never threw the pipe at Officer Ornelas or swung it at him.  (See Officer Ornelas Deposition pp. 40-41).  The photographs of the scene shows that a short approximately 11" metal pipe was several feet away from where Mr. Sesma fell and from where the blood stains were photographed.

Officer Ornelas further testified during his deposition that he played football and also wrestled.  Officer Ornelas was 6'3" tall and weighed 220 pounds at the time of the shooting; whereas Mr. Sesma was 5/9" tall and weighed 201 pounds.  On the day of the incident, Officer Ornelas also had a Taser and a collapsible baton on him.  However, Officer Ornelas testified at his deposition that he never considered using his Taser or baton when he saw Mr. Sesma standing up.  Officer Ornelas never gave any verbal warning that he was going to shoot Mr. Sesma, and Officer Ornelas did not slow down to count it individually when he fired his shots.

Also, according to the Use of Force/ De-escalation evaluation sheet, officers are required to have gone through training and to show several skill sets including situational and tactical awareness of his surroundings, should contact suspects from advantageous position, should select an objectively reasonable force, and should use appropriate officer safety techniques. (See Use of Force/De-escalation (LD #20).

### Considerations Regarding the Use of Deadly Force:

The use of deadly force is the most serious decision a peace officer may ever have to make.  Such a decision should be guided by the reverence for all human life (including the officer's life and others that may be in imminent danger) and, used only when other

means of control are unreasonable or have been exhausted

*Deadly force* applied by a peace officer is force that creates a substantial risk of causing death or serious bodily injury.

Reverence for all life is the foundation on which the use of deadly force rests.  The authority to use deadly force is an awesome responsibility given to peace officers by the people who expect them to exercise that authority judiciously.  In the law enforcement/community partnership, peace officers are expected to be self-disciplined, accountable, and in turn, the community is expected to support its peace officers.

An officer may use deadly force to protect oneself or others when the officer has the objective and reasonable belief that his/her life, or the life of another, is in imminent danger of death or serious physical injury based upon the totality of the facts known to the officer at the time.  (LD 20: Chapter 3 –Use of Deadly Force, page  3-3.)

Related Terms: - In order to understand the aspects of the use of deadly force, peace officers need to become familiar with the following terms.

*Serious bodily harm or injury* means a serious impairment of physical condition, including, but not limited to, the following: loss of consciousness, concussion, bone fracture, protracted loss or impairment of function of any bodily member or organ, a wound requiring extensive suturing, and serious disfigurement. *(Penal Code Section 243(f)(4))*

*Reasonable necessity* means that delay in apprehension would create substantial and unreasonable risk to officers or others possibly resulting in serious physical injury or death.

*Imminent danger* means a significant threat that peace officers reasonably believe will result in death or serious bodily injury to themselves or to other persons. Imminent danger is not limited to "immediate" or "instantaneous."  A person may pose an imminent danger even if they are not at the *very moment* pointing a weapon at another person.

*Sufficiency of fear* - According to the law, fear alone does not justify the use of deadly force.  There must be a *sufficiency of fear* for the use of deadly force to be justified. (Penal Code Section 198).  There are three elements needed to establish sufficiency of fear.

- The circumstances must be sufficient to excite the fears of *a reasonable person* in like circumstances.

- The person must not act *under the influence of fear alone*. There has to be some circumstance or overt act apart from the officer's fear.
- The decision to use deadly force must be made *to save one's self or another* from great bodily injury or death.

*Considerations when deciding to use deadly force* - The decision of whether or not to use deadly force may be influenced by the officer's:

- training and experience
- judgment
- mental alertness
- emotional maturity
- existing facts and circumstances
- understanding of the law as it relates to
  - agency policies concerning the use
  - amount of force that is objectively reasonable to achieve the law enforcement mission (LD 20: Chapter 3 –Use of Deadly Force, page  3-6 & 3-7.)

## Professional Standards Regarding the Use of Force:

Early on in the POST Basic Academy, the seriousness of the unique powers imbued on Law Enforcement Officers is stressed with the required responsibility they have to use them with "great care".  It is clear that there is no room for unprofessional, immature and/or hot-headed individuals in the law enforcement profession.  This is best expressed in Learning Domain # 2: "Criminal Justice System:"

"The criminal justice system gives law enforcement two extraordinary powers:

1. The power of arrest and
2. The power to use deadly force.

The authority to do so does not come from the rule of an authoritarian dictator.  Rather it comes from the will and consent of the people who put their trust in law enforcement to use that power with the utmost of care and restraint.  This is why it is important to emphasize that peace officers do not confer "police powers" on themselves.  These powers come to the criminal justice system from the people they serve."  (Learning Domain #2: "Criminal Justice System," page 1-4.  Emphasis added.)

Additionally, POST specifies that there are a number of key factors that can affect which

force option is approved and appropriate under the concept of the "totality of circumstances."  In view of this incident nothing other than "Officer Presence" and "Verbal Instruction" were justified in this case.  The standards in this regard are as follows (reference: POST LD # 20: "Use of Force." Page 2-5.):

## The Required (and Trained) Tactical Response in this Incident:

A seminal aspect of this shooting incident was the gross departure from required tactics, which resulted in the fatal shooting of Mr. Sesma.  As stated above, these tactics are so fundamental that absent highly unusual and rare instances, failures to adhere to them are not excused or forgiven.  In this regard, it is helpful to compare what occurred during this incident in view of the basic tactical steps expected from trained law enforcement officers.  However trained and expressed, the basic tactical steps understood and required are briefly stated as follows:

*Containment:*

This phase includes getting the subject (Mr. Sesma) under control by restricting any opportunity to flee or change position so that a safe apprehension can occur.  Initially, this can be a difficult problem when the subject is still in flight.  The professional wisdom (as taught by POST) is to create a containment zone, remain at a safe distance to relieve the emotional pressure on the target, and await sufficient assisting units and coordinate them into a team effort.

In this incident, Mr. Sesma was alone and standing in a remote area near a train track. The training is that once the subject is located and/or contained (as occurred here), the objective is to keep the subject contained - preferably within an isolated area away from the public (or to evacuate bystanders from the containment area) - while they are dealt with by officers who remain in positions of safety.

A primary purpose of establishing a containment includes providing the apprehending officers a safe and realistic assessment of the credible risks to be tactically resolved. Sound tactics accommodate the opportunity for such a safe assessment.  In this case, CHP Officers squandered the tactical advantage afforded by the existing containment by reacting too quickly and not giving sufficient time for Mr. Sesma to comply with the instructions given to him.  It cannot be overstated that any properly trained Officer would have taken a position of safety - "cover" - which would have allowed sufficient time as events unfolded for the next expected step in the process - "decompression."

