**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo, Esq. (SBN 144074)
dalekgalipo@yahoo.com
Cooper Alison-Mayne (SBN 343169)
cmayne@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367
Phone: (818) 347-3333

*Attorneys for Plaintiffs*

# UNTIED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

CANDIDO SESMA and CECILIA
SESMA, individually and as
successors in interest to CHARLES
SESMA, deceased,

                    Plaintiffs,

        vs.

STATE OF CALIFORNIA,
ANDREW ORNELAS,

                    Defendants.

Case No. 5:21-cv-1694- JWH (KKx)

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR NEW TRIAL OR, IN THE ALTERNATIVE, JUDGMENT AS A MATTER OF LAW; MEMORANDUM OF POINTS AND AUTHORITIES**

Hearing Date: February 14, 2025, 9:00 a.m.
Judge: Hon. John W. Holcomb
Court: Ronald Reagan Federal Building,
    411 W. 4th Street, Santa Ana, CA
Courtroom: 9D

TO THIS HONORABLE COURT, DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

Please take notice that on February 14, 2025 at 9:00 a.m. in Courtroom 9D of the United States District Courthouse in Santa Ana, located at 411 W. 4th Street, Santa Ana, CA, Plaintiffs CANDIDO SESMA and CECILIA SESMA, individually and as successors in interest to CHARLES SESMA, deceased, will move for a New Trial pursuant to Federal Rule of Civil Procedure 59, or in the alternative, for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), for the reasons set forth below.

The parties met and conferred regarding this motion on January 3, 2025, in compliance with local rule 7-3.

Plaintiffs move for a new trial regarding the second volley of shots on two grounds. First, the jury's verdict is against the clear weight of the evidence, which overwhelmingly demonstrated that Defendant Ornelas' second volley of shots constituted excessive and unreasonable force. Second, defense counsel's trial strategy prejudiced the jury through multiple improper tactics, including: emphasizing Ornelas's lack of prior shootings, improperly manipulating demonstrative evidence, and mischaracterizing the legal standard for immediate threat during closing arguments. In the alternative, Plaintiffs move for judgment as a matter of law because no reasonable jury could find that the second volley of shots was justified given the evidence that Mr. Sesma posed no immediate threat of death or serious bodily injury.

Dated: January 13, 2025

LAW OFFICES OF DALE K. GALIPO

/s/ *Cooper Alison-Mayne*
Dale K. Galipo
Cooper Alison-Mayne
*Attorneys for Plaintiffs*

i
PLAINTIFFS' MOTION FOR A NEW TRIAL

# **TABLE OF CONTENTS**

**I.    INTRODUCTION**.................................................................................1

**II.   LEGAL STANDARDS** ........................................................................2

   **A.   Rule 59** ......................................................................................2

   **B.   Rule 50(b)** .................................................................................3

**III.   SECOND VOLLEY WARRANTS NEW TRIAL**....................................4

   **A.   The Clear Weight of the Evidence Shows the Second Volley Was Excessive and Unreasonable** ..........................................................4

      i.    Ornelas' Testimony, Forensic Evidence, and Video Evidence Established Sesma Posed No Threat ........................................................5

      ii.   Defense Expert Admitted the Second Volley Was Against Policy ...........7

      iii.  Officer Ornelas's Testimony Lacked Credibility.............................8

   **B.   Defense Counsel's Trial Misconduct Further Justifies a New Trial** ......11

      i.    Counsel Introduced Prohibited Character Evidence ...................12

      ii.   Counsel Repeatedly Violated the Court's Order by Soliciting Testimony on the Ultimate Question ...............................................................13

      iii.  Counsel Misused Demonstrative Evidence to Inflame the Jury ...............16

      iv.   Counsel's Improper Arguments Misled the Jury About the Legal Standard for Immediate Threat.........................................................17

      v.    Jury's Confusion and Prejudice is Evident from their Incorrectly Completed Verdict Form ...........................................................18

**IV.   SECOND VOLLEY WARRANTS JUDGMENT AS A MATTER OF LAW 19**

**V.    CONCLUSION**.................................................................................20

# TABLE OF AUTHORTIES

**Cases**

*Allied Chem. Corp. v. Daiflon, Inc.*,
   449 U.S. 33 (1980) .......................................................................7

*Anheuser-Busch Inc. v. Nat. Beverage Distribs.*,
   69 F.3d 337 (9th Cir. 1995) ........................................................15

*Dupard v. Kringle*,
   76 F.3d 385 (9th Cir. 1996) ............................................ 16, 17, 18, 19

*EEOC v. Go Daddy Software, Inc.*,
   581 F.3d 951 (9th Cir. 2009) ........................................................7

*Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*,
   762 F.3d 829 (9th Cir. 2014) ............................................... 7, 8, 10

*Gates v. Rivera*,
   993 F.2d 697 (9th Cir.1993) .........................................................16

*Hemmings v. Tidyman's Inc.*,
   285 F.3d 1174 (9th Cir. 2002) ......................................................15

*Hesselbein v. Beckham*,
   168 F. Supp. 3d 1252 (E.D. Cal. 2016) ....................................... 15, 16

*Ho Sang Yim v. Barr*,
   No. 17-70624, 2020 WL 5001820 (9th Cir. Aug. 25, 2020) ...................13

