# Exhibit A

```
 1                  UNITED STATES DISTRICT COURT
 2                 CENTRAL DISTRICT OF CALIFORNIA
 3           HONORABLE JOHN W. HOLCOMB, JUDGE PRESIDING
 4   CANDIDO SESMA, ET AL.,          )
                                     )
 5                                   )
                                     )
 6                  Plaintiffs,      )
                                     )
 7                                   )
                                     )
 8        Vs.                        )   No. CV21-01694-JWH
                                     )
 9                                   )
                                     )
10   STATE OF CALIFORNIA, ET AL.,    )
                                     )
11                                   )
                                     )
12                  Defendants.      )
                                     )
13   _____  )
14
15
16            REPORTER'S TRANSCRIPT OF PROCEEDINGS
17                    JURY TRIAL, DAY 2
18                 LOS ANGELES, CALIFORNIA
19                TUESDAY, DECEMBER 3, 2024
20
21
22
23          MIRIAM V. BAIRD, CSR 11893, CCRA
            OFFICIAL U.S. DISTRICT COURT REPORTER
24          411 WEST FOURTH STREET, SUITE 1-053
              SANTA ANA, CALIFORNIA 97201
25             VELIZBAIRDMIRIAM@GMAIL.COM
```

1  used the amount of force necessary to stop the threat and
2  then he stopped shooting.  And then what did he do after
3  that?  He'll tell you about this, and so will the other
4  officers.  And you will hear it on the video.  You'll hear
5  the audio.
6          He immediately calls for a tourniquet, calls for a
7  chest seal to administer lifesaving aid to the man who
8  moments ago he thought was trying to kill him.  That's the
9  hallmark of a professional CHP officer.
10         He didn't just say:  We'll wait for the paramedics.
11 This guy just tried to kill me.  No.  He applied immediate
12 first aid.  Before joining the academy, he was an EMT for
13 five years, and you'll hear him telling the other officers
14 what he needs to apply first aid.  Get me the tourniquet.
15 Get me the chest seal.  Get me the halo.  Get me the trauma
16 shears.
17         He immediately goes to work on Mr. Sesma to patch
18 the wounds that he just fired because he realizes what a
19 serious responsibility the use of deadly force is, and he
20 used it only when he had to.  ==This is the first time in his==
21 ==entire career he had to do it.==
22         And then what does he do afterwards?  He starts
23 administering first aid to the suspect.  He gets the
24 tourniquet out from Officer Steen's belt.  He carries a
25 tourniquet on his belt.  Cuts the shirt to look for the

1  court reporter like we have here about what occurred?
2  A.   Yes, sir.
3  Q.   Now, in preparation for the trial, have you reviewed all
4  of those -- the first statement, the second statement, the
5  declaration, and your deposition testimony?
6  A.   Yes, sir.
7  Q.   And you have watched the MVARS video?
8  A.   Yes, sir.
9  Q.   Now, in your initial statement would you agree you
10 indicated that Mr. Sesma, when he first got up, was holding
11 this pipe above his head?
12 A.   Yes, sir.
13 Q.   And would you agree you indicated when he started
14 running, the pipe was above his head?
15 A.   Yes, sir.
16 Q.   Now, in watching the MVARS video or videos, do you ever
17 see him holding a pipe above his head?
18 A.   Not as depicted in the MVARS, sir.
19 Q.   Pardon?
20 A.   Not depicted in the MVARS, sir.
21 Q.   Not in the MVARS.  Okay.  Do you ever see him with a
22 pipe in his hand in the MVARS?
23 A.   Not that I can make out, sir.
24 Q.   So as he's running towards you, where do you believe
25 Officer Steen is?

1 had struck him?
2 A. Yes, sir.
3 Q. And you're still standing in about the same position
4 you've indicated to the jury earlier. I guess if we look --
5 and I'm pointing at the end of this fence line -- it would be
6 somewhere to the right of that?
7 A. Yes, sir.
8 Q. So how does he go down to the ground? Is he on his
9 stomach? his chest? How does he go down after the first
10 volley?
11 A. He goes down in a forward motion, putting him on his
12 stomach and chest.
13 Q. How much time would you estimate passed from the end of
14 the first volley of shots to when you fired the two
15 subsequent shots?
16 A. Approximately six seconds.
17 Q. And you know that now obviously from reviewing the video
18 and materials?
19 A. Yes, sir.
20 Q. But you would at least agree that when you gave your
21 initial statement, you indicated he got up immediately, like
22 within a second?
23 A. Yes, sir.
24 Q. And that there was only about a second between the two
25 volleys. That's what you initially stated?

