1   ROB BONTA
    Attorney General of California
2   DONNA M. DEAN
    Supervising Deputy Attorney General
3   DAVID KLEHM
    Deputy Attorney General
4   State Bar No. 165302
    TAMMY KIM
5   Deputy Attorney General
    State Bar No. 262510
6    300 South Spring Street, Suite 1702
     Los Angeles, CA  90013-1230
7    Telephone:  (213) 269-6182
     Fax:  (916) 731-2119
8    E-mail:  Tammy.Kim@doj.ca.gov
    *Attorneys for Defendants*
9   *State of California and Andrew Ornelas*

10

11                  IN THE UNITED STATES DISTRICT COURT

12              FOR THE CENTRAL DISTRICT OF CALIFORNIA

13

| | |
|---|---|
| **CANDIDO SESMA AND CECILIA SESMA, INDIVIDUALLY AND AS SUCCESSORS IN INTEREST TO CHARLES SESMA, DECEASED,**<br><br>Plaintiffs,<br><br>v.<br><br>**STATE OF CALIFORNIA; AND DOES 1-20, INCLUSIVE,**<br><br>Defendants. | 5:21-cv-01694-JWH-DTB<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR NEW TRIAL OR, IN THE ALTERNATIVE, JUDGMENT AS A MATTER OF LAW; DECLARATION OF DAVID KLEHM IN SUPPORT THEREOF**<br><br>Date:         February 14, 2025<br>Time:        9:00 a.m.<br>Courtroom:  9D<br>Judge:       Hon. John W. Holcomb<br>Trial Date:  12/02/2024<br>Action Filed:  7/30/2021 |

1

**TABLE OF CONTENTS**

2

**Page**

3  Memorandum of Points and Authorities .................................................................. 1

4      I.     INTRODUCTION ................................................................. 1

    II.    LEGAL STANDARD ............................................................ 1

5      III.   ARGUMENT .................................................................... 2

6          A.    The Clear Weight of the Evidence Supports the Jury's Verdict, and a New Trial Is Not Warranted Under Rule 59. ........................................ 2

7               1.   The Jury's Finding That the Second Volley Was Not Excessive Is Supported by the Clear Weight of the Evidence ........ 2

8                    a    "Lunging" is a Rapid *Forward* Motion ............................. 2

9                    b.   The MVARS Video Presented Convincing Evidence that Sesma Lunged Towards Ornelas Before the Second Volley. .................................................... 3

10

11                    c.   The Clear Weight of the Evidence Did Not Show Sesma Was 25 Feet or More Away ................................... 4

12                    d.   Even Though Sesma Never Appeared to Throw the Pipe, the Pipe was Found Close to His Body Corroborating Ornelas that Sesma Had the Pipe Through the Second Volley. ..................................... 5

13

14

15                    e.   The Fourth Amendment Requires Objective Reasonableness, Making Subjective Fear Irrelevant. ......... 6

16                    f.   Defendants' Ballistics and Police Practices Experts Both Opined that the Second Volley was Consistent with Sesma Lunging, and Never Opined the Subject Shooting was "Against Policy". ............................... 7

17

18                    g.   Plaintiffs Inaccurately Characterize and Misconstrue Steen's Testimony. ................................................. 7

19

20                    h.   The Jury Accurately Assessed the Credibility of Ornelas. .................................................... 9

21                2.   There Was No Misconduct By Defense Counsel at Trial, and, in Any Event, Plaintiffs Failed to Object. ............................. 11

22                    a.   There Was No Introduction of Any Evidence or Testimony of Ornelas's Past Shooting History. ................ 12

23                    b.   There Was No Testimony Elicited on Any Ultimate Question. ..................................................... 14

24                    c.   Plaintiffs Stipulated to the Demonstrative Use of the Pipe, Never Objected, and Present No Evidence That Its Use Was Improper or Prejudicial. .......................... 14

25

26                    d.   Defense Counsel's Closing Arguments About the Legal Standard for Immediate Threat Were Consistent With the Law and Did Not Mislead the Jury. .................................................... 16

27

28

i

**TABLE OF CONTENTS**
(continued)

Page

        e.    Plaintiffs' Wholesale Speculation That the Verdict Form Somehow Shows Jury Confusion Is Nothing But Conjecture. ................................................. 19

    3.    The Evidence Was Sufficient to Support the Defense Verdict and Thus Plaintiffs Are Not Entitled to Judgment as a Matter of Law under Rule 50(b)................................................. 19

IV.    CONCLUSION ................................................................... 21

Declaration of David Klehm ................................................................... 22

1

# TABLE OF AUTHORITIES

2

**Page**

3

CASES

4

*Cabrera v. Cordis Corp.*
5
134 F.3d 1418 (9th Cir. 1998) ........................................................... 11

6

*Crawford v. Tribeca Lending Corp.*
(2nd Cir. 2016) 815 F3d 121 (per curiam) ........................................ 9
7

*Dupard v. Kringle*
8
76 F.3d 385 (9th Cir. 1996) ............................................................. 14

9

*Freund v. Nycomed Amersham*
(9th Cir. 2003) 347 F.3d 752 ......................................................... 19
10

*Gates v. Rivera*
11
993 F.2d 697 (9th Cir. 1993) ...................................................... 13, 14

12

*Hemmings v. Tidyman's Inc.*
13
285 F.3d 1174 (9th Cir. 2002) ................................................... *passim*

14

*Hesselbein v. Beckham*
168 F.Supp.3d 1252 (E.D. Cal. 2016) ......................................... 12, 13
15

16

*Ho Sang Yim v. Barr*
972 F.3d 1069 (9th Cir. 2020) ..................................................... 9, 10

17

*Johnson v. Paradise Valley Unified School Dist.*
18
251 F3d 1222 (9th Cir. 2001) ......................................................... 19

19

*Reeves v. Sanderson Plumbing Products, Inc.*
530 US 133 (2000) .......................................................................... 19
20

21

*United States v. 4.0 Acres of Land*
175 F.3d 1133 (9th Cir. 1999) ......................................................... 1

22

*Vos v. City of Newport Beach*
23
892 F.3d 1024 (9th Cir. 2018) ....................................................... 20

24

*Winarto v. Toshiba America Electronics Components, Inc.*
974 F.3d 1276 (9th Cir. 2001) ........................................... 1, 2, 19, 20
25

CONSTITUTIONAL PROVISIONS
26

27
Fourth Amendment ......................................................................... 6, 7

28

iii

**TABLE OF AUTHORITIES**
**(continued)**

Page

**COURT RULES**

Fed. R. Civ. P.
    59(a)(1)(A) ............................................................................................... 1
    50 ............................................................................................................. 1
    50(a) .................................................................................................. 19, 20
    50(b) .................................................................................................. 19, 20

FRAP 32.1 .................................................................................................. 14

iv

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

In their attempt to overturn a carefully deliberated and clearly supported verdict, rendered by a most attentive and conscientious jury, Plaintiffs mischaracterize the evidence and testimony presented at trial and impugn the integrity of Officer Ornelas and defense counsel. Plaintiffs' efforts, however, are unavailing. After a full six days of testimony from 13 witnesses creating the expansive evidentiary universe for the jury's deliberations, a unanimous defense verdict was rendered on the seventh day. In addition to the obvious attentiveness displayed by the jury during the trial, including the taking of copious daily notes, another testament to their attentiveness was their requests for clarification on the law and for testimony readbacks during their deliberations. Clearly, the jury very carefully and thoroughly considered the ample evidence to support its defense verdict. Accordingly, and for the reasons set forth below, Plaintiffs' motion should be denied.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 59 authorizes new trials "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). The Court may grant a new trial if "the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent…a miscarriage of justice." *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999).

Similarly, under Rule 50, "the trial court can overturn the jury and grant such a motion only if, under the governing law, there can be but one reasonable conclusion as to the verdict. In other words, the motion should be granted only if 'there is no legally sufficient basis for a reasonable jury to find for that party on that issue.'" *Winarto v. Toshiba America Electronics Components, Inc.*, 974 F.3d 1276, 1283 (9th Cir. 2001)). The court is not to make credibility determinations or weigh

1

the evidence, should view all inferences in the light most favorable to the nonmoving party, should accept the jury's credibility findings consistent with the verdict, and must disregard all evidence favorable to the moving party that the jury is not required to believe. *Id.* "The court 'may not substitute its view of the evidence for that of the jury.'" *Id.* (quoting *Johnson v. Paradise Valley Unified Sch. Dist.,* 251 F.3d 1222, 1227 (9th Cir. 2001)).

## III. ARGUMENT

### A. The Clear Weight of the Evidence Supports the Jury's Verdict, and a New Trial Is Not Warranted Under Rule 59.

#### 1. The Jury's Finding That the Second Volley Was Not Excessive Is Supported by the Clear Weight of the Evidence

Plaintiffs complain that the evidence did not support the jury's reasoned and carefully considered finding that the second volley was not excessive. However, the clear and overwhelming weight of the evidence supports the verdict. A new trial is not warranted under Rule 59.

##### (a) "Lunging" is a Rapid *Forward* Motion.

First, the evidence, including through Ornelas's testimony, the forensic evidence including photographs at the scene and MVARS videos, corroborate that, during the second volley, Sesma was less than three seconds away from Ornelas when Sesma "lunged" at Ornelas while still holding the deadly weapon.

The Cambridge English Dictionary defines a "lunge" as "to move forward suddenly and with force, especially in order to attack someone." Essentially, Plaintiffs argue that the jury should not have interpreted "lunge" according to its commonly understood meaning, but should have interpreted "lunge" to mean "stayed on the ground motionless." Despite Plaintiffs' efforts to mischaracterize Ornelas's testimony on this point, the trial transcripts clearly reflect that Ornelas testified that Sesma "*lunged*" and that there was some *forward* movement prior to Ornelas firing the second volley. (Klehm Decl., ¶¶ 2-3; Exh. A [Day 2, 12/3/2024], at 121:11-15 [Ornelas describing Sesma's movement as a "lunging motion"]; Exh.

1    B [Day 3, 12/2/2024], at 33:15-21.)

2    **b.    The MVARS Video Presented Convincing Evidence that Sesma Lunged Towards Ornelas Before the Second Volley.**

3

4    Trial exhibit 1 was a key MVARS video depicting Sesma lunging towards

5    Ornelas, who was standing out of frame. That MVARS video shows Sesma's white

6    T-shirt rapidly rising in a forward angular motion in an easterly direction towards

7    Ornelas. (Klehm Decl., ¶ 8; Exh. G [Ornelas MVARS, Tr. Exh. 1].)

8    Additionally, the audio portion of Ornelas's MVARS video depicts Ornelas

9    yelling "Get down! Get down!" immediately before and during the last two shots of

10   the second volley. (*Id.*)

11   Furthermore, the frame-by frame image sequence of the video admitted as

12   trial exhibit 47 (which were still photographs of Ornelas's MVARS video in 30-

13   frames per minute increments), showed that Sesma's white T-shirt continued

14   lunging upwards and towards Ornelas between the sixth and seventh shot in the

15   second volley. (*Id.*, ¶ 12; Exh. K.) Sesma's lunging motion at Ornelas's second

16   volley of shots was also corroborated by Defendants' expert, Parris Ward's audio

17   timing spreadsheet of the shots fired during the second volley, which was admitted

18   as trial exhibit 45. (*Id.*, ¶ 11; Exh. J.) Additionally, Ward's "Shooting Clip+Frame

19   Numbers.mp4", admitted as trial exhibit 48, also showed Sesma's white T-shirt

20   lunging forward between the last two shots. (*Id.*, ¶ 13; Exh. L.)

21   Plaintiffs' police practices expert Roger Clark also admitted to seeing

22   Sesma's white T-shirt raising above the wall indicating that Sesma lunged. In

23   response to a cross-examination question asking if Sesma "lunged," Clark admitted

24   he was able to see Sesma's white T-shirt raising up after the first volley. (*Id.*, ¶ 3;

25   Exh. B [Day 3, 12/4/24], at 211:23-212:3.) Clark also testified that he had reviewed

26   Ornelas' deposition testimony wherein Ornelas stated that he fired because Sesma

27   was lunging at him while still holding the pipe. (*Id.*, at 224:21-225:1.)

28   //

It is undisputable that the jury carefully considered Sesma's movements and Ornelas's positioning prior to the second volley. During deliberations, the jury specifically requested a readback on this issue. (*Id.*, ¶ 15; Exh. N [Redacted Juror Note 3]; *id.*, ¶ 7; Exh. F [Day 7, 12/11/2024], at 30:15-31:11.]

The forensic evidence and expert testimony did not show that Sesma was "partially prone" but instead that Sesma was lunging. Defendants' ballistics expert Rocky Edwards testified that Sesma must have been in a forward leaning or lunging forward position to be in line with Ornelas's firearm for the trajectory of the bullets. (*Id.*, ¶ 5; Exh. D [Day 5, 12/9/2024], at 96:18-97:19; 118:6-13, 120:5-13.] Additionally, trial exhibit 47, which was created by Defendants' forensic video expert Ward and admitted without objection, showed the individual frames of the video depicting Sesma's white T-shirt continuing to rise above the wall of the bridge towards Ornelas between shots 6 and 7. (*Id.*, ¶ 12; Exh. K.)

      **c.**    **The Clear Weight of the Evidence Did Not Show Sesma Was 25 Feet or More Away.**

Ornelas testified that, when he fired the shots, he was a step or two to the west of the eastern end of the fence and across from the middle of the adjacent railroad car that was parked on the tracks. (*Id.*, ¶ 3; Exh. B [Day 3, 12/4/2024], at 26:3-13, 49:12-24, & 50:4-8; *id.*, ¶ 14; Exh. M-8 [photograph, Tr. Exh. 31-29]; *see also id.*, ¶ 2; Exh. A [Day 2, 12/3/24], at 83:3-18, 84:16-20, & 85:2-4 and *id.*, ¶ 14; Exh. M-4 [photograph, Tr. Exh. 14-11]; *id.*, ¶ 3; Exh. B [Day 3, 12/4/2024], at 23:16-19 and *id.,* ¶ 14; Exh. M-5 [photograph, Tr. Exh. 31-5].)

Ornelas testified that Sesma was approximately 20 feet or less away when Sesma fell on the ground after the first volley, and that Sesma moved forward before the second volley. (*Id.*, ¶ 3; Exh. B [Day 3, 12/4/2024], at 32:25-33:2 and 33:15-21.) Ornelas pointed out on the Steen MVARS video, trial exhibit 2, that the shadowy figure moving west to east in front of the railroad car was Sesma. Ornelas testified that Sesma was "within less than that distance [of one freight car]" when

1    Ornelas fired his second volley. (*Id.*, at 51:25-52:8; *id.*, ¶ 9; Exh. H.) Ornelas also

2    testified that Sesma was about half of a railroad car's length away from Ornelas

3    when Sesma fell from second volley (*see id.*, ¶ 3; Exh. B [Day 3, 12/4/2024], at

4    49:12-24 and 50:4-8; *id.*, ¶ 14; Exh. M-8 [Tr. Exh. 31-29]), and that Sesma's body

5    landed somewhere near placards 8 and 9. (*Id.*, ¶ 3; Exh. B [Day 3, 12/4/2024], at

6    22:4-8; *id.*, ¶ 14; Exh. M-5 [Tr. Exh. 31-5].)

7         Ornelas further testified that Sesma fell somewhere between placards 10 and

8    11 and placards 8 and 9, as approximation, and that blood next to placards 8 and 9

9    were closer to where Ornelas was standing when he fired. (*Id.*, ¶ 3; Exh. B [Day 3,

10    12/4/2024], at 40:2-16; *id.*, ¶ 14; Exh. M-9; [Tr. Exh. 31-44].) Officer Steen also

11    testified that Sesma's body was near placard 9. (*Id.*, ¶ 3; Exh. B [Day 3, 12/4/2024],

12    at 83:4-22; *id.*, ¶ 14; Exh. M-6 [Tr. Exh. 31-9].) Furthermore, Officer Cichella, who

13    testified to reaching the top of the embankment within seconds of all shots having

14    been fired, marked the location of Sesma's body by placard 8 in trial exhibit 14-2-1,

15    which placed Sesma closer than 25 feet. (*Id.*, ¶ 5; Exh. D [Day 5, 12/9/2024],

16    126:19-127:13 & 128:1-3; *id.*, ¶ 14; Exh. M-2.) Trial exhibits 14-2, 14-3, 31-9, 31-

17    11, and 31-44, photographs showing placards 8 and 9 depicting the blood puddles

18    on the ground near the bullet casings from Ornelas's gun, were also corroborative

19    evidence of the location of Sesma's body. (*Id.*, ¶ 14; Exhs. M-1, M-3, M-6, M-7,

20    and M-9.)

21              **d.    Even Though Sesma Never Appeared to Throw the Pipe, the**
              **Pipe was Found Close to His Body Corroborating Ornelas that**
22              **Sesma Had the Pipe Through the Second Volley.**

23         Somehow, the pipe landed at the location in the various scene photographs

24    admitted at trial that depicted placard 7. But Ornelas consistently testified that

25    Sesma never appeared to throw the pipe before firing either the first or second

26    volley. (*Id.*, ¶ 2; Exh. A [Day 2, 12/3/2024], at 94:9-11 & 99:15-17.) Ornelas

27    testified that he never said in any of his prior statements before trial that he thought

28    Sesma was trying to throw the pipe, or that was the reason why he fired his weapon.

1  (*Id.*, ¶ 2; Exh. A [Day 2, 12/3/2024], at 124:2-13].) Yet, Ornelas and Cichella both

2  testified that pipe ended up by placard 7 (*id.*, ¶ 3; Exh. B [Day 3, 12/4/2024], at

3  36:3-8; *id.*, ¶ 5; Exh. D [Day 5, 12/9/2024], at 129:9-16), and according to

4  Ornelas's uncontroverted testimony, it ended up there from the suspect who did not

5  throw the pipe. (*Id.*, ¶ 3; Exh. B [Day 3, 12/4/2024], at 36:3-8.) Ornelas and

6  Cichella's testimony were also corroborated by Nichols, who testified that the pipe

7  was roughly ten feet from the railroad tracks, in between the tracks and Sesma

8  laying on the ground. (*Id.*, ¶ 2; Exh. A [Day 2, 12/3/2024], at 194:10-17.) The clear

9  weight of the evidence supports the jury's finding, and reasonable inference, that

10  Sesma carried the pipe in the second volley and that it landed where it did after he

11  carried it beyond the point of the first volley.

12  **e.    The Fourth Amendment Requires Objective Reasonableness,
           Making Subjective Fear Irrelevant.**

13

14      Plaintiffs' contention that Ornelas never testified that he was in fear for his

15  life misses the mark, is irrelevant, and is directly contrary to their own position.

16      Indeed, throughout the trial from beginning to end, Plaintiffs consistently

17  maintained that subjective fear is irrelevant. For example, Plaintiffs' counsel stated

18  during his opening statement that subjective fear, no matter how great, is

19  insufficient to use deadly force. (*Id.*, ¶ 2; Exh. A [Day 2, 12/3/2024], at 24:18-20).

20  In closing, Plaintiffs' counsel also stated that he did not have to prove Ornelas's

21  intent. (*Id.*, ¶ 6; Exh. E [Day 6, 12/10/2024], at 125:1-3.) Plaintiffs' expert Clark

22  also testified that subjective fear is not enough for deadly force. (*Id.*, ¶ 3; Exh. B

23  [Day 3, 12/4/2024], at 189:22-190:12.)

24      Under the Fourth Amendment inquiry, the use of deadly force must be

25  objectively reasonable, and the officer's subjective fear is irrelevant. To that end,

26  Defendants' police practices expert Clarence Chapman also testified that subjective

27  fear is not enough for deadly force. (*Id.*, ¶ 4; Exh. C [Day 4, 12/5/2024], at 201:12-

28  15; *id.*, ¶ 6; Exh. E [Day 6, 12/10/2024], at 20:13-19.) Indeed, the jury was

instructed that "the officer's subjective intent or motive is not relevant to your [Fourth Amendment] inquiry." (*Id.*, ¶ 6; Exh. E [Day 6, 12/10/2024], at 109:18-20.)

**f.    Defendants' Ballistics and Police Practices Experts Both Opined that the Second Volley was Consistent with Sesma Lunging, and Never Opined the Subject Shooting was "Against Policy".**

Plaintiffs' incorrectly argue that expert Chapman's opinion that Ornelas's use of force was consistent with law-enforcement policy was based on a "false assumption" and that Chapman somehow testified that Ornelas's use of force was against policy. Contrary to Plaintiffs' mischaracterization, Chapman opined that the use of force was justified precisely on the actual facts and evidence in this case.

What Plaintiffs refer to (and quote) in their motion was, in actuality, Chapman's response to a cross-examination hypothetical from Plaintiffs' counsel that was based on an assumption of events *that never happened*. Chapman clearly testified that the hypothetical contradicted the facts depicted in the MVARS and Ornelas's testimony, because, based on his review of them, Sesma, in fact, had gotten up and lunged at Ornelas. (*Id.*, ¶ 4; Exh. C [Day 4, 12/5/2024], at 220:4-11.) Importantly, Chapman's opinions were based on the actual facts and evidence admitted during the trial, including but not limited to, Ornelas's testimony that Sesma "lunged" towards him; Ornelas's MVARS video which depicts the white shirt and Ornelas yelling "Get down! Get Down!"; ballistics expert Edwards's testimony regarding his bullet trajectory analysis; and video expert Ward's trial exhibits of the audio shot patterns and MVARS video frames which show Sesma's white T-shirt raising above the bridge wall and moving forward during the last two shots.

**g.    Plaintiffs Inaccurately Characterize and Misconstrue Steen's Testimony.**

Steen's testimony was that he arrived to Ornelas's location "shortly" (within one to two seconds) *after all shots were fired*, and that Sesma was moving on the

ground (i.e., a brief "push up" as if to trying to get up). (See *id.*, ¶ 3; Exh. B [Day 3, 12/4/2024], at 79:7-15, 158:6-25 & 159:10-21). Steen testified he saw Ornelas's position near the eastern end of the railroad bridge fence line when Steen arrived at the top of the bridge. (*Id.*, at 80:5-8). Importantly, Steen testified that he did *not* hear any more shots fired after he arrived. (*See id.*, at 80:12-15 and 159:15-18.) Corroborating Steen, Nichols also testified that Sesma was making a "slight flailing" motion on the ground and was still moving when Nichols got to the scene (*id.*, ¶ 2; Exh. A [Day 2, 12/3/2024], at 181:8-16) and that Sesma even tried to sit up while handcuffed and had to be held down (*id.*, at 183:8-21). Cichella also testified about Sesma's movements that he observed when he arrived on scene. (*Id.*, ¶ 5; Exh. D [Day 5, 12/9/2024], at 128:1-14.)

Not only does Steen's testimony, and that of Nichols and Cichella, corroborate Ornelas that Sesma was not, in fact, disabled even after *all* shots were fired, Steen's testimony as quoted in Plaintiff's Motion (*see*, ECF 159 [Pltfs's Mtn.], at 13:14-15) is based on a completely different timeframe. By the time Steen arrived on scene, Sesma had already been shot in *both* volleys and the threat he posed was over. None of Steen's testimony about his on-scene observations relate to events that occurred *before* the second volley, as compared to the aforementioned evidence showing that Sesma lunged towards Ornelas before the second volley.

Notably, Steen also testified that he himself drew his own weapon in approaching Sesma (*id.*, ¶ 3; Exh. B [Day 3, 12/4/2024], at 80:18-20 and 159:15-18), in fear that Sesma posed a deadly threat with the pipe. Similarly, Nichols also testified that he (Nichols) also drew his weapon during the incident because he perceived Sesma holding a sharp rusty object. (*Id.*, ¶ 2; Exh. A [Day 2, 12/3/2024], at 161:21-162:3.) Nichols testified, before the first volley, he could hear Ornelas give audible commands from the end of bridge, that Nichols was trained to draw his gun only when he perceives an imminent threat to safety, and that was the reason Nichols withdrew his gun. (*Id.*, at 177:6-24.) Notably, Nichols testified that the

imminent harm he perceived was Sesma running towards Ornelas with the same object in Sesma's right hand that defense counsel held during the questioning at the podium. (*Id*.)

### h.    The Jury Accurately Assessed the Credibility of Ornelas.

Plaintiffs correctly point out that Ornelas consistently admitted to all of his prior inconsistent statements. Like the Court, the jury heard this testimony, and obviously determined that Ornelas was credible and truthful. The whole point of trial is for the jury to determine witness credibility, which it did here in Ornelas's favor. Moreover, the physical and forensic evidence corroborated Ornelas' trial testimony. District courts have been cautioned to "not be quick to revisit a jury's credibility determinations, and must proceed with caution and great restraint when asked to do so." *Crawford v. Tribeca Lending Corp*. (2nd Cir. 2016) 815 F3d 121, 128 (per curiam). Ornelas was forthcoming, truthful, and credible, and this Court independently can and should come to that same conclusion as the jury did.

Plaintiffs' argument that Ornelas did not know if Sesma was holding the pipe during his running assault is neither persuasive nor corroborated by other evidence. Steen testified that Ornelas broadcasted, in real time, that the suspect had picked up a pipe (Klehm Decl., ¶ 3; Exh. B; [Day 3, 12/4/2024], at 66:2-4), and Ornelas is heard on the CHP audio dispatch and his own MVARS broadcasting that the suspect picked up a "metal object". (*Id*., ¶ 10; Exh. I [CHP audio dispatch recording, Tr. Exh. 20]; *id*., ¶ 8; Exh. G [Ornelas MVARS video, Tr. Exh. 1].)

Ornelas was also truthful at trial, freely admitting when he was incorrect in his prior declaration—but that is not the same as lying at trial. Ornelas testified honestly about past incorrect statements as witnesses are allowed to do; this is a primary reason for hearsay rules and its exceptions for prior consistent and inconsistent statements, which Plaintiffs' counsel used to his full advantage.

*Ho Sang Yim v. Barr*, 972 F.3d 1069, 1080 (9th Cir. 2020), cited by Plaintiffs, has no application here. *Yim* involved a petition for review of

immigration proceedings concerning perjury, where the Board of Immigration Appeals determined that an element of perjury is when the statement is material and the declarant *does not believe it to be true. Yim* was not a civil trial, and had *nothing* to do with requiring a new civil trial where a witness made inconsistent prior statements. Furthermore, here, none of Ornelas's trial testimony established that anything he said in his declaration was something that he believed to be untrue at the time he made that statement. As noted below, the jury had ample opportunities to assess Ornelas's credibility during his trial testimony.

During trial, Ornelas honestly owned up to numerous prior misstatements. (*See, e.g., id.*, ¶ 2; Exh. A [Day 2, 12/3/2024], at 90:9-18 & 93:18-23; *id.*, ¶ 3; Exh. B [Day 3, 12/4/2024], at 34:2-9.) For example, Ornelas admitted twice on the stand that he told detectives in his initial statement that when he fired second volley, Sesma was 20 *yards* away. (*Id.*, ¶ 2; Exh. A [Day 2, 12/3/2024], at 93:24-94:3 and 98:24-99:2.) Ornelas also clarified that in the same interview with detectives, he corrected himself that he had mixed up yards and feet. (*Id.*, ¶ 3; Exh. B [Day 3, 12/4/2024], at 37:14-38:11.) Ornelas further admitted that after rewatching the MVARS, the pause between the volleys was six seconds but that he incorrectly told investigators that the pause was within a second (*id.*, ¶ 2; Exh. A [Day 2, 12/3/2024], at 37:20-98:5), and that he told investigators that Sesma did not have a chance to get feet underneath him *to start running* just before the second volley. (*Id.*, at 99:3-9.) (Notably, saying Sesma was not running, does not also mean Sesma was not *lunging* forward.) Moreover, Ornelas candidly admitted during Plaintiffs' counsel's examination that he had a representative with him during his statement to investigators and changed "yards" to "feet" after a break with the representative. It was only upon defense counsel's examination that Ornelas clarified that his representative had not advised him to change his statement from "yards" to "feet" during the break. (*Id.*, ¶ 3; Exh. B [Day 3, 12/4/2024], at 60:22-25 & 61:7-10.)

Ornelas also repeatedly admitted telling officers at the scene after the

shooting that he did not know if Sesma was holding a pipe or a large stick, and admitted that this inaccurate statement should not have been made and that he tried to give honest, credible information to his fellow officers. (*Id.*, ¶ 2; Exh. A [Day 2, 12/3/2024], at 102:25-103:3 and 103:12-104:2.) But, as mentioned above, contemporaneous video and audio of *before* and *during* the shooting convey Ornelas exclaiming that Sesma had a "metal object" and to "Drop it!" And as also previously mentioned, Ornelas admitted that he never said, before trial, that he thought Sesma was trying to throw the pipe or that was the reason why he shot; indeed, Ornelas was consistent on this point throughout. (*Id.*, at 124:2-13.)

Moreover, after being shown his prior declaration, Ornelas accurately clarified that the declaration did not say that Sesma's "head" was next to placards 10 and 11 and that Plaintiffs' counsel's question, which inserted the word "head," was incorrect. (*Id.*, ¶ 2; Exh. A [Day 2, 12/3/2024], at 215:17-21; *id.*, ¶ 3; Exh. B [Day 3, 12/4/2024], at 39:6-16.) Ornelas further admitted that in his declaration, he said Sesma's body was by placards 10 and 11, admitted that he testified the day before in trial that Sesma's head was by placards 10 and 11, and then clarified that what he said previously was not inaccurate but were approximations and that Sesma was, by default, *also* close to placards 8 and 9. (*Id.*, ¶ 3; Exh. B [Day 3, 12/4/2024], at 27:24-28:16.) This falls far short of showing any knowingly false statement made at the time.

### 2. There Was No Misconduct By Defense Counsel at Trial, and, in Any Event, Plaintiffs Failed to Object.

As the trial transcripts reflect, there was no misconduct by defense counsel at trial, and, in whatever purported conduct or argument that Plaintiffs may now disagree with, Plaintiffs never objected and thus waived any such contention. *See, Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1420 (9th Cir. 1998) (failure to timely object constitutes waiver; the reason for alerting a court to the grounds of objection so that they may be addressed applies equally to procedural and substantive

1   objections).

2          None of the cases cited by Plaintiffs support their contention that a new trial

3   is warranted here. The Ninth Circuit holds that "federal courts erect a 'high

4   threshold' to claims of improper closing arguments in civil cases raised for the first

5   time after trial." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1193 (9th Cir. 2002).

6   Such a claim is reviewed "for plain or fundamental error, absent a contemporaneous

7   objection ..., where the integrity or fundamental fairness of the proceedings in the

8   trial court is called into serious question." *Id.* (quoting *Bird v. Glacier Electric*

9   *Coop. Inc.,* 255 F.3d 1136, 1148 (9th Cir. 2001)). "[T]he burden of making a

10  'concrete showing of prejudice' resulting from improper closing argument falls

11  upon [Plaintiffs]." *Id.* (quoting *Moses v. Union Pac. R.R.*, 64 F.3d 413, 418 (8th

12  Cir.1995)). The remedy "is available only in 'extraordinary cases.'" *Id.* (quoting

13  *Bird*, 255 F.3d at 1148).

14              **a.    There Was No Introduction of Any Evidence or**
                **Testimony of Ornelas's Past Shooting History.**
15

16         Where a claim of misconduct is based on improper character evidence, a new

17  trial would be considered (but not necessarily *granted*) when *actual testimony* about

18  past shooting or excessive force history was elicited *and* the other evidence to

19  support the verdict was weak or nonexistent. Indeed, all of the cases cited by

20  Plaintiffs on this point reflect that only the elicitation of testimony (and not mere

21  argument by counsel) could warrant consideration of a new trial, but that even in

22  such a case, a new trial will be denied where the error was harmless.

23         For example, in *Hesselbein v. Beckham,* 168 F.Supp.3d 1252, 1265 (E.D.

24  Cal. 2016), which is the *only* case cited by Plaintiffs where a new trial was granted

25  (and not controlling precedent), a new trial was granted because self-serving

26  testimony was elicited from the defendant officer that he had not shot anyone in the

27  past *and* because "the evidence supporting the verdict [was] scant." In *Hesselbein*,

28  the other evidence was only that the plaintiff had been searched, handcuffed, and

placed in a patrol car before deadly force was used. There was no evidence that the plaintiff had any weapon. *See, id.* at 1255-56 & 1265.