*Decompression:*

Page 9 of  24

All living creatures, including human beings, have instinctive protective reflexes that will take control of the body during extreme stress. This instinctive response is commonly called the "flight-fight" response and it occurs when a human being perceives danger. As part of this instinctive response, the subconscious body takes over and the rational mind loses control. Humans will invariably flee or, when there is no other option, they will fight to either ward off the danger or to create an avenue of escape. Trained and experienced officers have both seen and experienced this human response. It is a basic fact of life in the business of police work, and something every experienced officer is trained to cope with.

Officers are trained that there is always a point during any sudden demand upon a subject when it becomes counterproductive and can only be expected to drive the subject into a state of incoherent dread and terror rather than compliance. As stress and/or anxiety increase, the ability for the contained subject to comply decreases. Thus, a decompression pause is necessary, at which time, a rational activity (such as meaningful communication), can take place. This did not occur in this case. In my opinion, Mr. Sesma was not given ample opportunity to calm down and comply. Thus, the actions the Defendants unnecessarily escalated and exacerbated the situation.

*Communication:*

In this phase, an officer establishes contact with the subject (in this case Mr. Sesma) from a position of advantage/safety - typically at his vehicle or at another position of tactical advantage and safety. During this time, unknown issues such as language problems, impairments caused by intoxication, mental illness, emotional anxieties, and other issues that may interfere with safe apprehension become known, and are dealt with.

Ignoring this key phase of contact often leads to a situation that deteriorates into confusion, and in which officers take their own independent actions (as occurred in this incident), rather than working together in a coordinated plan. The necessity for a calm and skilled officer-subject communication cannot be overstated. When this does not occur, officers and civilians alike can be needlessly and avoidably injured or killed.

*Instruction:*

Once the communication link has been established, a clear set of instructions, which contains enough detail to avoid surprises and assures understanding, is conveyed to the subject. In this incident, the officers on scene would have explained to Mr. Sesma how to assume a position that would have facilitated a safe apprehension, and what he was not to do.

*Compliance:*

In this phase, the subject (in this case Mr. Sesma) states/expresses his understanding of the instructions that were given to him by the communicating officer/negotiator.  Mr. Sesma would have had an opportunity to ask questions for clarification, and would have demonstrated his understanding of the instructions to the take-down team.

*Surrender:*

This phase requires the subject (in this case Mr. Sesma) to physically perform the acts that were communicated to him by the communicating officer.  Mr. Sesma would have been instructed, and then taken the steps to move into a place and position for officers to approach and take him into custody without the use of any force. This would have included Mr. Sesma voluntarily placing himself in a apprehension position with his hands empty and at his back for handcuffing.

*Detention/ Apprehension:*

This final phase includes the actual proper reasonable physical restraint of the subject (if necessary), a search for any weapons, and his safe transport to a facility for booking.


**POST Force Options**

Officers are trained that a subjects' resistance/actions to an arrest coupled with the totality of circumstances will determine the type of force used by peace officers.  The following chart illustrates how a subject's resistance/actions can correlate to the force applied by an officer.  (Listed as Subject's Actions, Description of Resistance and Possible Force Option):

    *Cooperative* - Subject offers no resistance:

- Mere professional appearance
- Nonverbal actions
- Verbal requests and commands

    *Passive non-compliance* - Does not respond to verbal commands but also offers no physical form of resistance:

- Verbal requests and commands.
- Officers' strength to take physical control, including lifting/carrying.

- Control holds and techniques to direct movement or immobilize a subject.

*Active resistance* - Physically evasive movements to defeat an officer's attempt at control, including bracing, tensing, running away, or verbally signaling an intention to avoid or prevent being taken into or retained in custody:

- Control holds and techniques to control the subject and situation
- Use of personal weapons in self-defense and to gain advantage over the subject
- Use of devices to secure compliance and ultimately gain control of the situation

*Assaultive* - Aggressive or combative; attempting or threatening to assault the officer or another person:

- Use of devices and/or techniques to secure compliance and ultimately gain control of the situation
- Use of personal body weapons in self-defense and to gain advantage over the subject

*Life-threatening* - Any action likely to result in serious injury or possibly the death of the officer or another person

- Utilizing firearms or any other available weapon or action in defense of self and others

NOTE: Officers must take into account the *totality of the circumstances* when selecting a reasonable force option.  It is not the intent of this chart to imply that an officer's force options are limited based on any single factor.

NOTE: Officers must be aware of and comply with their specific agency policies regarding appropriate force options.

**Constant reevaluation requirement:**

Peace officers must use the force option appropriate for the situation as conditions may

change rapidly. Officers must continually reevaluate the subject's action and must be prepared to transition as needed to the appropriate force options. (LD 20: Chapter 2 – Force Options, pages 2-6 & 2-7 )

In this case, Defendants could see that Mr. Sesma was not a lethal threat, having allegedly only a small metal pipe in his hands, and Officers had several retreat avenues.  It is not enough that Mr. Sesma handled a metal pipe.

Competent police officers are also trained at the POST Basic Academy that the "totality of the circumstances" are an important aspect in the decision to use force and that California law requires that the use of force must meet an "Objectively Reasonable" standard.  The following quotes typify the training:

"A reasonable officer is defined as an officer with similar training, experience, and background in a similar set of circumstances, who will react in a similar manner." "Unreasonable force occurs when the type, degree and duration of force employed was not necessary or appropriate."  (Learning Domain #20: "Introduction to the Use of Force," page 1-4.)

Additionally, an entire chapter in POST Learning Domain #20 is devoted to the "Consequences of Unreasonable Force."  Cruelty and malicious assaults are absolutely forbidden:

"Unreasonable force occurs when the type, degree and duration of force employed was not necessary or appropriate."

"Malicious assaults and batteries committed by peace officers constitute unlawful conduct.  When the force used is unreasonable, the officer can face criminal and civil liability, and agency disciplinary action."  (Learning Domain #20, page 6-4.)

Officers are also trained that although Penal Code Section 834a states that the person being arrested must submit to an arrest, if unlawful or unreasonable force is used to effect the arrest, the person being arrested may lawfully resist to overcome that force.  The penal code sections include: Section 692 (Lawful resistance to the commission of a public offense may be made by the party about to be injured or by other parties); Section 693 (Resistance sufficient to prevent the offense may be made by the party about to be injured to prevent an offense against his person, or his family or some member thereof.  To prevent an illegal attempt by force to take or injure property in his lawful possession); and Section 694 (Any other person, in aid or defense of the person about to be injured, may make resistance sufficient to prevent the offense)."  As stated above, the necessity for a

direct intervention by officers occurs in the context of the "totality of circumstances."