*Huizar v. City of Anaheim (Estate of Diaz)*,
   840 F.3d 592 (9th Cir. 2016) ....................................................7, 23

*Hung Lam v. City of San Jose*,
   869 F.3d 1077 (9th Cir. 2017) ......................................................8

*Ledesma v. Runyon*,
   152 F.3d 926 (9th Cir. 1998) ........................................................7

*Molski v. M.J. Cable, Inc.*,
   481 F.3d 724 (9th Cir. 2007) ........................................................7

*Murphy v. City of Long Beach*,
   914 F.2d 183 (9th Cir. 1990) ........................................................8

*Vos v. City of Newport Beach*,
   892 F.3d 1024 (9th Cir. 2018) ......................................................24

*Wallace v. City of San Diego*,
   479 F.3d 616 (9th Cir. 2007) ........................................................7

*White v. Ford Motor Co.*,
   312 F.3d 998 (9th Cir. 2002) ........................................................7

*Zion v. Cnty. of Orange*,
   874 F.3d 1072 (9th Cir. 2017) ......................................................23

**Statutes**

42 U.S.C. § 1983 ............................................................................................5, 24

Fed. R. Civ. P. 50(b) .............................................................................................7

Fed. R. Civ. P. 59(a)(1) .........................................................................................6

PLAINTIFFS' MOTION FOR A NEW TRIAL

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

On August 6, 2020, Charles Sesma was shot and killed by California Highway Patrol Officer Andrew Ornelas. Sesma was suspected of committing a misdemeanor hit-and-run involving property damage, and Ornelas had no information that Mr. Sesma was either armed or dangerous. After the traffic accident, Sesma walked to a nearby railroad track, which was situated on an overpass above a road. When Officer Ornelas confronted Sesma on the overpass, Sesma was sitting down on the railroad track. Sesma then stood up and began running toward Officer Ornelas with an object in his hand. When Mr. Sesma was approximately 40 feet away from him, Ornelas open fired, shooting five shots, striking Mr. Sesma multiple times. Mr. Sesma went down face first and remained on the ground for 6 to 7 seconds before he started to get up. From approximately 25 feet away, Ornelas shot two additional shots, each shot striking Sesma first in the face then reentering his chest due to the partially prone angle of his body as he tried to get up. The last two shots were the fatal shots.

Sesma's parents, Candido and Cecilia Sesma, brought this action asserting a federal civil rights claim under 42 U.S.C. § 1983, alleging excessive force in violation of the Fourth Amendment to the United States Constitution, and two California state law claims for battery and negligence. (Dkt. 25.) A trial was held on December 2, 2024, and the jury returned a verdict on December 11, 2024, finding in favor of Ornelas on all three claims. (Dkt. 147.) The Court entered judgment for Ornelas and against Plaintiffs on December 16, 2024. (Dkt. 157.)

Plaintiffs move for a new trial pursuant to Federal Rule of Civil Procedure 59 because (1) the jury's verdict regarding Officer Ornelas's second volley of shots is against the clear weight of the evidence, and (2) defense counsel's misconduct at trial, including the introduction of improper character evidence, repeated attempts

to elicit testimony on ultimate legal issues despite the Court's order prohibiting such testimony, prejudicial misuse of demonstrative evidence, and improper arguments, collectively deprived Plaintiffs of a fair trial.

The clear weight of the evidence put on at trial demonstrated that prior to the second volley, Mr. Sesma did not have the present ability, opportunity, or apparent intent to immediately cause death or serious bodily injury. He did not pose an immediate threat of death or serious bodily injury to anyone, as he had already suffered at least four gunshot wounds, including two to his right arm in which he may have been holding an object. Rather than advancing on Ornelas, he was merely attempting to get up, and at no point did he attempt to throw the object or swing it in a threatening manner. Even Defendants' own police practices expert conceded that lethal force would not have been appropriate unless Sesma had gotten to his feet and advanced on Ornelas—actions which, by Ornelas's own admission, never occurred.

Plaintiffs also move for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) because, even viewing the evidence in the light most favorable to Ornelas, no reasonable jury could have found that the second volley of shots was objectively reasonable under the circumstances presented at trial. The uncontroverted physical, testimonial, and video evidence established that Sesma posed no immediate threat at the time of the fatal shots, and even Defendants' own witnesses provided testimony that undermined the justification for this use of deadly force.

## II.   LEGAL STANDARDS

### A.   Rule 59

"The court may, on motion, grant a new trial on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1). Rule 59 does not specify the grounds upon which a new trial may be granted, but the Ninth Circuit recognizes that courts

are bound by historically recognized grounds. For example, a new trial may be granted "if the verdict is contrary to the clear weight of the evidence" or "to prevent a miscarriage of justice." *Molski v. M.J. Cable, Inc*., 481 F.3d 724, 729 (9th Cir. 2007). The Court has broad discretion to order a new trial pursuant to Rule 59. *See Allied Chem. Corp. v. Daiflon, Inc*., 449 U.S. 33, 36 (1980). The Ninth Circuit grants "considerable deference to the district court's new trial decision and will not overturn the district court's decision to grant a new trial absent an abuse of discretion" *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 842 (9th Cir. 2014).