1  from you, correct?
2  A.  Yes, sir.
3  Q.  And would you agree from your perspective that Mr. Sesma
4  just prior to your second group of shots didn't have a chance
5  to get to his -- get his feet underneath him to start
6  running?
7  A.  Yes, sir.
8  Q.  And you stated that in one of your statements, correct?
9  A.  Yes, sir.
10 Q.  So in this approximate one second that he starts to get
11 up again and you fire the last two shots, would you at least
12 agree with me he wasn't throwing the pipe at you at that
13 time?
14 A.  Yes, sir.
15 Q.  And would you also agree with me that he wasn't swinging
16 the pipe at you at that time?
17 A.  Yes, sir.
18 Q.  Do you know what hand he had the pipe in when you fired
19 the second volley of shots?
20 A.  No, sir.
21 Q.  In fact, after the shooting you didn't know where the
22 pipe was; isn't that true?
23 A.  Initially.  Correct, sir.
24 Q.  You thought it was maybe underneath his body?  You
25 didn't know?

1  A.  Yes, sir.
2  Q.  Where were you aiming when you fired the second volley
3  of shots?
4  A.  At center mass again, sir.
5  Q.  Okay.  Now, you are a pretty tall guy.  I think you said
6  you're 6'2" or 6'3", correct?
7  A.  Yes, sir.
8  Q.  And am I correct that you're shooting from chest level?
9  A.  Approximately, yes, sir.
10 Q.  And if he's on the ground on his chest for about five
11 seconds and starts getting up and you shoot him within a
12 second, would you generally be aiming down at that point?
13 A.  Yes, sir.
14 Q.  So from your trajectory with him just starting to get
15 up, would center mass be his head and chest area?
16 A.  That would be the largest portion of his body.  Yes,
17 sir.
18 Q.  And that's where you were essentially aiming for the
19 second volley of shots?
20 A.  Yes, sir.
21 Q.  And when you fired the second volley of shots, he
22 immediately went down again; is that correct?
23 A.  Yes, sir.
24 Q.  And showing you 31-9.
25      MR. GALIPO:  I think that's one of the ones we

1  officers something to the effect:  I don't know whether it
2  was a pipe or a large stick?
3  A.   That's not verbatim but, yes, sir.
4  Q.   So why would you say -- and let's see if we could play
5  that.
6        MR. GALIPO:  That's from Exhibit 1, Your Honor.
7  This is a portion of the MVARS, but I want to give the
8  specific time.  Hold on.
9        May I confer with counsel?
10        THE COURT:  Yes.  Please do.
11  BY MR. GALIPO:
12  Q.   We'll probably play it after lunch, but for right now
13  would you at least agree that you've listened to it and
14  you've heard yourself saying after the shooting it was either
15  a pipe or a large stick?
16  A.   Yes, sir.
17  Q.   So why would you say it was a pipe or a large stick if
18  you thought for a hundred percent sure it was a pipe?
19  A.   The reasoning I don't know, but that statement should
20  not have been made.
21  Q.   But it was made.
22  A.   Correct.
23  Q.   And it was made shortly after this occurred, correct?
24  A.   Yes, sir.
25  Q.   And obviously you're trying to give honest, credible

1  information to your fellow officers?
2  A.   Yes, sir.
3  Q.   I mean, that was before you gave a statement with
4  representatives present, correct?
5  A.   Correct.
6  Q.   That was before litigation or a deposition or anything
7  like that?
8  A.   Yes, sir.
9            MR. GALIPO:  I think this is a good time for the
10 lunch break if it's good for Your Honor.
11           THE COURT:  Very well.  Yes.
12           Let's break for lunch now.  Ladies and gentlemen of
13 the jury, please remember your admonitions.  Please don't
14 communicate regarding the substance of the case with anyone,
15 including with each other, on the internet, text message,
16 none of that.
17           And please do not do any research regarding the
18 case, again, on the internet, consulting dictionaries, maps.
19 Don't do any of that.  So with that, let's take roughly an
20 hour.  Please be back a little bit after 1:00 o'clock and be
21 ready to resume.
22           Have a great lunch.  Thank you.
23           THE CLERK:  All rise for the jury.
24           (Open court - jury not present)
25           THE COURT:  You may be seated.