Here, there was absolutely *no* testimony elicited from Ornelas, let alone any other witness or admitted exhibit, about Ornelas's past history of any use of force. Moreover, as set forth above and unlike in *Hesselbein*, the evidence at this trial was abundant to corroborate Ornelas's justified use of force, including that Sesma ran at Ornelas with the pipe at 14 feet per second, lunged at Ornelas with the pipe during the second volley from 3 seconds away, and lunged even after having been shot five times from the first volley, thus corroborating the fact that Sesma was clearly not incapacitated or disabled before the second volley and still presented an immediate threat.

In *Gates v. Rivera,* 993 F.2d 697, 700-701 (9th Cir. 1993), the Ninth Circuit held that the admission of improper character evidence about the absence of the defendant officer's past use of deadly force was *harmless error* and did not warrant a new trial. There (unlike here), the defendant officer testified that he had never shot anyone before in his 16.5 years as a police officer. *See, id.* at 700. Nevertheless, the testimony of the officers and of the plaintiff's witness were essentially the same about the subject confrontation, with the only difference as to whether the decedent seemed poised to flee and if his hand was withdrawing something from his pocket. *Id.* at 700-01. To that end, the defendant officer's testimony was corroborated by other physical evidence – i.e., the cigarette lighter that the decedent, according to the officer, threw at the officer.[1] *Id.* As to that, *Gates* held, "the jury either believed what [the officer] said about the threat [the decedent] posed or they did not. Evidently they believed him. No likelihood exists that the

---

[1] It is worth mentioning that unlike this case, in *Gates*, the cigarette lighter, which was the subject weapon, was admitted into evidence over the plaintiff's objection and *Gates* held that this admission did not constitute an erroneous exercise of discretion. *Gates,* 993 F.2d at 700. Here, as this Court is aware, Defendants moved to admit the pipe after its authentication by a number of eyewitnesses (Ornelas, Nichols, Steen, and Cichella), but Plaintiffs objected and the Court ruled in Plaintiffs' favor. [Klehm Decl., ¶ 5; Exh. D (Day 5, 12/9/24), at 84:22-85:11.)

inadmissible answers affected the verdict." *Id.*

As for *Dupard v. Kringle*, 76 F.3d 385, 1996 WL 56098 (9th Cir. 1996), cited by Plaintiffs, firstly, it is an unpublished opinion that predates 2007 and is prohibited from citation as precedent. FRAP 32.1; 9th Cir. Rule 36-3(c). But, in any event, *Dupard* also involved actual testimony that was elicited, and *not* simply comment made by counsel. *See, Dupard*, 1996 WL 56098 at *3.

### b. There Was No Testimony Elicited on Any Ultimate Question.

There was absolutely no testimony elicited from any witness on the ultimate question of whether Ornelas's use of force was reasonable. As evident by Plaintiffs' motion, Plaintiffs' objections to any such question were *sustained* and no such testimony was elicited. Moreover, Plaintiffs' *own* expert Clark repeatedly expressed opinions on ultimate issues, by way of "hypotheticals" (based on incomplete and/or unsupported "facts"), that the use force was excessive and unreasonable, the pipe was a "contact" weapon (as opposed to a deadly weapon), and that Clark himself could not see the pipe in Sesma's hand on the videos. (Klehm Decl., ¶ 17; Exh. B.) Despite the advantage that Plaintiffs culled in eliciting this "ultimate issue" type of opinions from their own expert, they now complain that they were somehow prejudiced by having to object on three occasions to mere questions to defense expert Chapman. This is insufficient to present any purported misconduct by defense counsel, let alone to rise to a level requiring reversal of the carefully considered jury verdict.

### c. Plaintiffs Stipulated to the Demonstrative Use of the Pipe, Never Objected, and Present No Evidence That Its Use Was Improper or Prejudicial.

For counsel misconduct to rise to the level of prejudice or fundamental unfairness to warrant a new trial, the "high threshold" burden to show prejudice is squarely upon Plaintiffs. *See e.g., Hemmings*, 285 F.3d at 1193; *Anheuser-Busch, Inc.*, 69 F.3d at 346. Yet Plaintiffs present no evidence that their counsel ever

1  objected to the demonstrative use of the pipe, or that defense counsel's use of it was

2  in any way improper.

3      First and notably, in seven days of trial, Plaintiffs never objected to use of the

4  pipe. Indeed, they stipulated to its use as a demonstrative. The *only* time that

5  Plaintiffs ever even *mentioned* any purported "banging," or defense's counsel's

6  demonstrative use, of the pipe was on day three of trial, where Plaintiffs' attorney

7  specifically stated that the purported "banging" was "not intentionally" done by

8  defense counsel and wherein Plaintiffs' attorney agreed for defense counsel to show

9  the pipe to Ornelas during Ornelas's testimony. (Klehm Decl., ¶ 3; Exh. B [Day 3,

10  12/4/24], at 12:8-14:8.)

11      Second, Plaintiffs agreed to the pipe being shown to witnesses, as it had to

12  be, because Plaintiffs disputed that Sesma *even had* the pipe in his hand during the

13  volleys and objected repeatedly to its admission. Defendants were thus required to

14  show the pipe (from the podium) to lay foundation for it to each of the eyewitnesses

15  who observed it during the incident: Ornelas, Nichols, Steen and Cichella. (*See e.g.*,

16  Klehm Decl., ¶ 2; Exh. A [Day 2, 12/3/24], at 166:7-14 and 166:23-167:16; 170:19-

17  171:7 [Mr. Galipo agreeing to pipe being shown to Nichols and Ornelas "from a

18  distance, from the podium"]; and, at 174:21-175:18.)

19      Third, the misconduct that Plaintiff relies on in their cited cases, *Anheuser-*

20  *Busch, Inc.* and *Hemmings*, comes nowhere close to the proper conduct of defense

21  counsel in this trial. In *Anheuser-Busch, Inc.*, a new trial was warranted because

22  counsel repeatedly *elicited* actual testimony, over sustained objections, from the

23  defendant in violation of the court's *in limine* rulings *and* because that same counsel

24  used inadmissible evidence in closing argument in an *inflammatory* manner, calling

25  the plaintiff's conduct "extortion." *Anheuser-Busch, Inc.,* 69 F.3d at 346-348. In

26  *Hemmings*, it was held that a short comment by counsel during closing statement,

27  where the opposing counsel did not object or move to strike related portions of

28  testimony, supported an inference that the misconduct was not prejudicial or

1   fundamentally unfair to warrant a new trial. *Hemmings,* 285 F.3d at 1194-95. There,

2   the underlying trial court did not *sua sponte* issue a correction and waited to issue a

3   limiting instruction, and opposing counsel did not object before the jury was

4   instructed but instead, as characterized by *Hemmings*, "made a strategy decision to

5   gamble on the verdict." *Id*. at 1195. The real-time actions by the trial court and

6   parties at trial supported the trial court's determination that a new trial was not

7   warranted. *Id*.

8       Here, Plaintiffs present no evidence that defense counsel's conduct, let alone

9   the demonstrative use of the pipe, rose to a level to offend fundamental fairness.

10  Instead, they provide only conjecture that the demonstrative use of the pipe (to

11  which they agreed and never objected) somehow prejudiced the jury to such an

12  extent that their carefully reasoned verdict should be overturned. Plaintiffs made no

13  objection to the demonstrative use of the pipe, and should not now benefit from

14  their strategy decision to gamble on the verdict. The remedy of a new trial based on

15  purported misconduct is available only in "extraordinary circumstances," which are

16  wholly absent here.

17      **d.   Defense Counsel's Closing Arguments About the Legal
             Standard for Immediate Threat Were Consistent With
18           the Law and Did Not Mislead the Jury.**

19      Defendants agree with Plaintiffs on two key points.  The critical issue was,

20  indeed, whether Sesma posed an immediate threat of death or serious bodily injury

21  at the time of the second volley, and the jury instructions appropriately and

22  explicitly defined the standard. (*See,* ECF 159 [Pltfs' Mtn.], at 22:8-12.) To that

23  end, Plaintiffs concede and admit that the jury was well-instructed, with no error.

24  (*See*, ECF 141 [Final Jury Instructions], at p. 10, ¶ 1 [Court Instruction No. 18,

25  Battery By Peace Officer, defining "imminent"] and at p. 12, ¶ 2 [Court Instruction

26  No. 19, Negligence By Peace Officer, same definition of "imminent"].)[2]

27      _____
        [2] Notably, these instructions that defined "imminent" used the same language in the
28  versions proposed by Plaintiffs themselves. (See ECF 97-1 [Disputed Proposed Instruction No. 6,
                                                                              (continued…)

16

As for Plaintiffs' complaint concerning defense counsel's closing argument, they skew what defense counsel argued in closing on the legal standard. In closing, defense counsel argued repeatedly that the standard was threat of immediate danger of death or serious bodily injury, and that Sesma running with the pipe at 14 feet per second in the first volley, and lunging with the pipe at Ornelas from a distance of three seconds away in the second volley, constituted the imminent harm of immediate serious bodily injury. (Klehm ¶ 18; Exh. E [Day 6, 12/10/2024].)

As for the purported "parental analogy" complained of by Plaintiffs, they mischaracterize defense counsel's argument. On that point, defense counsel argued:

> Any parent knows if you tell your child immediately to go to their room, they get there in three seconds. That's pretty immediate. **Immediate is a concept. Three seconds is a concept we all understand. 40 feet, 30 feet, 26 feet, that's a little more nebulous. Three seconds, we understand that. That's immediate. That's what time Sergeant Ornelas had to respond to the threat of imminent grave bodily injury or death, three seconds when he fired his weapon**.

(Klehm ¶ 6; Exh. E [Day 6, 12/10/2024], at 184:25-185:7, emphasis added.)

That defense counsel focused the jury's attention on the three seconds and the pipe held in the second volley as the immediacy of the threat of grave bodily injury or death is *not* a misstatement of the law and was supported by the evidence. (*See also, id.*, Exh. E., at 173:23-174:23 [arguing that imminent does not mean instantaneous, and that three seconds away with pipe in hand is imminent].) Moreover, defense counsel himself pointed out to the jury that neither his closing statements nor that of Plaintiffs' counsel were to be considered evidence. (*Id.*, Exh. E, at 155:8-25.)

In any event, not only was the jury correctly instructed on the standard, but Plaintiffs' attorney also argued at length in both his closing and rebuttal arguments (which lasted a total of approximately 1.25 to 1.50 hours, spanned 38 pages of trial transcript, and far exceeded the length of defense counsel's

---

Plaintiffs' Version: Negligent Use of Deadly Force by Peace Officer], at 24:4-10; ECF 91 [Joint Agreed Proposed Instruction No. 18: Battery by Peace Officer (Deadly Force)] at 26:25-27:3.)

1   closing) about the concept of immediacy of the threat. (*Id*., ¶ 18; Exh. E.)

2   *See, e.g., Hemmings*, 285 F.3d at 1194 (in holding that a new trial was not

3   warranted, observing that the misconduct of counsel was "an isolated, short

4   comment during a closing statement that covered 66 pages when

5   transcribed").

6        As far as any asserted jury confusion, the jury in fact sent Juror Note 4,

7   in which they specifically sought clarification as to the standard concerning

8   bodily injury or harm. (*See,* ECF No. 145; Exh. O.) Plaintiffs' counsel, along

9   with the defense, discussed at length with the Court the proposed answer to

10   send back. In the process, Plaintiffs' attorney acknowledged that the court

11   instruction defined "imminent threat" properly (see Klehm Decl., ¶ 7; Exh. F

12   [Day 7, 12/11/2024] at 33:1-15), and vigorously argued for a response that

13   switched the order of certain terms and deleted a particular sentence of the

14   proposed response that the court had prepared—precisely due to Plaintiffs'

15   attorney's concern that he "[did not] want the jury to think, well, if it

16   could've happened in the next five or ten seconds, maybe that's imminent

17   enough." (*Id*., at 44:5-46:2.) Plaintiffs thereafter stipulated to the carefully

18   worked out proposed response, with Plaintiffs' requested edits, and the

19   following response was sent back to the jury:

20        To act in defense of human life is to defend against an imminent threat of
21        death or serious bodily harm. Please interpret those phrases in the context of the entire instruction, including the explicitly defined terms.

22   (*Id*., ¶ 7, Exh. F [Day 7, 12/11/2024] at 45:18-46:2.)

23        Indeed, before delivering this agreed upon response, the Court even

24   acknowledged, and both counsel agreed, that "the key concept to convey to

25   [the jury] is it's the same standard, and it's the narrow one of imminent – of

26   defending against an imminent threat of death or serious bodily harm" and

27   that the final version of the court's response adequately addressed the jurors'

28   question.  (*Id*., ¶ 7, Exh. F [Day 7, 12/11/2024], at 46:10-25.)

1

2

       **e.**     **Plaintiffs' Wholesale Speculation That the Verdict Form Somehow Shows Jury Confusion Is Nothing But Conjecture.**

3

4

5

6

7

8

The jury's purported "mishandling" of the verdict form in answering the comparative negligence question against Sesma actually provides only further proof that the jury carefully deliberated on the evidence concerning the actions of Sesma and Ornelas, and found unanimously and resoundingly that Ornelas's actions were justified. It is totally speculative, conjectural, and unsupported by *any* evidence that the jury was prejudiced, as posited by Plaintiffs.

9

10

    **3.**     **The Evidence Was Sufficient to Support the Defense Verdict and Thus Plaintiffs Are Not Entitled to Judgment as a Matter of Law under Rule 50(b)**

11

12

13

14

15

16

17

18

19

Evidence must be construed in the light most favorable to Defendants, who are the prevailing parties at trial. When ruling on a Rule 50(b) motion, the court must review the entire record and independently evaluate the evidence to determine its sufficiency. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 US 133, 149-150 (2000); *Johnson v. Paradise Valley Unified School Dist.*, 251 F3d 1222, 1227 (9th Cir. 2001). Even so, to avoid substituting its view of the evidence for that of the jury, the trial court must disregard all evidence favorable to the moving party except evidence that the jury is *required* to believe, such as uncontroverted expert testimony on a subject that requires expert testimony. *Winarto,* 274 F3d at 1283.

20

21

22

23

24

25

26

27

28

Moreover, a party cannot raise arguments in a post-trial Rule 50(b) motion that it did not raise in its pre-verdict Rule 50(a) motion. *Freund v. Nycomed Amersham* (9th Cir. 2003) 347 F.3d 752, 761. Here, Plaintiffs raise several grounds in their Rule 50(b) motion for the contention that the second volley was unreasonable which were not raised by them in their pre-verdict Rule 50(a) motion. Specifically, Plaintiffs' oral Rule 50(a) motion was made "on the second volley of shots," that the second volley struck in Sesma in the face then chest, that Sesma was not moving forward at the time of the second volley (while, at the same time, acknowledging that "there was a lunging suggestion"), that even from that distance

1    it could not have been an immediate threat of death or serious bodily injury, and

2    that it was "unlikely" that Sesma had the pipe in his hand. (*See,* Klehm Decl., ¶ 6;

3    Exh. E [Day 6, 12/10/24], at 102:7-103:3.)

4            However, in their post-verdict Rule 50(b) motion, Plaintiffs raise new

5    grounds, couched as "evidence", that was not raised in their pre-verdict oral motion.

6    Specifically, Plaintiffs now argue that Sesma was "partially prone and not

7    advancing toward Ornelas" (*see*, ECF 159 [Pltfs' Mtn.], at 19:24-25), despite that

8    this was never raised in their pre-verdict motion and is, in fact, contrary to

9    Plaintiffs' counsel's own acknowledgment that there was evidence of lunging. (*See,*

10   Klehm Decl., ¶ 6; Exh. E [Day 6, 12/10/24], at 102:18-20.) Plaintiffs now further

11   argue that Sesma was approximately 25 feet away, that he had been shot multiple

12   times including twice in the arm, and that he did not attempt to throw the pipe or

13   swing it an aggressive manner. (*See*, ECF 159 [Pltfs' Mtn.], at 19:25-26.) None of

14   these grounds were raised in Plaintiffs' pre-verdict Rule 50(a) motion, and were

15   therefore waived.

16           Plaintiffs' reliance on *Vos v. City of Newport Beach,* 892 F.3d 1024 (9th Cir.

17   2018) was also not raised in their Rule 50(a) motion and thus waived.

18   Notwithstanding, *Vos* provides no support, as that case involved a denial of a

19   *motion for summary judgment* and held that the evidence was sufficient to present a

20   triable issue *for a jury*. Here, the evidence *did* go to a jury, and the jury

21   unanimously determined, based on the weight of the evidence, that Ornelas's use of

22   force was justified and objectively reasonable.

23           In any event, the evidence construed in favor of Defendants is overwhelming

24   to support the verdict by a reasonable jury for the reasons set forth above. There is

25   no uncontroverted evidence, and Plaintiffs present none, that the jury was required

26   to believe, which the trial court can disregard and construe in Plaintiffs' favor. *See,*

27   *Winarto*, 274 F3d at 1283. Accordingly, Plaintiffs' motion for judgment as matter

28   of law under Rule 50(b) should be denied.

1   **IV.  CONCLUSION**

2           For the foregoing reasons, Defendants respectfully request that the Court

3   deny Plaintiffs' Motion for a New Trial, or, in the Alternative, for Judgment as a

4   Matter of Law.

5
    Dated:  January 23, 2025                    Respectfully submitted,
6
                                                ROB BONTA
7                                               Attorney General of California
                                                DONNA M. DEAN
8                                               Supervising Deputy Attorney General

9

10                                              */s/ David Klehm*
                                                DAVID KLEHM
11                                              TAMMY KIM
                                                Deputy Attorneys General
12                                              *Attorneys for Defendants*
                                                *State of California and Andrew Ornelas*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# DECLARATION OF DAVID KLEHM

I, DAVID KLEHM, hereby declare:

1.      I am an attorney at law, duly licensed to practice before the Courts of the State of California, a Deputy Attorney General and counsel of record, along with Deputy Attorney General Tammy Kim and Supervising Deputy Attorney General Donna Dean, for defendants State of California and Andrew Ornelas in the above-entitled action.  The matters stated herein are within my personal knowledge and I could and would testify competently thereto.

2.      Attached hereto as **Exhibit A** is a true and correct copy of pertinent, highlighted pages from the court reporter's transcript of the second day of trial, which took place on December 3, 2024.

3.      Attached hereto as **Exhibit B** is a true and correct copy of pertinent, highlighted pages from the court reporter's transcript of the third day of trial, which took place on December 4, 2024.

4.      Attached hereto as **Exhibit C** is a true and correct copy of pertinent, highlighted pages from the court reporter's transcript of the fourth day of trial, which took place on December 5, 2024.

5.      Attached hereto as **Exhibit D** is a true and correct copy of pertinent, highlighted pages from the court reporter's transcript of the fifth day of trial, which took place on December 9, 2024.

6.      Attached hereto as **Exhibit E** is a true and correct copy of pertinent, highlighted pages from the court reporter's transcript of the sixth day of trial, which took place on December 10, 2024.

7.      Attached hereto as **Exhibit F** is a true and correct copy of pertinent, highlighted pages from the court reporter's transcript of the seventh day of trial, which took place on December 11, 2024.

8.      Concurrently filed manually herewith as **Exhibit G** is a true and

correct copy of Trial Exhibit 1, Ornelas's MVARS video, which was admitted on the second day of trial, December 3, 2024.

9.      Concurrently filed manually herewith as **Exhibit H** is a true and correct copy of Trial Exhibit 2, Steen's MVARS video, which was admitted on the second day of trial, December 3, 2024.

10.     Concurrently filed manually herewith as **Exhibit I** is a true and correct copy of Trial Exhibit 20, the CHP Audio Dispatch recording, which was admitted on the second day of trial, December 3, 2024.

11.     Attached hereto as **Exhibit J** is a true and correct copy of Trial Exhibit 45, "Shot Times from MVARS Audio" spreadsheet, which was prepared by defense audio-visual expert Parris Ward and admitted into evidence on the fifth day of trial, December 9, 2024.

12.     Attached hereto as **Exhibit K** is a true and correct copy of Trial Exhibit 47-349 through 47-369, which are specific pages (video frames 9440 through 9460) from the MVARS video frames prepared by Mr. Ward, and were admitted on the fifth day of trial, December 9, 2024. The specific frames (i.e., video frames 9442 through 9460) that show Sesma's white shirt moving forward above the concrete wall can be seen at Trial Exhibit 47-351 through 47-368.

13.     Concurrently filed manually herewith as **Exhibit L** is a true and correct copy of Trial Exhibit 48, "Shooting Clip+Frame Numbers.mp4" video, which was prepared by Mr. Ward and admitted into evidence on the fifth day of trial, December 9, 2024.

14.     Various photographs of the scene were admitted into evidence at trial in this action.  Attached hereto are true and correct copies of Trial Exhibits 14-2, 14-2-1, 14-3, 14-11, 31-5, 31-9, 31-11, 31-29, 31-44, as **Exhibits M-1 through M-9**, which were admitted into evidence, all without objection, at this trial.

15.     Attached hereto as **Exhibit N** is a true and correct copy of redacted Juror Note No. 3, which is also filed as ECF 144 with this Court.

16.     Attached hereto as **Exhibit O** is a true and correct copy of redacted Juror Note No. 4, which is also filed as ECF 145 with this Court.

17.     Plaintiffs' police practices and use force expert Roger Clark testified on December 4, 2024, which was the third day of trial. During his testimony and elicited by Plaintiffs' counsel Dale Galipo, Mr. Clark repeatedly expressed his opinions on the ultimate issue that the use of deadly force by Officer Ornelas was excessive, by way of purported "hypotheticals" or assumption of facts concerning prior trial testimony presented by Mr. Galipo.  Mr. Clark also testified to an ultimate issue that the pipe was not a deadly weapon, but instead a "contact" weapon, and that Mr. Clark himself did not see the pipe in Sesma's hands in the MVARS videos. *See e.g.,* Exh. B, Day 3, 12/4/2024, at 191:8-10 (on Plaintiffs' direct examination, Clark opining, "So there is no, in my testimony here, objectively reasonable fear of someone with a striking object that far away."); at 191:20-192:8 (Clark testifying based on Plaintiffs hypothetical that  existence of threat or potential threat of Sesma running in Officer Ornelas's direction to justify use of deadly force); at 192:22-194:6 (Clark testifying based on Plaintiffs hypothetical that first volley of shots was not justified because there was no immediacy); at 194:10-195:10 (same); at 195:6-17 (Clark testifying, elicited from Plaintiffs, that Clark never saw a pipe in Sesma's hands on the videos); at 195:25-196:23 (based on Plaintiffs' various hypotheticals, testifying that shooting would be unjustified if Sesma did not have pipe in hands and at various distances); at 197:15-198:20 (Clark testifying based on Plaintiffs hypothetical that second volley of shots was not justified because, in his opinion, "no reasonably trained officer would ever fire under these circumstances because there is no longer…credible threat whatsoever…"); at 211:17-22 (on cross, Clark admitting that his opinion, "exactly", is that Sesma was so incapacitated after the first five shots that he did not pose a credible threat); at 250:11-24 (on Plaintiff's re-direct, Clark testifying that his main issue with the first group of shots was the distance and "the fact" that there were

other reasonable options; and that his main issue with the second group of shots was that Sesma was wounded, a "very substantial distance" of "over 20 feet", and that "there's still opportunity to stay out of contact and not shoot"); at 250:25-251:17 (on Plaintiffs' re-direct, answering Plaintiffs' counsel's fact assumptions that second volley was not supported in use of deadly force because "it's not a credible threat" and "There's no credible threat at that point."); at 252:24-253:7 (on Plaintiffs' re-direct, testifying that assuming Ornelas did not know where the pipe was, that Sesma was "not a credible threat with a weapon in hand, and it is a contact weapon" and "it would not be worthy or reasonable to use lethal force"); at 253:8-14 (on re-direct, Clark opining that Sesma throwing the pipe was not a credible threat at 40 feet away, or from 25 feet away after having been shot on the ground). Regarding the pipe as a purported "contact weapon", see *id*. at 178:12-20 (Clark testifying that a contact weapon is one where you can be hit in the head with it); at 187:2-16 (Clark testifying that a contact weapon presents no immediacy, and if you can move, there would be no authorized use of lethal force); at 187:24-188:5 (Clark testifying that, where it is an object of contact, "it would never be considered that lethal force would be appropriate in that circumstance because of the reverence of life that's required in the profession."); at 253:4-5 (Clark testifying that Sesma was not a credible threat with the pipe, as it was a contact weapon); and, 237:17-18 (Clark opining that he does not consider the pipe as a deadly weapon).

18.    In closing arguments, I repeatedly emphasized that the standard-was that the threat of death or serious bodily injury had to be immediate and objectively reasonable. In making this argument, I argued the evidence that Sesma ran with the pipe at Officer Ornelas at a speed of 14 feet per second before the first volley, that Officer Ornelas stopped shooting once Sesma fell after the first volley, but that Sesma lunged towards Officer Ornelas with the pipe from a distance of three seconds away at the second volley, and that constituted the imminent harm of immediate serious bodily injury. Examples of specific portions of my closing

1  argument on this point are at Exhibit E, day six of trial on December 10, 2024, at

2  154:8-13 [arguing that this is a case, that Ornelas "had an objective reasonable basis

3  to believe his life was in imminent danger of serious bodily injury or death based

4  on Mr. Sesma running with the pipe. It's in evidence"]; 167:20-25 [urging jury to

5  apply the law the judge has given to the jury, and that this is "a case where Sergeant

6  Ornelas had an objectively reasonable basis to fire his weapon because of an

7  imminent threat of severe bodily injury or death."]; and, 173:15-175:20 & 176:19-

8  22] [arguing objective reasonableness for Officer Ornelas "to be in fear of

9  imminent death or bodily injury"; that the word "imminent" does not mean

10  "instantaneous", but means close in time or immediate enough; and highlighting the

11  evidence, including the pipe and the speed at which Sesma was running, to argue

12  immediacy of the threat].) *See also id.*, at 184:20-24 [arguing that the evidence

13  showed that Officer Ornelas "conformed with the law, acted objectively reasonable

14  when being presented with a threat of imminent grave bodily harm.  Imminent, not

15  instantaneous. Imminent, about to happen, immediate.  It's coming up right now.

16  Very soon.  Three seconds.  That's immediate."]

17      I also repeatedly pointed to the evidence that was presented at trial that

18  focused on the immediacy of the threat of death or serious bodily injury. *See id.*, at

19  157:7-11 [arguing that Plaintiffs' expert Clark was only one to say there was no

20  imminent threat of serious bodily injury or death where a man ran at 14 feet per

21  second with pipe]; 157:17-159:5, 161:9-23, 164:5-165:9, 168:2-13, 170:2-173:8

22  [pointing out the physical evidence of the pipe and Sesma's movements], at 177:23-

23  178:8 [on the issue of reasonableness, pointing out the physical evidence].

24      My closing argument lasted for approximately 45 minutes, and consisted of

25  24 pages of trial transcript. In comparison, Mr. Galipo's closing and rebuttal

26  arguments totaled approximately 1.25 to 1.50 hours, and consisted of 38 pages of

27  trial transcript. In the span of his arguments, Mr. Galipo argued 13 to 14 pages of

28  trial transcript on how the threat of *death* (only, without mention of serious bodily

injury) must be "immediate" and how there was no evidence of immediacy in either the first or second volley. *See id.*, at 126:18 -133:7, 134:19-23, 136:8-13, 138:14-139:23, 140:19-23, 151:1-2.) On rebuttal, Mr. Galipo explicitly argued that the defense mischaracterized the law, and again repeated arguments at length on imminency and the standard as to immediacy in causing death or serious bodily injury. *See id.*, at 188:22-189:21, 190:15-192:25, 193:9-195:24, 196:6-18, 197:1-198:10, 198:18-199:10, 200:23-201:19. Additional examples of Mr. Galipo thoroughly addressing the concept of immediate threat in his closing and rebuttal are at Exhibit E, 126:22-24 [Mr. Galipo arguing, "the judge just read to you, whether there was the opportunity, ability, and apparent intent to immediately cause death or serious bodily injury."]; 127:4-8 [Mr. Galipo arguing that fear of future harm is insufficient, fear that Sesma could possibly get close enough is insufficient, and that it was not immediately happening]; and, 132:1-4 [Mr. Galipo arguing that Officer Ornelas conceded that you can only use deadly force if there's an immediate threat of death and no other options].

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed on January 23, 2025, at San Diego, California.

*/s/ David Klehm*
_____

David Klehm

1

**CERTIFICATE OF COMPLIANCE**

2       The undersigned, counsel of record for defendants State of California and Andrew Ornelas,

3   certifies that this brief contains 7,000 words, which complies with the word limit of L.R. 11-6.1.