Under the facts cited above, Mr. Sesma was never "assaultive" or "combative" or "life threatening."  Any "active resistance" perceive  by Mr. Sesma's actions is not "resistance" at all, but an attempt to avoid getting shot.

**Opinions Thus Far**:

1.   The shooting of Mr. Sesma by CHP Officer Ornelas was unreasonable, inappropriate, improper and contrary to police officer training and standards.  Both volleys of shots were inappropriate and the second volley of shots (possibly to the face) were particularly egregious because the use of deadly force was never justified in this incident.  A reasonable officer, under similar circumstances, would not have believed that deadly force was ever justified.  There was no immediate risk of death or serious bodily injury situation during this incident, and less-lethal options were available.  Mr. Sesma was not engaged in any criminal activity at the time of the shooting.  Moreover, Officer Ornelas admitted that hy never heard Mr. Sesma make any verbal threats toward him or anyone else.

**Training Regarding Excessive Force:**

Peace officers are trained that they must recognize the consequences of using unreasonable force, and their legal and ethical responsibilities to intervene if the force being used by another peace officer is inappropriate or unlawful.  They are trained that *Unreasonable force occurs when the type, degree, and duration of force employed was not necessary or appropriate*.  (Emphasis added.)

2.   Officer Ornelas' failure to use reasonable less-lethal alternatives was a departure from POST basic police training and law.

3.   The record shows that Officer Ornelas did not give a warning that deadly force would be used prior to shooting Mr. Sesma, even though it would have been feasible to do so.  Officer Ornelas' failure to issue Mr. Sesma a verbal warning that he would be shot prior

firing his deadly weapon against Mr. Sesma, was contrary to POST basic police training, and the law.

4.    Based on Officer Ornelas' testimony, that Mr. Sesma was shot without warning and never uttered any threats or harmed any Officer, all other CHP officers who were present at the time of the shooting failed in their trained duty to intervene and prevent the deadly force inflicted on Mr. Sesma by Officer Ornelas:

**<u>Training Regarding Excessive Force and Duty to Intervene:</u>**

Peace officers are trained that they must recognize the consequences of using unreasonable force, and their legal and ethical responsibilities to intervene if the force being used by another peace officer is inappropriate or unlawful.  They are trained that *Unreasonable force occurs when the type, degree, and duration of force employed was not necessary or appropriate*.  (Emphasis added.)

"Consequences of unreasonable force:

"Malicious assaults and batteries committed by peace officers constitute unlawful conduct.  When the force used is unreasonable, the officer can face criminal and civil liability, and agency disciplinary action.(Learning Domain #20: "Use of Force, Chapter 6.)

5.    National police standards and training required Officer Ornelas to have at least one other officer with him.  The tactical method taught nationally is commonly called "Cover Officer - Contact Officer" response.  Nonetheless, Officer Ornelas proceeded solo- even after putting out on the radio that the suspect picked up a metal pipe and possibly has that with him when he drove out of the parking lot where he had initial contact with Mr. Sesma. Also, Officer Ornelas knew that there were other units responding to where he parked his patrol vehicle before going up the embankment. Officer Ornelas should have waited the other officers to arrive before going up the embankment.

6.      Based on review of documents, Officer Ornelas' training on primary weapon (pistol) was conducted back on December 2019, about 8 months prior to this shooting incident.  It is understood in the profession that the accurate firing of a firearm is a perishable skill that requires frequent visits to the range.  Even though there was COVID shut down for a month in March of 2020, Officer Ornelas should have received the training either before March 2020 or after March of 2020.

7.      Based on review of the video evidence (Dash camera video footage and CVisual's video footage), Mr. Sesma never swung the metal pipe or threatened Officer Ornelas. Officer Ornelas could have backed off or moved out of the way when Mr. Sesma started approaching him up on the embankment.  Officer Ornelas certainly could have backed off or moved out of where he was especially after the first volley of shots were fired because there was 6-7 second-long gap between the first and second volleys of shots. Police officers trained to reassess the situation every time they use force and are responsible for every shot that they fire. Therefore, Officer Ornelas failed to reassess the situation especially after the first volley of shots were fired and is responsible for every shot he fired.

8.      Officer Ornelas' subjective fear is insufficient to use of deadly force because the use of deadly force has to be objectively reasonable, is supposed to be the last resort that officers use and the officers should show reverence for human life, and should only be used in an immediate defense of life situation.

9.      Based on the review of documents including the dash camera footage of Officer Ornelas' initial contact with Mr. Sesma, Mr. Sesma may have been experiencing mental health crisis after the vehicle collision.

10.     Based on the review of documents, there is no evidence that Mr. Sesma injured anyone or threatened anyone.

## My Qualifications To Review This Case:

My opinions are based in part on my training, professional experience and education.  I am a twenty seven year veteran of the Los Angeles County Sheriff's Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant.  I retired holding a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5, 1988).  The POST Command College was a Masters level two-year course of study requiring a thesis, in Police Administration, with the diploma awarded by the California Department of Justice (and not the California University system).

During the course of my service with the department, I had a wide range of duties.  Those duties included an 18 month assignment as a staff jail deputy and two years as an Administrator/Lieutenant in the same jail facility (Men's Central Jail).  I also served on the department as a patrol officer, field supervisor, jail watch commander and administrator, station watch commander, and commanding officer of investigative units. I was a field training officer while assigned as a patrol deputy, and I trained new officers in POST and department approved patrol procedures, field investigations, apprehension techniques, and emergency procedures.

I was a Station Detective and, as such, reviewed and assessed cases passed on to me by the patrol officers.  Those cases included possible complaints relating to both misdemeanor and felony crimes.  They frequently required follow up investigations and interviews before the exact nature of the case could be determined.  As a field officer and detective, I was trained in interview and interrogation methods and subsequently trained other officers.

Among other assignments as a Sergeant, I supervised field officers and station detectives as they took complaints and conducted preliminary investigations regarding criminal and administrative matters.

As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the POST accepted patrol tactics, and investigation and apprehension methods.

As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer-involved shootings. I was also assigned by my Department to sit as a member of Departmental review committees regarding the reasonable or unreasonable use of force and tactics.

As stated above, during my career I was assigned to the Los Angeles County Men's Central Jail (MCJ) for a period of 18 months as a line officer. Upon my subsequent promotion to Lieutenant, I returned to the same facility approximately 10 years later. During that time, I was assigned as a Jail Watch Commander, and as the Facility Training and Logistics Administrator. At the time of my assignment, the MCJ held a daily population in excess of 7,000 inmates, including a hospital, which was serviced by a staff of more than 900 sworn and civilian personnel.