**B.    Rule 50(b)**

Under Federal Rule of Civil Procedure 50(b), when a party has moved for judgment as a matter of law prior to the case being submitted to the jury, as Plaintiffs did here, that party "may file a renewed motion for judgment as a matter of law. . . In ruling on the renewed motion, the court may . . . direct the entry of judgment as a matter of law." Fed. R. Civ. P. 50(b); *see EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009)

A renewed motion for judgment as a matter of law is properly granted "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." *Huizar v. City of Anaheim (Estate of Diaz)*, 840 F.3d 592, 604 (9th Cir. 2016) (quoting *White v. Ford Motor Co.*, 312 F.3d 998, 1010 (9th Cir. 2002)). "[T]he court must not weigh the evidence, but should simply ask whether the plaintiff has presented sufficient evidence to support the jury's conclusion." *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007). "A district court's decision to grant judgment as a matter of law is reviewed de novo." *Ledesma v. Runyon*, 152 F.3d 926 (9th Cir. 1998).

PLAINTIFFS' MOTION FOR A NEW TRIAL

## III.    SECOND VOLLEY WARRANTS NEW TRIAL

Plaintiffs move for a new trial under Rule 59 on two grounds. First, the jury's verdict regarding Officer Ornelas's second volley of shots is against the clear weight of evidence. Second, defense counsel's repeated misconduct at trial unfairly prejudiced the Plaintiffs and warrants a new trial.

### A.    The Clear Weight of the Evidence Shows the Second Volley Was Excessive and Unreasonable

Courts have substantial latitude to find a verdict contrary to the weight of evidence, and such decisions are "virtually unassailable" on appeal. *Hung Lam v. City of San Jose*, 869 F.3d 1077, 1084 (9th Cir. 2017). In deciding such motions, courts have "the duty . . . to weigh the evidence as [the court] saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in [the court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence." *Murphy v. City of Long Beach,* 914 F.2d 183, 187 (9th Cir. 1990). In considering a Rule 59 motion, the court "is not required to view the trial evidence in the light most favorable to the verdict. *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014). "Instead, the district court can weigh the evidence and assess the credibility of the witnesses." *Id.*

The key issue for the jury to decide in this case was whether Ornelas's use of deadly force was "necessary to defend human life" (Jury Instruction on Battery, Dkt. 141 at 9) and whether Sesma "posed an immediate threat of death or serious bodily injury" to anyone at the time of the shots (Jury Instruction on Fourth Amendment Excessive Force, Dkt. 141 at 7). Regarding the battery claim, the jury was instructed:

> A threat of death or serious bodily injury is "imminent" when, based on the totality of the circumstances, a reasonable officer in the same situation would believe that a person has **the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury** to the peace officer or another person. An

> imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed.

(Dkt. 141 at 9 (emphasis added).)

Prior to the second volley, Sesma posed no imminent threat based on the clear language of the jury instructions. He had already suffered four gunshot wounds, including two through his right arm—the arm needed to wield any weapon. He was more than 25 feet from Ornelas, struggling to push himself up from the ground, but not advancing forward. These established facts show that prior to the second volley, Sesma did not have the ability to inflict harm (his shooting arm was disabled), the opportunity to attack (he lay partially prone 25 feet away), or any apparent intent to do so (he did not attempt to throw the object or swing it in an aggressive manner).

Notably, at trial, Ornelas never even testified that he was in fear for his life or that he believed that Sesma posed an immediate threat of serious injury to himself or anyone else. Given these circumstances, no reasonable officer could have perceived such an urgent threat from a severely wounded man struggling to stand at a considerable distance. The jury's verdict to the contrary defies the clear weight of the evidence presented at trial.

    i.   <u>Ornelas' Testimony, Forensic Evidence, and Video Evidence Established Sesma Posed No Threat</u>

The clear weight of the evidence at trial showed that Mr. Sesma was not advancing on Ornelas at the time of the second volley. Ornelas himself admitted that prior to the second volley, Mr. Sesma didn't have a chance to "get his feet underneath him to start running," (*Trial Transcript from December 3, 2024*, Declaration of Cooper Alison-Mayne ("Mayne Decl."), **Exhibit A**, p. 99) and that he did not perceive Mr. Sesma "move at all in [his] direction in between the two volleys." (*Trial Transcript from December 4, 2024*, Mayne Decl., **Exhibit B**, p.

33.) While Ornelas did claim there was "some movement" before the second volley, which he described as a "lunging motion," he admitted that before the second volley, he did not "believe he was moving forward." (**Exhibit B**, p. 33; **Exhibit A**, p. 121.) He also admitted that for the second volley, he was aiming down, since Mr. Sesma was just starting to get up from the ground. (**Exhibit A**, p. 100.)