1  Q.  Okay.  And then there seems to be another comment you
2  made, something -- what we talked about before lunch,
3  something to the extent it was either a pipe or a big stick.
4  Did you at least hear your voice saying that?
5  A.  Yes, sir.
6  Q.  Okay.  Now, your shift hours that day, were they from --
7          MR. GALIPO:  We could stop that, please.
8          May I have one moment with my colleague?
9          THE COURT:  Yes.
10 BY MR. GALIPO:
11 Q.  Did you essentially start at about 1:00 in the afternoon
12 and go to about 10:30 at night?
13 A.  That sounds about right, sir.
14 Q.  And you had reviewed the MVARS video before you gave
15 your statement two days later?
16 A.  Yes, sir.
17 Q.  And do you recall stating in your initial statement that
18 you thought Officer Steen was directly behind you when the
19 shooting occurred?
20 A.  I don't recall, sir.
21 Q.  Do you think it would refresh your recollection if I
22 provided a copy of your statement to you?
23 A.  Yes, sir.
24          MR. GALIPO:  With the Court's permission, I have an
25 original for the Court and a certified copy for the witness.

1     MR. GALIPO:  Thank you, Your Honor.
2  BY MR. GALIPO:
3  Q.  First of all, do you have what appears to be page 24 of
4  the transcription of your statement in front of you?
5  A.  Yes, sir.
6  Q.  And I think you indicated you have reviewed that several
7  times before?
8  A.  Yes, sir.
9  Q.  Okay.  And then I particularly want to draw your
10 attention to lines 12 to 14.  And you could read them to
11 yourself just for a moment and see if that refreshes your
12 recollection about your belief that Officer Steen was to your
13 right directly behind you.
14 A.  (Witness reading)  Yes, sir.
15 Q.  And is that what you stated in your initial statement?
16 A.  Yes, sir.
17 Q.  In fact, did you think that Officer Steen was behind you
18 the entire time?
19 A.  No, sir.
20 Q.  Did you think Officer Steen had fired?
21 A.  I wasn't sure, sir.  I don't believe so.  I believe he
22 was behind me but not directly behind me.  He was to my rear.
23 Q.  Okay.  Can you look at page 71 of your statement,
24 please.
25     THE COURT:  Is this still seeking to refresh the

1  witness's recollection?
2          MR. GALIPO:  At this point, yes.  Thank you, Your
3  Honor.
4  BY MR. GALIPO:
5  Q.  Can you read lines 16 through 18 to yourself and see if
6  that refreshes your recollection as to whether at the time of
7  your statement, you thought that Officer Steen was behind you
8  the entire time.
9  A.  Yes, sir.  It does.
10 Q.  Okay.  Is that what you said in your statement?
11 A.  Yes, sir.
12 Q.  And, in fact, looking at lines 9 through 10 above, see
13 if that -- or 9 through 11.  Read that and see if it
14 refreshes your recollection that you thought Officer Steen
15 had also fired.
16 A.  Yes, sir.
17 Q.  You recall, looking at that now, that you did say that
18 in your initial statement?
19 A.  Yes, sir.
20 Q.  Okay.  So just to summarize those points, you would
21 agree in your original statement you indicated that you
22 thought Officer Steen was behind you the entire time; is that
23 fair?
24 A.  Yes, sir.
25 Q.  And that he had fired?

1  A.   Yes, sir.
2  Q.   And going to page 69 for a moment, do you recall -- and
3  I think you talked about this earlier -- giving distance
4  estimates at your statement of less than 25 yards for the
5  first volley and less than 20 yards for the second volley?
6  A.   Yes, sir.
7  Q.   And is this the page, if we look at this page towards
8  the bottom, is this the page where you made those references?
9  A.   Yes, it is.
10 Q.   After you fired the second volley of shots, did you
11 reload a new magazine in?
12 A.   Yes, sir.
13 Q.   And that would've been while Mr. Sesma was again laying
14 chest down after the second volley?
15 A.   Yes, sir.
16 Q.   Do you recall -- strike that.
17      Have you listened to some of the radio dispatch
18 regarding this incident in preparation for the trial?
19 A.   Yes, sir.
20 Q.   And in listening to that, at some point before you went
21 up the embankment, did you hear Officer Steen say over the
22 radio that he's in the middle of the bridge just sitting
23 down?
24 A.   No, I did not, sir.
25 Q.   You didn't hear it at the time, or you didn't hear it