4

5   Dated:  January 23, 2025                          Respectfully submitted,

6                                                     ROB BONTA
                                                      Attorney General of California

7

8                                                     /s/ David Klehm
                                                      DAVID KLEHM
9                                                     TAMMY KIM
                                                      Deputy Attorneys General
10                                                    *Attorneys for Defendants*
                                                      *State of California and Andrew Ornelas*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "A"

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3     HONORABLE JOHN W. HOLCOMB, JUDGE PRESIDING

4   CANDIDO SESMA, ET AL.,              )
                                        )
5                                       )
                                        )
6                     Plaintiffs,       )
                                        )
7                                       )
                                        )
8          Vs.                          )   No. CV21-01694-JWH
                                        )
9                                       )
                                        )
10  STATE OF CALIFORNIA, ET AL.,        )
                                        )
11                                      )
                                        )
12                    Defendants.       )
                                        )
13  _____    )

14

15

16          REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                 *JURY TRIAL, DAY 2*

18              LOS ANGELES, CALIFORNIA

19            TUESDAY, DECEMBER 3, 2024

20

21

22

23          MIRIAM V. BAIRD, CSR 11893, CCRA
         OFFICIAL U.S. DISTRICT COURT REPORTER
24        411 WEST FOURTH STREET, SUITE 1-053
            SANTA ANA, CALIFORNIA 97201
25           VELIZBAIRDMIRIAM@GMAIL.COM

1

**INDEX**

2

**WITNESS:**                                                      **PAGE:**

3

  **Andrew Ornelas, Plaintiff's witness, sworn**        56
4  DIRECT EXAMINATION                                   58
  **Jason Nichols, Plaintiff's witness, sworn**        125
5  DIRECT EXAMINATION                                   126
  CROSS-EXAMINATION                                    145
6  REDIRECT EXAMINATION                                 187
  RECROSS-EXAMINATION                                  202
7  FURTHER REDIRECT EXAMINATION                         209
  FURTHER RECROSS-EXAMINATION                          210
8  **Andrew Ornelas, Plaintiff's witness, sworn**       213
  CROSS-EXAMINATION                                    213
9  REDIRECT EXAMINATION                                 228
  RECROSS-EXAMINATION                                  232

10                              * * * * *

11

12  **EXHIBITS:**

13  Exhibit 15 received                                  62
  Exhibit 16 received                                  65
14  Exhibit 31-1 received                                80
  Exhibits 31-5, 31-7, 31-9, 31-21, 31-24, and         82
15  31-26 received
  Exhibits 14-1, 14-2, 14-3, and 14-11 received        84
16  Exhibit one received                                 111
  Exhibit 20 received                                  146
17  Exhibit 12 received                                  196
  Exhibit 11 received                                  197
18  Exhibits 2 and 3 received                            205
  Exhibit 31-37 received                               219

19                              * * * * *

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
 1    deadly threat, the training is, is not enough to use deadly
 2    force.  The training is that the person would have to have
 3    the opportunity, the ability, and the apparent intent to
 4    immediately cause death or serious bodily injury to another
 5    person.  So there's two important components of that that the
 6    experts will explain to you.
 7              First of all, it's not any threat.  A weapon in
 8    someone's hand, even a gun in someone's hand, is not enough
 9    by itself to use deadly force against someone.  It has to be
10    a deadly threat, a life-threatening threat.
11              Secondly, it has to be immediate.  It has to be
12    happening at the time the shots are being fired.  And no
13    other reasonable options, which is going to be something for
14    you to consider, and a verbal warning that you're going to
15    use deadly force must be or should be given when feasible or
16    possible to alert the person that unless they do something or
17    don't do something, they're going to be shot.
18              You'll also learn that an overreaction is excessive
19    force and that subjective fear, no matter how great the fear,
20    is insufficient to use deadly force.
21              Finally, you will learn that an officer is
22    responsible to justify every shot when using deadly force.
23    In this case, as I explained, there's two volleys of shots.
24    So let's go back to what happening now.
25              Mr. Charles Sesma is running in the direction of
```

1    track?

2    A.    Yes, sir.

3    Q.    Looking at 31-7, when you fired your shots, you would've

4    been standing towards the end of where we see that fence?

5    A.    Yes, sir.

6    Q.    And how far to your left was the fence when you were

7    firing, if you can give us an estimate?

8    A.    Five to seven feet.

9    Q.    Looking at 31-5 also, I take it this would be, if I have

10   my directions correct, looking west?

11   A.    Yes, sir.

12   Q.    And obviously we see the railroad cars there.  They were

13   there at the time of the shooting; is that correct?

14   A.    Yes, sir.

15   Q.    And then showing you 31-9, that shows a portion of the

16   same area, but this picture would be generally looking east;

17   is that correct?

18   A.    Yes, sir.

19   Q.    And I realize there's some different exhibit numbers or

20   identifying markers there, like we see 10 and 11, for

21   example, in yellow.  Obviously those were placed there, as

22   you understand it, after the shooting?

23   A.    Yes, sir.

24         MR. GALIPO:  May I approach counsel, Your Honor?

25         THE COURT:  Yes.

1          MR. GALIPO:  By agreement, Your Honor, I'd like to

2    move in Exhibit 14-11.  We also have 14-1, 14-2, and 14-3

3    from that exhibit number.

4          THE COURT:  At this point, just those four pages?

5          MR. GALIPO:  Yes, Your Honor.

6          THE COURT:  The following exhibits are received

7    into evidence:  14-1, 14-2, 14-3, and 14-11.

8                    **(Exhibits 14-1, 14-2,**

9                    **14-3, and 14-11 received)**

10         MR. GALIPO:  May I publish, Your Honor?

11         THE COURT:  Yes.

12   BY MR. GALIPO:

13   Q.   Are you able to see that on your screen, Officer

14   Ornelas?

15   A.   Yes, sir.

16   Q.   My pen is pointing to an area here (indicating).  Do you

17   see where I'm pointing to?

18   A.   Yes, sir.

19   Q.   And is that a concrete area?

20   A.   Yes, sir.

21         THE COURT:  Which exhibit number is this, please?

22         MR. GALIPO:  I'm sorry, Your Honor.  Let me make

23   sure.  It's 14-11, Your Honor.

24         THE COURT:  Very well.  Thank you.

25

BY MR. GALIPO:

Q.   And that would've been just on the other side of where you were?

A.   Yes, sir.

Q.   So let's go now to you go up the embankment.  You're initially looking to the east or to your right; is that correct?

A.   Yes, sir.

Q.   And you don't see who we now know to be Mr. Sesma at that time?

A.   Yes, sir.

Q.   You then hear something over the radio or otherwise that he may be behind you?

A.   Yes, sir.

Q.   And then you look to the west, and that's when you see him?

A.   Yes, sir.

Q.   And at that point he's sitting down?

A.   Yes, sir.

Q.   Up to that point had you heard Mr. Sesma say anything?

A.   No, sir.

Q.   For example, did he ever verbally threaten to harm you or anything like that?

A.   No, sir.

Q.   And showing you 14-1, you've told us that you're at the

```
 1   court reporter like we have here about what occurred?

 2   A.   Yes, sir.

 3   Q.   Now, in preparation for the trial, have you reviewed all

 4   of those -- the first statement, the second statement, the

 5   declaration, and your deposition testimony?

 6   A.   Yes, sir.

 7   Q.   And you have watched the MVARS video?

 8   A.   Yes, sir.

 9   Q.   Now, in your initial statement would you agree you

10   indicated that Mr. Sesma, when he first got up, was holding

11   this pipe above his head?

12   A.   Yes, sir.

13   Q.   And would you agree you indicated when he started

14   running, the pipe was above his head?

15   A.   Yes, sir.

16   Q.   Now, in watching the MVARS video or videos, do you ever

17   see him holding a pipe above his head?

18   A.   Not as depicted in the MVARS, sir.

19   Q.   Pardon?

20   A.   Not depicted in the MVARS, sir.

21   Q.   Not in the MVARS.  Okay.  Do you ever see him with a

22   pipe in his hand in the MVARS?

23   A.   Not that I can make out, sir.

24   Q.   So as he's running towards you, where do you believe

25   Officer Steen is?
```

```
 1   had room to move to your left also; is that true?

 2   A.   Not much but, yes, there was room.

 3   Q.   Did you try to move in any direction, left, right, or

 4   back, before firing?

 5   A.   No, sir.

 6   Q.   Would you at least agree with me you considered

 7   tactically repositioning?  You thought about it?

 8   A.   Yes, sir.

 9   Q.   You just didn't do it; is that fair?

10   A.   Correct.

11   Q.   So I want to talk to you about the first volley of

12   shots.  You would agree you didn't specifically give him a

13   warning you were going to shoot him; is that true?

14   A.   Yes, sir.

15   Q.   And you're saying the first volley was four to

16   five shots?

17   A.   Yes, sir.

18   Q.   Now, would you agree in your original statement -- and

19   this is only a portion of it -- when you were asked by the

20   detectives what would you estimate the distance to be between

21   you and Mr. Sesma when you fired your first volley of shots,

22   you said approximately 25 yards?

23   A.   Yes, sir.

24   Q.   And then when you were asked in the same statement what

25   would you estimate the distance to be at the time of the
```

1    second volley of shots, you said approximately 20 yards.

2    Would you agree with that?

3    A.    Yes, sir.

4    Q.    At any time before you fired your first volley of shots,

5    did you hear Mr. Sesma say anything to you?

6    A.    No, sir.

7    Q.    Did you ever see him throwing this object at you?

8    A.    No, sir.

9    Q.    Did it ever appear to you before you fired your first

10   volley of shots that he was throwing the object at you?

11   A.    No, sir.

12   Q.    He was in a running motion with his arms pumping,

13   correct?

14   A.    Yes, sir.

15   Q.    Did you ever see him at any time swinging the object at

16   you or now making a swinging motion with it?

17   A.    No, sir.

18   Q.    Where were you aiming on his person when you fired the

19   first volley of shots?

20   A.    At center mass, sir.

21   Q.    And I think that term was mentioned several times in the

22   opening, but center mass, you're referring to the

23   chest/stomach area essentially?

24   A.    Yes, sir.

25   Q.    Is that where you were aiming when you fired your first

1   had struck him?

2   A.   Yes, sir.

3   Q.   And you're still standing in about the same position

4   you've indicated to the jury earlier.  I guess if we look --

5   and I'm pointing at the end of this fence line -- it would be

6   somewhere to the right of that?

7   A.   Yes, sir.

8   Q.   So how does he go down to the ground?  Is he on his

9   stomach? his chest?  How does he go down after the first

10  volley?

11  A.   He goes down in a forward motion, putting him on his

12  stomach and chest.

13  Q.   How much time would you estimate passed from the end of

14  the first volley of shots to when you fired the two

15  subsequent shots?

16  A.   Approximately six seconds.

17  Q.   And you know that now obviously from reviewing the video

18  and materials?

19  A.   Yes, sir.

20  Q.   But you would at least agree that when you gave your

21  initial statement, you indicated he got up immediately, like

22  within a second?

23  A.   Yes, sir.

24  Q.   And that there was only about a second between the two

25  volleys.  That's what you initially stated?

1    A.    Yes, sir.

2    Q.    But you would agree that you at least are aware that

3    that is incorrect now because you can actually time and hear

4    the shots?

5    A.    Yes, sir.

6    Q.    So how much time passed from him starting to get up

7    again and you firing?

8    A.    I'm not sure, sir.

9    Q.    Do you know if it was more or less than a second?

10    A.    That sounds -- that sounds about right, but I'm not

11    certain.

12    Q.    And you can see in the MVARS video -- and the jury will

13    probably see it this afternoon -- but you could see his white

14    shirt starting to rise up just before the last two shots; is

15    that true?

16    A.    Yes, sir.

17    Q.    So if you shot about a second after he started getting

18    up and there are six seconds between the volleys, are you

19    saying he was chest down for five seconds?

20    A.    Yes, sir.

21    Q.    And where was this pipe when he was chest down for five

22    seconds after you shot him in the first volley?

23    A.    I'm not certain, sir.

24    Q.    And you estimated in your initial statement initially

25    that at the time of the second volley, he was about 20 yards

1    from you, correct?

2    A.    Yes, sir.

3    Q.    And would you agree from your perspective that Mr. Sesma

4    just prior to your second group of shots didn't have a chance

5    to get to his -- get his feet underneath him to start

6    running?

7    A.    Yes, sir.

8    Q.    And you stated that in one of your statements, correct?

9    A.    Yes, sir.

10   Q.    So in this approximate one second that he starts to get

11   up again and you fire the last two shots, would you at least

12   agree with me he wasn't throwing the pipe at you at that

13   time?

14   A.    Yes, sir.

15   Q.    And would you also agree with me that he wasn't swinging

16   the pipe at you at that time?

17   A.    Yes, sir.

18   Q.    Do you know what hand he had the pipe in when you fired

19   the second volley of shots?

20   A.    No, sir.

21   Q.    In fact, after the shooting you didn't know where the

22   pipe was; isn't that true?

23   A.    Initially.  Correct, sir.

24   Q.    You thought it was maybe underneath his body?  You

25   didn't know?

1    Q.   And finally --

2              MR. GALIPO:  I'm not sure when we're going to take

3    our break, but I'm assuming it's in a little bit.

4    BY MR. GALIPO:

5    Q.   Do you recall after -- this is my last --

6              MR. GALIPO:  Are we going to break around 12:00?

7              THE COURT:  Yes, roughly, when it's a convenient

8    stopping point for you.

9              MR. GALIPO:  I think it will be convenient if I can

10   have just a couple more minutes.

11             THE COURT:  Yes.

12             MR. GALIPO:  Okay.

13   BY MR. GALIPO:

14   Q.   Do you recall after the shooting --

15             THE COURT:  Can you get next to a microphone.

16             MR. GALIPO:  Yes.  I'm sorry.

17   BY MR. GALIPO:

18   Q.   Do you recall after the shooting your MVARS was still

19   picking up what you were saying?

20   A.   Yes, sir.

21   Q.   And you have told us, I believe, that you in your mind

22   confirmed that the object that you saw as he was approaching

23   was a pipe?

24   A.   Yes, sir.

25   Q.   And do you recall saying after the shooting to the other

```
 1    officers something to the effect:  I don't know whether it
 2    was a pipe or a large stick?
 3    A.    That's not verbatim but, yes, sir.
 4    Q.    So why would you say -- and let's see if we could play
 5    that.
 6              MR. GALIPO:  That's from Exhibit 1, Your Honor.
 7    This is a portion of the MVARS, but I want to give the
 8    specific time.  Hold on.
 9              May I confer with counsel?
10              THE COURT:  Yes.  Please do.
11    BY MR. GALIPO:
12    Q.    We'll probably play it after lunch, but for right now
13    would you at least agree that you've listened to it and
14    you've heard yourself saying after the shooting it was either
15    a pipe or a large stick?
16    A.    Yes, sir.
17    Q.    So why would you say it was a pipe or a large stick if
18    you thought for a hundred percent sure it was a pipe?
19    A.    The reasoning I don't know, but that statement should
20    not have been made.
21    Q.    But it was made.
22    A.    Correct.
23    Q.    And it was made shortly after this occurred, correct?
24    A.    Yes, sir.
25    Q.    And obviously you're trying to give honest, credible
```

1   information to your fellow officers?

2   A.    Yes, sir.

3   Q.    I mean, that was before you gave a statement with

4   representatives present, correct?

5   A.    Correct.

6   Q.    That was before litigation or a deposition or anything

7   like that?

8   A.    Yes, sir.

9          MR. GALIPO:  I think this is a good time for the

10  lunch break if it's good for Your Honor.

11         THE COURT:  Very well.  Yes.

12         Let's break for lunch now.  Ladies and gentlemen of

13  the jury, please remember your admonitions.  Please don't

14  communicate regarding the substance of the case with anyone,

15  including with each other, on the internet, text message,

16  none of that.

17         And please do not do any research regarding the

18  case, again, on the internet, consulting dictionaries, maps.

19  Don't do any of that.  So with that, let's take roughly an

20  hour.  Please be back a little bit after 1:00 o'clock and be

21  ready to resume.

22         Have a great lunch.  Thank you.

23         THE CLERK:  All rise for the jury.

24         (Open court - jury not present)

25         THE COURT:  You may be seated.

1    Q.   And we talked before our lunch break about a portion of

2    your second statement where you indicated that when you fired

3    the second group of shots, Mr. Sesma didn't have a chance to

4    get his feet underneath him to start running.  Do you

5    remember that?

6    A.   Yes, sir.

7    Q.   And you've already told us that you fired that second

8    volley within approximately a second of him trying to get up,

9    correct?

10   A.   Yes, sir, when he was standing with the pipe, sir.

11   Q.   Right.  So obviously he was not running when you fired

12   the second volley because according to your statement, he

13   hadn't had a chance to get his feet underneath him to start

14   running, correct?

15   A.   Correct.  I would describe it as a lunging motion.

16   Q.   And I think you've already said this, but as soon as you

17   shot him a second time, he went right down immediately,

18   correct?

19   A.   Yes, sir.

20   Q.   You recall -- and you're not sure exactly where the pipe

21   was immediately after the shooting, true?

22   A.   Correct.

23   Q.   You recall at some point that Mr. Sesma after the second

24   group of shots was handcuffed?

25   A.   Yes, sir.

```
 1    A.    Yes, sir.
 2    Q.    Okay.  And when you say to get within range to strike
 3    you with the pipe, you mean to actually get to you and swing
 4    it and strike you with it?
 5    A.    Yes, to strike or to even throw it at me.
 6    Q.    I just want to be clear on this point.  In your first
 7    statement, your second statement, your declaration, or your
 8    deposition, did you ever say once that you thought he was
 9    trying to throw the pipe at you?
10    A.    No, sir.
11    Q.    Did you ever say once that you shot him because you
12    thought he was going to throw the pipe at you?
13    A.    No, sir.
14          MR. GALIPO:  Thank you.  That's all I have at this
15    time, Your Honor.
16          THE COURT:  Very well.
17          At this point, Mr. Klehm, are you going to
18    cross-examine the witness, or are we going to go to another
19    witness?
20          MR. KLEHM:  Yes.  Mr. Galipo and I have agreed that
21    we could go to another witness, Officer Jason Nichols, who is
22    waiting outside.
23          THE COURT:  Very well.
24          Officer Ornelas, you're welcome to step down.
25    Please remember the admonition about communicating with
```

1    yelling:  Drop it.  Drop it?

2    A.    Yes, sir.

3    Q.    Okay.  So based on your ability to hear Officer Ornelas

4    even though you couldn't see him, where did you think he was?

5    A.    Behind the grove of -- a couple trees up on the

6    embankment.

7    Q.    Okay.  On the bridge?

8    A.    On the bridge, on the railroad tracks, correct.

9    Q.    Thank you.  Now, originally you were pointing with your

10    left hand at the suspect as he's getting up and running

11    across the bridge.  Now we see your right hand on your hip.

12    What are you doing here with your right hand?

13    A.    Probably turning up my radio volume on my extender, my

14    radio.

15    Q.    All right.

16              MR. KLEHM:  Please play.

17              (Videotape recording played)

18    BY MR. KLEHM:

19    Q.    And what did you hear right there?

20    A.    That was gunfire.

21    Q.    Okay.  Had you withdrawn your weapon from your holster

22    at this point?

23    A.    Yes, sir.

24    Q.    Why did you withdraw your weapon from your holster at

25    this point?

1    A.    Once I got a visual on the subject walking in that

2    easterly direction, I noticed he had a sharp rusty object in

3    his right hand.

4    Q.    Okay.  And when you saw him running across the bridge in

5    an easterly direction towards where you could hear Officer

6    Ornelas's voice coming from, did you see anything in the

7    suspect's hand?

8    A.    Yes, sir.

9    Q.    What did you see in his hand?

10    A.    In his right hand a sharp, pointed, rusty object.

11            THE COURT:  We need to take our afternoon break

12    soon.

13            MR. KLEHM:  This would be a good time, Your Honor.

14            THE COURT:  All right.

15            Ladies and gentlemen of the jury, we're going to

16    take our afternoon break.  Please remember the admonitions.

17    Don't communicate with anybody about the substance of the

18    case, including with each other, and please do not do any

19    research about the case on the internet or otherwise.

20            So let's take about ten minutes, please.

21            THE CLERK:  All rise for the jury.

22            (Open court - jury not present)

23            THE COURT:  You may be seated.

24            Officer Nichols, you're welcome to step down.

25    Please be back at the witness stand here when we resume.  And

1    authenticate it.

2              THE COURT:  And if he says yes, then you're going

3    to offer it into evidence?

4              MR. KLEHM:  Not at that point, Your Honor.  No.  I

5    certainly want to work with Mr. Galipo on getting some type

6    of agreement as to how it would be offered into evidence.

7              THE COURT:  So if you're not seeking to offer it

8    into evidence now, what's the purpose of showing it to the

9    witness?

10             MR. KLEHM:  To help lay the foundation for it so

11   that I can offer it into evidence with Officer Ornelas, one

12   of the other officers who saw it.  My concern is that since

13   this is a one-and-done situation with Officer Nichols, I need

14   him to say this is what he saw with his own eyes.

15             THE COURT:  Is that disputed?

16             MR. KLEHM:  Well, it is, because -- there's one

17   time where Officer Ornelas says -- even references a big

18   stick.  Everything else is metal pipe, metal object, pipe.

19             So I think it's fair to have the pipe displayed at

20   least at this point to the first officer who we see pointing

21   to the suspect.  His testimony will be that's why he drew his

22   gun, because he saw this metal object in the suspect's hand.

23             THE COURT:  So, Mr. Galipo, do plaintiffs dispute

24   that this is the object that Mr. Sesma had in his hand?

25             MR. GALIPO:  Yes.

```
 1                    THE COURT:  You can say yes.  I don't know if you
 2    do or not.
 3                    MR. GALIPO:  Well, I do.
 4                    THE COURT:  You do dispute that?
 5                    MR. GALIPO:  I dispute that he did have this object
 6    in his right hand as he was running because it's clearly not
 7    visible in the video.  So I do dispute that.
 8                    THE COURT:  Let me make sure I understand.  Let me
 9    take this in pieces.  Do plaintiffs dispute -- back up -- at
10    some point Mr. Sesma had an object in his hand?
11                    MR. GALIPO:  Yes.
12                    THE COURT:  Plaintiffs agree with that?
13                    MR. GALIPO:  Yes.
14                    THE COURT:  There's an issue about what, if
15    anything, was in his hand at the time shots were fired.
16                    MR. GALIPO:  Yes.
17                    THE COURT:  Do plaintiffs dispute that the object
18    that was at some point in Mr. Sesma's hand was this object
19    that's on defendant's counsel's table?
20                    MR. GALIPO:  No.
21                    THE COURT:  That's not disputed?
22                    MR. GALIPO:  That's not disputed.
23                    THE COURT:  Okay.  So plaintiffs -- counsel may
24    work out a stipulation for the object to be admitted into
25    evidence.  You're going to discuss that.
```

1          MR. KLEHM:  I appreciate the input from the Court,

2     Your Honor.

3          THE COURT:  Okay.

4          MR. KLEHM:  I certainly will do that.

5          THE COURT:  Anything else?

6          MR. GALIPO:  No.  Thank you, Your Honor.

7          THE COURT:  Okay.  We're going to take ten minutes.

8     So I'll come -- after ten minutes, after Ms. Baird is ready,

9     I'll come back and take the bench and see if you've got any

10    kind of an agreement on this object, and we'll take it from

11    there.  Thank you.

12         (Recess taken from 2:48 p.m. until to 3:02 p.m.)

13         THE CLERK:  All rise.

14         (Open court - jury present)

15         THE COURT:  All right.  Please have a seat,

16    everybody.  I do not need the case to be called.

17         Have you reached any kind of agreement?  Anything

18    to report to me?

19         MR. GALIPO:  Yes.  At this point I'm going to allow

20    or agree to have counsel show it to him from a distance, from

21    the podium, to identify it as the object that he recalls

22    being in his hand.  We'll deal with the other issues later as

23    to what else, if anything, could be done with the pipe.

24         But I would say that to get ahead of it, after this

25    officer is done, I think they're then going to call Ornelas

1    to do their examination.  I would probably agree to the same

2    thing if he shows it from here.

3         Beyond that, we might have to have a sidebar.  But

4    if he wants to just identify it from a distance, probably

5    less than the distance -- if they were at a greater distance

6    than this, I will allow that.  My concerns are what happens

7    beyond that with it.

8         THE COURT:  All right.  If we're going to have a

9    situation where there's a dispute about admissibility, I may

10   want to do that outside of the presence of the jury --

11        MR. GALIPO:  Right.

12        THE COURT:  -- and permit cross-examination.

13        MR. GALIPO:  Right.  I don't think they're going

14   to -- yeah.  I don't think they're going to move to admit it.

15   I think they want to show it demonstratively.  That's my

16   understanding.

17        MR. KLEHM:  And then I think -- yes, we do want to

18   move to admit it, Your Honor, at some point through Officer

19   Ornelas's testimony.

20        THE COURT:  So what I'm saying is give me a

21   heads-up before you get to that point, because if there's

22   still a dispute, I want Mr. Galipo to have the opportunity to

23   cross-examine the witness on admissibility questions.  I'll

24   just call it that.  And that should all be done outside the

25   presence of the jury.

 1   those circumstances that I was telling you about where we're

 2   working on things to make the presentation here at trial

 3   easier for you.  So that's why there was a longer break than

 4   usual.

 5           Let's see.  Mr. Klehm, are you ready to resume your

 6   cross-examination of this witness?

 7           MR. KLEHM:  Yes, Your Honor.  Thank you.

 8           THE COURT:  And, Officer Nichols, this is a

 9   reminder that you're still under oath.

10           THE WITNESS:  Yes, sir.

11           THE COURT:  Go ahead.

12   BY MR. KLEHM:

13   Q.   Officer Nichols, just since we've had a little break,

14   I'm just going to briefly replay the last few seconds of the

15   video so that we can sync up again.

16           THE COURT:  And just for a reminder this is exhibit

17   what?

18           MR. KLEHM:  Exhibit 1, Your Honor.

19           THE COURT:  Thank you.

20   BY MR. KLEHM:

21   Q.   So we'll display Exhibit 1.  When you're looking up at

22   the bridge and you see the suspect running across the bridge,

23   you testified that he had a metal object.  In which hand did

24   you see this metal object?

25   A.   His right hand.

1    Q.    Okay.  And can you approximate the distance between

2    where you are on the sidewalk and where you're looking up at

3    the bridge?  Is it more distance than from you to me right

4    now or less?

5    A.    I would say slightly more but not much.

6    Q.    Okay.  A few steps backwards?

7    A.    Yes, sir.  I would say five more feet.

8              MR. KLEHM:  Your Honor, could I move backwards?

9    BY MR. KLEHM:

10    Q.    Is it about here (indicating)?

11    A.    That seems reasonable.

12    Q.    Okay.  And is this the view that you had of the

13    suspect's right hand with the object in it?

14    A.    Yes, sir.

15    Q.    All right.  Does this look like the object that you saw

16    in the suspect's right hand as he was running towards Officer

17    Ornelas?

18    A.    Yes, sir.

19    Q.    Thank you.

20              Were you concerned for Officer Ornelas's safety as

21    you saw the suspect running towards Officer Ornelas with this

22    object in his right hand?

23    A.    Yes, sir.

24    Q.    Okay.  What type of concern did you have for Officer

25    Ornelas at that point in time?

1  be?

2          MR. GALIPO:  Objection.  Irrelevant, 403, and lacks

3  foundation.

4          THE COURT:  Sustained.

5  BY MR. KLEHM:

6  Q.   How did you know that Officer Ornelas was at the end of

7  the bridge?

8  A.   I could hear him giving audible commands.

9  Q.   Okay.  All right.  And are you trained to withdraw your

10 gun only under certain situations?

11 A.   Yes, sir.

12 Q.   And what are those situations?

13 A.   Imminent threat and harm to the safety of the public and

14 ourselves.

15 Q.   Okay.  Is that the reason why you withdrew your duty

16 firearm at that point in time?

17 A.   Yes, sir.

18 Q.   All right.  And what was the imminent harm that you

19 perceived at that point in time?

20 A.   The subject was running towards Officer Ornelas with an

21 object in his right hand.

22 Q.   All right.  And did that object appear to be this

23 particular object that I'm holding in my right hand?

24 A.   Yes, sir.

25 Q.   And did in fact you see this object -- well, we'll get

```
 1    the subject.  So he was closer to the wall but in between the

 2    tracks and the wall.

 3    Q.   Okay.  All right.  And at that point in time did you see

 4    anyone trying to attend or provide first aid to the suspect?

 5    A.   I believe the first thing we did was handcuff him --

 6    Q.   Okay.

 7    A.   -- for safety purposes.

 8    Q.   And was the -- was there a need to handcuff the suspect

 9    because of something he was doing at that point in time?

10    A.   He was moving.

11    Q.   Okay.  When you say moving, what do you mean?  Can you

12    be -- can you describe that more.

13    A.   Just a slight flailing on the ground.

14    Q.   Yes?

15    A.   I'm not talking about him trying to get up, but there

16    was movement, and it's procedure to handcuff the subject.

17    Q.   All right.  And which officer do you recall handcuffing

18    the subject?

19    A.   I believe it was Officer Cichella.

20    Q.   Okay.  And do you recall if the handcuffs were put in

21    front of the suspect or behind him at that point?

22    A.   They were placed to the front.

23    Q.   Okay.  All right.

24         MR. KLEHM:  I'm going to pull up what has already

25    been admitted as Exhibit 31-5, Your Honor.
```

```
1    were you assisting at all with any hands on the suspect?

2    A.   Yes, I was.

3    Q.   And what were you doing?

4    A.   I applied a trauma dressing to the right eye area.

5    Q.   Okay.  All right.  Was the suspect being cooperative?

6    Uncooperative?  What was he doing as you were providing first

7    aid?

8    A.   I remember at one point while working on him, I believe

9    I talked to him, told him to try to relax, that we were going

10   to take care of him.  At one point he tried -- he reached

11   forward.  He tried to sit up in a forward motion while

12   handcuffed.

13   Q.   Okay.  All right.  Did you have to hold him down so he

14   did not move?

15               MR. GALIPO:  Objection.  Leading.

16               THE COURT:  Overruled.

17               THE WITNESS:  I changed positions from his head to

18   his legs to hold his lower extremities down to prevent him

19   from trying to get up as my partner took over the facial

20   trauma care, and I assisted Officer Ornelas while holding him

21   down with additional medical care.

22               MR. KLEHM:  Okay.

23               Is it possible to zoom in on this?  Okay.

24   BY MR. KLEHM:

25   Q.   Can you describe -- there's a bunch of yellow evidence
```

1    Q.    Can you see this object in his right hand in the video?

2    A.    Not in the video.

3    Q.    Did you tell anyone at the scene before the shooting

4    that you saw this object in his hand?

5    A.    I did not.

6    Q.    Did you tell anyone at the scene after the shooting and

7    before you left that you saw this object in his hand?

8    A.    I don't recall if I did or not.

9    Q.    I'm assuming that you didn't give any -- strike that.

10          When you went up the embankment afterwards, did you

11   see that object somewhere on the ground?

12   A.    Yes, sir.

13   Q.    Where was it?

14   A.    It was between Mr. Sesma who was laying on the ground

15   and the railroad tracks.

16   Q.    How far from the railroad tracks was it?

17   A.    I could only guesstimate ten feet roughly.

18   Q.    When did you first notice it?  Before or after the

19   medical attention was being given?

20   A.    It was before, as soon as we positioned ourselves on top

21   of the embankment.

22   Q.    Now, I want to show you Exhibit 31-9.

23          MR. GALIPO:  I told you I would embarrass myself

24   soon enough.  Thank you.

25          Exhibit 31-9, which I think has already been

```
 1   eight on page 3 of your declaration above your signature,

 2   lines approximately 18 through 20.  It's the final sentence

 3   in paragraph eight.

 4              THE COURT:  Read it to yourself, please.

 5   BY MR. KLEHM:

 6   Q.   Yes, to yourself.  Thank you.

 7   A.   Yes, sir.

 8   Q.   Does that refresh your recollection as to where

 9   Mr. Sesma's body was when he fell after the second volley of

10   shots?

11   A.   Yes, sir.

12   Q.   Does your declaration in any way refer to his head being

13   next to evidence markers 10 and 11?

14              THE COURT:  That's not refreshing recollection.

15              MR. KLEHM:  I'm sorry.

16   BY MR. KLEHM:

17   Q.   When you answered Mr. Galipo's question about

18   Mr. Sesma's head being next to evidence placards number 10

19   and 11 as stated in your declaration, was the word head

20   mentioned in your declaration at all?

21   A.   No, sir.

22   Q.   After you used the trauma shears to cut Mr. Sesma's

23   shirt, did you remove the shirt or keep it on his body?