During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I worked closely with the State of California Peace Officer Standards and Training in revamping our Reserve Academy to bring it into state compliance. This process gave me an expertise in the POST Basic curriculum. I also supervised the training of cadets at our Reserve Training Academy. They were taught proper investigation, interview, and apprehension procedures. Among other topics, I lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

During the 1984 Olympics held in Los Angeles, I was assigned and served as the Department's Intelligence Officer at the Los Angeles Olympics Emergency Operations Center.

During the last five and one half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major (career) criminals. I held this position until my retirement from the Department on March 31, 1993.

Criminals investigated and arrested by N.O.R.S.A.T. included suspects involved with homicide, robbery, kidnaping, extortion, burglary, major narcotics violations and police corruption. The majority of our cases were homicide cases, including the murder of police officers. Arrests frequently occurred in dynamic circumstances including crimes in progress.

My unit also conducted major narcotics investigations including undercover narcotics buys, buy busts, and reverse stings. We frequently deployed at the request of investigative units, such as Narcotics, which provided the initial investigative leads for our operations. These narcotics cases usually involved multiple kilogram quantities of drugs and amounts of money ranging from one hundred thousand to more than one million dollars.

Approximately 80% of cases assigned to N.O.R.S.A.T. were active Homicide investigations. In that regard, the unit processed, under my command and supervision,

various aspects (depending on the complexity of the cases involved) of approximately 1,000 Homicides ranging from deaths of police officers to serial homicide suspects.

Additionally, the majority of the over 1900 cases for which I have been retained as a consultant (since 1993) have involved injuries or deaths connected with some aspect of force during either apprehension or while in police custody.

During the first three months of my command of N.O.R.S.A.T., the unit had three justifiable shooting incidents.  From that time, and over the next five years of my command, N.O.R.S.A.T. established a remarkable record of more than two thousand arrests of career criminals without a single shot fired – either by my officers or by the suspects whom we arrested.

Many of these suspects were armed and considered to be very dangerous.  Some were apprehended during the course of their crimes and were very prone to use firearms to escape apprehension.  This record of excellence was accomplished through the use of proper tactics, management and supervision of personnel, training in correct apprehension methods, and adherence to the moral and ethical standards endorsed by California POST and my Department.  These methods and principles are also embraced by every state training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice.

As a result of my position and record as the commanding officer of N.O.R.S.A.T., I was assigned to author Field Operations Directive 89-3, "Tactical Operations Involving Detective Personnel."  This order remained in force 20 years (until September 30, 2009), and included the basic standards and considerations with which investigative officers must comply in the event of a tactical deployment such as the dynamic entry into a building for the purpose of an arrest and/or seizure of evidence.

Since my retirement, I have testified as an expert on use of force, jail procedures and jail administration, investigations, police procedures, police tactics, investigative procedures, shooting scene reconstruction, and police administration in Arizona State Courts, California State Courts, Washington State Courts and Federal Courts in Arizona, California, Colorado, Florida, Illinois, Indiana, Louisiana, Missouri, Nevada, Ohio, Oregon, Pennsylvania, Texas, Utah, Washington, New Mexico, New York and Wisconsin.  I have testified before the Los Angeles Police Department Board of Rights and the Los Angeles County Civil Service Commission.  I have testified before the Harris County (Texas) Grand Jury and the Cleveland Grand Jury.  I have also submitted written opinions in matters before Alaska, Delaware, Idaho, Montana, North Carolina, New York, Oregon, Kentucky, and Wyoming Federal and State Courts.  I was selected (January 20, 2007) to present on the topic of: "Police Experts" at the National Police

Accountability Project held at Loyola Law School, Los Angeles, California.  I was selected (September 23, 2010) to present on the topic of: "Using POST Modules to Establish Police Officer' Standard of Care" at the National Police Accountability Project, National Lawyers Guild Convention, in New Orleans, Louisiana.  I was selected (March 30, 2012) to present to the Kern County Public Defenders in Bakersfield, California, on the topics of "Ethics, Police Investigations, the California POST Curriculum, and the M26 and X26 Taser weapons."  On August 7, 2013 I was invited and presented to the Texas Civil Rights Project (TCRP) 2013 Annual Legal Summit in Austin, Texas on the topic: "Ethically Working with Experts from the Prospective of a Police Expert."  On October 15, 2015 I was the invited presenter at a Community Forum in Victorville, California on the topics of Police Procedures, Community Policing, Use of Force, and features of the M26, X26 and X2 Taser weapons.  I was selected (January 24, 2020) to present on the topic of: "Use of force litigation under California's negligence standard and the impact of AB 392" at the National Police Accountability Project held at Loyola Law, Los Angeles, California.  On February 18, 2020, and on March 10, 2021, I lectured (at request) at the University of California - Irvine, School of Law, Civil Rights Litigation Clinic.

I have worked on several projects with the Paso Del Norte (El Paso, Texas) Civil Rights Project and the Texas Civil Rights Project (Austin, Texas).  As a result of my expert testimony in *Border Network, et al. v. Otero County, et al.*, Case No. 07-cv-01045 (D.N.M. 2008), a federal court issued a temporary injunction to stop the illegal and widespread immigration raids in Chaparral, New Mexico, implemented pursuant to Operation Stonegarden.  The case resulted in the adoption of a model policy for inquiring into a person's immigration status, which has been adopted nationwide and has also been presented to the United States Senate, the Secretary of Homeland Security, and other government officials seeking to reform immigration enforcement.