Forensic evidence presented at trial confirmed that Mr. Sesma was partially prone during the second volley. Defense expert Rocky Edwards testified that Ornelas' last two shots caused reentry injuries, first causing grazing wounds to Mr. Sesma's face before reentering his right chest area. (Mayne Decl. ¶ 10.) He testified that this pattern of injuries could only be explained by Mr. Sesma being in a partially prone position, as the bullets had to travel at a downward angle to first graze his face and then continue into his chest. (*Id.*)

Video evidence further established that Sesma was partially prone and not advancing prior to the second volley. Defense expert Paris Ward analyzed Ornelas' MVARS footage of the incident and identified the exact frames of the video when the last two shots occurred. (Mayne Decl. ¶ 11; *Trial Exhibit 45*, Mayne Decl, Exhibit E.) Mr. Sesma is not even visible when Ornelas begins shooting his second volley. (*Trial Exhibit 47*, Mayne Decl. **Exhibit F**, frame 9440.) During earlier parts of the video when Mr. Sesma was standing upright, a low wall only partially obscured him - his upper body remained visible above it. (E.g., *Id.*, frame 9200.) However, at the time of the second volley, Mr. Sesma's entire body was out of view behind this same wall. Since we know the wall's height relative to a standing person, the fact that Mr. Sesma was completely hidden behind it proves he must have been either on the ground or just beginning to get up. This is consistent with the forensic evidence showing downward bullet trajectories and reentry wounds, as well as Ornelas's own admissions at trial.

PLAINTIFFS' MOTION FOR A NEW TRIAL

Though some evidence suggested Sesma was within 25 feet of Ornelas during the second volley, the clear weight of the evidence shows he was at least 25 feet away. Officers Steen and Ornelas stated in their declarations that Sesma's final position corresponded to Evidence Markers 10 and 11, as shown in their declaration exhibits. (Dkt. 38-3, 38-2.) Evidence at trial also clearly established that Ornelas was positioned at the end of the fence and that each post spaced 8 feet apart. Given that Markers 10 and 11 were more than three fence-posts away from Ornelas, the clear weight of the evidence showed that Sesma's final resting position was further than 25 feet from Ornelas.

      ii.    <u>Defense Expert Admitted the Second Volley Was Against Policy</u>

Defense expert Clarence Chapman opined that Ornelas' use of force was consistent with law-enforcement policy, which he was qualified as an expert to educate the jury on. But his opinion was based on the false assumption that Sesma had gotten up and started running at Ornelas before he shot the second volley. When Mr. Galipo asked him to *assume* that Sesma *had not* gotten his feet underneath him to start running toward Ornelas, Chapman's opinion of the case changed.

> **Q.**    Okay. Would it change your opinion if you assume that fact to be true, that Mr. Sesma never got up with his feet underneath him to start running towards Officer Ornelas again after the first volley?
>
> **A.**    Well, this is not a hypothetical. It certainly goes against what I saw in the video, because Mr. Sesma certainly got up off the ground and was sprinting forward. But if you're saying in a hypothetical if that never happened, what I saw in the video, then, yeah, sure. *It would probably not rise to the level of deadly force.*

(*Trial Transcript from December 5, 2024*, Mayne Decl., **Exhibit C**, p. 218 (emphasis added).)

PLAINTIFFS' MOTION FOR A NEW TRIAL

This was far from a hypothetical question; it aligned precisely with Ornelas' sworn testimony from the previous day as well as the forensic and video evidence. Thus, based the actual facts of the case as described by Ornelas himself, Chapman concluded that the circumstances leading up to the second volley likely did not justify the use of deadly force.

Officer Steen's testimony also supports conclusion that the second volley of shots was unreasonable. Steen, who arrived at Ornelas's side almost immediately after Ornelas shot Sesma, testified that Sesma was on the ground about 25 feet away from them. (**Exhibit B,** p. 159.) He drew his weapon, because he did not know if Sesma was armed or not. Then seconds after he arrived, he saw Sesma push himself up, starting to get up before collapsing back down. Mr. Galipo asked him if he considered shooting him at that time and follow up with him on his evaluation of the threat posed by Sesma:

> **Q.**    I mean, you're not going to just shoot someone for trying to get back up from 25 feet away; are you?
> **A.**    Correct . . .

(**Exhibit B**, p. 160.) Steen's testimony reinforces the point that the second volley of shots was unnecessary since even another officer at the scene recognized that, under the circumstances, Sesma merely attempting to get up from that distance did not warrant the use of deadly force.

### iii.    Officer Ornelas's Testimony Lacked Credibility

While the jury may have credited certain aspects of Ornelas's testimony in reaching its verdict, this Court has both the authority and duty to independently evaluate his credibility in determining whether that verdict was contrary to the clear weight of the evidence. Ornelas's testimony was riddled with inconsistencies and contradicted by objective evidence, including his own prior statements. Most egregiously, he admitted to making false statements under penalty of perjury in his declaration to this Court regarding the key moment before the second volley of shots. Given the Court's substantial latitude to weigh evidence and assess witness

credibility on a Rule 59 motion, Ornelas's lack of credibility should weigh heavily in the Court's determination of whether justice requires a new trial.

At trial, Ornelas was confronted with false statements he made in his September 15, 2022 declaration to this Court. In that declaration, he stated under penalty of perjury that before the second volley, Mr. Sesma "got up quickly and started running at me again." (Dkt. 38-2 at 3.) But at trial, Ornelas admitted the truth: that Mr. Sesma never got his feet under him to start running at him and did not move at all in his direction in between the two volleys. His declaration was perjurious as it contained a false statement made under penalty of perjury that was material to the matter at hand. *Ho Sang Yim v. Barr*, No. 17-70624, 2020 WL 5001820 (9th Cir. Aug. 25, 2020) (elements of written perjury). He was confronted directly on this issue in front of the jury.