1  Q.  And we talked before our lunch break about a portion of
2  your second statement where you indicated that when you fired
3  the second group of shots, Mr. Sesma didn't have a chance to
4  get his feet underneath him to start running.  Do you
5  remember that?
6  A.  Yes, sir.
7  Q.  And you've already told us that you fired that second
8  volley within approximately a second of him trying to get up,
9  correct?
10 A.  Yes, sir, when he was standing with the pipe, sir.
11 Q.  Right.  So obviously he was not running when you fired
12 the second volley because according to your statement, he
13 hadn't had a chance to get his feet underneath him to start
14 running, correct?
15 A.  Correct.  I would describe it as a lunging motion.
16 Q.  And I think you've already said this, but as soon as you
17 shot him a second time, he went right down immediately,
18 correct?
19 A.  Yes, sir.
20 Q.  You recall -- and you're not sure exactly where the pipe
21 was immediately after the shooting, true?
22 A.  Correct.
23 Q.  You recall at some point that Mr. Sesma after the second
24 group of shots was handcuffed?
25 A.  Yes, sir.

1  Q.  Okay.  And can you approximate the distance between
2  where you are on the sidewalk and where you're looking up at
3  the bridge?  Is it more distance than from you to me right
4  now or less?
5  A.  I would say slightly more but not much.
6  Q.  Okay.  A few steps backwards?
7  A.  Yes, sir.  I would say five more feet.
8          MR. KLEHM:  Your Honor, could I move backwards?
9  BY MR. KLEHM:
10 Q.  Is it about here (indicating)?
11 A.  That seems reasonable.
12 Q.  Okay.  And is this the view that you had of the
13 suspect's right hand with the object in it?
14 A.  Yes, sir.
15 Q.  All right.  Does this look like the object that you saw
16 in the suspect's right hand as he was running towards Officer
17 Ornelas?
18 A.  Yes, sir.
19 Q.  Thank you.
20          Were you concerned for Officer Ornelas's safety as
21 you saw the suspect running towards Officer Ornelas with this
22 object in his right hand?
23 A.  Yes, sir.
24 Q.  Okay.  What type of concern did you have for Officer
25 Ornelas at that point in time?

1         MR. GALIPO: I'll object. Irrelevant and 403.

2         THE COURT: Hold on one second. Move that

3 microphone much closer because I definitely want to hear your

4 objections. So hold on one second.

5         MR. KLEHM: I'll withdraw, Your Honor, and ask a

6 different question.

7         THE COURT: Very well.

8         MR. KLEHM: Thank you.

9 BY MR. KLEHM:

10 Q. Were you concerned that the suspect at this point,

11 running towards Officer Ornelas with this object in his right

12 hand, posed an imminent threat of grave bodily injury or

13 death to Officer Ornelas?

14         MR. GALIPO: Irrelevant. 403 and lacks foundation

15 since he couldn't see Officer Ornelas.

16         THE COURT: Sustained.

17 BY MR. KLEHM:

18 Q. Did you know that Officer Ornelas, based on what you

19 could hear, was at the end of the bridge?

20 A. Yes, sir.

21 Q. Okay. When you saw the suspect running towards Officer

22 Ornelas with this metal object that I just showed you in his

23 right hand, were you concerned the suspect posed an imminent

24 threat of grave bodily injury or death to Officer Ornelas

25 standing at the end of the bridge as you understood him to

1   And if we don't have any, that's great. We'll
2   start promptly at nine with the jury. But if we do have
3   housekeeping, I want to do that, reserve that half hour to
4   deal with it.
5        MR. GALIPO: We'll be here 8:30 promptly.
6        THE COURT: Okay.
7        Have a good evening. I hope you can have a restful
8   evening. I'll see you tomorrow. Thank you.
9        MR. GALIPO: Thank you so much.
10       THE CLERK: All rise. This court is adjourned.
11            (Proceedings adjourned at 5:07 p.m.)
12                      CERTIFICATE
13  I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT
14  TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN
15  THE ABOVE MATTER.
16  FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE
17  REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE
18  REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.
19
20  /s/ Miriam V. Baird                    12/03/2024
21  MIRIAM V. BAIRD                        DATE
    OFFICIAL REPORTER
22
23
24
25