24   A.   I removed the shirt, sir.

25   Q.   Did you -- what did you do with the shirt after you
```

```
 1            And if we don't have any, that's great.  We'll
 2    start promptly at nine with the jury.  But if we do have
 3    housekeeping, I want to do that, reserve that half hour to
 4    deal with it.
 5            MR. GALIPO:  We'll be here 8:30 promptly.
 6            THE COURT:  Okay.
 7            Have a good evening.  I hope you can have a restful
 8    evening.  I'll see you tomorrow.  Thank you.
 9            MR. GALIPO:  Thank you so much.
10            THE CLERK:  All rise.  This court is adjourned.
11              (Proceedings adjourned at 5:07 p.m.)
12                          CERTIFICATE
13    I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT
14    TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN
15    THE ABOVE MATTER.
16    FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE
17    REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE
18    REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.
19
20    /s/ Miriam V. Baird           12/03/2024
21    MIRIAM V. BAIRD                        DATE
      OFFICIAL REPORTER
22
23
24
25
```

EXHIBIT "B"

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3         HONORABLE JOHN W. HOLCOMB, JUDGE PRESIDING

4    CANDIDO SESMA, ET AL.,          )
                                     )
5                                    )
                                     )
6                     Plaintiffs,    )
                                     )
7                                    )
                                     )
8         Vs.                        )   No. CV21-01694-JWH
                                     )
9                                    )
                                     )
10   STATE OF CALIFORNIA, ET AL.,    )
                                     )
11                                   )
                                     )
12                    Defendants.    )
                                     )
13   _____ )

14

15

16          REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                *JURY TRIAL, DAY 3*

18              LOS ANGELES, CALIFORNIA

19            WEDNESDAY, DECEMBER 4, 2024

20

21

22

23           MIRIAM V. BAIRD, CSR 11893, CCRA
          OFFICIAL U.S. DISTRICT COURT REPORTER
24         411 WEST FOURTH STREET, SUITE 1-053
             SANTA ANA, CALIFORNIA 97201
25            VELIZBAIRDMIRIAM@GMAIL.COM

```
1                          INDEX

2    WITNESS:                                      PAGE:

3
     Andrew Ornelas, Plaintiff's witness, sworn      19
4    FURTHER CROSS-EXAMINATION RESUMED               19
     FURTHER REDIRECT EXAMINATION                    24
5    FURTHER RECROSS-EXAMINATION                     37
     FURTHER RECROSS-EXAMINATION                     61
6    Jason Steen, Plaintiff's witness, sworn         63
     DIRECT EXAMINATION                              64
7    Christofer Bowen, Plaintiff's witness, sworn    92
     DIRECT EXAMINATION                              92
8    CROSS-EXAMINATION                              103
     REDIRECT EXAMINATION                           119
9    Jason Steen, Plaintiff's witness, previously   123
     sworn
10   CROSS-EXAMINATION                              124
     REDIRECT EXAMINATION                           152
11   RECROSS-EXAMINATION                            157
     FURTHER REDIRECT EXAMINATION                   159
12   FURTHER RECROSS-EXAMINATION                    161
     Roger Clark, Plaintiff's witness, sworn        162
13   DIRECT EXAMINATION                             163
     CROSS-EXAMINATION                              200
14   REDIRECT EXAMINATION                           241
     RECROSS-EXAMINATION                            253
15                             *****

16

17   EXHIBITS:

18    Exhibit 14-5 received                          30
      Exhibit 31-41 received                         35
19    Exhibit 31-44 received                         39
      Exhibit 31-29 received                         41
20    Exhibit 47-108 received                        54
      Exhibit 31-3 received                          79
21    Exhibit 6 received                             96
      Exhibit 17-1 received                         245
22    Exhibit 4 received                            248

23                             *****

24

25
```

**UNITED STATES DISTRICT COURT**

1    consider reaching some agreement and taking that out of the

2    Court's having to decide that issue.

3         I would rather do that now than have this lingering

4    and have them want to re-call him again in their

5    case-in-chief later, not knowing what the scope might be at

6    that time.  That's why I asked counsel what would be the

7    scope of what you want to ask him.

8         The problem that I have -- and I'm not blaming

9    anyone -- I conceded to this pipe, and it was used quite

10    honestly more extensively than I had imagined in the

11    questioning and the holding and the banging down on the

12    podium loudly.

13         I'm not saying anyone was doing that intentionally,

14    and I tried to be very courteous to counsel.  I always do in

15    every case, including this counsel.  I just don't want to be

16    taken advantage of, if you will, by trying to be nice and

17    courteous.

18         So if we reach an agreement such as he's only going

19    to show him the pipe one time and say, "Was this the object

20    you saw in his hand?" and he'll say yes.  You just don't know

21    which hand.  Fine.  Let's talk a little bit about your

22    background.  If that's the end of it, then I might agree,

23    just to resolve this issue now and not having it lingering

24    later or have a post-trial issue regarding this issue.

25         So that's my first thought.

1              THE COURT:  Well, do you -- we're short on time,
2    because I do want to bring in the jury promptly at nine.  Do
3    you want to spend the next five minutes --
4              MR. GALIPO:  Well, I guess we could just inquire,
5    because I wanted to talk about the two other issues.  If
6    counsel would be agreeable to that, only to showing him the
7    object, asking him was this the pipe, and only asking him
8    about his background and that other question, you know, did
9    you have any information that he had any mental health
10   issues.  If I knew that's all he was going to get into, I
11   might agree.
12             If he says he wants to do much more than that, my
13   inclination is not to agree.  So if counsel is willing to
14   agree to that now, we can handle it right now.  If he needs
15   time to talk about it, I'll quickly address my other issues
16   in 30 seconds and spend the time talking to counsel.
17             Mr. Klehm, you're in the hot seat.
18             MR. KLEHM:  Sold.  Yes, Your Honor.  Agreed.
19             THE COURT:  Okay.  Sounds like we have this piece
20   of the issue resolved.  So if you go further than what this
21   agreement is, I'm sure, Mr. Galipo, you'll raise an
22   objection.
23             MR. GALIPO:  Right.  Just so we're clear, you can
24   ask him the background questions.  You can ask him if he had
25   any specific information that he had a mental health issue.

1   And you can show him the pipe and say, without trying to bang

2   it around or holding it in a threatening manner, because I

3   believe the decedent was running with it when he was shot and

4   on the ground at some point.  Was this the object?  Then I'm

5   okay.

6              The other two --

7              THE COURT:  Mr. Klehm, good?

8              MR. KLEHM:  That's good.  And in terms of the

9   allowable scope based on Mr. Galipo's redirect of the

10  witness, he was asking about a body, the positioning of

11  certain items -- yeah, he discussed the shoes, the pants, and

12  the shirt.

13             I think it would be allowable, irregardless of our

14  current horse-trading deal, that I ask Sergeant Ornelas about

15  the position of those items.

16             THE COURT:  Yes, you can -- on recross you can

17  inquire.  You can ask questions that are within the scope of

18  Mr. Galipo's redirect.  I have a copy of the transcript right

19  here, so I will know.  If you stray from that and there's an

20  objection, I can check it.

21             MR. KLEHM:  I'm only going to ask about the body

22  position with regard to those items.

23             THE COURT:  Very well.  I think this seems to be

24  resolved.  If not, I'm sure an appropriate objection will be

25  raised and we'll deal with it.

```
1              MR. GALIPO:  The other two issues --
2              THE COURT:  What were the other two?
3              MR. GALIPO:  The pipe later being introduced into
4    evidence, we don't have to deal with that right now, but I'm
5    going to maintain my objection to that.  I think it's been
6    used already quite extensively, but we could talk about that
7    later.
8              THE COURT:  I think that's a later issue.
9              MR. GALIPO:  Fine.
10             THE COURT:  I mean, we can talk about it more
11   later.
12             MR. GALIPO:  Yeah.  We don't need to spend time
13   now.  I know we have a jury about to come in.
14             Also this mental health issue, I technically don't
15   agree that because someone said someone was acting abnormal
16   that this is totally opening the door to mental health.
17             If counsel does not want to get into mental health
18   at all with the family and they're not testifying yet, I
19   think we could probably reach an agreement on that.  I don't
20   mind them asking the officer if he had any information.
21             The curative instruction we talk about later
22   because part of the instructions that the -- as part of CACI,
23   for example, talk about whether there was any indication the
24   person might have been mentally disordered or have some
25   issues.
```

22

```
 1    so the EMT bag is a bit more in the foreground and we can see

 2    the shirt and the pants to the left next to the concrete pony

 3    wall, the bottom of the concrete wall with the chain-link

 4    fence on top, can you approximate the location of Mr. Sesma's

 5    body after the second round, the two shots that you fired

 6    where Mr. Sesma's body landed.

 7    A.    Just an approximation, sir, somewhere near placards 8

 8    and 9.

 9              MR. KLEHM:  Could you zoom in on placards 8 and 9.

10    BY MR. KLEHM:

11    Q.    And in relation to placards 8 and 9 which depict the

12    shirt and the pants, I believe, do you recall where

13    Mr. Sesma's head was pointing?

14    A.    I do not, sir.

15    Q.    Was he in a horizontal position in relation to the

16    concrete wall, or diagonal?  Are you able to recall what --

17    A.    To the -- I'm sorry.  To my best recollection, it was a

18    horizontal position.

19    Q.    That would be horizontal -- would that be parallel to

20    the wall or --

21    A.    Yes, sir, parallel to the wall.

22              MR. KLEHM:  If we can zoom out, please.

23    BY MR. KLEHM:

24    Q.    The position of the other yellow placards depicted in

25    this photo in relation to the shirt and the pants, do you
```

 1   know what was in that general position that those placards

 2   are next to?

 3   A.   I'm sorry.  I don't understand the question.

 4   Q.   Do you know what those placards indicate, the 1, the 2,

 5   the 3, the 4 that are depicted in this paragraph?  What

 6   pieces of evidence or items are those next to?

 7   A.   Yes.  That's more than likely going to be my shell

 8   casings.

 9   Q.   And were you standing as you're looking west in this

10   photograph to the left of where those placards 1, 2, 3, 4

11   are, denoting -- in relation to the shirt and the pants?

12          MR. GALIPO:  I'm going to object to the question as

13   vague and ambiguous as phrased.

14          MR. KLEHM:  I'll withdraw, Your Honor.

15   BY MR. KLEHM:

16   Q.   Where were you standing in relation to where your shell

17   casings landed?

18   A.   I would be to the left, given how shells eject from a

19   weapon.

20   Q.   And the weapon that you were using that we -- that

21   Mr. Galipo asked -- strike that.

22          In regards to the body positioning, as Mr. Sesma

23   was coming towards you, is this the metal object that you saw

24   in his right hand?  I'm sorry.  Strike that.

25          Is this the object you saw in one of his hands?

1    something similar yesterday?

2    A.    Yes, sir.

3    Q.    Okay.  And I think, if I understood your testimony --

4    you correct me if I'm wrong -- you told us you were

5    positioned at the end of this gate maybe five to seven feet

6    to the right, or north?

7    A.    That's correct, sir.

8    Q.    Okay.  So if I would draw a line from the end of the

9    gate out going north five to seven feet, that would be your

10   approximate position?

11   A.    Yes, sir.  However, I think to be more accurate, it

12   might be, like, a step or two in, not directly in line with

13   the end of the wall.

14   Q.    Okay.  And are you -- is that more -- are you

15   comfortable with me referring to that as a fence?

16   A.    If that's how you want to refer to it, I'm good with

17   that.

18   Q.    Okay.  I didn't mean to confuse anyone.  I was using

19   fence or gate.  What are you more comfortable with?

20   A.    Fence is fine, sir.

21   Q.    Okay.  Thank you.

22          So going now back to 14-2, would you agree that

23   evidence marker 11 is further from the end of the fence than

24   evidence marker 10?

25   A.    By end of the fence, you mean -- I guess that would be

1    the start of the fence on the east end, correct?

2    Q.   Yes.

3    A.   Yes, sir.  It is.

4    Q.   Near where you were.

5    A.   Correct.  I understand.

6    Q.   Okay.  And also you would agree that evidence marker 11

7    is further than, for example, 8 and 9?

8    A.   Yes, sir.

9    Q.   Okay.  Now, I think some of this conversation came up in

10   the first place, as you may recall, because I was referring

11   to a declaration submitted to this Court by you, signed under

12   penalty of perjury.  Do you recall that discussion?

13   A.   Yes, sir.

14   Q.   And I don't know if you need to see it again, but if you

15   do, I have a copy for you.  Would you like to see it again?

16   A.   No, sir.

17   Q.   Don't need to?

18   A.   No, sir.

19   Q.   Did you look at it last night?

20   A.   No, sir.  I think at some point you presented that to me

21   yesterday.

22   Q.   Okay.  So you remember what it says?

23   A.   Yes, sir.

24   Q.   And would you agree that it says when:  Sesma finally

25   fell, he was approximately where evidence markers 10 and 11

1    are visible in the photograph?

2    A.    Yes, sir.  I do remember saying that.

3    Q.    Okay.  You don't make any reference to exhibit

4    identifiers 8 and 9 in your declaration; do you?

5    A.    No, sir.

6    Q.    And when I asked you yesterday before this jury, you

7    indicated that that part of your declaration was accurate and

8    that his head was in the area of identifiers 10 and 11.  Do

9    you remember giving that testimony to the jury yesterday?

10    A.    Yes, sir.

11    Q.    And are you saying now that's inaccurate and he was

12    actually at markers 8 and 9?

13    A.    No, sir.  I gave approximations, and I believe I

14    corrected myself on that yesterday, that 10 and 11 is also an

15    approximation.  So if he's close to 10 and 11, as an

16    approximation he's by default also close to 8 and 9.

17    Q.    Well, you would agree, sir, there's some distance

18    between 11 and 9?  We could see that in the photo, correct?

19    A.    Yes, sir.

20    Q.    And I'm assuming when you signed your declaration under

21    penalty of perjury with the Court, you tried to be as

22    accurate as possible?

23    A.    That's correct, sir.

24    Q.    Now, regarding the positioning, you were just asked

25    about the clothing by your attorney.  Do you recall that?

32

1    true?

2    A.    Correct.

3    Q.    And I think you told us you fired four or five rounds in

4    the first volley?

5    A.    Correct.

6    Q.    So obviously he would've traveled some distance between

7    your first shot when he was running and your fourth or fifth

8    shot; would you agree?

9    A.    Yes, sir.

10   Q.    And so when you gave the estimate in your initial

11   statement that he was less than 25 yards away when you fired

12   your first shot, you're talking about when he was running in

13   your direction?

14   A.    Yes, sir.

15   Q.    So however far he was away when you fired your first

16   shot, he would have traveled forward or continued to travel

17   forward during some of your shots; is that fair?

18   A.    Yes, sir.

19   Q.    And at some point started going to the ground?

20   A.    Yes, sir.

21   Q.    And then I think you told us he was on the ground chest

22   down for approximately five seconds after your first volley

23   of shots?

24   A.    Yes, sir.

25   Q.    How far was he away from you when he was on the ground

1  for those five seconds after your first volley of shots?

2  A.    Again, just an approximation, 20 feet or less, sir.

3  Q.    Well, that's where I'm trying to figure this out,

4  because item 11 you just told me was 24 or 26 feet from the

5  end of the fence, correct?

6  A.    Yes, sir.

7  Q.    But that's where he ended up after all the shots

8  happened?

9  A.    That's correct, sir.

10 Q.    So when he went down to the ground the first time, are

11 you saying he was near item 11 or further back?  In other

12 words, did he move at all in your direction in between the

13 two volleys?

14 A.    No, I don't believe so, sir.

15 Q.    Okay.  So if I'm understanding you, then, it is your

16 testimony that he was not moving in your direction at all

17 between him going down after the first volley and the second

18 volley.  Do I have that correct?

19 A.    Well, there had to be some movement prior to the second

20 volley in order for me to fire my weapon a second time.  So

21 excluding that, no, I don't believe he was moving forward.

22 Q.    Okay.  So obviously it wasn't as if he was -- after the

23 first volley of shots, it's not like he went down to the

24 ground, got up, and started running at you again.  Would you

25 at least agree with that?

A.    Correct, sir.

Q.    I don't know if you have your declaration memorized or not, but do you recall in the declaration you submitted to this Court under penalty of perjury that you said after your first volley of shots, he got up quickly and started running at me again?

A.    I do recall that, sir.  Yes.

Q.    Would you agree, sir, that is inaccurate?

A.    Yes, sir.

Q.    In this Exhibit 14-1, do you see identifier number 7?

A.    Yes, sir.

Q.    I'm going to point to it, but is that basically where it is?

A.    Yes, sir.

Q.    And I think you told us earlier regarding the pipe, you thought it was potentially underneath his body?

A.    Yes, sir.

Q.    After all the shots occurred?

A.    Yes, sir.

Q.    And I know counsel showed you the pipe again and asked you whether you saw it in his hand.  And just again, so we're clear, you don't recall which hand it was in?

A.    That's correct, sir.

Q.    And that includes for your first volley of shots and second volley of shots?

1   we had just talked about?

2   A.   Yes, sir.

3   Q.   And then showing you 31-41, we see the pipe by item 7?

4   A.   Yes, sir.

5   Q.   Do you have any idea how it got there?

6   A.   From the subject, sir.

7   Q.   Well, you told us you never saw him throw it, correct?

8   A.   Correct.

9   Q.   And you told us that after the incident you didn't know

10  where it was and you thought it was underneath his body,

11  correct?

12  A.   Yes, sir.

13  Q.   I'm just wondering if you know how it got to this

14  position.

15  A.   Specifically in the manner, no, sir.

16  Q.   You indicated that Mr. Sesma's body, when it came to

17  rest, was more or less parallel to the wall?

18  A.   Yes, sir.

19  Q.   Are you saying that you don't know whether his head was

20  closer to you or his feet?

21  A.   I'm not certain, sir, but I would assume his head.

22  Again, I'm not certain.

23  Q.   Okay.  And when he -- I'm assuming he was chest down

24  after the second volley because you indicated you thought the

25  pipe maybe was underneath him.  Was that the case?  He was

```
 1    chest down?

 2    A.    Yes, sir.

 3    Q.    And how far was he chest down from the fence?

 4    A.    I don't recall, sir.

 5    Q.    Well, would you agree, given that we see some blood next

 6    to number 11, he had to be pretty close to the fence?

 7    A.    That's possible.

 8              MR. GALIPO:  Thank you.  That's all I have,

 9    Your Honor.

10              THE COURT:  Very well.  Any re-recross?

11              MR. KLEHM:  Yes, Your Honor.  Thank you.

12                   FURTHER RECROSS-EXAMINATION

13    BY MR. KLEHM:

14    Q.    Officer Ornelas, this 25-yard figure that Mr. Galipo

15    keeps referring to, do you recall your testimony where he was

16    asking you about where that first came up during your

17    interview with the Ontario Police Department?

18    A.    Yes, sir.

19    Q.    Do you recall during the exact same interview that you

20    corrected yourself and said -- do you recall how you

21    corrected yourself during that same interview with the

22    Ontario Police Department?

23    A.    Yes, sir.

24    Q.    What did you tell the Ontario Police Department during

25    that exact same interview about the yards?
```

A.    I don't recall the exact wording, but I had mixed up
yards and feet -- not that I was confused in what a yard was
versus what a foot was, but it's more that I misspoke and
used the term synonymously of yards and feet.

Q.    And that was in time approximately how far after you
first used the word yards did you then correct yourself and
indicate, no, you meant feet?

A.    Exactly, I don't know, but it was shortly after, and I
offered to correct myself.

Q.    And it was during this same interview?

A.    Yes, sir.

Q.    Now, in addition to the blood from Mr. Sesma's face, was
he bleeding from other parts of his body?

A.    Yes, he was, sir.

Q.    What other parts was he bleeding from?

A.    From his torso, his arm, and his leg.

Q.    And are you able to tell in regards to what blood
Mr. Galipo showed you that's on the rocks whether that blood
came from any particular part of his body?

A.    No, sir.

Q.    Now, Mr. Galipo referred to several times your
declaration, and yesterday he asked you, and I quote:  And in
your declaration you attached a photograph saying when he
finally came to rest, his head was near where we see exhibit
numbers 11, 10 and 11, correct?

```
1    A.    Yes, sir.

2    Q.    And you answered:  Yes, sir?

3    A.    Yes, sir.

4    Q.    Do you remember that?

5    A.    Yes, sir.

6    Q.    But your declaration never mentions the word head; does

7    it?

8    A.    No, it does not, sir.

9    Q.    So Mr. Galipo's questioning to you in that regard

10   incorrectly summarized what your declaration said to your

11   knowledge, right?

12   A.    It was inaccurate, sir.

13   Q.    And Mr. Galipo has never shown you any part of your

14   declaration where you mention the word head being next to

15   exhibits 10 and 11, right?

16   A.    That's correct, sir.

17             MR. KLEHM:  By agreement, Your Honor, I'd like to

18   admit Exhibit 31-44.

19             THE COURT:  Very well.  Exhibit 31-44 is received.

20             (Exhibit 31-44 received)

21             MR. KLEHM:  May I publish, Your Honor?

22             THE COURT:  Yes, you may.

23   BY MR. KLEHM:

24   Q.    I'd like to show you what has now been marked and

25   admitted as Exhibit 31-44.  It's again another picture of the
```

```
 1    bloody shirt and some blood on the rocks.
 2              Now, you testified a few minutes ago that you
 3    weren't sure how far from the wall Mr. Sesma's body was, but
 4    you believe -- can you point out in this picture or describe
 5    in this picture generally where you recall his body being
 6    after the last time that he went down?
 7    A.    It's difficult to say, sir.  It's somewhere between the
 8    groupings of 10 and 11, and 8 and 9.  Again, that's just an
 9    approximation.
10    Q.    And there is blood next to the placards indicated by
11    8 and 9, correct?
12    A.    Yes, sir.
13    Q.    And that blood, was that closer to where you were
14    standing when you fired at the end of the fence, bridge?
15    A.    It's tough to tell, but based on the picture, that would
16    appear to be closer to me.
17              MR. KLEHM:  Can you zoom out, please.
18    BY MR. KLEHM:
19    Q.    Do you see the little EMT bag on the left side?
20    A.    Yes, sir.
21    Q.    All right.  There's another exhibit we can show you that
22    has that from a different angle.
23              Now, Mr. Galipo mentioned to you the fence posts on
24    the bridge as being eight feet apart.
25              MR. KLEHM:  Your Honor, by agreement, I'd like to
```

1   A.   Straight up from the bridge support, sir?

2   Q.   Not straight up.  To the east of it.

3   A.   Correct, to the east.

4   Q.   To the east.  And if we are using one of those railroad

5   cars as a frame of reference, would it be about the length of

6   a railroad car between you and Mr. Sesma when he fell?

7           MR. GALIPO:  I'm going to object as lacks

8   foundation.

9           THE COURT:  Sustained.  Can you lay a foundation.

10          MR. KLEHM:  Yes.  Thank you.

11  BY MR. KLEHM:

12  Q.   Where you were standing, was it at the end of a railroad

13  car or in the middle?  What portion of that railroad car was

14  next to you where you were standing?

15  A.   Based on those options, it was closer to the middle.  I

16  would say towards the middle of the car.

17  Q.   And that would be the car depicted on the opposite side

18  of that telephone pole that's in this screenshot --

19  A.   That's correct.

20  Q.   -- Exhibit 31-29.

21          And we see the bridge support that the left arrow

22  is pointing to.  Did Mr. Sesma fall behind where that tree is

23  as depicted in this photograph?

24  A.   Yes, sir.

25  Q.   So behind the tree is where he fell, and you were at the

```
 1    end of that bridge approximately where in relation to that
 2    telephone pole on the right side?
 3    A.    Yes, sir.
 4    Q.    No.  I'm asking -- sorry.  Bad question.  Where were you
 5    in relation on the bridge behind that telephone pole?
 6    A.    At the end of the fence and, like I mentioned, maybe
 7    just a step or two within the fence.  So it would be a step
 8    or two west of the end of the fence.
 9    Q.    I'm going to show you one more video.  This is the MVARS
10    from Officer Steen's MVARS.
11              MR. KLEHM:  Officer Steen's has been marked as
12    Exhibit 2, Your Honor.  I'd like to publish that.
13              Go to right around the five-minute mark.  Let's go
14    to 4 minutes, 50 seconds, of Officer Steen.  Can we go to
15    4 minutes, 50 seconds, please.
16              The bottom left view is from Officer Steen's video,
17    which has been marked as Exhibit Number 2, Your Honor.
18              THE COURT:  Very well.
19              MR. KLEHM:  Please play that from 4:50.
20              (Videotape recording played)
21    BY MR. KLEHM:
22    Q.    I want you to focus on the train car that's depicted.
23    The right screen is an enlargement of what's depicted in
24    Officer Steen's MVARS.
25              MR. KLEHM:  Can you pause it, please.  Go back five
```

 1    seconds and then play it again.  I'd like you to focus on

 2    that right train car.

 3                (Videotape recording played)

 4    BY MR. KLEHM:

 5    Q.   I'm going to draw a circle around the area that I'd like

 6    you to focus on.  Okay.  We're going to move the cursor

 7    instead because apparently we don't have the technical

 8    ability to draw a circle on a video.

 9                So where that cursor is circling, if you could

10    please focus your attention on that area in front of that

11    railroad car on the train tracks.

12    A.   Yes, sir.

13    Q.   And then play it.

14                (Videotape recording played)

15    BY MR. KLEHM:

16    Q.   Is that you walking up on the right side?

17    A.   Yes, sir, that is me.

18    Q.   Thank you.

19          MR. KLEHM:  Please play -- continue.

20                (Videotape recording played)

21    BY MR. KLEHM:

22    Q.   Did you see a figure moving from west to east towards

23    your position in front of that freight car?

24    A.   Yes, sir.

25    Q.   And that figure that was moving towards you in front of

52

1   that freight car that you were standing in front of was who?

2   A.    That was the subject, Mr. Sesma, sir.

3   Q.    And was he within a distance of one of those freight

4   cars?

5   A.    Within less than that distance, sir.

6   Q.    And those freight cars to your recollection were not

7   25 yards long; were they?

8   A.    Not to my knowledge, sir.

9          MR. KLEHM:  Thank you.  No further questions.

10         THE COURT:  Any more direct examination for this

11  witness?

12         MR. KLEHM:  Come one.  Really?

13         MR. GALIPO:  I hate to do this, but I feel

14  compelled.

15         THE COURT:  That's why we have these trials.  Do

16  the proper examination that you desire.  Go ahead.

17         MR. GALIPO:  All right.

18                **FURTHER REDIRECT EXAMINATION**

19  BY MR. GALIPO:

20  Q.    Are you aware that he was wearing a white tee shirt?

21  A.    Yes, sir.

22  Q.    And this image that counsel just told you to look at,

23  this dark image, do you see a white tee shirt in that image?

24  A.    I cannot make that out based on the quality of the

25  MVARS, sir.

1    question?

2                MR. GALIPO:  No, I'm not.

3                THE COURT:  So the question was:  Do you recall

4    five minutes or so after that your representative asking for

5    a ten-minute break?  The witness asked for the page number.

6                MR. GALIPO:  Let me rephrase.  I think it's better.

7    BY MR. GALIPO:

8    Q.    Do you recall after you gave the estimates of 25 yards

9    and 20 yards, at some point your representative asked for a

10   break?

11   A.    At some point after, yes, sir.

12   Q.    And is that -- if you look at page 78, is that the time,

13   looking at lines 23 and 24, that he asked for a break?

14   A.    On lines, yes, sir, 23 and 24.

15   Q.    And he asked for a ten-minute break; is that fair?

16   A.    Yes, sir.

17   Q.    And then the very next page, page 79, after your break

18   isn't that where you -- when you changed from yards to feet?

19   A.    Just give me one moment, sir.

20   Q.    Lines 20 and 21, if it helps you.

21   A.    Yes, sir.  I'm with you on this.

22   Q.    Would you agree with that?  You gave estimates in yards.

23   You took a break, and then right when you came back from the

24   break, you said feet, not yards?

25   A.    Correct, sir.

```
 1              MR. GALIPO:  Thank you.  That's all I have,

 2    Your Honor.

 3              THE COURT:  No need to apologize.  As long as it's

 4    within the scope, you can ask more questions.

 5                    FURTHER RECROSS-EXAMINATION

 6    BY MR. KLEHM:

 7    Q.    Do you recall that break having anything to do with

 8    being advised to change your answer from yards to feet?

 9    A.    I recall the break, sir, and that was never brought up

10    during the break.

11    Q.    And based on Exhibit Number 31-29 --

12              MR. KLEHM:  I'd like to publish that again,

13    Your Honor.

14              THE COURT:  Yes.

15              MR. KLEHM:  It's been admitted into evidence.

16    BY MR. KLEHM:

17    Q.    Mr. Galipo was asking you just moments ago about the

18    fence posts when he showed you a picture of the white shirt

19    over the bridge and indicated that it's about four fence post

20    sections from that bridge support to the end of the bridge.

21    Do you recall that testimony?

22    A.    Yes, sir.

23    Q.    And Mr. Galipo also said that those fence posts are

24    about eight feet apart.  Do you recall agreeing to that?

25    A.    Yes, sir.
```

1   A.   Yes.

2   Q.   And did you broadcast that he had picked up the pipe at

3   that point?

4   A.   Officer Ornelas did.

5   Q.   Okay.  But you could see it was a pipe from your

6   distance?

7   A.   Yes.

8   Q.   At some point did he go out of your view?

9   A.   No.

10  Q.   He -- you were -- he remained in your view all the way

11  up to the time of the shooting?

12  A.   At what point?

13  Q.   At any point did he go out of your view? is my question.

14  A.   When he sat down on the train tracks.

15  Q.   Okay.  So you saw him at some point sit down on the

16  train tracks?

17  A.   Correct.

18  Q.   Where were you at that point?

19  A.   Watching him.  I was on the fence.

20  Q.   And how long -- for how long a period of time did you

21  see him sitting on the train tracks?

22  A.   Probably for roughly a minute or two.

23  Q.   And where was he sitting?  Was he sitting on the gravel?

24  the actual tracks?  Can you describe that.

25  A.   Where I saw him stop and sit, it was along the fence,

1    up because of the adrenaline.

2    Q.    I'm sorry.  I keep -- I think you're done and then I say

3    something.  So I don't mean to do that.

4    A.    No worries.

5    Q.    Did you finish your answer?

6    A.    Yes.

7    Q.    So after you heard approximately four popping noises,

8    you got to the top of the embankment?

9    A.    Yes.

10   Q.    And it sounds like there was a short time between

11   hearing those four popping noises and you getting to the top

12   of the embankment.  Is that fair?

13   A.    Very short, yes.

14   Q.    Maybe within a second or so?

15   A.    Very short, yes.

16   Q.    And when you got --

17          MR. GALIPO:  We have an additional exhibit,

18   Your Honor, by agreement, 31-3.

19          THE COURT:  Very well.  Exhibit 31-3 is received.

20          **(Exhibit 31-3 received)**

21   BY MR. GALIPO:

22   Q.    What we have right now on the screen is 14-1.  Can you

23   see that on your screen, Sergeant?

24   A.    Of the bridge?

25   Q.    Yes.

1    A.    Yes.

2    Q.    Okay.  And we can see -- you can see the fence and the

3    concrete under the fence?

4    A.    Yes.

5    Q.    And you -- when you got up the embankment, you saw

6    Officer Ornelas towards the end of this fence line; is that

7    fair?

8    A.    Yes, at the very end of it.

9    Q.    Right.  And I think you've indicated that before in a

10   statement that you had given after the incident?

11   A.    Yes.

12   Q.    And after getting up the embankment within about a

13   second of hearing those four pops, did you happen to hear any

14   other pops?

15   A.    No.

16   Q.    So it's not like there was a group of pops, a pause, and

17   more pops?

18   A.    In my mind all I heard was popping, urgency to get up

19   the embankment.  That's when I came up the embankment with my

20   gun out.

21   Q.    Right.  And the four pops you heard were all in a short,

22   very short period of time; is that fair?

23   A.    Yes.

24   Q.    Showing you just another view, 31-03.

25          MR. GALIPO:  May I publish, Your Honor?

1    How close was he to the concrete wall?

2    A.   Probably, like, just a few feet away.  Probably two or

3    three feet from the wall.

4    Q.   Okay.  And my question specifically was can you tell us

5    where he was in relation to any of the yellow markers in this

6    photograph.

7    A.   Like, in relation?

8    Q.   Right.  Do you see, like, for example, there's a 10, an

9    11, and a 9?

10   A.   Yeah.  There's yellow markers everywhere.

11   Q.   Yes, there are.

12   A.   I just wanted to make sure.  It's not the markers by the

13   train.  Where there's, like, the darker rocks, that's not

14   where he was.  It was more like the lighter rocks where his

15   body was and more to the right.

16   Q.   Okay.  How about by which number evidence marker?

17   A.   You mean -- so the closest ones, I would think that

18   would be near his body.  That's what you're saying?

19   Q.   Yes.  That's one way to put it.

20   A.   Probably 9.

21   Q.   Marker 9?

22   A.   Yeah.

23   Q.   Now, you mentioned earlier at some point you I think

24   reviewed a declaration that you had signed related to this

25   case; did you?

BY MR. KLEHM:

Q.   So, Sergeant Steen, when you got to the top of the bridge, Officer Ornelas did not fire his weapon any further; is that correct?

A.   That is correct, 100 percent.

Q.   So when you got up to the bridge, there were no more popping sounds or gunfire; is that correct?

A.   That is correct.

Q.   And you didn't see Mr. Sesma go down or get back up; is that correct?

A.   Correct.  There was one time it looked like he was going to get back up.

Q.   What did you see?

A.   Like, it looked like a push-up position momentarily, but then he fell back down.

Q.   But when he was in that push-up position, Officer Ornelas did not fire at him, correct?

A.   Correct.

Q.   And did you see the other CHP officers administer first-aid to Mr. Sesma when you got to the top of the bridge at any time?

A.   Correct.

Q.   And was Mr. Sesma moving around at that point, trying to get up?

A.   Correct.

1    Q.    Nobody was shooting him at that time, correct?

2    A.    Correct.

3    Q.    What were they doing for him?

4    A.    Medical aid.

5              MR. KLEHM:  No further questions.  Thank you.

6              THE COURT:  Go ahead, Mr. Galipo.

7              MR. GALIPO:  Yeah, just on this last point.

8                    **FURTHER REDIRECT EXAMINATION**

9    BY MR. GALIPO:

10   Q.    When you say he did like a push-up position, is that

11   what you're saying?

12   A.    It looked like he was possibly going to get up, because

13   we didn't -- because I didn't want to approach him yet to get

14   hit by the pipe.

15   Q.    Okay.  How long after you got to the top of the

16   embankment did you see him possibly try to get up?

17   A.    Probably a few seconds after I got to the top, because I

18   had my gun out at the same time.

19   Q.    Okay.  And he would've been on his chest about 25 feet

20   away from you?

21   A.    Correct.

22   Q.    Did you think from your perspective it would have been

23   appropriate to shoot him at that time?

24   A.    What do you --

25   Q.    You didn't shoot him, correct?

1    neutralize it, and apprehend the person.  In this case is

2    very likely a misdemeanant subject.

3    Q.   Okay.  You mentioned the fact that you don't have a gun,

4    and then you also referenced something like a metal object

5    being a contact weapon.  Can you explain the importance of

6    that to the jury.

7    A.   Right.  So a gun is significantly different because, of

8    course, with a firearm you can -- the rule is you have to

9    stay in a cover, which is a place of safety in case the

10   person takes a shot at you.

11          And so cover, a safe cover, is a very fundamental

12   rule if somebody might be armed with a gun.  A knife, stick,

13   rock, brick, fist, these are contact weapons and devices, and

14   the rule is stay out of the way use the tools that will give

15   you a reach if you want it or, if you go hands on, will be

16   the issue you're dealing with.

17          A contact weapon, typically the area you're going

18   to get hurt in is if they hit you in the head with it.

19   You're trained to avoid that and stay out of the way of that

20   even if you're physically grappling with them.

21          I'll wait for the next question.

22          MR. GALIPO:  Okay.  Is this a good time maybe for

23   our break, Your Honor?

24          THE COURT:  Yes.  Let's take our afternoon break

25   now.