I have been recognized, and my expert report was quoted by the USDC in *Burns v. City of Redwood City*, 737 F.Supp.2d.1047.  I have been recognized, and my expert report was quoted by, the United States Court of Appeals for the Ninth Circuit as an expert in Police Administration and Use of Force in *Blankenhorn v. City of Orange, et al.*, 485 F.3d 463, 485 (9th Cir. 2007).  The Ninth Circuit also drew from my expert report in a second published case involving Police Detective Investigations. *Torres, et al. v. City of Los Angeles, et al.*, 540 F.3d 1031, 1042-43 (9th Cir. 2008).  The *Torres* case was appealed to the U.S. Supreme Court and returned for trial.  I provided the expert opinion in *Chavies Hoskin v. City of Milwaukee, et al.*  (E.D. Wis Case No. 13-cv-0920), regarding field strip and cavity searches, hiring, training, discipline and supervision, and which resulted in significant policy changes within the MPD.  My opinions supported argument in the Ninth Circuit case: *A. D., a Minor; J. E., a Minor; Sue Casey, Plaintiffs-Appellees, v. State of California Highway Patrol, Defendant, and Stephen Markgraf.*, No. 09-16460,

D.C. No. 3:07-cv-05483-SI (9th Circuit, Published Opinion).  My opinions supported argument in the Ninth Circuit case: *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1102 (9th Cir. 2014).  The Ninth Circuit also drew from my expert reports regarding credible threats justifying the use of force, *Hayes v. County of San Diego*, 658 F.3d 867 (9th Cir. 2011), and *Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011).  The Ninth Circuit also drew from my expert reports regarding Jail Administration and Administrative Responsibilities, *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011).  The Ninth Circuit also drew from my expert reports regarding an officer's violation of the 14th Amendment if an officer kills a suspect when acting with the purpose to harm, unrelated to a legitimate law enforcement objective, in *AD v. California Highway Patrol*, 712 F. 3d 446 (9th Cir. 2013).  The Fifth Circuit drew from my expert report regarding search and seizure, investigations and no-knock requirements in *Bishop et al. v. Arcuri et al.*, 674 F.3d 456 (5th Cir. 2012).  The Ninth Circuit also drew from my expert report regarding the use of impact weapons (PepperBall) on civilians in *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012).  I was the expert in the Ninth Circuit opinion regarding the allegations proffered by police officers and their use/display of firearms against civilians in *Green v. City and County of San Francisco*, 751 F. 3d 1039 (9th Cir. 2014).  Most recently, I was the expert in an important Ninth Circuit opinion regarding the allegations proffered by police officers and their use of lethal force against unarmed persons in *Jennifer Cruz, et al., v. City of Anaheim, et al.*, 765 F.3d 1076 (9th Cir. 2014).  I was the expert at trial in the Ninth Circuit opinion regarding the order of evidence at trial in *Estate of Manuel Diaz, v. City of Anaheim*, et al., No. 14-55644.  My opinion is quoted in the Ninth Circuit opinion regarding the use of lethal force in *A.K.H. a minor, et al, v. City of Tustin, et al.*, No. 14-55184.  My opinions supported argument in the Ninth Circuit case: *Estate of Angel Lopez, et al., v. Kristopher Michael Walb*, No. 14-57007 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court.  My opinions supported argument in the Ninth Circuit case: *Estate of Shakina Ortega, et al., v. City of San Diego, et al.* No. 14-56824 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court.  My opinions supported argument in the Ninth Circuit case: *Jerry Newmaker, et al., v. City of Fortuna, et al.* No. 14-15098 (for publication).  My opinions supported argument in the Ninth Circuit Case: *Tonya E. Shirar, v. Miguel Guerrero, et al.* regarding use of lethal force and "suicide by cop,"  No. 15-55029 (not for publication).  My opinions supported argument in the Ninth Circuit Case *Angel Mendez; Jennifer Lynn Garcia, v County of Los Angeles, et al.*, Nos. 13-56686, and 13-57072 (for publication) and which was settled before the Supreme Court, No. 16-369, regarding the use of lethal force and searches.  My opinions supported argument in the Ninth Circuit case: *Chien Van Bui, et al, v City and County of San Francisco, et al*, No. 14-16585 (not for publication), regarding the use of lethal force.  My opinions supported argument in the Sixth Circuit opinion, Case No. 16-5322*, Carey Woodcock v. City of Bowling Green, et al,* Originating Case No. 1:13-cv-00124 regarding the use of lethal force.  My opinions

Page 21 of  24

supported argument in the Ninth Circuit opinion, Case No. No. 14-17388 (for publication), *Johnathan Jones, et al v. Las Vegas Metropolitan Police Department, et, al,* Originating Case No. 2:12-cv-01636- regarding the use of lethal force and Taser weapons. My opinions supported argument in the Ninth Circuit opinion, Case No. 16-15606 (for publication), *Christian Longoria, et al v. Pinal County, et al,* Originating Case No. 2:15-cv-00043, PHX SRB, regarding the use of lethal force after a vehicle pursuit. My opinions supported argument in the Ninth Circuit case: *S. B. v. County of San Diego,* 864 F.3rd 1010 (9th Cir. 2017), (for publication) regarding issues of qualified immunity. My opinions supported argument in the Tenth Circuit case: *Russell Tenorio v. Brian Pitzer,* Case No. 2012-CV-01295 (U.S. Supreme Court No. 15-795) regarding issues of qualified immunity and use of deadly force. I participated as a retained expert in the USDC Fifth District case, *Stephen McCollum et al., v. Texas Department of Criminal Justice, et al.,* Case No.3:12-CV-02037 regarding in-custody hyperthermia deaths. My opinions supported argument (and I was cited by name) in the Ninth Circuit opinion, Case No. 17-55116 (for publication), *Susan Mellen, et al v. Marcella Winn, et al,* D.C. Case No. 2:15-cv-03006, GW AJW, regarding Detective Investigations and Qualified Immunity. My opinions supported argument in the Ninth Circuit Case *Richard Vos; Jenelle Bernacchi, v City of Newport Beach, et al.,* Nos. 16-56791 (for publication) and which was settled by the Supreme Court, No. 16-56791, regarding the use of lethal force and mental illness. My opinions (and quoted by name) supported argument in the Ninth Circuit Case *S.R. Nehad, et al. v. Browder, et al.,* No. 18-55035 (for publication) regarding the use of lethal force and custom and practice. My opinions supported argument in the Ninth Circuit opinion, Case No. 17-55930 (not for publication), *Estate of Kevin Brown, et al. v. Michael Lambert, et al.,* D.C. No. 3:15-cv-01583-DMS-WVG, regarding Detective Investigations and Qualified Immunity. My opinions supported argument in the Ninth Circuit opinion, Case No. 15-56339 (for publication), *Shane Horton, by his Guardian Ad, Litem Yvonne Horton, v. City of Santa Maria; Santa Maria Police Department; Andrew Brice*, D.C. Case No. 2:14-cv-06135- SJO-PJW, and *Jonathan Michael Castro v. County of Los Angeles, et al,* D.C. Case No. CV 10-5425 DSF (JEMx), 833 F.3d 1060 (9th Cir. 2016) (en banc), regarding in-custody suicidal prisoners and qualified immunity. My opinions supported argument in the Ninth Circuit opinion, Case No. 17-56270 (not for publication), *James Soler v. County of San Diego, et al.,* D.C. No. 3:14-cv-02470-MMA-RBB, regarding required verification of persons taken into custody pursuant to a warrant of arrest. My opinions supported argument in the Ninth Circuit opinion, Case No. 18-17404 (for publication) *Tan Lam, v. City of Los Banos, et al.* D.C. No. 2:15-cv-00531-MCE-KJN, regarding the use of lethal force. My opinions supported argument (and I was cited by name) in the Ninth Circuit opinion, Case No. 19-56035 (for publication), *Tiffany Tabares, et al v. City of Huntington Beach, et al,* D.C. Case No. 8:18-cv-00821, JLS-JDE, regarding use of force and subjects suffering mental illness. I was retained as consultant regarding the October 15, 2019 Law Enforcement Activity Related Death (including positional asphyxia) of Mr. Angel