> **Q.**   I don't know if you have your declaration memorized or not, but do you recall in the declaration you submitted to this Court under penalty of perjury that you said after your first volley of shots, he got up quickly and started running at me again?
> **A.**   I do recall that, sir. Yes.
> **Q.**   Would you agree, sir, that is inaccurate?
> **A.**   Yes, sir.

(**Exhibit B**, p. 34.)

That was only one of many credibility issues presented by Ornelas' testimony. Ornelas admitted that just after the shooting, he told his fellow officers that the object he saw in Mr. Sesma's hand was either a pipe or a "large stick." (**Exhibit A**, pp. 103, 113.) He admitted that when he said that the object could have been a stick, he was trying to give "honest, credible information" to his fellow officers. (**Exhibit A**, pp. 103–104.) His subsequent testimony that he could identify the object at the time of the shooting as a metal pipe is not credible. Statements made in the immediate aftermath of a startling event, before a person has time to reflect and fabricate, are inherently more reliable. While the excited

utterance exception to hearsay is not directly applicable here since Ornelas' statements fall in the party-opponent hearsay exception, the underlying principle is relevant. And that principle strongly supports giving greater weight to Ornelas's initial description of his uncertainty about the object, rather than his later, more definitive and self-serving statements.

In his initial statement, Ornelas claimed that when Sesma got up, he was holding the pipe above his head before running. (**Exhibit A**, p. 90.) The evidence contradicted his statement: Officer Cichella's MVARS shows Sesma get up and start running, and Sesma does not raise anything above his head. (Trial Exhibit 3, Declaration of Cooper Alison-Mayne, **Exhibit D** at 2:58–3:02.) When confronted with this evidence, Ornelas admitted that the video evidence does not depict Sesma lift the pipe above his head. (**Exhibit A**, p. 90.) The timing of events presented another discrepancy: while Ornelas initially claimed Sesma got up within a second after the first volley (**Exhibit A**, p. 97), trial evidence showed that Sesma was down for almost 7 seconds between the first and second volleys. (*Trial Exhibit 45*, **Exhibit E**.) The inconsistencies continued regarding Officer Steen's involvement in the incident: though Ornelas initially told investigators that he thought Officer Steen was right behind him and had fired his gun (**Exhibit A**, pp. 116–117), at trial he reversed his position, claiming that he did not think Steen was behind him and did not believe Steen had fired. (**Exhibit A**, p. 115.)

These numerous contradictions between Ornelas's trial testimony and the objective evidence—including video footage, radio transmissions, and his own prior statements—severely undermine his credibility. Most troubling is his admission that he made false statements to this Court under penalty of perjury regarding the critical moment before the second volley of shots. His evolving narrative about the object in Sesma's hand, the timing of events, and Officer Steen's involvement suggests a pattern of tailoring his testimony to avoid taking responsibility for his actions rather than providing truthful, consistent testimony.

Given this Court's duty to independently weigh evidence and assess witness credibility on a Rule 59 motion, these serious credibility issues warrant careful consideration in determining whether the jury's verdict was contrary to the clear weight of the evidence.

For all the reasons above, the clear weight of the evidence presented at trial demonstrates that Ornelas's second volley of shots was an unreasonable use of force against a partially prone, wounded man who posed no imminent threat of death or severe bodily injury. When viewed through the lens of Rule 59, which permits this Court to independently weigh the evidence and assess witness credibility, justice requires setting aside the jury's verdict and ordering a new trial.

## B.    Defense Counsel's Trial Misconduct Further Justifies a New Trial

While the clear weight of the evidence alone justifies a new trial, defense counsel's misconduct at trial provides additional independent grounds for relief.

"A new trial is warranted on the ground of attorney misconduct during the trial where the 'flavor of misconduct . . . sufficiently permeates an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict.'" *Anheuser-Busch Inc. v. Nat. Beverage Distribs.*, 69 F.3d 337, 346 (9th Cir. 1995). Courts consider "the totality of circumstances" in evaluating the likelihood of prejudice from improper comments made by counsel. *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1193 (9th Cir. 2002). Considerations include "the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, **the strength of the case**, and the verdict itself." *Id*. (emphasis added). Courts give attorneys less when the jury's verdict rests on weak evidence. *See Hesselbein v. Beckham*, 168 F. Supp. 3d 1252, 1265 (E.D. Cal. 2016) (introduction of inadmissible evidence more likely to be prejudicial in cases with weak evidence supporting the verdict).

The Court should grant a new trial based on defense counsel's pervasive pattern of misconduct that undermined the fairness of the trial and likely influenced the jury's verdict. Specifically, defense counsel: (1) introduced inadmissible character evidence regarding Officer Ornelas's lack of prior shootings; (2) repeatedly attempted to elicit prohibited expert testimony on the ultimate issue of reasonableness, in direct violation of the Court's order; (3) misused a demonstrative exhibit by engaging in theatrical displays that served only to inflame the jury's passions; and (4) caused such confusion and inflamed sentiment that the jury submitted an incorrectly completed verdict form. Given the weakness of the evidence supporting the jury's verdict in this case, these instances of misconduct sufficiently permeated the proceeding to warrant a new trial under *Anheuser-Busch* and its progeny.