```
1    A.    Exactly.

2    Q.    Why does that become important, this immediately causing

3    death, if the person is not pointing or shooting a gun but

4    simply has an object?

5    A.    Well, as I -- an object is a tool of contact.  So if the

6    obvious reasonable alternative is to stay out of the way,

7    you're required to do that, not stand and wait to get hit.

8    That would be a short way of saying it.

9              If a person has an object that can hurt you but

10   they're from here to the wall, there's no immediacy.  Of

11   course, there would be absolutely no justification to respond

12   with lethal force.

13             So IDOL, immediate defense of life.  If you can

14   avoid by moving yourself to keep distance, then there's no

15   immediacy, and there would be no authorized use of lethal

16   force.

17   Q.    So in terms of -- first of all, there has to be the

18   IDOL.  There has to be the immediate defense of life?

19   A.    Yes.

20   Q.    And then another consideration, even if there is IDOL,

21   whether there's other reasonable options?

22   A.    Exactly.

23   Q.    Is less lethal sometimes other reasonable options?

24   A.    Well, yes.  If it's an object of contact, then the

25   obvious method of dealing with the object of contact would be
```

```
 1    less than lethal because those are tools that would
 2    incapacitate and overwhelm that kind of assault.  And it
 3    would never be considered that lethal force would be
 4    appropriate in that circumstance because of the reverence of
 5    life that's required in the profession.
 6    Q.   Can you give the jury some examples of less-lethal
 7    options?
 8    A.   Well, in the scenario you depicted, staying out of the
 9    way.  Obvious.  But the tools on the belt, the kinetic
10    energy, the baton, which would at least strike the hand that
11    holds the object or parry off an opportunity to have it hit
12    you.
13            I have to add, officers are expected to physically
14    engage.  I mean, it's part of what we do, and we're trained,
15    and officers enter the profession with that understanding.  I
16    certainly did.
17            So -- and then the electronic device, the taser,
18    which was something that I never had the opportunity to have
19    but that I've learned about and talked about often, is a
20    device that despite any intent by the person, it overwhelms
21    muscles and nerves and makes the person incapacitated if it's
22    done properly for five seconds for handcuffing.
23            And if the person gets close enough, the end of the
24    weapon is like a cattle prod and they don't -- it really is
25    like a hot iron and will cause a person to retract and stay
```

 1    away.

 2            So those are two, plus the ability of the officer

 3    that's trained to use what we call personal weapons -- the

 4    fist, the elbow, the foot, the knee, those things that you

 5    have physically that you could use to engage and incapacitate

 6    or overwhelm.

 7    Q.    In this case did you also take into consideration the

 8    height and weight and age of Officer Ornelas, including his

 9    background in wrestling and football?

10    A.    Yes, I did.

11    Q.    How did that play into your opinion?

12    A.    So that's part of the totality as well, and officers in

13    the profession get sort of a favored response when they need

14    to engage physically.

15            It would be, if someone is rushing at you, pushing

16    them away, knocking them away, making them -- putting them

17    off balance.  And if you're -- if the totality of the

18    circumstances is if you're bigger and I was not a large

19    officer, but you can still deal with people even bigger than

20    yourself.  In this case the size is part of the totality of

21    the circumstance.

22    Q.    How about subjective fear?  What if the officer said I

23    was afraid he was going to do something.  I was afraid he was

24    going to possibly get closer to me and try to hit me with the

25    pipe.  Is that enough to use deadly force?

```
 1   A.   No.
 2   Q.   Why not?
 3   A.   So that's also part of the training, and it's in the
 4   learning domain 20, and it's repeated a number of places.
 5   The use of force is justified only based on objectively
 6   reasonable facts.  Subjective fear is taught as a factor that
 7   is not to be considered or not as justified in the use of
 8   force.
 9            So individuals, officers, can have -- be fearful or
10   imaginary, have an imaginary fear, but it's not authorized
11   for the officer to operate on that basis.  There must be
12   objectively reasonable facts.
13            So in this case, as you've depicted, not a firearm.
14   There's not a gun.  It's a piece of metal 11 inches long.
15   And the person is 40 feet away to begin with.  You're not
16   going to consider that that creates a fear of great bodily
17   harm or death and would justify use of lethal force.
18   Q.   And you referenced the distance of 40 feet.  Based on
19   your analysis of this case, is that the approximate distance
20   that Mr. Sesma was from Ornelas when the shooting started?
21   A.   Yes.
22   Q.   And 40 feet probably would be somewhere between you and
23   the back of this courtroom?
24   A.   That would be my estimate.
25   Q.   Okay.  And is the distance important if you're talking
```

1   about an imminent threat of death?  In other words, someone

2   in the process of striking someone in the head with a baton?

3   A.   Well, of course, because it takes some time to get from

4   there to here, and it would require me to stay where I am

5   rather than move to a better position tactically; and to

6   instruct my partner to use something that I may not have,

7   which is the cover officer/contact officer configuration.

8        So there is no, in my testimony here, objectively

9   reasonable fear of someone with a striking object that far

10  away.

11  Q.   How about what's the training on giving a verbal warning

12  before you use deadly force.

13  A.   In the training that's one of the requirements taught

14  pursuant to law taught that, if possible, you will give a

15  warning that you're going to use lethal force, because that's

16  an opportunity for the person to realize the gravity of what

17  they may be doing, and it would result in their death.  But

18  if possible, you will give a warning that you're going to use

19  lethal force.

20  Q.   Is there -- and I'm going to get into a hypo in a

21  moment, Mr. Sesma running in the direction of Officer

22  Ornelas.  Is the existence of a threat or potential threat

23  enough based on the training to use deadly force?

24  A.   No.

25  Q.   Why not?

1    A.    Well, because it's not part of the objectively

2    reasonable basis.  A person armed with an object obviously

3    can inflict harm, but there's -- in this totality of

4    circumstance as I've explained it and as is taught and as I

5    taught it, was there has to be other factors that will

6    justify the imminent injury or death, the IDOL, to exist.

7    And as I've discussed, distance is a huge factor in this

8    scenario.

9    Q.    And finally, if an officer overreacts in using deadly

10   force, is that, based on the training, a situation of

11   excessive force?

12   A.    Yes.  That's one of the factors that would define

13   excessive force, overreaction.

14   Q.    Okay.  Now, we've talked about the standards.  I want to

15   try to relate them to the facts of this case.  I'm assuming

16   that's what you did in your work on this case?

17   A.    Yes.

18   Q.    And you wrote a report at some point with your opinions?

19   A.    Yes.

20   Q.    You gave a deposition in this case?

21   A.    Yes.

22   Q.    Okay.  I want to talk to you about the first volley of

23   shots, and I'm going to do it in terms of a hypothetical.

24   Officer Ornelas gets to the top of the embankment.  He

25   initially looks east.  Doesn't see anyone.  He hears someone

```
1  saying something about maybe someone sitting down.  He then

2  looks west and sees for a few seconds Mr. Sesma sitting down.

3           Are you with me so far?

4  A.    Yes.

5  Q.    He then sees Mr. Sesma stand up and start running in his

6  direction.  Are you with me?

7  A.    Yes.

8  Q.    According to Officer Ornelas, he sees this pipe that I

9  showed you in one of Mr. Ornelas's hands but he doesn't know

10 which one.  Are you with me so far?

11 A.    Yes.

12 Q.    He says something from approximately 50 feet away to

13 stop or drop it.  And within about a second of giving those

14 commands, when Mr. Ornelas is 40 feet away, the distance we

15 just talked about, he starts firing his first volley of

16 shots.  Are you with me?

17 A.    Yes.

18 Q.    He gives no verbal warning that he's going to fire.  He

19 doesn't see Mr. Sesma throw or attempt to throw the pipe or

20 swing the pipe or attempt to swing the pipe, and in my

21 hypothetical he's approximately 40 feet away.

22           Are you with me?

23 A.    Yes.

24 Q.    Based on the POST standards and the principles you just

25 went over, would it be appropriate to use deadly force?
```

UNITED STATES DISTRICT COURT

1    A.    No.

2    Q.    Why not?

3    A.    Because there's no IDOL.  It may be interpreted as an

4    attempt and some sort of ability such as with the pipe, but

5    there's no immediacy.  So there would be no use of lethal

6    force in that scenario.

7    Q.    Okay.  Are you critical of Officer Ornelas firing his

8    first volley of five shots under the facts of this case?

9    A.    I am.

10   Q.    Now, assume that during this first volley of shots, even

11   after the second shot, Mr. Sesma starts going down, and he's

12   falling to the ground during the first volley of shots.

13         Are you with me?

14   A.    Yes.

15   Q.    As of shot three, let's assume -- and you've seen the

16   MVARS videos, correct?

17   A.    Yes.

18   Q.    You can no longer see his white shirt.  Are you still

19   with me in my hypothetical?

20   A.    Yes.

21   Q.    And a couple of additional shots are fired as his white

22   shirt goes out of view and he's falling to the ground.  Are

23   officers required within a given volley to justify each shot

24   and assess?

25   A.    Yes.

```
1    Q.   Can you explain that to the jury.

2    A.   So that's range training, and you fire and you assess.

3    The scenario you've given me here is that he's now reacted to

4    the shots and he's going down.  The officer would cease to

5    fire.

6    Q.   Okay.  You are aware based on your review of the

7    materials in this case that one or more other officers say

8    that Mr. Sesma had this pipe in his right hand when he was

9    running?

10   A.   I'm aware of that statement, those statements.

11   Q.   You looked at the MVARS videos in this case?

12   A.   Yes.

13   Q.   And you're aware of some expert workup on the case?

14   A.   Yes.

15   Q.   Did you at any time from your viewing of the videos, as

16   Mr. Sesma is running, see a pipe in his hand?

17   A.   I did not.

18   Q.   Did you ever see him raise an object over his head in a

19   striking motion?

20   A.   No.

21   Q.   Okay.  So that first hypothetical I gave you, assuming

22   he had a pipe in one of his hands, your opinion is it would

23   have been inappropriate to shoot?

24   A.   That's my -- not shoot at all, period.

25   Q.   What if he didn't have any pipe in his hand at all?  I
```

```
 1    assume your opinion would be the same?

 2    A.    Well, it certainly would.

 3    Q.    How about if it was 35 feet rather than 40?  Would that

 4    make any difference?

 5    A.    No.

 6    Q.    30 feet rather than 40?

 7    A.    No.

 8    Q.    25 feet?

 9    A.    No.

10    Q.    Why not?

11    A.    Because it would not be necessary or appropriate to

12    shoot someone with an object, a contact object in their hand

13    at that -- especially at that distance.  And you have ample,

14    per the distance, time, plus cover -- excuse me, distance

15    plus cover equals time.  Time is part of the tool box.

16              So movement to create more distance, movement to go

17    to cover, which would be around the corner of the fence, or

18    using the boxcars, the space between the boxcars, that would

19    -- that creates even more time.

20              So it's not an issue of time just because of the

21    distance you've depicted.  It's time that the distance that

22    you will create for yourself plus the distance that exists in

23    your hypothetical.

24    Q.    Okay.  Now, if the facts of this case were different, if

25    they were that Mr. Sesma ran up within three to five feet of
```

1    Officer Ornelas, Officer Ornelas tried to tactically

2    reposition but Mr. Ornelas tracked him or followed him, and

3    he got within three to five feet of him and he was trying to

4    swing the pipe towards Officer Ornelas's head.  If those were

5    the facts of our case, would you then have a different

6    opinion?

7    A.    No.

8    Q.    Why not?

9    A.    Because Ornelas would know per his training how to deal

10    with that kind of contact if it was going to occur, and it

11    would be push, block, use his arms to prevent contact with

12    his head, and use his strong side, his strong hand, with the

13    taser, the baton, or fist to over power the assault that he's

14    found himself in.

15    Q.    Okay.  I want to talk to you next about the second

16    volley of shots.  Let's assume that in the first volley of

17    shots, based on Officer Ornelas's perception, Mr. Sesma

18    almost immediately went down to the ground.  Are you with me?

19    A.    Yes.

20    Q.    And his impression was initially -- he struck him

21    because he initially went down to the ground.  You still with

22    me?

23    A.    Yes.

24    Q.    Further assume that Mr. Sesma is at least 25 feet from

25    Officer Ornelas when he's down on the ground chest down.  And

```
 1   he's down in that position for approximately five seconds.

 2   Are you still with me in my hypothetical?

 3   A.    Yes.

 4   Q.    And Officer Ornelas is at the end of the fence line.

 5   And according to Officer Ornelas, he sees Mr. Sesma trying to

 6   push himself up or partially come up, but Mr. Sesma, again

 7   according to Officer Ornelas, never got to his feet, never

 8   was able to start running or advancing towards him.  And as

 9   Mr. Sesma appeared to be trying to get up, Officer Ornelas

10   fired two more shots essentially aiming at his face and chest

11   area because that's what was center mass at that point.

12          Are you with me?

13   A.    Yes.

14   Q.    What is your opinion as to the second volley of shots,

15   the two shots that according to Officer Ornelas struck

16   Mr. Sesma in the face?

17   A.    So that is a very troubling scenario.  In my opinion no

18   reasonably trained officer would ever fire under those

19   circumstances because there is no longer, the term is,

20   credible threat whatsoever, I will add, in my opinion.

21   Q.    Let's further assume that Officer Ornelas in the second

22   volley of shots is not sure which hand the pipe is in.  In

23   fact, after the shots he thinks the pipe might be underneath

24   Mr. Sesma's body.  Are you with me?

25   A.    Yes.
```

1    when he held it in his hand.

2    Q.    And it's your testimony today, according to Mr. Galipo's

3    hypothetical, that if a suspect was within three to five feet

4    of Sergeant Ornelas with this pipe and running at him still,

5    that Officer Ornelas should have used his wrestling

6    techniques and pushed him out of the way or used his baton or

7    used a taser?

8    A.    That's exactly what I'm saying.

9    Q.    You're aware in this case that even after Mr. Sesma was

10   shot multiple times, he still got up and lunged towards

11   Officer Ornelas with this pipe in his hand?  Are you aware of

12   that?

13   A.    I am not aware of it.  I'm not -- you want me to accept

14   that --

15   Q.    Well, did you read the testimony from the depositions in

16   this case?

17   A.    I read the testimony, and I did not consider a credible

18   threat after -- most certainly after the first five shots.

19   Q.    And that's because your opinion is that after the first

20   five shots, Mr. Sesma was so incapacitated that he did not

21   pose a credible threat, correct?

22   A.    Exactly.

23   Q.    Did you see on the MVARS where he lunged after being

24   shot?  He lunged forward again?

25   A.    I watched the MVARS and I watched the analysis of the

1    MVARS, and I watched.  He was wearing a white shirt, so you

2    can see a brief -- after the first volley you can see the top

3    of his shirt momentarily and then down again.  That's not a

4    credible threat in my opinion, especially at 20 some odd

5    feet.

6    Q.   Now, you answered in response to Mr. Galipo's questions

7    that you heard shots after Mr. Sesma was falling down.  Do

8    you recall that line of questioning?

9    A.   I recall the questioning and I recall the MVARS, yes.

10   Q.   So in the MVARS you see Mr. Sesma falling forward,

11   falling down after the initial shot.  And then you see -- I'm

12   sorry.  You see Mr. Sesma falling down after the initial

13   shot, and then you hear another shot or two, correct?

14   A.   Yes.

15   Q.   On the MVARS?

16   A.   You hear it.

17   Q.   And do you know what travels faster?  Light or sound?

18   A.   I do know what travels faster.

19   Q.   What travels faster?

20   A.   Well, light travels faster than sound.  Sound is around

21   600 miles an hour, 198,000 miles I think for light.  But it's

22   like -- something like 100 feet that you would be able to

23   differentiate.  I think it could be -- I'll wait for the

24   question.

25   Q.   Did you look at the report prepared by defendant's

```
 1   information that you're seeking is within this expert

 2   witness's area of expertise.

 3           MR. KLEHM:  Thank you, Your Honor.

 4           THE COURT:  That's the foundation that I was

 5   talking about.

 6   BY MR. KLEHM:

 7   Q.   Would you agree based on your review of the MVARS that

 8   Officer Ornelas stopped firing after the suspect was on the

 9   ground?

10   A.   The first volley, he was down on the ground, and there

11   was no -- after five shots there were no further shots, and

12   he was down.

13   Q.   Do you have any evidence from anything you looked at

14   that indicates in your opinion that Officer Ornelas fired at

15   the suspect while he was actually down on the ground?

16   A.   You mean chest contact with the ground?

17   Q.   I mean down on the ground?

18   A.   Well, I don't know.  I wasn't there.  So -- you can see

19   his white shirt come up from the edge and after -- and then

20   two more shots six to seven seconds later.

21   Q.   And did you review Officer Ornelas's testimony that the

22   reason he fired was because the suspect was lunging at him

23   while still holding this metal pipe?  Lunging.  Not just

24   standing up casually but lunging.

25   A.   That's what I remember in his deposition that I reviewed
```

UNITED STATES DISTRICT COURT

1    and referenced in my report.

2    Q.   Would you agree in watching the MVARS as you did and

3    testified to that while the suspect was running across the

4    bridge towards the position where Officer Ornelas was at,

5    that he waited approximately four seconds before discharging

6    his weapon?

7    A.   I didn't count.

8    Q.   Was that important to you or not important to you?

9    A.   Well, no, because the distance was still very

10   significant.  So it could be that much time.

11   Q.   Well, how did you arrive at this 40-feet figure that you

12   testified to that the suspect was away from Officer Ornelas

13   when he first fired?

14   A.   It was calculated by the position -- there's a pillar

15   that supports the overpass -- where the shot starts.  There's

16   posts for the fence that are eight feet apart, so you -- and

17   then you can calculate from that point to the end of the

18   fence, which is 40 feet.

19   Q.   And in this calculation you're referring to, where do

20   you place Officer Ornelas's position when he was firing?

21   A.   I put him exactly where he said he was, which was at the

22   end of the fence, where the fence started or the end of the

23   fence.

24   Q.   And where did -- where did you obtain that information

25   that Officer Ornelas was at the very end of that fence?

```
 1    Q.   You wouldn't consider Mr. Sesma getting up after the
 2    first volley of shots, that he got up quickly?  Is that what
 3    you're saying?
 4    A.   I considered Mr. Sesma after the first volley of shots
 5    wounded, easily accommodated in terms of being handcuffed,
 6    and treated medically.
 7    Q.   Did you -- were you aware of the officer's testimony
 8    that after the first volley of shots, he still, when he got
 9    up, had a pipe in his hand, the same pipe he had before?
10    A.   That's his testimony.  I wasn't there.  I don't know if
11    he had the pipe or not.  I know the pipe was not in proximity
12    of the body when he fell.
13    Q.   We'll get there.  What I'm talking about -- is it your
14    testimony that the officers on the scene should have started
15    to render aid to Mr. Sesma even though he was still armed
16    with a deadly weapon.
17    A.   I think you're asking me to consider that as a deadly
18    weapon, which I hope I've said no, and that I would
19    absolutely consider him wounded and in need of medical care.
20    That's the obligation.
21    Q.   It's -- again I'm going to show you this pipe.  Have you
22    ever held this pipe?
23    A.   I said that I have not.
24         MR. KLEHM:  Your Honor, may I present the pipe to
25    the witness to see if he considers this a deadly weapon or
```

1    the first group of shots, the pause, and the last two shots?

2    A.    Yes.

3    Q.    Okay.

4              MR. GALIPO:  We're going to play it just one more

5    time if it's okay with the video and audio.

6              (Videotape recording played)

7    BY MR. GALIPO:

8    Q.    That's part of what you considered in not only

9    determining the distance but in the sequence of shots?

10   A.    Yes.

11   Q.    And applying all of the principles and standards that

12   you told this jury about, is your main issue with the first

13   group of shots the distance?

14   A.    Yes.

15   Q.    And the fact that there were other reasonable options?

16   A.    Yes.

17   Q.    And the second group of shots, what are your main issues

18   with that?

19   A.    Well, he's wounded and it still is a very substantial

20   distance.  It's over 20 feet.  So there's still opportunity

21   to stay out of contact and not shoot.  But you're now -- he's

22   wounded and you would render the medical care and you would

23   use physical restraint rather than lethal force, if

24   necessary.

25   Q.    I will proffer to you, Mr. Clark, that after this first

1  group of shots, Mr. Sesma went down on his chest for about

2  five seconds.  And he fell in the area the jury has seen,

3  markers number 10 and 11.  And then looked like he was about

4  to get up.  Never got his feet under him.  Never ran or

5  further advanced.  And you have the last two shots, and then

6  he went down flat again.  Are you with me?

7  A.    Yes.

8  Q.    And we had an officer testify earlier today that he

9  estimated when he got to the top of the embankment, Officer

10  Steen, that the distance from Officer Ornelas to Mr. Sesma on

11  the ground was 25 feet.  Can you accept that?

12  A.    Yes.

13  Q.    If someone is down on the ground and been shot, and

14  they're 25 feet away, does the fact that they have a pipe in

15  their hand support using additional deadly force against

16  them?

17  A.    No.

18  Q.    Why not?

19  A.    Well, because the term, as I said, it's not a credible

20  threat.  You would get up to him and take the pipe away and

21  tend to him.  That would be what would be expected.  There's

22  no credible threat at that point.

23  Q.    And let's say hypothetically that after the first group

24  of shots, some of the shots hit him in the right arm and

25  somehow the pipe got tossed to the side as he was going to

1    the ground.  Are you with me in terms of my hypothetical?

2    A.    Yes.

3    Q.    So he didn't have the pipe on him at all under my

4    hypothetical in the second group of shots.  Are you with me?

5    A.    Yes.

6    Q.    Again showing you Exhibit 14-2, you can see here the

7    exhibits or markers 10 and 11 and how far they are from the

8    end of the fence.  Do you see that?

9    A.    Yes.

10   Q.    Now, assuming nobody saw him with the pipe after the

11   second volley of shots in his hand, under his body, and they

12   see this pipe some distance away from him, and assuming no

13   one saw him toss it there after he was shot in the face in

14   the second volley, and further assuming he didn't even have

15   the pipe on him in the second volley of shots, how would that

16   play into your opinion regarding whether the second volley of

17   shots was necessary?

18   A.    Well, then he is unarmed.  Officers are trained that we

19   watch the hands.  That's where the weapon will be.  So it

20   would be expected they would see he no longer has possession

21   of the pipe.  He's wounded.  He's down.  And now it's -- you

22   tend to him.  You do not consider him a credible threat.  He

23   has no weapon in that scenario.

24   Q.    And assuming further that after the -- immediately after

25   the second volley of shots, Officer Ornelas doesn't know

1    where the pipe was.  He thought it was underneath possibly

2    Mr. Sesma's body.  How would that further play into your

3    opinion?

4    A.    Well, further, he's not a credible threat with a weapon

5    in hand, and it is a contact weapon.  He admitted he's been

6    wounded.  So it would not be a credible threat, and it would

7    not be worthy or reasonable to use lethal force.

8    Q.    Lastly, Mr. Clark, it has been suggested that there was

9    a threat of Mr. Sesma throwing this pipe from 40 feet away.

10   Do you think that is a credible lethal threat?

11   A.    No.

12   Q.    And from 25 feet away after he's been shot on the

13   ground, do you think that's a credible lethal threat?

14   A.    No.

15   Q.    And in reviewing all the materials, including deposition

16   testimony, that Officer Ornelas never said it looked like he

17   was throwing or attempting to throw the pipe?

18   A.    I noted that.

19           MR. GALIPO:  Thank you.  That's all I have.

20           THE COURT:  Any recross?

21           MR. KLEHM:  Just a few, Your Honor, if I may.

22           THE COURT:  Yes.

23           MR. KLEHM:  Again, I understand the time, so I will

24   be very quick.

25                     **RECROSS-EXAMINATION**

```
1    tomorrow whether I'm going to call them or not so they don't
2    have to spend time preparing if I'm not going to call them.
3            THE COURT:  So if you do wish to call a witness
4    like that out of order after -- well, you'll end your
5    case-in-chief but for this witness?
6            MR. GALIPO:  Correct.
7            THE COURT:  If you're going to do that, let me
8    know.
9            MR. GALIPO:  I will let you know, Your Honor.
10           THE COURT:  Okay.
11           What else?
12           MS. KIM:  That is all I can think of, Your Honor.
13           THE COURT:  Okay.
14           MS. KIM:  I'm sure I will think of more.
15           THE COURT:  Well, be here, please, at 8:30, and
16   hopefully we won't have more than 15 minutes' worth of
17   housekeeping.  Then we can start at 8:45.
18           All right.  Have a good evening, everybody.  I hope
19   you have a restful one.
20           MS. KIM:  Thank you.
21           MR. GALIPO:  Thank you, Your Honor.
22           MR. KLEHM:  Thank you.
23           (Proceedings adjourned at 5:21 p.m.)
24                       CERTIFICATE
25   I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT
```

```
1    TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN

2    THE ABOVE MATTER.

3    FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

4    REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

5    REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

6

7    /s/ Miriam V. Baird          12/05/2024

8    MIRIAM V. BAIRD                    DATE
     OFFICIAL REPORTER
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT "C"

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3              HONORABLE JOHN W. HOLCOMB, JUDGE PRESIDING

4    CANDIDO SESMA, ET AL.,            )
                                       )
5                                      )
                                       )
6                       Plaintiffs,    )
                                       )
7                                      )
                                       )
8           Vs.                        )   No. CV21-01694-JWH
                                       )
9                                      )
                                       )
10   STATE OF CALIFORNIA, ET AL.,      )
                                       )
11                                     )
                                       )
12                      Defendants.    )
                                       )
13   _____  )

14

15

16              REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                      *JURY TRIAL, DAY 4*

18                   LOS ANGELES, CALIFORNIA

19              THURSDAY, DECEMBER 5, 2024

20

21

22

23            MIRIAM V. BAIRD, CSR 11893, CCRA
            OFFICIAL U.S. DISTRICT COURT REPORTER
24          411 WEST FOURTH STREET, SUITE 1-053
              SANTA ANA, CALIFORNIA 97201
25              VELIZBAIRDMIRIAM@GMAIL.COM

1                                 <u>INDEX</u>

2    <u>WITNESS:</u>                                              <u>PAGE:</u>

3

     <u>Julie Huss-Bawab, Plaintiffs' witness, sworn</u>          13
4    DIRECT EXAMINATION                                       14
     REDIRECT EXAMINATION                                     56
5    RECROSS-EXAMINATION                                      59
     FURTHER REDIRECT EXAMINATION                             60
6    <u>Alex Sesma, Plaintiff's witness, sworn</u>                 62
     DIRECT EXAMINATION                                       63
7    CROSS-EXAMINATION                                        79
     CROSS-EXAMINATION                                        82
8    REDIRECT EXAMINATION                                    109
     Susan Sesma, Plaintiff's witness, sworn                114
9    DIRECT EXAMINATION                                      115
     CROSS-EXAMINATION                                       119
10   <u>Cecilia Sesma, Plaintiff's witness, sworn</u>            121
     DIRECT EXAMINATION                                      122
11   <u>Clarence Chapman, Defendant's witness, sworn</u>         128
     DIRECT EXAMINATION                                      129
12   CROSS-EXAMINATION                                   **185**

13                              * * * * *

14

15   <u>EXHIBITS:</u>

     Exhibit 9 received                                       42
16   Exhibit 10 received                                      43
     Exhibit 18 received                                      64
17   Exhibit 35-35 received                                   84
     Exhibit 19 received                                     127
18   Exhibit 31-25 received                                  165

19                              * * * * *

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
 1    A.    That is correct.
 2    Q.    So that's the standard, you would agree, that applies to
 3    someone deciding whether the use of deadly force was
 4    appropriate or not?
 5    A.    That is correct.
 6    Q.    And then in number nine in your report, you talk about
 7    the sanctity of life, correct?
 8    A.    Yes.
 9    Q.    In number ten you talk about giving a warning that
10    you're going to use deadly force when feasible, true?
11    A.    True.
12    Q.    And I think we talked about some of this in your
13    deposition, but you would agree subjective fear is
14    insufficient alone to use deadly force?
15    A.    I agree, yes.
16    Q.    And a potential threat is not enough.  It has to be a
17    lethal threat, and the lethal threat has to be imminent or
18    immediate?
19    A.    Yes, just like in this case.  Exactly.
20    Q.    Well, let's talk about that.  You've been an expert for
21    many years now, true?
22    A.    True.
23    Q.    You've testified in many trials including jury trials
24    like this one, correct?
25    A.    True.
```

1    hypotheticals of people doing push-ups and then all of a

2    sudden it transitions to a person who is actually standing

3    up -- his arms aren't that long.

4            When his tee shirt pops up, that's not a push-up.

5    That's a person who standing or crouching in a way that

6    they're off the ground.  It's different, because if you see

7    his white tee shirt over that abutment, he's not on the

8    ground and he's not doing a push-up.

9            If the -- if you take the testimony of the officer

10   as fact -- and you don't have to.  But if you take it as

11   fact, Mr. Sesma was lunging at that point.  So when we -- if

12   we can separate out these hypotheticals from the facts of the

13   case and what we can see visually in the video, I have to

14   disagree with you.  I still think both things can be true.

15           Your hypothetical is actually correct.  You can't

16   shoot a person on the ground doing a push-up, but the officer

17   can use deadly force if the individual has something in his

18   hand, right or left, and is lunging at that officer at the

19   time in a sufficient fashion to make that officer fear for

20   his or her safety.

21   Q.   Well, it's gotta be more than a fear for safety, right?

22   It has to be an immediate threat of death?

23   A.   Well, I can violate your safety by killing you.  I mean,

24   that's inclusive.  Safety includes death.

25   Q.   Right, but safety is much more general than the standard

1              THE WITNESS:  We have an understanding.

2              MR. GALIPO:  Thank you.

3              THE COURT:  Anything else we have to do?

4              MR. KLEHM:  We're still on track for Wednesday

5    closing, Your Honor.

6              THE COURT:  That's terrific.  Happy to hear that.

7    You've heard the promises that I've made.

8              MR. GALIPO:  Thank you, Your Honor.

9              THE COURT:  Okay.  Anything else?

10             MR. GALIPO:  No.  I think we're good.

11             THE COURT:  Okay.  Well, have a good and restful

12   weekend.  I wish you peace.  I'll see you Monday morning at

13   8:00 o'clock.  Thank you.

14             MR. GALIPO:  Thank you, Your Honor.

15             MR. KLEHM:  Thank you, Your Honor.

16             MS. DEAN:  Thank you, Your Honor.

17          (Proceedings adjourned at 4:52 p.m.)

18                        CERTIFICATE

19   I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

20   TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN

21   THE ABOVE MATTER.

22   FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

23   REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

24   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

25

1    /s/ Miriam V. Baird          12/06/2024

2    MIRIAM V. BAIRD                    DATE
     OFFICIAL REPORTER

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT "D"

1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3    HONORABLE JOHN W. HOLCOMB, JUDGE PRESIDING

4  CANDIDO SESMA, ET AL.,              )
                                       )
5                                      )
                                       )
6                    Plaintiffs,       )
                                       )
7                                      )
                                       )
8        Vs.                           )   No. CV21-01694-JWH
                                       )
9                                      )
                                       )
10 STATE OF CALIFORNIA, ET AL.,        )
                                       )
11                                     )
                                       )
12                   Defendants.       )
                                       )
13 _____    )

14

15

16        REPORTER'S TRANSCRIPT OF PROCEEDINGS

17              *JURY TRIAL, DAY 5*

18             LOS ANGELES, CALIFORNIA

19           MONDAY, DECEMBER 9, 2024

20

21

22

23        MIRIAM V. BAIRD, CSR 11893, CCRA
        OFFICIAL U.S. DISTRICT COURT REPORTER
24       411 WEST FOURTH STREET, SUITE 1-053
           SANTA ANA, CALIFORNIA 97201
25          VELIZBAIRDMIRIAM@GMAIL.COM

<pre>
 1                              INDEX

 2   WITNESS:                                       PAGE:

 3
       Kyle Bumanlag, Defendants' witness, sworn      36
 4     DIRECT EXAMINATION                             37
       CROSS-EXAMINATION                              48
 5     REDIRECT EXAMINATION                           62
       RECROSS-EXAMINATION                            64
 6     FURTHER REDIRECT EXAMINATION                   66
       Anthony Cichella, Defendants' witness, sworn   68
 7     DIRECT EXAMINATION                             69
       Rocky Edwards, Defendants' witness, sworn      87
 8     DIRECT EXAMINATION                             88
       CROSS-EXAMINATION                              97
 9     REDIRECT EXAMINATION                          120
       RECROSS-EXAMINATION                           123
10     Anthony Cichella, Defendants' witness, sworn  123
       DIRECT EXAMINATION RESUMED                    124
11     CROSS-EXAMINATION                             143
       REDIRECT EXAMINATION                          155
12     RECROSS-EXAMINATION                           159
       FURTHER REDIRECT EXAMINATION                  160
13     FURTHER RECROSS-EXAMINATION                   162
       Parris Ward, Defendants' witness, sworn       164
14     DIRECT EXAMINATION                            165
       CROSS-EXAMINATION                             193
15     REDIRECT EXAMINATION                          202

16                            *****

17

       EXHIBITS:
18
       Exhibit 5 received                             40
19     Exhibit 31-15 received                         41
       Exhibit 31-11 received                         43
20     Exhibit 31-11-1 received                       44
       Exhibit 31-32 received                         72
21     Exhibit 45 received                           104
       Exhibit 14-2-1 received                       127
22     Exhibit 47 received                           179
       Exhibit 66 received                           181
23     Exhibit 48 received                           204

24                            *****

25
</pre>

**UNITED STATES DISTRICT COURT**

```
 1    A.   Yes, I did.