Zapata-Hernandez by San Diego Metropolitan Transit System (MTS) Code Compliance Officers.  My consultations included recommendations and resulted in significant changes in policy and training by the MTS.  I was a retained expert in the Temporary Restraining Order restricting the use of kinetic weapons during demonstrations issued April 19, 2021 in *Black Lives Matter v. City of Los Angeles, et al*, Case No.: CV 20-5027 CBM (Asx).  .  My opinions supported argument in the Ninth Circuit opinion, Case No. 20-16351 (not for publication), *Terrance Amons, et al., v. Dillon Tindall et al.*  D.C. No. 4:19-cv-00301 KAW regarding use of lethal force.

The California Court of Appeal (Second Appellate District) drew in part from my expert report regarding search warrant service, *Macias v. County of Los Angeles*, 144 Cal. App.4th 313, 50 Cal. Rptr.3d 364 (2006).  The California Supreme Court drew in part from my expert opinion regarding police tactics and the use of deadly force, *Hayes et al. v. County of San Diego et al.*, 57 Cal.4th 622 (2013).  I was quoted by the California Appellate Court (Second Appellate District, Division Three) in *B.B., a Minor, etc., et al., v. County of Los Angeles, et al., Case No. B264946 Super. Ct. Nos. TC027341, TC027438, BC505918* regarding positional asphyxia issues.

On February 10, 1989, I was personally commended at the Los Angeles County Hall of Administration by United States Attorney General, the Honorable Edwin Meese III, for my work to establish California Penal Code Section 311.11 (forbidding the Possession of Child Pornography).  On February 22, 1993 (at the time of my retirement), Mr. Meese presented a second personal commendation for the success of this critical five-year effort to bring this law into effect.  California Penal Code Section 311.11 is required training for all Law Enforcement Officers in California and taught extensively in the POST Basic Learning Domain #9: "Crimes Against Children,"pages 1-18 to pages 1-21.

On December 7, 2015 I was requested by the Cleveland District Attorney to present my opinions to the Cleveland Grand Jury regarding the November 22, 2014 shooting death of Tamir Rice by City of Cleveland police officers.  In March, 2016 I was requested by the Delaware Attorney General to review and provide my opinions regarding the shooting death of Jeremy McDole.  The AG report was published May 12, 2016.  I provided a written Opinion for New Mexico AG regarding the shooting Death of Teresa Anaya that included requested training opinions.  I have also consulted with, and provided written opinions at the request of the U.S. Attorney (New York), the Santa Clara County District Attorney, and the San Francisco District Attorney.  On June 16, 2021, I was selected by the Los Angeles County District Attorney as a member of FACCT - an independent team assigned to re-examine fatal use of force incidents by law enforcement officers and recommend further action when appropriate.  On November 7, 2021, I was an Honoree of the 2021 National Lawyers Guild of Los Angeles at their annual Awards Gala as a recognized defender of Constitutional Rights.

I have been found competent by both Federal and State Courts to render opinions as to responsibilities as occurred in this case.  A number of my cases have involved law enforcement officers as civil plaintiffs and as criminal defendants.

Since my retirement, I have become an expert in the features and the use of TASER International's products, including the Model M26, Model X26 and Model X2 ECDs.  I own each, along with the download software.  I have reviewed all the TASER training materials and am familiar with the risks and tactics associated with these potentially lethal devices.  I have qualified as an expert on TASER products and testified both in deposition and before juries on their usage.  Two published examples are *Lee v. Nashville*, 596 F. Supp. 2d 1101, 1121-22 (M.D. Tenn. 2009), and *Heston v. City of Salinas*, 2007 U.S. Dist. LEXIS 98433, *25-*26 (E.D. Cal. 2007).  My most recent Federal acceptance/certifications as an expert in the general use and deployment of the TASER weapon (including Taser International product warnings/bulletins sent to every agency using the Taser weapon) occurred in Los Angles, California on November 7, 2017 in *William Mears, et al., v. City of Los Angeles, et al,* USDC Case No.: CV 15-08441 JAK (AJWx) and on February 22, 2018 in *Maria Hernandez; A.J., Jr., et al, v. City of Los Angeles, et al,* USDC Case No. 2:16-c-02689 AB (JEMx), and on May 3, 2018 in Heleine Tchayou, et al. v. City of Los Angeles, et al., Case No. 16-cv-06073-TJH-MRW, and on November 1, 2018 in Alma Rosa Godinez, v. San Diego County, et al. Case No. 3:16-cv-00236 BAS-NLS.  There are many others.

Attached as Exhibit A is a statement listing my law enforcement qualifications and experience; Exhibit B is my fee schedule; Exhibit C is a listing of matters in which I have testified in the last four years as an expert.

I reserve the right to modify my opinions to the extent additional information is provided.

I declare under penalty of perjury that the foregoing is true and correct.  Executed July 8, 2022, at Santee, CA.


*Roger A Clark*
Roger A. Clark


Page 24 of  24

EXHIBIT 4

1 **LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo, Esq. (Bar No. 144074)
2 dalekgalipo@yahoo.com
Ranhee Lee (SBN: 330979)
3 rlee@galipolaw.com
21800 Burbank Boulevard, Suite 310
4 Woodland Hills, California 91367
Tel:   (818) 347-3333
5 Fax:   (818) 347-4118

6

*Attorneys for Plaintiffs*
7

8 **UNITED STATES DISTRICT COURT**

9 **CENTRAL DISTRICT OF CALIFORNIA**

10

11 CANDIDO SESMA and CECILIA
SESMA, individually and as successors
12 in interest to Charles Sesma, deceased,

13                    Plaintiffs,

14          vs.