### i.    Counsel Introduced Prohibited Character Evidence

In his opening argument, defense counsel stated that this shooting was the first time "in his entire career" that Ornelas used lethal force; and he may have emphasized it again in his closing. (**Exhibit A**, p. 50.)

This directly parallels the impermissible character evidence at issue in *Hesselbein v. Beckham*, 168 F. Supp. 3d 1252 (E.D. Cal. 2016), where an officer in an excessive force case introduced evidence about the fact that he had not shot a suspect in 150 to 200 prior arrests. The court found that this was impermissible character evidence and granted a new trial under Rule 59, explaining that such evidence was improper because "[t]he controlling inquiry is whether an objectively reasonable officer under the same or similar circumstances would have shot the plaintiff, not whether defendant is or was a reasonable officer." *Id* at 1264.

An officer's lack of prior shootings is clearly impermissible character evidence under *Gates v. Rivera*, 993 F.2d 697 (9th Cir.1993). In *Gates*, the Ninth Circuit held that "character evidence is normally not admissible in a civil rights case" and specifically found that an officer's testimony about not having

previously shot anyone is inadmissible character evidence. *Id.* at 700. The court explained that such evidence is irrelevant to the key question of whether the officer's use of force was objectively reasonable in this specific instance. *Id.*; *see also Dupard v. Kringle*, 76 F.3d 385 (9th Cir. 1996) (holding that testimony about officers' lack of prior excessive force complaints was inadmissible character evidence warranting new trial due to its likely substantial influence on jury's verdict).

While Plaintiffs did not object at trial, this is not determinative, as Rule 59 gives the Court broad discretion to prevent "miscarriage[s] of justice." In *Hesselbein*, even though counsel had abandoned his objection during trial, the court still granted a new trial based on the admission of this type of character evidence. *Hesselbein*, 168 F. Supp. 3d at 1263. The court found that when the evidence supporting the verdict is questionable, testimony about an officer's lack of prior shootings likely improperly influences the jury in two ways: (1) it affects the jury's assessment of the officer's credibility regarding their claimed fear/belief about the need to use force; and (2) it improperly suggests that because the officer had never shot anyone before, their decision to shoot in this case must have been reasonable and necessary. *Id.* at 1264.

This improper character evidence was introduced through counsel's statements rather than testimony or exhibits. However, this distinction should not be dispositive here. The prejudicial effect remains largely the same—the jury was still exposed to inadmissible information about the officer's lack of prior shootings. The mode of introducing this prejudicial information should not shield it from Rule 59's remedial purpose of preventing miscarriages of justice.

        ii.    <u>Counsel Repeatedly Violated the Court's Order by Soliciting Testimony on the Ultimate Question</u>

In a motion in limine, defense counsel requested that the Court prohibit expert testimony on the ultimate issue of whether the force used by Ornelas was

reasonable. (Dkt. 76 at 7.) Plaintiffs did not oppose that portion of the motion, and the Court granted the request. (Dkt. 112 at 15.) In its Order, the Court explicitly cautioned "both parties that their respective experts should refrain from opining regarding the ultimate issue of law." *Id*.

Nevertheless, in direct contradiction of both the Court's order and his own motion in limine, defense counsel repeatedly attempted to elicit precisely such testimony from his expert, Mr. Chapman. First, he asked: "In your opinion did Officer Ornelas use a reasonable or justifiable force when he fired the first time?" (**Exhibit C**, p. 179.) After Mr. Galipo's objection, defense counsel withdrew the question, only to immediately rephrase it: "In your opinion did Officer Ornelas use justifiable force?" (*Id.*) Mr. Galipo objected and noted that there was a motion in limine on this issue, and the Court directed defense counsel to move on. (*Id.*) Undeterred, defense counsel soon asked Mr. Chapman for a third time: "Were any of the shots in your opinion fired by Officer Ornelas excessive?" (*Id.*, p. 182.) Mr. Galipo was forced to object yet again, and the Court sustained the objection. (*Id.*)

The risk that a jury will be unduly influenced by expert testimony on the ultimate issue is not merely theoretical—it is a risk that has been addressed in countless Ninth Circuit cases, many of which were cited in Defendants' motion in limine on the issue. Defense counsel clearly recognized this risk, when he took his and the Court's time to address the issue before trial in a motion in limine. Plaintiffs, sharing this concern, did not oppose the motion and scrupulously avoided any such questioning during their examination of their expert, Mr. Clark.

Defendants' counsel deliberately violating the Court's order, asking an impermissible question three times to gain an unfair advantage for his clients. The fact that the questions were never answered is immaterial. Through his repeated attempts to elicit this forbidden testimony, he effectively telegraphed to the jury that Mr. Chapman believed the shooting was justified. And by forcing Mr. Galipo to object three separate times, he created the prejudicial impression that the

Plaintiffs were attempting to suppress favorable defense testimony. This tactical manipulation completely undermines the purpose of motions in limine, which exist precisely to prevent parties from creating such prejudicial situations in front of the jury.

This was not a single slip of the tongue or momentary lapse in judgment. Mr. Klehm's three separate attempts to introduce this prohibited testimony, each carefully reworded but seeking the same forbidden opinion, demonstrate a calculated strategy to circumvent the Court's order. Such deliberate disregard for the Court's rulings not only prejudices the Plaintiffs but also undermines the integrity of the judicial process.