 2    Q.   For approximately how long?

 3    A.   I can't tell you for sure how long.  I remember while I

 4    was standing there, I was watching the suspect being treated

 5    by CHP personnel and eventually by Ontario Fire personnel.

 6    So it was a considerable amount of minutes, but I couldn't

 7    tell you how long.

 8    Q.   So you stayed nearby -- were you standing over the metal

 9    object --

10    A.   I wasn't standing --

11    Q.   -- close to it?

12    A.   I was standing close to -- not over it but standing

13    close to it, making sure that any personnel that was walking

14    up was staying to the, on my visual, the right here, on the

15    left of that weapon.

16    Q.   And you stayed in that position until the -- at least

17    until the Ontario Fire Department paramedics arrived?

18    A.   I was still there when they arrived, yes.

19    Q.   And while you were standing there, were you looking down

20    at the metal object just to look at it?

21    A.   Yes.

22    Q.   Is this the metal object that you were standing next to

23    for some amount of time and that you saw in the suspect's

24    hands as he was running towards Officer Ornelas?

25    A.   Yes, it is.
```

 1              MR. KLEHM:  Your Honor, I'd like move this into
 2    evidence.
 3              MR. GALIPO:  I think we have to have that
 4    discussion later, Your Honor.  I would object on the grounds
 5    that we previously talked about.  We can discuss it further
 6    later if the Court would like.
 7              THE COURT:  The objection is sustained.
 8              MR. KLEHM:  Without prejudice, Your Honor?  Are we
 9    talking about --
10              THE COURT:  You made an offer.  There is an
11    objection.  I sustained it.
12              MR. KLEHM:  As I notified the Court, Your Honor,
13    our expert witness is here and I would like to put him on the
14    stand so that we could complete his testimony this morning.
15              THE COURT:  Yes.  Thank you, Mr. Klehm, for
16    reminding me.
17              So, ladies and gentlemen of the jury, we're going
18    to take our morning break now.  When we come back, we're
19    going to take a witness out of order.
20              So, Mr. Cichella, did I pronounce it properly?
21              THE WITNESS:  Excellent.  Yes.
22              THE COURT:  I'm -- I apologize.  I'm going to ask
23    you to wait.  Somebody else is going to testify for a while,
24    and then we'll bring you back.
25              Please do not communicate with either set of

```
 1   portion of his body.  So in other words, whether it's out,
 2   higher, I don't know, but that bullet did not enter anywhere
 3   else on his body.
 4   Q.   So --
 5   A.   It's a through-and-through shot.
 6   Q.   Okay.  So the exit wound that was on the anterior side
 7   of the forearm was not in line with any other part of the
 8   suspect's body because the bullet didn't strike any other
 9   part of the body, right?
10   A.   That's correct.
11   Q.   And as part of your review, did you see the -- review
12   the Ornelas MVARS which shows the suspect lunging forward
13   after the first volley of shots?
14              MR. GALIPO:  I'm going to object as leading and
15   mischaracterizing the video.
16              THE COURT:  Sustained.  You can reask it.
17   BY MR. KLEHM:
18   Q.   Did you as part of your review look at the video from
19   Officer Ornelas's vehicle which shows the suspect rapidly
20   getting up after the first volley of shots?
21   A.   Yes.
22   Q.   And were the last two shots consistent in terms of the
23   trajectory of those two shots occurring while the suspect was
24   in a lunging or forward motion?
25   A.   He was in a leaning motion or, like, whether it's
```

1    lunging forward or -- but he's got to be in line with the

2    muzzle of the gun in order to get a shot where they go

3    through the face and into the chest.

4            So he has to be leaning forward in a position to

5    where he's in line with the firearm so when the shot happens,

6    it's got -- the trajectory has got to go through the face and

7    into the chest.  So you gotta picture his body is leaning

8    forward and being able to receive those four wounds actually.

9    So you got the two face shots and you got the two shots into

10   the chest.

11   Q.    So the leaning forward would be consistent with either a

12   lunge or a fall or --

13   A.    Yes.  We don't really know what caused him to be in this

14   position.  It's consistent with him moving, like, in a

15   forward moving position, or it could be from him in a forward

16   falling type of position.  But more than likely it's whatever

17   position that is, he's got to be in line with that firearm.

18   Q.    Is that because of the angle of the wounds?

19   A.    Yes.

20            MR. KLEHM:  No further questions.  Thank you.

21            THE COURT:  Very well.

22            Mr. Galipo, so you have any cross-examination for

23   this witness?

24            MR. GALIPO:  Yes.  Thank you.

25                          **CROSS-EXAMINATION**

118

```
1              THE COURT:  Yes.  Of course.
2    BY MR. GALIPO:
3    Q.   It sounds like you yourself did not do any distance
4    analysis in your report; is that correct?
5    A.   That's correct.
6    Q.   And would you agree that someone can get the trajectory
7    of these last two shots that you're describing to the face
8    and chest with just -- even if they were down on their knees,
9    hypothetically, lifting up their upper body to come at an
10   angle in line with the trajectory of the shots?
11   A.   No.  I don't think they're on their knees.  I think
12   they're in a forward-leaning position.  In other words, this
13   has to be in alignment.
14              So if I'm on my knees and leaning all the way
15   forward like that, it would have to be -- the positioning of
16   the firearm, the barrel, the muzzle of the gun in alignment
17   with Mr. Sesma's face and with the chest.
18   Q.   Okay.
19   A.   So I don't see that -- I think it would be very hard for
20   somebody to be on their knees and be able to get that kind of
21   a shot.
22   Q.   Okay.  So when you did the demonstrative and you put him
23   on your knees, it was just the way the demonstrative ended up
24   being?
25   A.   Yes.
```

120

1          MR. GALIPO:  That's all I have, Your Honor.

2          THE COURT:  Any redirect?

3                    **REDIRECT EXAMINATION**

4    BY MR. KLEHM:

5    Q.   Based on your review of everything that you've testified

6    that you reviewed and that's in your report also, is there

7    any indication that Mr. Sesma was on his knees at the time of

8    the last two shots?

9    A.   No.

10   Q.   And why is that?

11   A.   Because of the alignment of the shots to the face and to

12   the chest puts him in a forward-type leaning position.  So

13   it's in a lunging type position or whatever.  Whatever action

14   that is, we don't know, but we know that his face and his

15   chest are in alignment with the muzzle at the time those two

16   shots were fired.

17   Q.   And all of the shots that you have observed were to the

18   right side of Mr. Sesma's body, correct?

19   A.   Yes.

20   Q.   And as far as the particular shots, the sequencing, is

21   it common in your experience that when a suspect is running

22   quickly towards the person that is shooting them, that if

23   there's multiple shots made to that subject, that some of the

24   bullets would strike the subject after he's already been hit

25   by a prior bullet and is falling down?

```
 1    through with the highway patrol, we used to run practical

 2    scenarios at Ben Clark Training Center for CHP officers in

 3    Inland Division.

 4             MR. GALIPO:  Your Honor, I apologize.  I think this

 5    goes beyond the scope of the question.  This question could

 6    have been answered with a yes or no, because I don't believe

 7    this specific officer's training is relevant.  It would be

 8    more appropriate as to Officer Ornelas, and he has not been

 9    designated as a nonretained expert.

10             THE COURT:  Very well.  The witness answered the

11    question yes.  Why don't you ask your next question,

12    Mr. Klehm.

13             MR. KLEHM:  Let's publish Exhibit 14-2, Your Honor.

14             THE COURT:  Very well.

15             MR. KLEHM:  I'm going to use the electronic version

16    for clarity, Your Honor.

17             Can we zoom in just a little bit.

18    BY MR. KLEHM:

19    Q.    You had testified earlier that Mr. Sesma's body when you

20    arrived up here was somewhere in the area depicted in this

21    Exhibit 14-2.  Do you recall that?

22    A.    Yes, sir.

23    Q.    All right.

24             MR. KLEHM:  Your Honor, I'd like to hand the

25    witness a paper copy of this same Exhibit 14-2 and ask the
```

```
 1    witness to encircle the area where he recalls seeing the
 2    suspect's body when he arrived up on the bridge.
 3              THE COURT:  Any objection, Mr. Galipo?
 4              MR. GALIPO:  No objection.
 5              MR. KLEHM:  We'd introduce that as Exhibit 14-2-1,
 6    Your Honor.
 7              THE COURT:  Show it to Mr. Galipo first, please.
 8              (Document handed to counsel)
 9              THE COURT:  Any objection to admitting what has
10    been identified as Exhibit 14-2-1?
11              MR. GALIPO:  No objection.
12              THE COURT:  Exhibit 14-2-1 is received.
13              (Exhibit 14-2-1 received)
14              MR. KLEHM:  May I publish, Your Honor?
15              THE COURT:  Yes, you may.
16    BY MR. KLEHM:
17    Q.   Now, in the marking that you made on this picture, is
18    the round circle that you drew towards the front of the
19    picture, is that depicting where Mr. Sesma's head was?
20    A.   Yes, sir, approximately.
21    Q.   And you had -- did you get up there -- strike that.
22              When you got up there, were any more shots fired?
23    A.   There were two more shots fired that I heard -- that I
24    did not see but that I heard as I was starting to go up the
25    embankment.
```

1    Q.    So by the time you got up the embankment, approximately

2    how long did it take you to scale that embankment?

3    A.    Five, six seconds approximately.

4    Q.    And was the suspect moving around -- moving when you got

5    up there?

6    A.    Yes, he was.

7    Q.    And by moving, how was he moving?  Was he -- how was he

8    moving?

9    A.    He was moving back and forth.  He was on his back.  He

10   was, you know, moving a little bit up and down like that a

11   little.  He was trying to get onto his left side.  I remember

12   that very much because I was trying -- once I did get up to

13   him and after I handcuffed him, I tried to keep him multiple

14   times from moving onto his left side.

15   Q.    Was he -- even though he was moving about, was he moving

16   any distance away from where you saw him at any time during

17   the time you observed him?

18   A.    No.  While he was moving from the time I observed him,

19   he was on his back and he wasn't moving distance, no.

20   Q.    So he was moving about; that is, his body was moving,

21   but physically his body was staying in the same general area?

22   A.    That's correct.

23   Q.    And where was Officer Ornelas if you recall at this time

24   when you got to the top of the bridge?

25   A.    If I recall, Officer Ornelas and Officer Steen were

 1    still in the area of, I would say, somewhere over in this

 2    area with their guns still drawn when I got up there.

 3    Q.    And the first thing that you did -- when you got up

 4    there after checking to make sure that Officer Ornelas and

 5    Officer Steen weren't harmed, what did you do next?

 6    A.    I went up towards the subject.  I made sure that there

 7    were no weapons that I could see within his reach, and then I

 8    proceeded to handcuff him to the front.

 9              MR. KLEHM:  If we could zoom in on the left side of

10    this photograph, please, Julian.

11    BY MR. KLEHM:

12    Q.    There's a placard marked number 7.  Do you see number 7?

13    A.    Yes, sir.

14    Q.    Is that generally the area that you observed the metal

15    object to be in when you got up there?

16    A.    Yes, sir.

17    Q.    Given that surface, when you saw Mr. Sesma running

18    towards Sergeant Ornelas where you saw him also up on the

19    bridge, did you expect that Sergeant Ornelas would have taken

20    out his baton to strike the subject as he was running with

21    that metal object that you saw?

22              MR. GALIPO:  I'm going to object as irrelevant,

23    403, and not listed as a nonretained expert.

24              THE COURT:  Sustained.

25

```
 1              Okay.  What else do we need to cover?

 2              MR. GALIPO:  I think that covers it.  I think we'll

 3    finalize the jury instructions and verdict form in the

 4    morning.  We'll finish with the testimony.  We'll finalize

 5    the exhibits.  I think we'll be good to go for the afternoon

 6    to get them the case.

 7              THE COURT:  Okay.

 8              MS. KIM:  I'm sorry, Your Honor.  I should probably

 9    mention that the defense does plan on bringing a Rule 50

10    motion.  So I did want to raise that for purposes of time

11    calculation.

12              THE COURT:  That sounds good.  So when you wish to

13    raise that, tell me that you've got a legal issue to discuss.

14    I'll obviously hear the motion outside the presence of the

15    jury, but it will be incumbent upon you to raise that and let

16    me know you've got a legal issue we need to cover.

17              MS. KIM:  Okay.  Thank you, Your Honor.

18              MR. GALIPO:  Sounds good.

19              THE COURT:  Okay.  Thank you.

20              Have a good -- I hope you can have a peaceful,

21    restful evening.  I'll see you at 8:30 in the morning.

22              MS. KIM:  Thank you, Your Honor.

23              MR. GALIPO:  Thank you, Your Honor.

24          (Proceedings adjourned at 4:26 p.m.)

25                        CERTIFICATE
```

UNITED STATES DISTRICT COURT

1    I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

2    TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN

3    THE ABOVE MATTER.

4    FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

5    REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

6    REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

7

8    /s/ Miriam V. Baird           12/09/2024

9    MIRIAM V. BAIRD                    DATE
     OFFICIAL REPORTER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT "E"

1                UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3       HONORABLE JOHN W. HOLCOMB, JUDGE PRESIDING

4  CANDIDO SESMA, ET AL.,        )
                             )

5                          )
                             )

6              Plaintiffs,  )
                             )

7                          )
                             )

8       Vs.               )  No. CV21-01694-JWH
                             )

9                          )
                             )

10  STATE OF CALIFORNIA, ET AL.,   )
                             )

11                          )
                             )

12              Defendants.  )
                             )

13  _____  )

14

15

16        REPORTER'S TRANSCRIPT OF PROCEEDINGS

17             *JURY TRIAL, DAY 6*

18           SANTA ANA, CALIFORNIA

19       TUESDAY, DECEMBER 10, 2024

20

21

22

23       MIRIAM V. BAIRD, CSR 11893, CCRA
      OFFICIAL U.S. DISTRICT COURT REPORTER
24      411 WEST FOURTH STREET, SUITE 1-053
       SANTA ANA, CALIFORNIA 97201
25       VELIZBAIRDMIRIAM@GMAIL.COM

1                              <u>INDEX</u>

2     <u>WITNESS:</u>                                          <u>PAGE:</u>

3
      <u>Clarence Chapman, Defendants' witness, sworn</u>      14
4     CROSS-EXAMINATION RESUMED                           14
      REDIRECT EXAMINATION                               49
5     RECROSS-EXAMINATION                                78
      FURTHER REDIRECT EXAMINATION                       85

6                                   * * * * *

7

8     <u>EXHIBITS</u>:

9       Exhibits 31-45, 31-46, and 31-47 received         65

10                                  * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1    Q.   And I think you told us on Thursday this section is also

2    supported by a California Penal Code section?

3    A.   Correct -- 835a.  Correct.

4    Q.   And is it your understanding that this section applies

5    to the use of deadly force?

6    A.   Yes.  It would, yes.

7    Q.   And it essentially defines what an imminent danger or

8    imminent threat is in the context of deadly force?

9    A.   That is correct.

10   Q.   And it talks about the totality of the circumstances,

11   correct?

12   A.   It does include that.  Yes, sir.

13   Q.   And it talks about what a reasonable officer in the same

14   situation would believe or do?

15   A.   And that is the objective part of it, yes.

16   Q.   And just so we're clear, it's not just subjectively what

17   the officer felt at the time, but it's objectively what a

18   reasonable officer would do?

19   A.   Yes.  That's the objective portion of it.  Yes, sir.

20   Q.   And it goes on to talk about the ability, opportunity,

21   and apparent intent to immediately cause death or serious

22   bodily injury?

23   A.   That is correct.

24   Q.   And that's part of the standard and part of the

25   training?

1          MS. KIM:  I think the only thing is getting the

2     jury exhibit binder ready, which we will be working on

3     together at noon, Your Honor.

4          THE COURT:  So hopefully counsel who are not

5     arguing will be tasked with that -- tasked with that task.

6          Anything else, Mr. Galipo?

7          MR. GALIPO:  Yeah.  Just to protect the record,

8     Your Honor, the plaintiffs are going to also move under

9     Rule 50(a) on the second volley of shots, just to protect the

10    record.

11         THE COURT:  Tell me your motion, then, please.

12         MR. GALIPO:  Yes.  I think it's undisputed from the

13    evidence before this jury that the second volley of shots

14    struck him in the face and then the chest.  We know that the

15    chest wound was fatal.

16         I think it's undisputed even from the officer's

17    testimony here, which I referenced, that he was not moving

18    forward at the time of the second volley of shots.  Now, I'll

19    acknowledge there's a lunging suggestion, that he was

20    lunging.  But from that distance, even for some movement, I

21    don't see how under the law that could be an immediate threat

22    of death or serious bodily injury, which is clearly the

23    standard.

24         And, of course, it's unlikely that he even had the

25    pipe in his hand, but I realize the officer thinks he still

1    did.  So just to protect the record, not knowing what this

2    jury will do, we'd like to make a motion as a matter of law

3    the second volley of shots was unreasonable.

4                THE COURT:  All right.  Thank you.

5                So I have also received a Rule 50(a) motion from

6    plaintiffs, as Mr. Galipo just stated, specifically

7    pertaining to the so-called second volley of two shots.

8                For the same reasons that I denied defendants'

9    motion, I'm going to deny plaintiffs' Rule 50(a) motion.

10   Again, the standard here is that I would have to find that a

11   reasonable jury would not have a legally sufficient

12   evidentiary basis to find for plaintiffs in this instance on

13   that issue, and I cannot -- I cannot do that.

14               There has been -- as Mr. Galipo properly noted,

15   there has been evidence and testimony pertaining to the

16   subject's movements toward Officer Ornelas, so I can't make

17   the finding that I would have to make under Rule 50(a) on

18   this particular point.

19               So that motion is likewise denied.

20               Anything else?

21               MR. GALIPO:  No.  Thank you, Your Honor.

22               THE COURT:  Nothing else from plaintiffs

23   housekeeping wise.

24               Anything else from defendants housekeeping wise?

25               MR. KLEHM:  No, Your Honor.  Thank you.

 1          Court's instruction number 17, plaintiffs'

 2     instruction regarding Fourth Amendment.  Unreasonable search

 3     of person.  Excessive force.

 4          In general, the seizure of a person is unreasonable

 5     under the Fourth Amendment if a police officer uses excessive

 6     force in making a lawful arrest, defending himself, or in

 7     attempting to stop a fleeing or escaping suspect.

 8          Therefore, in order to establish an unreasonable

 9     seizure in this case, the plaintiffs must prove by a

10     preponderance of the evidence that Officer Andrew Ornelas

11     used excessive force against the decedent, Charles Sesma.

12          Under the Fourth Amendment an officer may use only

13     such force as is objectively reasonable under all of the

14     circumstances.  You must judge the reasonableness of a

15     particular use of force from the perspective of a reasonable

16     officer on the scene and not with the 20/20 vision of

17     hindsight.

18          Although the facts known to the officer are

19     relevant to your inquiry, the officer's subjective intent or

20     motive is not relevant to your inquiry.

21          In determining whether Officer Andrew Ornelas used

22     excessive force in this case, consider all of the

23     circumstances known to Officer Andrew Ornelas, including:

24          One, the nature of the crime or other circumstances

25     known to the officer at the time force was applied.

```
 1    very important for two different reasons.  First of all, I

 2    don't have to prove that any crime was committed or that

 3    Officer Ornelas had any bad intent at all.  The only intent

 4    that I have to prove in this case is that he intentionally

 5    pressed the trigger.  I think it's undisputed that he pressed

 6    the trigger seven times in this case.

 7            Also, the burden of proof as we discussed in jury

 8    selection is very different in a criminal case versus a civil

 9    case.  In a criminal case, because someone's liberty is at

10    stake, the burden of proof is very high.

11            Some of you may have heard or been on a jury, proof

12    beyond a reasonable doubt.  That is the burden for a criminal

13    case.  You wanted to put a percentage on it.  Maybe it's

14    99 percent.  But the reason it's so high is because someone's

15    liberty is at stake if they get convicted.  So the law puts

16    the burden extremely high in those cases.

17            In this case, as the judge read to you, the burden

18    is only preponderance of the evidence.  We talked about that

19    a little bit in jury selection.  It's slightly over

20    50 percent.

21            So if you can imagine the scales of justice being

22    equal and just a feather tipping it in plaintiffs' favor,

23    that's all we need.  If you want to think about percentages,

24    it would be 50.001 percent.

25            We believe the evidence is much stronger than
```

```
 1    50 percent in this case, but we just want to remind you when

 2    you're thinking about different issues, that is the burden

 3    that applies.

 4          The judge just read you the instructions.  I know

 5    it's a lot to take in in one reading, but you'll have copies

 6    of those in the jury room.  I'm going to go over a few of

 7    them with you and try to explain how they may relate to this

 8    case.

 9          Also, the judge just mentioned a verdict form.  I

10    want to show you the verdict form in a moment so you'll

11    understand what the questions are that you have to answer.  I

12    will tell you that in my opinion, although there's many

13    important parts of a trial, there's no part more important

14    than jury deliberations because then you are able to express

15    your thoughts on the case and talk to your fellow jurors and

16    collectively come together and try to make a fair decision

17    based on the evidence and the law.