15
STATE OF CALIFORNIA; Andrew
16 Ornelas, and DOES 2-20, inclusive,

17                    Defendants.

18

19

20

21

22

23

24

25

26

27

28

Case No. 5:21-cv-1694-JWH-(KKx)

[Hon. John W. Holcomb]

**DECLARATION OF POLICE
PRACTICE EXPERT ROGER A.
CLARK IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT**

[*Filed concurrently with Plaintiffs'
Opposition to Defendants' Motion for
Summary Judgment; Declaration of
Ranhee Lee and exhibits thereto;
Declaration of Scott Holdaway and
exhibits thereto; Plaintiffs' Separate
Statement of Facts; Evidentiary
Objections*]

## <u>DECLARATION OF ROGER A. CLARK</u>

I, Roger A. Clark, declare as follows:

1.      I am a police practices expert specializing in the procedures of police practices and proper police tactics, including proper procedures for the detention and arrest of individuals and the type and degree of force, if any, appropriate under different circumstances.

2.      I am a competent adult and personally familiar with the facts contained herein and would and could competently testify thereto if called upon to do so.

3.      I am a twenty-seven-year veteran of the Los Angeles County Sheriff's Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant. I hold a California Peace Officer Standards and Training (P.O.S.T.) Advanced Certificate, and I am a graduate of the P.O.S.T. Command College (class #5).

4.      As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the P.O.S.T. accepted investigation and apprehension methods.

5.      Since my retirement, I have testified as an expert on jail procedures and jail administration, police procedures, police tactics, investigative procedures, shooting scene reconstruction, trajectory, use of force issues, and bullet casings in Arizona State Courts, California Courts, Washington State Courts and Federal Courts in California, Texas, Colorado, Illinois, Indiana, Pennsylvania, and Washington.

6.      At the time of the signing of this declaration, I have reviewed the following materials:

        a.  Complaint for damages;

b. Interview transcripts/ audio recordings of Andrew Ornelas, Jason Nichols, and Jason Steen;

c. Photographs and diagrams of scene and area maps;

d. Incident Detail Report;

e. CHP reports on scene and evidence;

f. Employee training records including Andrew Ornelas' training documents;

g. Deposition transcripts of Andrew Ornelas and Jason Nichols;

h. Dash cam videos and dispatch audio recordings;

i. CHP policies;

j. Autopsy report and photos;

k. P.O.S.T. Basic Learning Domains:

> #1: Leadership, professionalism & Ethics,
> #2: Criminal Justice System
> #3: Policing in the community
> #5: Introduction to Criminal Law
> #15: Laws of Arrest
> #16: Search and Seizure
> #20: Use of Force/ De-escalation
> #21: Patrol Techniques
> #23: Crimes in Progress
> #33: Arrest Methods/ Defensive Tactics
> #35: Firearms/Chemical Agents
> #36: Information Systems
> #37: Persons with Disabilities

l. Expert report and video footage prepared and produced by CVisual.

7. Based on my review of materials and as I noted in my report, information Officer Ornelas had was that the call was for a property damage only vehicle collision which later became a hit-and-run incident when Dispatch notified Mr. Charles Sesma was on foot bail. Then, Officer Ornelas had an initial contact with Mr. Sesma at a railroad next to a parking lot where Mr. Sesma followed Officer

Ornelas' instruction to "get over here," picked up a pipe and slowly walked away toward west.  At this initial contact, Mr. Sesma did not come at Officer Ornelas and did not show any violence against anyone.  Officer Ornelas did not have any information about whether Mr. Sesma had any criminal history, whether Mr. Sesma had injured anyone, whether Mr. Sesma had verbally threatened to harm anyone, and whether Mr. Sesma had attempted to fight physically with anyone.

8.     Standard police practices and P.O.S.T. standards at the time of the shooting of Mr. Charles Sesma on August 6, 2020 include as follows:

(a) Police officers are trained to follow a "Cover Officer-Contact Officer" tactic when approaching a person potentially have an object such as a pipe with him.

(b) Officers are trained that once a subject is located, the objective is to keep the subject contained by not approaching the subject and making sure that officers have "cover" in order to allow sufficient time for the subject to decompress.

(c) Police officers are trained that deadly force can only be used in an Immediate Defense of Life ("IDOL") situation; meaning, in defense of immediate threat of death or serious bodily injury. The immediate threat of death or serious bodily injury is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm is.

(d) Police officers are trained to give a verbal warning that they are going to shoot prior to using deadly force, when feasible.

(e) Police officers are trained that in consideration of the sanctity of life, deadly force should only be used in the direst of circumstances when all other options have been exhausted and no other reasonable alternatives are available.

(f) Police officers are trained that deadly force can only be used as a last resort.

(g) Police officers are trained that they must show a reverence for human life.

(h) Police officers are trained that they are required to justify every shot they fire.

(i) Police officers are trained that deadly force is only justified on the basis of an "objectively reasonable" belief that the suspect poses an immediate threat of death or serious bodily injury that is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm is; in other words, a subjective fear is not enough.

9. National police standards and training including P.O.S.T. standards required Officer Ornelas to have at least one other officer with him to establish "cover officer-contact officer." Nonetheless, Officer Ornelas violated his training by proceeding solo-even after putting out on the radio that the Mr. Sesma picked up a metal pipe and walked westbound towards the overhead railroad and by proceeding solo when he knew that there were other units responding to the overhead railroad on Haven. Officer Ornelas should have waited the other officers to arrive before going up the embankment. Also, tactical plan should have been formulated and outlined verbal skills (such as defusing and de-escalation techniques) and less lethal force options prior to going up the embankment.

10. Based on my review of documents and videos as well as the zoomed-in video prepared and produced by Plaintiffs' video expert, the shooting officer Ornelas violated basic police standards/training when he started firing his handgun at Mr. Sesma who did not appear to have anything in his hands, never swung a pipe or verbally threatened anyone. In my opinion based on basic police standards and training including P.O.S.T. standards and based on my experience as police practice expert, a pipe in hand, failure to drop the pipe, and approaching toward an officer

DECLARATION OF ROGER CLARK

are not enough to shoot a handgun at that person. In order to use deadly force, there must be threat of immediate death or serious bodily injury along with no other reasonable alternative options and a verbal warning that a deadly force will be used before shooting.

11.    Officers are trained that they are responsible for every shot and to reassess the threat or danger before firing the next shot. Officer Ornelas in this case did not appear to reassess after every shot he shot a total of approximately 6-7 times, most of which were in quick succession. Officer Ornelas should not have shot at all and certainly not the second volley of shots. Therefore, Officer Ornelas failed to reassess the situation especially before the second volley of shots were fired and is responsible for every shot he fired.