Mr. Klehm asked similar impermissible questions of Officer Nichols. First, he asked whether Nichols was "concerned for Officer Ornelas's safety as [he] saw the suspect running towards Officer Ornelas with this object in his right hand," and "what type of concern he had." (**Exhibit A**, pp. 175–176.) Mr. Galipo objected as irrelevant, and Mr. Klehm withdrew the question. (*Id*.) Then Mr. Klehm, holding the pipe up dramatically, asked the same question but in a *leading* manner: "Were you concerned that the suspect at this point, running towards Officer Ornelas with this object in his right hand, posed an imminent threat of grave bodily injury or death to Officer Ornelas?" (*Id*. at 76.) Mr. Galipo objected as irrelevant, and the Court sustained the objection. (*Id*.) Undeterred, defense counsel asked the question again: "When you saw the suspect running towards Officer Ornelas with this metal object that I just showed you in his right hand, were you concerned the suspect posed an imminent threat of grave bodily injury or death to Officer Ornelas standing at the end of the bridge as you understood him to be." (*Id*.) Mr. Galipo was obliged to object a third time, and the Court sustained the objection, again. (*Id*. at 77.)

The Court should not reward such obvious gamesmanship. To allow Defendants to benefit from the calculated violation of their own motion in limine

would send a dangerous message that tactical violations of court orders carry no consequences. This would encourage future litigants to engage in similar misconduct, knowing they could violate court orders on motions in limine with impunity to gain strategic advantages at trial. Such a precedent would severely undermine the effectiveness of motions in limine as a vital tool for preventing prejudice and ensuring fair trials.

### iii.   Counsel Misused Demonstrative Evidence to Inflame the Jury

Plaintiffs should be granted a new trial due to defense counsel's prejudicial misuse of the pipe as a demonstrative exhibit. While Mr. Galipo agreed to the pipe's use as a demonstrative, defense counsel's actions far exceeded permissible bounds, creating unfair prejudice that likely swayed the jury.

The pipe's relevance to this case is inherently limited by Officer Ornelas's own post-shooting admission that he was uncertain whether the object in Mr. Sesma's hand was a pipe or a wooden stick. Under the Fourth Amendment's excessive force standard, which evaluates the reasonableness of force based on circumstances known to the officer at the time, this uncertainty significantly diminishes the relevance of the pipe's actual characteristics.

Defense counsel repeatedly used the pipe in ways that magnified its significance and inflamed the jury's passions. Throughout witness testimony, counsel excessively brandished the pipe, drawing disproportionate attention to it. (Mayne Decl. ¶ 12.) He dramatically banged the pipe against the podium, an action serving no evidentiary purpose while instilling a sense of danger in the jury. (*Id*.) Counsel also waved the pipe above his head, though it is undisputed that the pipe was never brandished by Mr. Sesma in that manner. (*Id*.) Furthermore, he repeatedly emphasized the pipe's weight and solid construction—details irrelevant to Officer Ornelas's perception at the time but likely to influence the jury's assessment of the severity of the threat posed by Mr. Sesma. (*Id*.)

PLAINTIFFS' MOTION FOR A NEW TRIAL

These theatrical displays transformed the pipe from a neutral demonstrative exhibit into a potent symbol of threat and danger. Given the pipe's limited relevance under the applicable legal standard, this prejudicial conduct likely tainted the jury's deliberations and denied Plaintiffs a fair trial. A new trial, with appropriate restrictions on the pipe's use, is to prevent a miscarriage of justice.

        iv.    <u>Counsel's Improper Arguments Misled the Jury About the Legal Standard for Immediate Threat</u>

The critical issue before the jury was whether Sesma posed an immediate threat of death or serious bodily injury at the time of the second volley. The jury instructions explicitly defined this standard, requiring that Sesma have "the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury."

Rather than addressing these specific legal requirements, defense counsel instead offered a misleading analogy that fundamentally mischaracterized the legal meaning of "immediate." Counsel argued that three seconds qualifies as "immediate" because when a parent tells a child to go to their bedroom "immediately" and the child does so within three seconds, the child has complied. (Mayne Decl. ¶ 12.) This analogy not only trivializes the gravity of using deadly force but also contradicts the legal standard for immediate threat that the Court instructed the jury to apply.

The distinction is crucial. A parental instruction about bedroom compliance bears no relation to the constitutional standard for using deadly force, which requires an officer to face a threat that "must be instantly confronted and addressed." (Dkt. 141 at 9.) At the time of the second volley, Sesma was 25 feet away, partially prone, and not advancing toward Ornelas. A threat that would take three seconds to materialize—if it materialized at all—is precisely the type of future threat that the law distinguishes from an immediate one requiring deadly force.