18          What's the case about?  What is the issue in the

19    case?  Well, the issues -- there's really three issues.  One

20    of them which you've heard a lot about is whether the use of

21    deadly force was necessary, and that relates to the law that

22    the judge just read to you, whether there was the

23    opportunity, ability, and apparent intent to immediately

24    cause death or serious bodily injury.  And you'd have to look

25    at that for both volleys of shots.
```

```
1              As part of the law that you have to follow which
2    the judge read to you, which was also included in
3    Mr. Chapman's report, the POST standards, the policy, fear of
4    future harm, is insufficient, no matter how great the fear,
5    no matter how likely harm.  Why is that important?  Because
6    really the entire defense case is based on fear of possible
7    future harm, fear that he could possibly get close enough to
8    do something.  But it was not immediately happening.
9              If you think about it for a moment, this object
10   which interestingly after the shooting Officer Ornelas didn't
11   know if it was a pipe or a large stick -- at least that's
12   what he said on the audio -- officers carry batons which are
13   made out of metal.  And under certain circumstances they're
14   allowed to strike people with their batons on their bodies.
15             Those strikes are not considered deadly force.  So
16   the only way that you could potentially have an immediate
17   threat of death or serious bodily injury with the object as
18   we have in this case is to strike someone in the head with
19   it.
20             In order to do that, you'd have to be close, within
21   three feet or so, and you would have to be swinging it or
22   striking at the person.  Even then you would have to look at
23   whether there are any other reasonable alternatives for the
24   officer.
25             Obviously we know that Mr. Sesma never got within
```

UNITED STATES DISTRICT COURT

1  striking distance or close to it.  He never swung the pipe.

2  He never attempted to swing the pipe.  He never threw the

3  pipe, and he never attempted to throw the pipe.  That's the

4  undisputed evidence.

5          Even the defense -- and in opening statements,

6  you'll recall I said to you I believe the evidence will show

7  that he was at least 40 feet away at the time of the first

8  shots, 40 feet.

9          Even the defense has conceded with their experts it

10  was 40 to 45 feet.  That's almost the distance of this

11  courtroom from one side to the other.  That is not an

12  immediate threat of death.

13          Was Officer Ornelas in some fear?  In some concern?

14  I'm sure he was.  But shooting someone and killing someone

15  under the facts of this case we believe the evidence shows

16  was not necessary.

17          So the first volley of shots, he's 40 to 45 feet

18  away, five shots, at least two them, perhaps three, as he's

19  going to the ground.  You don't even see him for shots four

20  and five in the first volley, so he had to be below that

21  barrier.

22          And then a pause of 6.9 seconds.  Think about this

23  for a moment.  All the shots have to be justified, all of

24  them.  We know he was struck in the first volley.  The most

25  likely scenario from the evidence, he was struck four times

1    in the first volley, two strikes to his right arm and one to

2    his right side and one to his knee area on his leg.  And he

3    immediately went down to the ground.

4            Now, I know there's been some disputes as to how

5    far he was, and we spent probably too much time on this

6    issue.  But the reason it started, as you might recall, is

7    because I pointed out that in two of the officer's

8    declarations that were submitted to this Court under penalty

9    of perjury well before the trial, they said the body came to

10   rest at exhibit markers 10 and 11.  I didn't come up with

11   that.  They came up with that.

12           Officer Ornelas both in initial statements and even

13   here said to you that he was standing at the end of the fence

14   line.  I asked him that multiple times.  At the end of the

15   fence line.  Of course, as the trial is going on, Officer

16   Ornelas's position has moved forward, and the position they

17   claim Mr. Sesma was in has moved closer.

18           So in judging distance and credibility, one of the

19   things you can do is compare what the initial statements were

20   and whether there were later inconsistent statements.  You'll

21   recall both Officer Ornelas and Officer Steen said the body

22   was in areas of 10 and 11 in their declarations.

23           When I asked Officer Ornelas when he testified, he

24   said, yes, that's correct.  But as the trial went on, it

25   became 8 and 9 instead of 10 and 11.  I would submit to you,

1    ladies and gentlemen, it doesn't matter, because even at post

2    8 and 9 you'll see from the exhibits that's more than two of

3    the posts, and they're eight feet each.  So that's over

4    16 feet even at 8 and 9.

5            At 10 and 11, it's about 25 feet, which ironically

6    is exactly the estimate Officer Steen gave you when he was

7    asked by his own attorney:  How far was he from Officer

8    Ornelas when you got up there?  25 feet.

9            Now, what we do know is that he was down on the

10    ground for at least five seconds.  That's Officer Ornelas's

11    testimony.  Chest down.  He immediately went down.  His

12    initial impression was correct.  He had struck him.

13            Now, we know he raised up some, not much but some,

14    because we could see his white tee shirt for about a half a

15    second, I guess, in the videos we watched.  What's really

16    interesting is shot six happened before you can see his white

17    tee shirt, and shot seven happened after his white tee shirt

18    again goes out of view.

19            So there he is chest down, been struck most likely

20    four times.  How does someone respond to being struck by

21    bullets?  Who knows?  I don't think the expected response is

22    you don't move at all.  What's particularly sad about this

23    case, based on the evidence, it was the last two shots that

24    killed him.  The last two shots.  If those last two shots

25    weren't fired, most likely he would be alive.

1          Now, why do I say that?  Because the medical

2    examiner testified that the shots to the face did not enter

3    the face but were tangential to the face and are consistent

4    with reentering the chest.  Rocky Edwards, their expert --

5    now, imagine.  This doesn't come from my expert.  This comes

6    from their expert who wrote a report, who was compensated for

7    his time, and who in his report and in his testimony before

8    you, ladies and gentlemen, said:  In my opinion the last two

9    shots hit him in the face and then they entered his chest.

10          That's what fits best for the ballistic and

11   forensic evidence and the position he was as he was on the

12   ground just starting to lift up.

13          What do we know?  One of the shots that hit him in

14   the chest was the fatal shot because that went through the

15   heart and other vital organs.  The medical examiner testified

16   that was the shot that most directly killed him.  She also

17   said one of the shots to the face contributed.

18          So that is the evidence.  Now, also important in

19   that respect is Officer Ornelas's trial testimony.  I would

20   submit to you if you only had Officer Ornelas's testimony in

21   this case, only his testimony and not the other officers, not

22   Roger Clark, not the experts, the paramedics, the family,

23   only his testimony, there was more than enough to meet the

24   burden of proof just based on his testimony that his use of

25   deadly force was excessive.

1          Why?  Because Officer Ornelas conceded that you can

2   only use deadly force if there's an immediate threat of death

3   and no other options, and that you're supposed to give a

4   warning when feasible.  He conceded he never swung it or

5   threw it or never was close enough.

6          We know the first group of shots -- think about it.

7   If he was 40 or 45 feet away at the time of the first shot

8   and was running before that, and let's say hypothetically

9   Officer Ornelas decided he was going to shoot, about a second

10   before he shot, he would've been traveling that 10 or 14 feet

11   during that seconds.  He would have even been further back

12   when Officer Ornelas first decided to shoot.

13          I very carefully asked Officer Ornelas during this

14   trial whether, after he went down to the ground and

15   immediately before the second volley of shots, Mr. Ornelas

16   was moving forward.  I don't believe he was moving forward.

17   That's Officer Ornelas's testimony.

18          So you have -- and also equally important, and I

19   referenced Officer Ornelas's statement where he said he never

20   got his feet underneath him after the first volley and before

21   the second volley, and was never able to start running.

22          The reason that is so important is because part of

23   Chapman's report and a declaration that was submitted to this

24   Court by Officer Ornelas says that he was running at me for

25   the second volley of shots.  I had to ask him:  Is that

1    accurate?  He said, no, it's not.  And you know based on
2    other evidence, he wasn't.
3          So the second volley of shots is really egregious.
4    Now, I am not saying that Officer Ornelas is a bad officer or
5    a bad person.  I don't have to prove that.  That's all I have
6    to show is that he overreacted by using deadly force and used
7    more force than was necessary.
8          This case is not necessarily about whether
9    Mr. Sesma did something stupid, did something you wouldn't
10   have done.  We heard about the sanctity and reverence for
11   human life.  Guess what.  Everybody has people that care
12   about them, that love them, usually siblings, parents for
13   sure.
14         That's why life has to have value.  That's why
15   there has to be limitations on when a police officer has the
16   right to take another human being's life, because there's
17   really going to be traumatic circumstances for the family, as
18   you heard in this case.
19         You saw some of the photos, and you heard from the
20   family.  I will say that I'm very humbled and honored to
21   represent this very nice family and to be in this beautiful
22   courthouse presenting this case to you nice people.
23         You saw some family photos during the course of the
24   trial, and you could see the love and the closeness.  Does
25   that mean everything was perfect all the time?  No.  But life

1    is not like that.

2             So even with Officer Ornelas's testimony, if you

3    just have that -- and let's back up for a moment, because you

4    heard the experts talk about tactics, and I want to show you

5    a little bit of the verdict form now and a few of the jury

6    instructions as we continue to talk about the evidence

7    because I'm hopeful it will be helpful to you.

8             Questions -- these are questions one and two on the

9    verdict form.  They deal with the Fourth Amendment claim.

10   You might remember in the beginning I said there's a federal

11   claim for a violation of the Fourth Amendment, and then

12   there's state claims for something called battery and

13   negligence.

14            Questions one and two deal with the federal claim

15   for violation of the Fourth Amendment for using excessive

16   deadly force.  Did Officer Andrew Ornelas use excessive or

17   unreasonable force against Charles Sesma?  We believe the

18   evidence strongly supports a yes.

19            And from the plaintiffs' perspective, the first

20   volley of shots was excessive because he was 40 or 45 feet

21   away, and there was not an immediate threat of death.  There

22   might have been some potential threat but not an immediate

23   threat of death.

24            And there were other reasonable options.  One of

25   them was simply moving to the right or left to see where this

1    of the jury instructions that relate to the Fourth Amendment

2    claim and the battery claim that the judge just read to you.

3    Instruction 17 relates to the Fourth Amendment claim.  You

4    could see the title at the top referencing the Fourth

5    Amendment, and it talks about the factors to consider.  I

6    just circled a few of them as you could relate them to this

7    case.

8            The most important factor in a deadly force case is

9    item two, whether the decedent posed an immediate threat of

10   death or serious bodily injury to the officer or to others.

11   I would submit to you he maybe posed a threat or potential

12   threat but not an immediate threat of death or serious bodily

13   injury.

14           Then the factors continue on the instruction which

15   you'll have, and you'll see factor five, the relationship

16   between the need for the use of force and the amount of force

17   used.  Here we have seven shots of deadly force.  The extent

18   of decedent's injuries, they're horrific.

19           In fact, they're so horrific that I didn't show you

20   all the autopsy photos out of respect for some of you and the

21   family.  The shots to the face, the pictures are horrific.

22   If you feel you can stomach it, you might want to glance at

23   it briefly during your deliberations, but I'm not going to

24   put them up or show them to you right now.  They're horrible.

25           Any effort made by the officer to temper or to

1    about in the almost seven seconds between the volley?

2              Whether it should have been apparent to the officer

3    that the person he used force against was emotionally

4    disturbed, well, I'll concede to you the officer did not have

5    specific information, but I think you've heard some testimony

6    including from Mr. Chapman that it wasn't unreasonable to

7    think something unusual might have been going on with this

8    person.  He didn't -- he's sitting up there by himself,

9    walking away.  It's not usual behavior.

10             Now, officers have training or are supposed to be

11   trained about let's see what's going on.  Is this person

12   having a mental-health crisis?  What's going on?  Maybe they

13   need help.  So that's the Fourth Amendment instruction.

14             Then the battery instruction which relates to

15   questions three and four, you'll note it says a peace officer

16   may use deadly force only when necessary in defense of human

17   life, which is repeated in factor two and in the paragraph

18   below.  I would submit to you it wasn't necessary to shoot

19   and kill him.

20             And then it explains that it's only necessary if a

21   reasonable officer in the same situation, if there's an

22   imminent threat of death or serious bodily harm to the

23   officer or to another person.  That's the key language,

24   imminent threat of death or serious bodily injury.  It

25   doesn't say potential harm, potential threat to safety.

1          So then you have to say, well, what is the

2    definition of that, which ironically is the same wording that

3    was in Chapman's report that's part of the POST standards.

4    That's part of the Penal Code, and that is the law.  And that

5    goes to the issue you have to decide.

6          It's imminent when based on the totality of the

7    circumstances a reasonable officer in the same situation

8    would believe that a person has the present ability,

9    opportunity, and apparent intent to immediately cause death

10   or serious bodily injury.  Immediately.

11         We all have an understanding of what immediately

12   means.  I would submit to you, ladies and gentlemen, that

13   wasn't the case at 40 or 45 feet away.  He was not able to

14   immediately cause anyone's death, nor was it when he was down

15   on the ground, whether he was 25 feet away or 30 feet away or

16   20 feet away, and already struck.

17         Again, the fear of future harm, no matter how great

18   and how likely, is insufficient.  And then if you look at the

19   next paragraph, this is also important.  In determining

20   whether Officer Andrew Ornelas's use of deadly force was

21   necessary in defense of human life, you must consider Officer

22   Andrew Ornelas's tactical conduct and decisions before using

23   deadly force.  So that's why we talked about tactics.

24         Now, he claims, Officer Ornelas, that had he heard

25   that someone was sitting down up there, he wouldn't have gone

1    up there by himself.  Well, we heard it clearly over the

2    radio that he's sitting on the tracks.  Now, they claim the

3    radios weren't working very well.  You'll have to decide how

4    credible that is, but we hear it clearly in the MVARS.  He's

5    up there sitting on the tracks.  That's coming over the

6    police radio, and all the other officers seem to know that

7    he's sitting up there on the tracks.

8          Now, would it have been different if Officer

9    Ornelas had gone up there with another officer?  I guess

10   we'll never know for sure, but one could say it would have

11   been safer for the officers and better for Mr. Sesma, because

12   having two officers there, one assigned less lethal if

13   necessary, it's just better.

14         And here's the other thing that's extremely

15   important, and you'll see this at the end of two of the

16   instructions, the last sentence:  A peace officer does,

17   however, have a duty to use reasonable tactical repositioning

18   or other deescalation tactics.  They have a duty to do that.

19         So when you're looking at the first volley of shots

20   and the second volley of shots, first, think, okay.  I get

21   that he's saying he had concerns.  He felt some threat.  Was

22   it an immediate threat of death?  If the answer is no, it

23   wasn't immediate threat of death, it's excessive by law.

24         Secondly, were there other reasonable options?  So

25   one option is not to shoot.  One option is to use less

1    We believe the evidence shows at the time of those shots,

2    nobody was about to be killed.  So, thank you.

3                THE COURT:  Thank you, Mr. Galipo.

4                Let's take our afternoon break now.

5                Ladies and gentlemen of the jury, you know the

6    admonitions.  I'm not going to say them again.  Plan on

7    taking about ten minutes, and then we'll come back.

8                THE CLERK:  All rise for the jury.

9                (Open court - jury not present)

10               THE COURT:  You may be seated.

11               Any housekeeping at this point?

12               MR. GALIPO:  Not on behalf of the plaintiffs.

13               MR. KLEHM:  No, Your Honor.

14               THE COURT:  Okay.  Still -- you take as long as you

15   want within your time frame, of course, Mr. Klehm.  Still

16   45 minutes to an hour?

17               MR. KLEHM:  Well, that went quite beyond the one

18   hour that I was understanding Mr. Galipo --

19               THE COURT:  No.  I got done at 1:38, I believe.

20               MR. KLEHM:  I'm thinking about 45 minutes.

21               THE COURT:  I'm not trying to cramp you in any way.

22   I'm just curious.  45?

23               MR. KLEHM:  About 45.

24               THE COURT:  Okay.  Have a good break, everybody,

25   and I'll see you in roughly ten minutes.

 1          There's no secrecy here.  We put all the cards on

 2    the table and let the jury decide.  That's what makes this

 3    process so great.  That's why it works.  Obviously you hear

 4    cases in the news where things go south.  This is not one of

 5    those cases.  I think the evidence shows that.  This is not

 6    an abuse-of-power case.  This is not a George Floyd type

 7    case.

 8          This is a case where an officer, as we believe the

 9    evidence has shown, had an objective reasonable basis to

10    believe that his life was in imminent danger of serious

11    bodily injury or death based on Mr. Sesma running with the

12    pipe.  It's in evidence.  You'll see the pictures are in

13    evidence.  You'll see that.

14          You've heard about this pipe.  You've seen it

15    during trial.  You've seen the video.  And admittedly it's of

16    poor quality, but we have the testimony of multiple officers

17    with their own eyes who came into court and saw it.  And

18    their testimony has been consistent from the first statement

19    that they made to the Ontario Police Department, throughout

20    deposition, and in court.

21          Mr. Sesma was holding a pipe, this pipe.  It's not

22    a paper clip.  It's a hefty piece of metal with a serrated

23    edge.  It's a deadly weapon.  Yet plaintiffs' expert, Roger

24    Clark, on that witness stand told all of you in his opinion

25    without ever even having held the pipe that it wasn't a

1    deadly weapon.

2          He said that Officer Ornelas wouldn't have even

3    been justified in firing his weapon at Mr. Sesma from three

4    feet away as Mr. Sesma was running towards him.  Three feet,

5    still not appropriate, not justified.  So we have to think

6    about that.

7          Now, Mr. Galipo has made many conjective,

8    speculative statements during his closing argument.  Neither

9    his closing argument nor mine are evidence.  They're not to

10   be considered as evidence.  That's why it's called argument.

11   It's the chance for the lawyers to get up here and argue or

12   advocate for their respective clients.  It's not testimony.

13   It's not under oath.

14          Fortunately, we have an extremely intelligent jury

15   of eight people right now.  That's why you've all been

16   selected.  You've been taking wonderful notes throughout this

17   trial.  You'll be able to reflect on your notes which

18   document what people have said under oath.  That's the

19   evidence, the evidence that you saw with your own eyes.  The

20   evidence that you saw, what you've heard on the videos, that

21   is the evidence.

22          What Mr. Galipo and I say, it's just what we do at

23   the end of cases.  It's argument.  It's our chance to be

24   skillful advocates for our clients and kind of wrap things up

25   in a way that hopefully makes sense.

credible in this case when he's telling you that Sergeant

Ornelas had an opportunity to use less lethal or shouldn't

have discharged his weapon because Mr. Sesma running at

14 feet per second with this metal object did not present an

immediate threat, a credible threat of imminent bodily harm,

serious bodily harm, grave bodily injury, or death.

Think about that, what he's saying.  That is the

only critical opinion that you've heard, that a man running

at 14 feet per second with this (indicating) does not present

an imminent threat of death or serious bodily injury.  It

doesn't make sense.

Now, Mr. Galipo has a lot of conjecture about

things.  Well, what if?  Maybe this is why that happened.

This is why the officers testified a certain way or didn't

say something.  For instance, the Steen testimony.  It was in

2020, granted.  But let's look at the physical evidence.

As you all heard, the approximations from the

different witnesses were all over the place as to the amount

of feet, how many feet the body was from Sergeant Ornelas.

How many feet the body was from the pony wall.  Where it was.

Officer Cichella drew the body on a map where he

remembered it being.  The paramedic put it in a different

place.  These people have no dog in this fight.  They're not

biased.  Officer Cichella is retired, and the paramedic, it

certainly doesn't make any difference to him where the body

1    is.  He just came here to tell you what he saw.

2         So I think it's incumbent to consider what evidence

3    we have, not based on speculation, not based on conjecture,

4    not based on people's faulty memories.  What is the evidence?

5    We showed that to you.  We showed you where the blood was.

6         When you see these photos which Mr. Galipo and I

7    have purposely not shown you yet, you'll understand why the

8    blood evidence is the real physical evidence of body

9    positioning, and not just a little drop of blood by the shoe

10   or the pants.  You'll see the most blood in that area is by

11   the bloody white tee shirt.  And there is a pool of blood on

12   the rocks.  And it's there for a reason.

13        As you heard Officer Ornelas testify and Officer

14   Steen, after the second volley of shots and even after the

15   first volley, Mr. Sesma fell face down, face forward.  I

16   think Mr. Galipo may have confused things about supine and on

17   the back because Officer Cichella did say when he got up

18   there, Mr. Sesma was on his back.  That's a supine position.

19        The other way, stomach down, is prone.  Supine is

20   exactly the way that the paramedic testified he found the

21   body.  It's the same way -- well, the paramedic, Kyle

22   Bumanlag.  It's the same way that Captain Bowen, who

23   apparently just came off a game show, he also testified the

24   same way, supine, was on his back.

25        The testimony is that Mr. Sesma was moving around a

1    little bit.  He wasn't crawling around, but he was turning.

2    He was turning his body.  So, yes, he -- the evidence does

3    show based on the testimony from multiple witnesses that he

4    moved from a prone position on his front, on his stomach, to

5    a supine position.  That's -- that shouldn't be in dispute.

6              Let's look at the beginning.  The officers that

7    were involved, we have four of them that came to the scene

8    trying to contain or arrest Mr. Sesma for a hit-and-run who

9    have a combined history of over 50 years of patrol

10   experience -- at that time in 2020, not now.

11             This is a lot of experience that was being brought

12   to bear to effect the arrest and contain Mr. Sesma.  You've

13   all seen the videos of where the different police cars were.

14   We have to think about that.  This is 50 years of combined

15   experience on patrol arresting people compared to Roger

16   Clark's two and a half or three years.  Yet he's coming here

17   in court offering his judgments on what these officers could

18   have done.

19             But as you will see in the instructions which the

20   Court read to you, especially Court's instruction number 17

21   under the excessive force category, that you must judge the

22   reasonableness of a particular use of force from the

23   perspective of a reasonable officer on the scene and not with

24   20/20 vision of hindsight.

25             This is not about Roger Clark saying, well, he

 1   Mr. Galipo and Roger Clark are saying there was no objective

 2   basis for Sergeant Ornelas to believe that Mr. Sesma posed an

 3   immediate threat of serious bodily injury or death.

 4          Well, then, why did Officer Nichols pull his gun

 5   out?  Why did Officer Steen have his gun out?  The only

 6   person that didn't have his gun out was Officer Cichella, and

 7   he was running up the embankment after he put Jack back in

 8   the car.

 9          Then how did the pipe get to number 7?  That was

10   one of the things that Mr. Galipo brought up in his closing.

11   Well, if he didn't have the pipe when he got up after the

12   first volley, how would it end up there where the bullet

13   casings are from Officer Ornelas's gun?  The lunging, the

14   forward momentum, simple physics.  The pipe didn't get up and

15   walk over there.

16          Of course, Mr. Galipo can argue, well, maybe

17   somebody moved it.  Yeah, if you want to decide a case based

18   on what ifs and conjecture, then there's not much we can do

19   to defend this case.  But if you want to decide it based on

20   the facts, what the evidence is in front of you, that pipe

21   got there from Mr. Sesma lunging forward immediately before

22   the second volley.  That's the only way it could've got

23   there.

24          Sure, Officer Steen said he didn't see it at first

25   because they were attending to Mr. Sesma.  You heard Officer

1          As Chief Chapman said, he had nine seconds to

2     decide whether or not he was going to go home to his wife and

3     kids that day.  Nine seconds.  That determined the outcome of

4     what was going to happen that day in nine seconds.

5          About four to five of those seconds was spent

6     commanding Mr. Sesma to stop and drop the weapon.  Did he

7     fire as soon as Mr. Sesma started running at him?  No.  He

8     held his fire.  You can see that on the MVARS.  You can count

9     the seconds.

10          You can count how many fence posts.  And by now

11     we're all very familiar with how far away those fence posts

12     are, eight feet on center.  You can see how many fence posts

13     he goes by.  You can count how long he was running before the

14     first shot was fired.  Maybe he didn't hear; maybe he did.

15     We don't know.

16          What we do know is Sergeant Ornelas is pointing a

17     gun at him while he's commanding him to stop and drop it.  So

18     who runs at an officer who is pointing a gun at them?  Even

19     if the officer doesn't say "I'll shoot" after they say stop

20     or drop it, when an officer is pointing a gun at somebody,

21     it's pretty obvious what's going to happen if you don't

22     comply when you're being told to stop and drop it, not just

23     from one officer up on the bridge but from Officer Nichols

24     down below, two different officers in two different locations

25     telling him to stop and drop it.

1            Officer Ornelas is pointing his gun at him.  We saw

2    Officer Nichols pointing his gun.  Of course, Mr. Sesma in

3    the video wasn't looking down at the sidewalk.  He was

4    looking at Sergeant Ornelas as he's running straight at him

5    with this hunk of metal, not down by his side.  It was up

6    here.

7            How do we know that?  From the coroner.  You've

8    seen the picture.  It's in evidence.  The bullet goes in here

9    and comes out here.  That's physical evidence.  Mr. Galipo

10   doesn't focus on physical evidence.  He wants to talk about

11   the what ifs and the could'ves and the maybes.

12           Why didn't somebody say this?  Why didn't somebody

13   say that?  He had a chance to depose everybody in this case.

14   This case has been going on for years.  Yet now he's in

15   court.  If he doesn't have the facts, he's going to invent

16   them.  How many hypotheticals did he say during the course of

17   this trial?

18           He's a skillful advocate.  That's his M-O.  That's

19   what he does.  That's what a skillful advocate does.  They

20   take a standard and they change it just a little bit, just

21   add this one fact.  Take away this fact.  Move this fact over

22   here.

23           It's like the frog-in-boiling-water analogy.  If

24   you turn it up just a little bit, a few degrees every minute

25   or so, the frog never jumps out of the pot.  That's how you

```
 1    truth, the totality of circumstances that we are presenting,

 2    and this smoke and mirrors.  I'm just going to cherry-pick

 3    certain facts and I'll add hypos, and hopefully I'll confuse

 4    the jury.

 5            Not only is Mr. Galipo a skillful advocate.  He's a

 6    skillful musician, and his instrument is playing the

 7    heartstrings.  That's what happens here in this type of case.

 8    Hopefully the family emotion is a plus for Mr. Galipo's case.

 9    That's why he saves those witnesses for the end.

10            You've seen this before.  I've seen it before.  But

11    don't let that cloud the facts.  I have the unenviable job of

12    asking all of you to not award damages in this case, to not

13    award a grieving family -- doing the math -- $17 million or

14    something.

15            But that's what's required in this case because

16    based on the evidence that was presented here which is in

17    Mr. Galipo's view only supported by the testimony of Roger

18    Clark.  That's it, the one critical witness of my client,

19    just one, Roger Clark, and this case is worth $17 million.

20            But I submit to you that if you apply the law which

21    the judge has given you and which you will be reading when

22    you get back in that jury deliberation room, this is not a

23    $17 million case.  It's a case where Sergeant Ornelas had an

24    objectively reasonable basis to fire his weapon because of an

25    imminent threat of severe bodily injury or death.  That's
```

1    what this case is.

2            Do we have the video of what happened before the

3    second volley?  No.  We see Mr. Sesma getting up.  Again,

4    Mr. Galipo is kind of phrasing that as, well, he didn't even

5    have his feet under him.  Sergeant Ornelas testified from the

6    very first person that asked him a question within 24,

7    36 hours or so of this event when he's being interviewed by

8    the Ontario Police Department that Mr. Sesma's was track-star

9    position.

10           There's a reason he said that.  He was coming right

11   at me.  He's lunging.  That's movement.  That's quick

12   movement.  That's powerful movement.  And that's after being

13   shot five times, he still did that.  Is there any doubt what

14   the outcome of this case is going to be even if Sergeant

15   Ornelas would have waited another second or two while

16   Mr. Sesma gained another 14 feet, or waited a second after

17   that?

18           The result was going to be the same because

19   Mr. Sesma dictated the outcome of this by running at Sergeant

20   Ornelas with a pipe, and then even after being shot,

21   continuing to lunge at him with a pipe.  It wasn't Sergeant

22   Ornelas's doing.

23           He didn't go up there saying, oh, I want to shoot

24   somebody today because I've never shot anyone in my ten years

25   of being a California Highway Patrol officer.  He went up

1    position on that little wall to the middle of the bridge.

2              Then we counted the fence posts, and that

3    approximation after we did the math and counted the fence

4    posts came down to a little bit over half.  So some people

5    are not good at approximating.  I can't change that.  But we

6    have physical evidence, and that's what needs to be focused

7    on, not coming up with reasons why officers are saying one

8    thing or something else that's contradictory.  That's just

9    conjecture.

10             Let's stick with the facts, what facts we saw on

11   the video.  So let's walk through those a little bit.  Let's

12   start off with what has been marked as Exhibit 66.  It's a

13   composite photo.  This is the first time we see Mr. Sesma

14   picking up this pipe at 2:39.

15             If we could run that, please.  It doesn't last very

16   long.

17             (Videotape recording played)

18             MR. KLEHM:  So that's the MVARS.  Then we had

19   Parris Ward show us a pixelated image, basically a blowup of

20   that one moment in time when Mr. Sesma picks up that pipe.

21   Yes, it's grainy and it's horrible, but that's all we got.

22             You can clearly see there is something in that area

23   of the bottom of his hand because there's no blue sky coming

24   through there.  Does it show a pipe?  It does not show a

25   pipe.  But it doesn't show his hand either.  We know he had a

1    hand, but we can't see that.  So there's something there.

2             Does it mean that Sergeant Ornelas didn't see what

3    he testified to with his own two eyes?  No.  You hear him on

4    the video saying:  Don't you pick that up.  He saw him pick

5    up the pipe.  He said:  Picked up a metal object.  He said it

6    with his own voice on the audio.  You can hear him:  He

7    picked up a metal object.  This is a metal object.  He saw

8    him pick it up from the very beginning.

9             Then let's look again at the same video,

10   Exhibit 66, at 4:37 to 5:13.  What do we see?  We see

11   Sergeant Ornelas going up, going up the embankment.  Then on

12   the right video you'll see at the very right side, you'll see

13   his head popping up because the sunlight reflects off his

14   head.  And you'll see where he's at on the very right-hand

15   side.

16             (Videotape recording played)

17             MR. KLEHM:  If you can stop it right here.

18             It's hard to see, and we'll maybe have to rewind it

19   a couple seconds and go back.  But on the far right video you

20   can see Mr. Sesma.  Doesn't have a name tag on.  It's the

21   only person running in an easterly direction at that point,

22   running towards where Sergeant Ornelas is.

23             We know where Sergeant Ornelas is because

24   fortunately the sun was going down at that time of day in the

25   afternoon after 4:00 o'clock, and it's shining off all the

1    car windows as you can see in the top right video.  It also

2    shined off Sergeant Ornelas's head.  We know he's up there.

3    We don't have to guess where he's at.

4           And then we see Mr. Sesma running towards him.  We

5    don't have to guess where he's at.  It's in the video.

6           Can you play that, please.

7           (Videotape recording played)

8           MR. KLEHM:  And you'll see him running -- let's go

9    back five seconds if we can and then play it again.  Again,

10   it's hard to see, but it is on the video.  You can see him

11   running.

12          (Videotape recording played)

13          MR. KLEHM:  Let's do that same scene with the Steen

14   enlargement, the same point in time.  Just the same video,

15   Steen video, on that right-hand side.  This is just a bigger

16   version of it.  You'll see Mr. Sesma running across the

17   bridge in the top left.

18          And then on the right, on the very far, furthest

19   right train car, right there where he's putting the cursor,

20   you'll see Mr. Sesma running towards Officer Ornelas.

21          (Videotape recording played)

22          MR. KLEHM:  Let's go to -- as Mr. Ward demonstrated

23   when he was here, he did another pixelation of Mr. Sesma

24   running right in between the two freight cars, and you can

25   see something in his hand.  Again, there's no blue sky right

1   above -- you can't see his hand, but where that arm and hand

2   would be, there's something above his hand because there's no

3   blue sky right there.

4           You heard Chief Chapman testify and I think in a

5   very credible manner about how officers are trained to face a

6   threat of somebody running at them with a deadly weapon.

7   They're not trained to wait.  This is not a zero sum game

8   where they match a pipe with a pipe or a pipe with a baton.

9           That's not how this works.  An officer has to

10  maintain a superior edge so they can make it home at the end

11  of the shift.  When they are faced with a deadly weapon, they

12  use deadly force.  That's what happens when you're an

13  officer.  That's how you're trained.  That's what the law

14  allows.

15          It has to be objectively reasonable.  That's true.

16  We know that because Officer Nichols drew his weapon.  We

17  know it was objectively reasonable for Sergeant Ornelas to be

18  in fear of imminent death or bodily injury.  Let's think

19  about that word imminent.  It's not instantaneous.

20  Mr. Galipo keeps focusing on, well, it wasn't immediate

21  enough.  He's running, but it's not immediate enough when

22  Sergeant Ornelas fired his weapon.

23          The pipe doesn't have to be right here (indicating)

24  next to your head before you fire.  Imminent.  If you look in

25  the dictionary, it means forthcoming, upcoming, close in

1    time.  Imminent, not instantaneous.  If that was the

2    standard, it would be open season on police officers.  People

3    could just go up to them and hit them with things like this

4    all the time and say, well, there was no imminent threat.

5            No.  That's not what the law provides.  They use

6    the word imminent for a reason.  Imminent, about to happen,

7    not instantaneous.  And as Chief Chapman testified, this is

8    how officers are trained.  You deal with the threat as it's

9    approaching, three seconds away.  Fourteen feet per second he

10   was moving.

11           He was doing this with Chief Chapman.  It was

12   early.  He didn't sleep much last night, so it was hard for

13   the math.  But we got through it -- 14 feet per second.

14   Shots 40 feet away.  14 plus 14 is 28, plus another 14, 42.

15   Three seconds away.  That's how far Mr. Sesma was running at

16   that pace.

17           He was three seconds away from being able to hit

18   Sergeant Ornelas with this pipe in the head -- three seconds.

19   That I submit is imminent.  That's imminent enough.  Three

20   seconds.  And he waited.  You'll see on the video Sergeant

21   Ornelas waited about four seconds, four and a half seconds,

22   before discharging his weapon.  He waited until he couldn't

23   wait any longer, and then he fired.

24           Let's go if we can to the composite video at 5:07,

25   Exhibit 66.

```
1              (Videotape recording played)

2              MR. KLEHM:  Exhibit 66, 5:07.

3              If you can stop it there.  We see even after the

4    shots are fired, Mr. Sesma is going forward because that's

5    how much momentum he had running.  He doesn't just get hit

6    with a bullet and drop straight down.  He's moving forward.

7    He's moving forward still.  That's how fast he was running.

8              It's that same momentum as he was lunging when he

9    got up, as Sergeant Ornelas testified to and told the Ontario

10   Police Department a track-like start that required the second

11   volley of shots, two shots.  And, yes.  It is sad.  It is

12   tragic, but it was objectively reasonable.  It was within the

13   policy.  It was legal because of the imminent threat of grave

14   bodily harm or death that Sergeant Ornelas was being faced

15   with.

16             He still had the pipe.  He wasn't just rolling over

17   giving up, as Roger Clark seemed to imply.  Roger Clark said

18   that the officers should have just gone up to him at that

19   point and started providing medical aid.  He still had a pipe

20   on him.

21             Even when the paramedics got there, they said, as

22   you heard, his blood pressure was normal.  Full motor

23   function.  You'll see that in the AMR records and the Ontario

24   Fire Department records.  He was still a capable, credible

25   threat.  Amazingly enough he was shot in the heart after, but
```

1    he was still able to move around, had normal blood pressure,

2    and was even being combative and uncooperative, combative

3    with the paramedics.  You'll see that in the records.

4          The paramedic didn't have an ax to grind.  He just

5    told you exactly what happened.  Combative.  As they were

6    trying to save his life, he was being combative, trying to

7    push away the mask.  And he didn't say that the mask was on

8    his face.  It wasn't like it was being painful on his face.

9    You didn't hear that.  You didn't hear them say, oh, we put

10   it on his face and he jerked away because we touched his

11   wounded area.

12         From all objective measures, he did not want to

13   have lifesaving treatment after he was shot, which is

14   consistent with what happened after the first volley.  Why

15   would you continue to go after a police officer who has

16   already shot you five times?  Why would you lunge at an

17   officer who has already shot you with a metal pipe?  The

18   reason is obvious.

19         Sergeant Ornelas did what he was lawfully

20   authorized to do when faced with a suspect who was providing,

21   creating an imminent threat of severe bodily injury or death.

22   And then he stopped shooting.  He didn't keep shooting.  Once

23   the suspect was down again, he immediately went to his EMT

24   training and started providing first-aid.

25         I have to focus on the reasonableness, because as

1    you will see, there's three causes of action.  Excessive

2    force, as Mr. Galipo pointed out, that's the constitutional

3    claim under the Fourth Amendment, but that's excessive only

4    if it's not reasonably necessary.  That word reasonably is

5    throughout these instructions.  It's the concept that keeps

6    coming up over and over again, what was reasonable to a

7    reasonable police officer.

8            That's sometimes a hard concept because none of us

9    are in that position.  We're not dealing with these types of

10   threats every day.  So we have to look at what a reasonable

11   police officer would do who is faced with this situation.

12   You heard the testimony of the other CHP officers.

13           The only person who said it wasn't reasonable was

14   Roger Clark, and he hasn't held a gun for some 30, 40 years.

15   He's never been faced with this situation.  He never

16   testified about anything similar in his career, in that short

17   amount of two and a half or three years that he was a patrol

18   officer back in the 1980s, 40 years ago.

19           That's the only critical opinion that's been

20   expressed to you.  That's it.  Everything else is smoke and

21   mirrors and conjecture, and it doesn't comport with the

22   physical evidence and the testimony you've heard in this

23   case.  And that, I submit, is the most reliable evidence you

24   have, the physical evidence, the videos, the blood on the

25   rocks, the testimony from Sergeant Ornelas which has been

1    unwavering since the beginning about Mr. Sesma lunging at him
2    before the second volley.
3         And even though he didn't know which hand that pipe
4    was in, he said there was a pipe which ended up by the body.
5    It wasn't ten feet back.  It was in front of Mr. Sesma
6    because he was lunging.  That's the physical evidence.  If he
7    had dropped it, as Mr. Galipo seemed to suggest without any
8    evidence whatsoever, it would have been behind him.
9         So how does Mr. Galipo account for this
10   contradictory physical evidence that doesn't support his
11   case?  Oh, somebody moved it.  Nobody testified they moved it
12   here.  If he just wants to invent facts, then I'll invent
13   some facts, too.
14        I would like to invent the fact that my client knew
15   which hand it was in on both volleys, but I didn't.  I'm
16   working with the facts because that's what we do.  We are
17   being transparent, giving you everything, and you decide.
18        The battery claim.  Again, it uses the word
19   excessive, but the test is the same.  It's force that
20   appeared, that would appear -- I'm sorry.  It does not use
21   the word excessive, but the test is the same in terms of
22   reasonableness.
23        So excessive force obviously uses the word
24   excessive, but the battery claim under state law doesn't use
25   the word excessive.  But the test is the same.  So if the

1    still causes him to be emotional because it is a very rare

2    event indeed for an officer to shoot somebody like this.

3            But it's a serious responsibility that they're

4    given, and Sergeant Ornelas to his credit accepted that

5    responsibility when he joined the force, and he's owned up to

6    it throughout this trial.  He's not denying anything.  He's

7    not trying to sugarcoat anything.  If he was, he wouldn't be

8    saying he doesn't remember what hand the pipe was in.  He's

9    being totally honest.  This is what he recalls.  This is what

10   happened.

11           It's the totality of circumstances that is so

12   important in this case.  Look at everything.  And it's

13   obvious there's probably a hundred or more pages of notes in

14   that jury box that you can discuss in the deliberation room,

15   and they'll come in handy.

16           We invite you to look over everything.  Turn over

17   every rock, because we want you to look at all the evidence.

18   We're putting it all out there for you to decide what

19   happened and if Sergeant Ornelas, as I think the evidence

20   will show and did show, conformed with the law, acted

21   objectively reasonable when being presented with a threat of

22   imminent grave bodily harm.  Imminent, not instantaneous.

23   Imminent, about to happen, immediate.  It's coming up right

24   now.  Very soon.  Three seconds.  That's immediate.

25           Any parent knows if you tell your child immediately

```
1    to go to their room, they get there in three seconds.  That's
2    pretty immediate.  Immediate is a concept.  Three seconds is
3    a concept we all understand.  40 feet, 30 feet, 26 feet,
4    that's a little more nebulous.  Three seconds, we understand
5    that.  That's immediate.  That's what time Sergeant Ornelas
6    had to respond to the threat of imminent grave bodily injury
7    or death, three seconds when he fired his weapon.
8             Thank you for your time.  I thank you for
9    considering all of the evidence and for waiting until you get
10   into the deliberations room to go over all the facts and
11   discuss this case amongst yourselves.
12            Thank you very much.
13            THE COURT:  Thank you, Mr. Klehm.
14            Ladies and gentlemen of the jury, we're going to
15   take one last break.  Please remember your admonitions.  I
16   won't go over them again because you can probably recite them
17   to me by heart.  Enjoy your break.
18            (Open court - jury not present)
19            THE COURT:  You may be seated.
20            So, rebuttal argument?
21            MR. GALIPO:  Yes, Your Honor.
22            THE COURT:  Very well.  20 minutes?  I'm not trying
23   to rush you.  Just curious.
24            MR. GALIPO:  Probably closer to 30, but between 20
25   and 30.  I'll try to keep it within 30, Your Honor.
```

```
 1              MR. KLEHM:  I'll convey the Court's concerns.