12.    Based on my review of documents and from the standpoint of police practices and basic police training, the first volley of shots Officer Ornelas fired at Mr. Sesma was contrary to P.O.S.T., improper, and inappropriate, and unreasonable, including but not limited to the following reasons:

a.  Dash cam video footage of the incident (including the zoomed-in version by Plaintiffs' video expert) does not show that Mr. Sesma had a pipe in his hand while he was on the overhead bridge on Haven Avenue. Officers are trained that deadly force cannot be used simply because a person was advancing toward them.

b.  Even if Mr. Sesma had the pipe in his hand, the first volley of shots were improper, inappropriate and unreasonable and violated the P.O.S.T. standards and police officer training because:

1)  Mr. Sesma was approximately 25 yards away from Officer Ornelas when the first shot was fired; there has to be a contact with force to cause death or serious bodily injury with a pipe; Mr. Sesma never swung, attempted to swing, threw, or attempted to throw a pipe at

Officer Ornelas; Mr. Sesma never raised his hand above his head or
shoulder level; Mr. Sesma never verbally threatened to harm anyone;
and Officer Ornelas did not have any information that Mr. Sesma
seriously injured anyone. Based on that, there was no immediate threat
of death or serious bodily injury to anyone at the time the first volley of
shots were fired.

2) There were reasonable alternatives to using deadly force such as using
a taser that Ornelas had in his duty belt. Officers are trained that using a
taser to a person with a pipe is a reasonable alternative to using their
guns because a taser incapacitates muscle movements.

3) It was feasible to give a verbal warning that deadly force was going to
be used especially because Mr. Sesma was 25 yards away from Officer
Ornelas at the time the first shot was fired.

c. Based on my review of documents and from the standpoint of police
practices and basic police training, the second volley of shots Officer
Ornelas fired at Mr. Sesma was contrary to P.O.S.T., improper, and
inappropriate, and unreasonable, including but not limited to the following
reasons:

1) Mr. Sesma fell to the ground after the first volley of shots were fired;
Officer Ornelas aimed at Mr. Sesma's upper torso while he fired shots;
Mr. Sesma was approximately 20 yards away from Officer Ornelas
when the first shot in the second volley of shots was fired; The second
volley of shots were fired when Mr. Sesma's upper body was
completely bent in 90 degree angle and when Mr. Sesma was beginning
to raise his body off from the ground; There was a gap of
approximately 6-7 seconds between the first volley of shots and the
second volley of shots; There has to be contact with force to cause

death or serious bodily injury with a pipe; Mr. Sesma never swung, attempted to swing, threw, or attempted to throw a pipe at Officer Ornelas; Mr. Sesma never raised his hand above his head or shoulder level; Mr. Sesma never verbally threatened to harm anyone; and Officer Ornelas did not have any information that Mr. Sesma seriously injured anyone. Based on that, there was no immediate threat of death or serious bodily injury to anyone at the time the second volley of shots were fired, and there was a reasonable alternative to using a deadly force such as the taser that Officer Ornelas had in his duty belt.

2) Officers are trained that they should reassess each time they fire and should use reasonable alternatives because the use of deadly force is the last resort, and each shot needs to be justified. Officer Ornelas failed to reassess and reevaluate the situation when he fired his second volley of shots because based on materials reviewed, Officer Ornelas aimed at Mr. Sesma's upper torso and when Mr. Sesma fell to the ground after the first volley of shots were fired, Officer Ornelas' impression was that Mr. Sesma was struck by the bullets; however, he started shooting again.

d. For both volleys of shots, Officer Ornelas' subjective fear is insufficient to use of deadly force because the use of deadly force has to be objectively reasonable and is supposed to be the last resort that officers use. Also, the officers should show reverence for human life, and the deadly force should only be used in an immediate defense of life situation. Therefore, after reviewing materials in this case, especially the video prepared by Plaintiffs' video expert, the second volley of shots were particularly in violation of standard police practice and P.O.S.T. standards because Officer Ornelas fired his handgun as soon as Mr. Sesma started to get off

of the ground with his upper body completely bent over and the last two shots most likely struck Mr. Sesma's face given that Officer Ornelas was aiming at Mr. Sesma's upper torso area based on the material reviewed.

  e. At a minimum, Officer Ornelas overreacted when he fired shots, and an overreaction when using deadly force is a use of excessive force.

  13. Officer Ornelas should have received training on primary weapon (pistol) either before March 2020 or after March of 2020 prior to August 2020 because it is understood in the profession that the accurate firing of a firearm is a perishable skill that requires frequent visits to the range. Based on the review of documents, the last time Ornelas received training on the primary weapon was back on December 2019.

  I declare under penalty of perjury of the law of the United States of America, that the foregoing is true and correct.

  Executed on September 23, 2020, at Santee, California.

Roger A. Clark

EXHIBIT 5

CURRICULUM VITAE

**Scott Holdaway**
CVisualEvidence, LLC
2441 W 205th Street, Suite C102
Torrance, CA 90501
Phone: (310) 831-8900
Scott@CVisualEvidence.com

## Employment History

**(2019 – Current)**          **CVisualEvidence, LLC – Torrance, CA**

**Videographer, Editor, and Forensic Video Analyst**
- Forensic video and audio analysis
- Digital video editing
- Still-frame video capture
- Photo and video conversions, cropping, resizing, and clarification
- Video time and frame counters
- Deposition videographer

**(2019)**          **PADNET – Long Beach, CA**

**Instructor, Editor, and Membership Services**
- Producing promos, public service announcements, and long-form programming from pre-production to post-production stages.
- Hands-on studio and field production; conducting interviews and filming b-roll
- Instructed classes on how to use camera gear and editing software

## Education

**(2017 – 2019)**          **California State University, Dominguez Hills**
- Bachelor of Arts, Digital Media

**Honors:**
Dean's List Fall 2017, Spring 2018, Fall 2018, Spring 2019
Graduating with University Honors, 2019 - Magna Cum Laude

## **Certifications/Commissions**

- State of California Notary Public

## **Training**

- iNPUT-ACE – Getting Started – Online Webinar – 1:08:47
- iNPUT-ACE – Aspect Ratio: Resizing and Interpolation – Online Webinar – 1:06:56
- iNPUT-ACE – Digital Multimedia Evidence – Online Webinar – 1:04:18

## **Fee Schedule**

**Forensic Imaging:**

- Forensic image analysis
- Media conversions
- Still-frame video capture
- Photo and video clarification
- Video slow motion, spotlighting, time and frame counters
- Production of color photo exhibits/prints/enlargements
- Production of custom annotated photo/video trial exhibits
- Case and/or trial preparation meetings and consultation
- Analysis and Report Writing

$ 195.00 per hour

**Deposition and Trial Testimony:**

$ 250.00 per hour