By presenting this misleading analogy, defense counsel invited the jury to ignore the Court's carefully crafted instructions and substitute a colloquial understanding of "immediate" that fails to account for the constitutional requirements for deadly force. This improper argument likely confused the jury about the applicable legal standard and contributed to their verdict.

v.   <u>Jury's Confusion and Prejudice is Evident from their Incorrectly Completed Verdict Form</u>

The jury's mishandling of the verdict form provides evidence that defense counsel's misconduct and improper arguments may have influenced their deliberations and led to both confusion about the law and prejudice against Mr. Sesma. The verdict form explicitly instructed the jury to address questions about Sesma's contributory negligence only if they first found Officer Ornelas negligent. (Dkt. 147 at 4.) Despite finding that Ornelas was not negligent, the jury proceeded to complete the contributory negligence section, finding that Sesma was negligent and that his negligence caused his death. (*Id.*)

This deviation from the verdict form's clear instructions is significant for two reasons. First, it demonstrates that the jury may have been confused about fundamental principles of contributory negligence law. The jury's decision to apportion fault to Sesma despite finding no primary negligence by Ornelas shows they may not have understood that Ornelas can still be liable for an incident caused in some part by Sesma's negligence.

More troublingly, the jury's insistence on completing the contributory negligence section despite explicit instructions not to do so reveals that their passions were inflamed against Sesma. Rather than following the verdict form's straightforward directives, the jury went out of their way to express their view that Sesma was at fault for his own death—even when the form's structure provided no legitimate avenue for such a finding. This suggests the jury was so intent on

18

PLAINTIFFS' MOTION FOR A NEW TRIAL

assigning blame to Sesma that they disregarded both the law and the court's instructions.

Under these circumstances, it cannot be said that the verdict was the product of a fair and impartial deliberation process.

## IV.    SECOND VOLLEY WARRANTS JUDGMENT AS A MATTER OF LAW

Under Rule 50(b), judgment as a matter of law is proper when "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion." *Huizar v. City of Anaheim*, 840 F.3d 592, 604 (9th Cir. 2016). The Court should grant judgment as a matter of law on the second volley of shots because no reasonable jury could find that use of deadly force was justified under the circumstances.

"When police confront a suspect who poses an immediate threat, they may use deadly force against him. But they must stop using deadly force when the suspect no longer poses a threat. " *Zion v. Cnty. of Orange*, 874 F.3d 1072, 1075 (9th Cir. 2017). "'[I]f police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended.' But terminating a threat doesn't necessarily mean terminating the suspect. If the suspect is on the ground and appears wounded, he may no longer pose a threat; a reasonable officer would reassess the situation rather than continue shooting." *Id*. at 1076 (internal citation omitted).

Even viewing the evidence in the light most favorable to Officer Ornelas, no reasonable jury could have found that the second volley of shots was objectively reasonable. The evidence established that: (1) Sesma was partially prone and not advancing toward Ornelas; (2) he was approximately 25 feet away; (3) he had already been shot multiple times, including twice in his right arm; and (4) he did not attempt to throw the object or swing it in an aggressive manner. Ornelas himself admitted that Sesma "didn't have a chance to get his feet underneath him

PLAINTIFFS' MOTION FOR A NEW TRIAL

to start running" and did not "move at all in [his] direction in between the two volleys." Even defense expert Chapman conceded that, based on these facts, the second volley "would probably not rise to the level of deadly force."

Given this evidence, no reasonable jury could conclude that Sesma had "the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury" at the time of the second volley, as required by the law. When a severely wounded suspect is struggling to get up from the ground at a considerable distance, without making any threatening movements, the law simply does not permit the use of deadly force.

In *Vos v. City of Newport Beach*, 892 F.3d 1024 (9th Cir. 2018), the threat posed was much more severe than here: the suspect was actively charging officers with a metal object raised above his head and was "within 20 feet of the officers when he was shot." *Id.* at 1033. Yet even under those far more threatening circumstances, the Ninth Circuit found that a reasonable jury could conclude deadly force was not justified under the Fourth Amendment. While this case comes to the Court in a different procedural posture, *Vos* provides strong support for Plaintiffs' argument that Sesma, *who was partially prone rather than charging*, and who had already been shot multiple times including through his right arm, could not possibly have posed the kind of immediate threat that would justify Ornelas' second volley of shots.

Because the evidence permits only one reasonable conclusion—that the second volley constituted excessive force—this Court should enter judgment as a matter of law in Plaintiffs' favor on this issue.

## V.    CONCLUSION

For the reasons set forth above, the Court should grant Plaintiffs a new trial on all three claims: excessive force under § 1983, battery, and negligence. The jury's verdict regarding Officer Ornelas's second volley of shots was against the clear weight of the evidence, and defense counsel's pervasive misconduct deprived

Plaintiffs of a fair trial. In the alternative, the Court should enter judgment as a matter of law in Plaintiffs' favor on all three claims with respect to the second volley of shots, as the uncontroverted evidence establishes that no reasonable jury could find that use of deadly force was justified against a partially prone, severely wounded man who posed no immediate threat of death or serious bodily injury to anyone.


Dated: January 13, 2025                    LAW OFFICES OF DALE K. GALIPO


                                           /s/ *Cooper Alison-Mayne*
                                           Dale K. Galipo
                                           Cooper Alison-Mayne
                                           *Attorneys for Plaintiffs*




### <u>CERTIFICATION OF COMPLIANCE</u>

The undersigned, counsel of record for Plaintiffs, certify that this Motion contains 6,653 words, which complies with the word limit of L.R. 11-6.1.


Dated: January 13, 2025                    /s/ *Cooper Alison-Mayne*
                                           Cooper Alison-Mayne
                                           *Attorneys for Plaintiffs*