 2              THE COURT:  Please do.  Thank you very much.

 3              All right.  Let's take our break.

 4         (Recess taken from 3:54 p.m. until 4:05 p.m.)

 5              THE CLERK:  All rise for the jury.

 6              (Open court - jury present)

 7              THE COURT:  Good afternoon again, everybody.

 8    Please have a seat.

 9              THE CLERK:  Calling item number one, case number

10    5:21-CV-01694, Candido Sesma, et al, versus State of

11    California, et al.

12              THE COURT:  I don't need appearances.

13              Mr. Galipo, would you like to provide a rebuttal

14    argument?

15              MR. GALIPO:  Yes.  Thank you, Your Honor.

16              THE COURT:  Please do so.

17              MR. GALIPO:  Good afternoon again.  They say when

18    the evidence is against you and the law is against you, just

19    start trying to be critical of the other lawyer.  I'd like to

20    focus on the evidence and the law, which is what we've been

21    trying to do the entire case.

22              To start with, I believe they're mischaracterizing

23    the law.  That's why I spent so much time showing you the

24    law.  And again, I hope you discuss this during your

25    deliberations because this is the law, and one of the duties
```

1    of the jury is to follow the law whether you agree with it or

2    disagree with it.

3            So for it to be imminent, it has to be the present

4    ability, opportunity, and apparent intent to immediately

5    cause death or serious bodily injury, immediately cause it,

6    not three seconds later, not sending people to their bedroom.

7    Immediately.

8            We're talking about taking someone's life --

9    ability, opportunity, and apparent intent, all three.  The

10   only way you can do it with that pipe is to get within

11   striking distance as I am to Mr. Mayne, coming at him, and

12   swinging it at his head.

13           That never happened.  That never even got close to

14   happening in this case.  Never close.  First volley of shots,

15   40 to 45 feet away.  Nobody was about to be killed.  And

16   quite frankly, Officer Ornelas, 6'3", 215, 220, ex- wrestler,

17   ex- football player, well-conditioned athlete, I don't think

18   that was about to happen.

19           And fear of future harm, which is their whole

20   theory, their whole theory is conjecture.  How do we know

21   what he was going to do?  That is speculation and conjecture.

22           Even their own expert, Mr. Chapman, who is

23   extremely biased, he has testified in 160 officer-involved

24   shooting cases before juries like you, people shot unarmed,

25   people shot in the back running away.  In every single case

1    he said the shooting was okay, 160 out of 160.

2         In every case he gets paid 20,000-plus dollars, and

3    many of those cases are for the CHP, including current cases

4    he has right now, many of them officer-involved shooting

5    cases.  Even he said that he has to be within striking

6    distance to use it as a weapon, that a pipe in and of itself

7    is not a weapon, that if he wasn't raising it over his head,

8    it changes the whole analysis as to intent or imminency.  He

9    had to be close enough.

10        That's their expert who clearly has bias in favor

11   of CHP when he gets paid hundreds of thousands of dollars by

12   them.  Even he admitted, Mr. Chapman, for the second volley

13   of shots, if he wasn't running at him or advancing, it would

14   be inappropriate to shoot him.

15        I don't want you to speculate or conjecture.  I

16   want you to focus on the evidence that we know.  Officer

17   Ornelas testified before you.  He did not move forward

18   towards me prior -- during the second volley of shots.

19   That's his testimony.

20        You want to throw it out and say we don't care?

21   That's not right.  That's his testimony.  Where he came down

22   after the first volley of shots is exactly where he ended up

23   and where I shot him in the second volley, because he only

24   raised up a little bit -- which is why he told you that he

25   was aiming center mass at his face and chest, because he was

down and just starting to get up, so the face and chest was in line with the shots as he was shooting them down towards the ground.

That is the evidence in this case, and I have tried my best to put the evidence on for you and to do it efficiently. I wanted you to know where Officer Ornelas was standing at the end of the fence, which multiple witnesses said. That's where he was. He said it. There's people that marked Xs. He was at the end of the fence.

I wanted you to know where Mr. Sesma came to rest based on the declarations they filed with the Court. I wanted you to know that in Officer Ornelas's initial statement, he said when he fired the first volley, he was approximately 25 yards away, and the second volley, 20 yards -- until they took a break with their representative and then started bringing the estimates down.

I wanted you to know everything. I don't want conjecture. I don't want speculation. I want you to look at the law and the undisputed facts. The undisputed facts of this case are that this was no serious crime. They weren't looking for someone with a gun that had injured people, that had committed violent acts, that was some felon they were looking for with a dangerous history.

They had a guy sitting up there on the tracks, a guy that Mr. Chapman says the officers should have considered

1     might have a mental disability based on his abnormal actions,

2     which is why he referenced learning domain 37 in his report.

3     That's who they had, a guy who was running.  We don't know

4     why he was running.  Was he afraid?  Were officers coming up

5     the other side?  Did he see the K9?  Did he panic?  We don't

6     know.

7                 But to say that suddenly this person who has never

8     committed an act of violence against anyone in his whole life

9     wanted to kill a police officer is crazy.  We know he was 40

10    or 45 feet away.  That is more, ladies and gentlemen, than

11    the back of that wall to the back of that wall (indicating).

12                There was no verbal warning he was going to shoot.

13    In fact, the commands were given one or two seconds before

14    the shots.  And we don't even know if he heard them.  Five

15    shots.  No imminent threat of death.  And he goes down, and

16    he's struck.  And what makes matters even worse is the last

17    two shots are horrific.  Really?

18                I don't care if he's 15, 20, 25 feet away.  He's

19    down.  He's been shot.  He's laying down for five seconds,

20    and he moves a little bit like he's going to get up, and

21    you're going to take him out?  You're going to shoot him

22    twice in the face and kill him?  And you're going to claim

23    that that was an imminent threat of death?  You were to be

24    killed, when he was laying on the ground 15, 20, 25 feet from

25    you?

1          And why are we here?  Because the State of

2    California and the CHP refuses to accept any responsibility

3    for this.  Zero.  They stand up here and say this is a

4    hundred percent his fault.  Let's go home and go to the next

5    shooting.  This family had to hire a lawyer just to find out

6    what happened to their loved one, and now they're forced to

7    go to trial with no acceptance at all of anything.  That's

8    not right.

9          If you really want to be true to your role as

10   jurors and you want to apply this law, not some law

11   mischaracterized or made up by the other side, and you want

12   to decide was he about to immediately inflict death on

13   someone during the first volley of shots, the fair answer is

14   no.

15         And was he about to inflict death on someone for

16   the second volley of shots after he had been shot and laying

17   there?  The answer is no.  What do we know?  One of the shots

18   hit him in the leg from the first volley.  You want to talk

19   about the evidence?  He wasn't running towards him for the

20   second volley.  Officer Ornelas admitted that.  He wasn't

21   moving forward towards him in the second volley.  Officer

22   Ornelas admitted that.

23         So where is the imminent threat of death from 15 or

24   20 or 25 feet away that you gotta shoot someone twice in the

25   face?  We have to expect better than that.  There has to be

UNITED STATES DISTRICT COURT

1    some restrictions on when you can kill another human being.

2    And, yes, it is an awesome responsibility that you can shoot

3    someone, but that responsibility has to come with some

4    restrictions and some accountability.

5            Then this idea of how the pipe ended there.  I

6    don't want to speculate anything.  I want you to focus on the

7    evidence in this case.  When you start talking about he

8    would've broken the dog's jaw and then run after someone

9    else, now, that's speculation.

10           What's more likely?  Is it more likely that when he

11   was running forward for the first volley of shots and shot

12   twice in the arm with his forward momentum, that the pipe

13   came out then?  Or is it more likely that after he was shot

14   and on the ground and on his chest for five seconds and

15   lifted up for, like, half a second, I want you to look at

16   Exhibit 47, those clips of the sequence of shots that you'll

17   recall we went through each one.

18           You look at those frame numbers.  Is it more likely

19   that after he's laying there, he's shot twice in the face?

20   After being shot twice in the face with the bullets entering

21   his chest and heart, he then threw the pipe with his broken

22   right arm?  Come on.  That is not likely to have occurred.

23           If you want to fairly consider the evidence and if

24   that had occurred, the officer would have seen it.  He would

25   have seen it, which is why he doesn't know which hand the

1   pipe was in because he didn't even see it for the second

2   volley of shots, which is why he didn't know where it was

3   after shooting.  He didn't know where it was.

4          And remember, he was wearing sunglasses.  He said

5   he had trouble seeing far, but he claimed he wore corrective

6   lenses, and from this weapon, this gun, seven shots.  And

7   they're responsible to justify every shot.

8          Mr. Clark said there should have been no shots

9   fired, but at most you shoot twice and assess the situation.

10  You don't just keep firing.  20/20 vision of hindsight?  This

11  isn't 20/20 vision of hindsight.  This is looking at the

12  evidence as it exists, what jurors do in this country every

13  day.

14         20/20 vision of hindsight would be this:  Someone

15  is pointing what looks to be a real gun at the police

16  officer.  It's dark.  It looks like a real gun, and it's

17  pointed at the police officer.  And they shoot in

18  self-defense, and then they find out later that although it

19  looked like a real gun, it was not a real gun.  That's 20/20

20  vision of hindsight.

21         That's not this case.  That might explain also why

22  Officer Ornelas makes the statement shortly after the

23  shooting he either had a pipe or a large stick.  That's his

24  statement.  And Roger Clark is a nationally renowned expert.

25  He's very selective on the cases he takes.  He's consulted by

1    the attorney general's office, the district attorney's

2    offices.

3         He was a lieutenant the last five and a half years,

4    2,000 arrests, not one shot fired.  Many of the people were

5    armed, not with pipes but with guns.

6         We put on the evidence.  Think about how much

7    evidence we put on -- the timing of the shots, the frame

8    numbers for each shot; the fact that Rocky Edwards, their

9    expert, said the shots to the face hit the chest.  We put

10   that on.  We got ahead of it on that.

11        We're not trying to hide any of the evidence.  We

12   want you to know all the evidence.  I called the officers.  I

13   called Officer Ornelas first.  They want you to look at

14   shadowy images.  They want you to look at a shadow and say

15   oh, see that?  That must be Mr. Sesma running.

16        Well, why don't we see his white shirt?  If it's a

17   shadow and the sun is setting, maybe that's a shadow.  But

18   they want you to think, oh, that is so convincing.

19        Thomas Jefferson.  There was a reference to that by

20   the judge and by the other side.  I don't remember the exact

21   quote, but it was something to the effect that trial by jury

22   is a means by which the people can hold the government

23   responsible for the violations of the very principles they

24   stand for.

25        So if our Constitution says you can't use excessive

1    force against citizens, there you go.  And you as a jury have

2    to decide was it necessary to kill him, all the shots

3    necessary to defend human life.  No other options.  If that's

4    where we are, we're in a bad state.  And these experts have

5    told us how many officer-involved shootings they reviewed.

6    Sounds like too many.  Even Chapman, as I stated earlier,

7    said, hey, if he wasn't throwing it and he wasn't advancing

8    towards him for the second volley of shots, that would be

9    inappropriate.  So there you go.  Their own expert admitted

10   that would be inappropriate.

11           They want to say, oh, there was a lunge.  You look

12   at the exhibits.  You'll see no lunge.  Even if there was a

13   two-foot or one-foot movement, you're going to kill someone

14   from 25 feet away who has already been shot?  And they claim

15   his closing speed, his running.  Well, I think it's

16   undisputed he wasn't running after the first set of shots.

17           I want you to look at the evidence.  I want you to

18   look at the videos, the frames, the timing, the shots, the

19   medical examiner's testimony, the expert testimony, the fact

20   that he never swung it, never raised it over his head, never

21   threw it.

22           I want you to look at all of that -- the 6.9

23   seconds delay, the shots, the distance, everything, the fatal

24   shots to the face and chest.  Just because an officer draws a

25   weapon doesn't mean they have to start killing people.

1    That's why I put on the physical evidence, the forensic

2    evidence, and the medical evidence.  And I started with

3    Ornelas.

4            And as I told you, even if you had no other

5    evidence in this case but Ornelas, even if you just had him,

6    the distance, the number of shots, the shots to the face, the

7    fact that he wasn't running or advancing forward for the

8    second volley, and you looked at the law that you have to

9    follow, the reasonable conclusion would obviously be it's

10   excessive.

11           And even though I only have to prove 50.01 percent,

12   I would submit in this case the evidence on the plaintiffs'

13   side is, like, 80 or 85 percent.  That's how strong it is,

14   especially the second volley of shots.

15           Then they say, well, Mr. Galipo, he's trying to

16   create trickery.  Officer Steen is on the stand and I ask

17   him -- I asked him.  I don't know about this yes game.  I

18   said:  Officer Steen, what was the distance between you and

19   Mr. Sesma when you got to the embankment?  And he said, not

20   me, 25 feet.

21           They act like I'm somehow some magician that's

22   getting these officers to say something that they don't want

23   to say.  That's why it was so important in the statement that

24   I referenced for Officer Ornelas the day he gave a statement

25   where he said he never got his feet underneath him to start

1    running again for the second volley of shots.

2             I don't know about this track-star thing.  I never

3    heard Officer Ornelas tell you about a track-star thing.

4    They want you to believe this guy is a world-class sprinter

5    after he's been shot five times.  I don't think we even heard

6    Officer Ornelas tell you he was in immediate fear of death.

7    I don't think we heard that in this trial.  I was convinced

8    this guy was going to hit me in the head with a pipe?  He was

9    just about to hit me in the head with a pipe?  I don't think

10   we heard that.

11            So here we are.  Let's go to trial.  Let's deny any

12   responsibility.  Let's blame the family.  Let's blame the

13   decedent, and let's go on.  Our system of justice cannot work

14   that way.

15            Yes, we want to support the police.  Yes, we want

16   to follow the law.  But when there's a case where the

17   evidence shows that it was not necessary to kill someone,

18   that it was literally overkill for the last volley of shots,

19   then jurors have to be courageous and do the right thing and

20   say that's too much.  That's not reasonable.  That's not what

21   we want.

22            That's what I'm asking you to do, but I want you to

23   make your decision, just so we're clear, based on the

24   evidence and the law and what you feel is right in your

25   heart.  They say, oh, Ornelas was going up the embankment and

1    looked initially to the east.  That's because that's the way

2    the embankment leads you.

3          The point is, maybe he didn't know at first where

4    he was, but he knew he was up there.  That's the point.  He

5    knew he was up there.  So why not wait to go with other

6    officers with some tactical plan?  They even got so

7    desperate, the defense, as suggesting to you ladies and

8    gentlemen that the bullet hit the pipe.

9          You want to talk about speculation.  Believe me, if

10   that bullet hit the pipe, there would have been forensic

11   evidence, techs from Ontario and everyone else to show you

12   the bullet strike.  There is no evidence at all that a bullet

13   ever hit a pipe.

14         He was combative and uncooperative.  You know, this

15   is unbelievable.  A person has been shot six times.  They got

16   two shots to the face that dislodged an eye.  They got a

17   bullet that went through their heart.  They're handcuffed and

18   they're moving around a little bit, and they want to tell you

19   they're being combative, as if to suggest the shooting was

20   okay because they're moving around a little bit after being

21   shot twice in the face and having a bullet go through their

22   heart.

23         The reason that I told you and showed you the

24   exhibits that I did -- and it's pretty obvious -- I started

25   with Officer Ornelas to confirm where he was standing.  And

1    when he confirmed on multiple occasions he was standing in

2    line with the end of the fence, not in the middle as they're

3    trying to suggest as the trial goes on, but at the end.

4    And then, based on their declarations they

5    submitted to the Court under penalty of perjury, he ended up

6    near 10 and 11.  Now, obviously it could've been a little

7    back, to the side, forward, I don't know.  I am just going by

8    their declarations.

9    And quite frankly, whether he's at 10 or 11 or in

10   between 11 and 9, it doesn't matter because as you'll see, 9

11   is beyond two of the poles.  And if they're eight feet each,

12   that's 16 feet right there.

13   And if 9 is on two feet more, that's 18 feet even

14   at 9.  And 10 and 11 are, like, 26 feet, and Steen estimated

15   25 feet.  So one can imagine the back wall to me is about

16   25 feet.  I'm going to shoot someone twice in the face who is

17   on the ground and already shot, claiming he's about to

18   immediately kill me?  That is not reasonable, objectively

19   reasonable.

20   I know you've heard a lot, and I know you're all

21   smart people.  You were selected for this jury from my

22   perspective for two reasons:  one, because you're smart, good

23   people; and two, that I was convinced that at the end of the

24   day you would follow the law and the evidence and do what is

25   right despite your leanings as we started off.  And that's

```
 1                          CERTIFICATE

 2   I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

 3   TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN

 4   THE ABOVE MATTER.

 5   FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

 6   REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

 7   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

 8

 9   /s/ Miriam V. Baird            12/11/2024

10   MIRIAM V. BAIRD                          DATE
     OFFICIAL REPORTER
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT "F"

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3          HONORABLE JOHN W. HOLCOMB, JUDGE PRESIDING

 4   CANDIDO SESMA, ET AL.,            )
                                       )
 5                                     )
                                       )
 6                     Plaintiffs,     )
                                       )
 7                                     )
                                       )
 8          Vs.                        )   No. CV21-01694-JWH
                                       )
 9                                     )
                                       )
10   STATE OF CALIFORNIA, ET AL.,      )
                                       )
11                                     )
                                       )
12                     Defendants.     )
                                       )
13   _____ )

14

15

16            REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                  JURY TRIAL, DAY 7

18                 SANTA ANA, CALIFORNIA

19            WEDNESDAY, DECEMBER 11, 2024

20

21

22

23          MIRIAM V. BAIRD, CSR 11893, CCRA
          OFFICIAL U.S. DISTRICT COURT REPORTER
24          411 WEST FOURTH STREET, SUITE 1-053
            SANTA ANA, CALIFORNIA 97201
25             VELIZBAIRDMIRIAM@GMAIL.COM
```

```
 1              Would you call the case.

 2              THE CLERK:  Calling item number one, case number

 3     5:21-CV-01694, Candido Sesma, et al, versus State of

 4     California, et al.

 5              Counsel, please state your appearances for the

 6     record, beginning with plaintiff.

 7              MR. GALIPO:  Good morning, Your Honor.  Dale Galipo

 8     on behalf of the plaintiffs.

 9              THE COURT:  Good morning, Mr. Galipo.

10              MR. KLEHM:  Good morning, Your Honor.  David Klehm

11     and Tammy Kim on behalf of defendants Sergeant Ornelas and

12     the California Highway Patrol.

13              THE COURT:  Good morning, Mr. Klehm and Ms. Kim.

14     Please have a seat.

15              Ladies and gentlemen of the jury, welcome back.  We

16     have received your third note.  I've had a chance to

17     communicate with counsel, and we've done our best to identify

18     the testimony that you are asking for here.

19              In a moment I'm going to ask madam court reporter

20     to read to you the portions of the testimony that we believe

21     that you are seeking.

22              I'll tell you for the record what portions it is

23     that we've identified.  So this is from day two, which is

24     Tuesday, December 3rd, from the transcript:  Page 99, lines 3

25     through 7; and page 121, lines 1 through 15.
```

```
 1              We've identified from day three, which is
 2    Wednesday, December 4th, page 33, line 15, through page 34,
 3    line 1.
 4              In each of these three pieces of testimony, the
 5    examining attorney is plaintiffs' counsel, Mr. Galipo.  And
 6    the witness is defendant Officer Ornelas.
 7              Madam court reporter, could you please read each of
 8    those three portions of testimony to the jury.
 9              (Record read)
10              THE COURT:  All right.  Thank you, madam court
11    reporter.
12              Thank you, ladies and gentlemen of the jury.  I'm
13    going to ask you again to head back to the jury room and
14    deliberate.  The good news is I just got a note that your
15    lunch is here -- or it will be here momentarily.  My judicial
16    assistant is picking it up.  Thank you.
17              THE CLERK:  All rise for the jury.
18              (Open court - jury not present)
19              THE COURT:  You may be seated.
20              I guess I should ask you:  Any objections to the
21    way madam court reporter read the testimony?
22              MR. GALIPO:  Not at all.  I think she did very
23    well.
24              MR. KLEHM:  Not at all.  Concur, Your Honor.
25              THE COURT:  All right.
```

```
 1            MR. GALIPO:  I'm pondering, Your Honor.  It's --
 2    you know, I'm looking at the instruction.  I've been reading
 3    and re-reading it, and as one of the elements in the opening
 4    line, as the Court is aware, it says deadly force can only be
 5    used when necessary in defense of human life.
 6            THE COURT:  Right.
 7            MR. GALIPO:  It then says that in order to be
 8    necessary, it has to be to defend against an imminent threat
 9    of death or serious bodily harm.  And then on page 9, the
10    opening paragraph, it defines what that means, what imminent
11    means, the context.
12            THE COURT:  Forgive me for interrupting you.  I
13    agree, and I had exactly the same thoughts.  The top of
14    paragraph nine, I regard that as defending the imminent word.
15            MR. GALIPO:  Defining the imminent.
16            THE COURT:  I think the critical or a critical part
17    is an act in defense of human life.  For something to qualify
18    as that, there has to exist an imminent threat of death or
19    serious bodily injury.  I think imminent is the key word in
20    that definition.  And then I think the paragraph at the top
21    of page 9 defines imminent.  But if you have a different
22    view --
23            MR. GALIPO:  Well, I do, but I'm afraid -- in other
24    words, I'm afraid that the simplistic approach that the Court
25    is contemplating may suggest that whatever they think is an
```

```
 1    To defend against is a verb.  So the defend word is used as a
 2    verb in the one sentence and as a noun in the other phrase or
 3    clause.  So I added the word act, to act in defense of human
 4    life, to make it an infinitive actually.
 5              MR. GALIPO:  Well, can we say to act in defense of
 6    human life is to defend against an imminent threat of death
 7    or serious bodily harm as defined in the instruction?
 8              THE COURT:  So you want to swap the order of the
 9    two.
10              MR. GALIPO:  And the reason is is because the
11    element in the instruction is necessary to defend human life.
12    That's the element.  So it seems like we start with that.
13    And what does that mean? -- rather than the reverse order.
14    That's part of the problem I'm having.
15              THE COURT:  The element is to defend against an
16    imminent threat?  Is that what --
17              MR. GALIPO:  Well, if you look at the instruction,
18    the first sentence says you may use deadly force only when
19    necessary in defense of human life.  That's the first
20    sentence.  And then the five elements of the instruction
21    include whether -- not necessary to defend human life.  It
22    doesn't get to later in the instruction that it defines what
23    that means.
24              So it seems to me you start with what -- necessary
25    to defend human life is the element.  What does that mean?
```

UNITED STATES DISTRICT COURT

```
 1    And the Court is saying it would be necessary to defend
 2    against an imminent threat of death or serious bodily harm.
 3            And then the last component is the instruction
 4    defines what that means, which I think is critical because I
 5    don't want the jury to just be making a decision on what they
 6    think that means apart from the instruction.
 7            The instruction says obviously it has to be the
 8    opportunity, ability, and apparent intent to immediately
 9    cause death or serious bodily harm.  I don't want the jury to
10    think, well, if it could've happened in the next five or
11    ten seconds, maybe that's imminent enough.
12            THE COURT:  Would you strike the sentence:  The two
13    phrases are synonymous?
14            MR. GALIPO:  I would.
15            THE COURT:  Okay.
16            MR. KLEHM:  Yes, Your Honor.
17            THE COURT:  All right.
18            So, Mr. Galipo, what I'm hearing plaintiffs
19    advocate for is something like this:  For the purpose of jury
20    instruction number 18, to act, quote, in defense of human
21    life, end quote, is to, quote, defend against an imminent
22    threat of death or serious bodily harm, end quote.
23            And then:  Please interpret those phrases in the
24    context of the entire instruction, including the explicitly
25    defined terms.
```

UNITED STATES DISTRICT COURT

```
 1                    MR. GALIPO:  Yes.

 2                    MR. KLEHM:  Acceptable, Your Honor.

 3                    THE COURT:  Madam clerk, I don't know if you got

 4        that.

 5                    THE CLERK:  I got that.  I'm printing.

 6                    THE COURT:  Let me see it, please, and then we'll

 7        circulate it.

 8                    THE CLERK:  Yes.

 9                    (Pause in proceedings)

10                    THE COURT:  I think that the problem that the jury

11        is expressing in this note is -- the problem that the jury

12        perceives is that they are two different standards.

13                    MR. GALIPO:  Right.

14                    THE COURT:  I think the key concept to convey to

15        them is it's the same standard, and it's the narrow one of

16        imminent -- of defending against an imminent threat of death

17        or serious bodily harm.

18                    MR. KLEHM:  Agreed.  The current version of the

19        Court's response adequately addresses the jurors' question

20        and parameters of the instruction on battery by a peace

21        officer, CACI 1305B.

22                    THE COURT:  Plaintiffs' counsel, what do you think?

23                    MR. GALIPO:  We're okay with it, Your Honor.

24                    THE COURT:  Okay.  So that is what I will give to

25        the jury.
```

```
 1    Otherwise, again, you're also just free to go.

 2              So please hand out the certificates.

 3              Thank you very much.

 4              THE CLERK:  All rise for the jury.

 5              (Jurors dismissed)

 6              THE COURT:  You may be seated.

 7              If either counsel would like to inspect the verdict

 8    form, you're welcome to do that.  Does anybody want to look

 9    at it right now?

10              MR. GALIPO:  No.  I trust Your Honor and the court

11    clerk.

12              THE COURT:  Okay.  Anything else we need to handle

13    right now?

14              MR. KLEHM:  No.  I was just going to say for the

15    last time in this trial, I am agreeing with Mr. Galipo,

16    Your Honor.

17              THE COURT:  Thank you again, both counsel, for a

18    very well presented case.  Extremely professional and very

19    skilled lawyers.  Thank you.

20              MR. GALIPO:  Thank you, Your Honor.

21              MR. KLEHM:  Thank you, Your Honor.

22              (Proceedings concluded at 3:47 p.m.)

23                         CERTIFICATE

24    I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

25    TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN
```

1   THE ABOVE MATTER.

2   FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

3   REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

4   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

5

6   /s/ Miriam V. Baird          12/12/2024

7   MIRIAM V. BAIRD                    DATE
    OFFICIAL REPORTER
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT TO BE MANUALLY FILED WITH NOTICE OF LODGING

Ornelas's MVARS video, which was admitted at trial as Trial Exhibit 1

# **EXHIBIT G**

EXHIBIT TO BE MANUALLY FILED WITH NOTICE OF LODGING

Steen's MVARS video, which was admitted at trial as Trial Exhibit 2

# **EXHIBIT H**

EXHIBIT TO BE MANUALLY FILED WITH NOTICE OF LODGING

CHP Audio Dispatch recording, which was admitted at trial as Trial Exhibit 20

# EXHIBIT I

EXHIBIT "J"

# Shot Times From MVARS Audio

| Shot | Time | Video Frame* |
|------|------|--------------|
| 1 | 5:07.03 | 9199 |
| 2 | 5:07.31 | 9207 |
| 3 | 5:07.58 | 9216 |
| 4 | 5:07.86 | 9224 |
| 5 | 5:08.14 | 9233 |
|  |  |  |
| 6 | 5:15.06 | 9440 |
| 7 | 5:15.75 | 9460 |

*Represents 2 frames prior to video-audio stream sync to account for the distance sound traveled, from the shooting location to the in-car microphone.

EXHIBIT 45 - 1

EXHIBIT "K"



9440

EXHIBIT 47 - 349



9441

EXHIBIT 47 - 350



9442

EXHIBIT 47 - 351



9443

EXHIBIT 47 - 352



9444

EXHIBIT 47 - 353



9445

EXHIBIT 47 - 354



9446

EXHIBIT 47 - 355



9447

EXHIBIT 47 - 356



9448

EXHIBIT 47 - 357



9449

EXHIBIT 47 - 358



9450

EXHIBIT 47 - 359



9451

EXHIBIT 47 - 360



9452

EXHIBIT 47 - 361



9453

EXHIBIT 47 - 362



9454

EXHIBIT 47 - 363



9455

EXHIBIT 47 - 364



9456

EXHIBIT 47 - 365



9457

EXHIBIT 47 - 366



9458

EXHIBIT 47 - 367



9459

EXHIBIT 47 - 368



9460

EXHIBIT 47 - 369

EXHIBIT TO BE MANUALLY FILED WITH NOTICE OF LODGING

Shooting Clip+Frame Numbers.mp4 video,

which was admitted at trial as Trial Exhibit 48

# EXHIBIT L

EXHIBIT "M-1"



Exhibit 14
Page 2 of 11

# EXHIBIT "M-2"



EXHIBIT 14-2-1

Exhibit 14
Page 2 of 11

EXHIBIT "M-3"



Exhibit 14
Page 3 of 11

EXHIBIT "M-4"



Exhibit 14
Page 11 of 11

EXHIBIT "M-5"



EXHIBIT 31 - 5

EXHIBIT "M-6"



EXHIBIT 31 - 9

# EXHIBIT "M-7"



EXHIBIT 31 - 11

EXHIBIT "M-8"



EXHIBIT 31-33

EXHIBIT "M-9"



EXHIBIT 31 - 44

EXHIBIT "N"

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

JURY NOTE

**FILED**
CLERK, U.S. DISTRICT COURT

12/11/24

CENTRAL DISTRICT OF CALIFORNIA
BY: _____cla_____ DEPUTY

## JURY NOTE • NUMBER ___3___

Case No. 5:21-cv-01694-JWH(DTBx)

Title:  Candido Sesma et al v. State of California et al
================================================================

☐   The Jury has reached a unanimous verdict.

☒   Other: __- From Ornelas Testimony:__

Day1- description of Sesmas stance after coming
to the ground before second set of shots

Day2- During Cross: "Sesma did not get his feet
under him" with regard to getting up after
the 1st set of shots

Dated this ___11___ day of ___Dec___, 2024.

Time: 10:24 am/pm

Foreperson of the Jury

Court's Response:

EXHIBIT "O"

**FILED**
CLERK, U.S. DISTRICT COURT

12/11/24

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ cla _____ DEPUTY

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

JURY NOTE

## JURY NOTE • NUMBER ___4___

Case No. 5:21-cv-01694-JWH(DTBx)

Title:   Candido Sesma et al v. State of California et al
=================================================================

☐   The Jury has reached a unanimous verdict.

☒   Other: Court Instruction #18
        -defending human life - stated 8x

        -defending bodily injury or harme - stated 4x

        -Question: which one is the standard?


Dated this ___11___ day of ___Dec___, 2024.

Time:  2:03 am/pm

_____
Foreperson of the Jury

┌─────────────────────────────────────────┐
│              Court's Response:            │
│                                           │
│                                           │
│                                           │
│                                           │
│                                           │
└─────────────────────────────────────────┘