**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo, Esq. (SBN 144074)
dalekgalipo@yahoo.com
Cooper Alison-Mayne (SBN 343169)
cmayne@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367
Phone: (818) 347-3333

*Attorneys for Plaintiffs*

**UNTIED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CANDIDO SESMA and CECILIA SESMA, individually and as successors in interest to CHARLES SESMA, deceased,<br><br>Plaintiffs,<br><br>vs.<br><br>STATE OF CALIFORNIA, ANDREW ORNELAS,<br><br>Defendants. | Case No. 5:21-cv-1694- JWH (KKx)<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR NEW TRIAL OR, IN THE ALTERNATIVE, JUDGMENT AS A MATTER OF LAW**<br><br>Hearing Date: February 14, 2025, 9:00 a.m.<br>Judge: Hon. John W. Holcomb<br>Court: Ronald Reagan Federal Building, 411 W. 4th Street, Santa Ana, CA<br>Courtroom: 9D |

1

## **TABLE OF CONTENTS**

I.    INTRODUCTION...................................................................................1

II.   LEGAL STANDARDS.........................................................................1

III.  NEW TRIAL PURSUANT TO RULE 59.............................................1

   A.  Sesma Was Not Advancing at the Time of the Second Volley......................1

   B.  Sesma Was Further than 25 Feet Away ..........................................3

   C.  Sesma Was Not "Less than Three Seconds Away" .......................................5

   D.  Ornelas' Credibility .........................................................5

   E.  Clarence Chapman's Opinion...................................................7

IV.   DEFENSE COUNSEL'S TRIAL MISCONDUCT FURTHER JUSTIFIES
      A NEW TRIAL...................................................................8

V.  CONCLUSION ...................................................................12

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

# <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*,
  762 F.3d 829 (9th Cir. 2014) .................................................................................2

4

*Gates v. Rivera*,
  993 F.2d 697 (9th Cir.1993) ................................................................................10

5

6

*Hemmings v. Tidyman's Inc.*,
  285 F.3d 1174 (9th Cir. 2002) ........................................................................9, 12

7

8

*Molski v. M.J. Cable, Inc.*,
  481 F.3d 724 (9th Cir. 2007) ...........................................................................1,2

9

**Statutes**

10

Rule 50(b) ..............................................................................................................1, 2

11

Rule 59 ............................................................................................................... 1, 2, 9

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A NEW TRIAL

I.     **INTRODUCTION**

II.     **LEGAL STANDARDS**

The legal standards governing motions brought pursuant to Federal Rules of Civil Procedure 59 and 50(b) are fully set forth in Plaintiffs' motion for a new trial and need not be restated here. (*See* Dkt. 159 at 7–9 ["Motion"].) In their opposition to Plaintiffs' motion, Defendants conflate the two standards, characterizing them as "similar." (Dkt. 163 at 8 ["Opposition"])]. But the Ninth Circuit has repeatedly emphasized that Rule 50(b) and Rule 59 motions are judged by different standards. *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 842 (9th Cir. 2014). For example, under Rule 50(b), the Court cannot weigh the evidence or make credibility determinations; but under Rule 59, the Court has a *duty* to do exactly that. *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007). Moreover, the appellate courts grant "considerable deference" to district courts' Rule 59 decisions, making such rulings "virtually unassailable" on appeal, *Hung Lam v. City of San Jose*, 869 F.3d 1077, 1084 (9th Cir. 2017), which stands in stark contrast to the *de novo* review applied to Rule 50(b) determinations.

III.     **NEW TRIAL PURSUANT TO RULE 59**

In their Opposition, Defendants argue that Officer Ornelas' second volley was reasonable because: (1) Sesma moved forward suddenly prior to the second volley, (2) Sesma was closer than 25 feet from Ornelas, and (3) Sesma was "less than three seconds away from Ornelas." However, the evidence does not support any of these claims.

    A.     **Sesma Was Not Advancing at the Time of the Second Volley**

Defendants assert that Ornelas testified that "Sesma moved forward before the second volley" (Opposition at 9), but this mischaracterizes Ornelas' actual testimony. In the portion of the transcript cited by Defendants, Ornelas says the opposite:

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A NEW TRIAL

**Q [Mr. Galipo].** So when he went down to the ground the first time, are you saying he was near item 11 or further back? In other words, did he move at all in your direction in between the two volleys?

**A [Officer Ornelas].** No, I don't believe so, sir.

**Q.** Okay. So, if I'm understanding you, then, it is your testimony that he was not moving in your direction at all between him going down after the first volley and the second volley. Do I have that correct?

**A.** Well, there had to be some movement prior to the second volley in order for me to fire my weapon a second time. So, excluding that, no, I don't believe he was moving forward.

(Dkt. 163 at 27, *Klehm Decl.*, ¶¶ 2-3; Exh. A [Day 2, 12/3/2024], at 121:11–15.) This testimony cannot reasonably be interpreted to mean Sesma moved forward before the second volley. Instead, Ornelas twice confirmed that Sesma *was not* moving forward between volleys, only qualifying his answer to acknowledge some unspecified movement that prompted his second round of fire.

Ornelas' MVARS video confirms that this unspecified movement was Sesma attempting to get up, not Sesma rapidly advancing. Defense expert Paris Ward created a frame-by-frame version of the video and identified the frames that corresponded with each of Ornelas' shots. The first shot of the second volley occurs at frame 9440, when Sesma is still so low to the ground that he is out of view. Then, in frames 9441–9447, Sesma's white t-shirt appears, rising vertically but not moving forward. In frames 9448–9460, Sesma falls forward, which is not surprising, given that the first shot struck him in the face and chest. As Sesma falls, Ornelas fires again at frame 9460, striking him in the face and chest again. This video evidence strongly corroborates Ornelas' testimony that Sesma made no movement in his direction between the two volleys. Forward motion only occurred *after* the first shot of the second volley, as he fell forward in response to the devastating wounds.

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A NEW TRIAL

1    Defendants' additional arguments to support their claim that Sesma was
2 advancing quickly prior to the second volley do not have any merit. Defendants
3 claim that Richard Clark "admitted to seeing Sesma's white t-shirt raising above
4 the wall indicating that Sesma lunged." (Opposition at 8.) However, the testimony
5 they cite says the opposite. (Dkt. 163 at 27, *Klehm Decl.*, ¶ 3; Exh. B [Day 3,
6 12/4/2024], at 211:9–14) (Clark testifying that he *is not* aware that "even after Mr.
7 Sesma was shot multiple times, he still got up and lunged towards Officer
8 Ornelas.") Defendants claim that the forensic evidence "showed . . . that Sesma
9 was lunging." (Opposition at 9.) But they concede that Rocky Edwards testimony
10 was inconclusive on this point, and Mr. Wards video analysis supports the opposite
11 conclusion, as explained above. (*Id.*)
12    Finally, Defendants' reliance on the "shadowy figure" in Trial Exhibit 2
13 undermines their position. (Opposition at 9.) While this figure is visible advancing
14 before the first volley, it never reappears after that. This absence directly
15 contradicts Defendants' argument that Sesma was advancing on Ornelas before the
16 second volley. The shadowy figure is never seen again because after the first
17 volley, Sesma never regained his footing but was shot as he attempted to push
18 himself up off the ground and again while he fell forward.
19    Thus, the clear weight of the evidence, including Ornelas' own testimony
20 and Mr. Ward's frame-by-frame video analysis, established that Sesma was not
21 advancing toward Ornelas before the second volley.
22    **B.    Sesma Was Further than 25 Feet Away**
23    The clear weight of the evidence at trial established that Sesma was further
24 than 25 feet from Ornelas when Ornelas shot the fatal second volley. Defendants
25 attempt to muddy the waters with citations to testimony about freight cars,
26 Ornelas' self-serving statements, and various estimates of where Sesma ended up
27 at the end of all the shots. (Opposition at 9–10.) But there is only one piece of
28

3

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A NEW TRIAL

1  evidence that really matters on this issue: Ornelas' MVARS video showing

2  Sesma's location during the second volley.



17  When Sesma's t-shirt first becomes visible immediately after the initial shot of the

18  second volley, he appears at approximately the fifth fence post when counting from

19  Ornelas' position at the first post on the fence's east end. There are eight feet

20  between posts, so Sesma was approximately 32 feet from the end of the fence.[1]

21      Even if we credit Ornelas' testimony that he was positioned one or two steps

22  west of the end of the fence, the clear weight of the evidence establishes that

23  Sesma was more than 25 feet away from Ornelas when he shot the second volley.

---

[1] The numbering of the posts was not in dispute at trial; significant time was spent
by both sides explaining to the jury how the posts established distances in this case.
Defendants themselves explained through their expert that Post 6 depicted above
would have been 40 feet away from the end of the fence.

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A NEW TRIAL

1

**C.     Sesma Was Not "Less than Three Seconds Away"**

Defendants argue that Ornelas' use of deadly force was reasonable because Sesma was less than three seconds away from Ornelas at the time of the second volley. (Opposition at 7, 18, 22.) But this fundamentally misrepresents the evidence put on at trial. While defense experts testified that Sesma was initially running at 14 feet per second before the first volley and could have reached Ornelas in under three seconds from 40 feet away, the circumstances were dramatically different by the time of the second volley.

As discussed above, Sesma had not moved toward Ornelas at all before the second volley was fired. Therefore, a time estimate based on a speed of 14 feet per second is completely irrelevant. There was no evidence presented at trial that Sesma was less than three seconds away from Ornelas when Ornelas shot the second volley.

Officer Ornelas did not even testify that he feared that Sesma was only 3 seconds away, but if he had, that still would not justify the use of lethal force, especially given the fact that Sesma had already sustained gunshot wounds to his torso and leg, severely impairing any ability to run. Allowing officers to use deadly force based on their fear of what a suspect might do, rather than the suspects' actual conduct, would give officers virtually unlimited discretion and eliminate meaningful constitutional constraints on the use of deadly force.

**D.     Ornelas' Credibility**

At trial, Officer Ornelas admitted to making a false statement in his declaration to this Court regarding a crucial material fact. He represented to the Court, under penalty of perjury, that before the second volley, Mr. Sesma "got up quickly and started running at me again." (Dkt. 38-2 at 3.) This was a lie, and it may have been perjury.

Before the declaration, in his statement to Ontario Police Department investigators, Ornelas admitted that Sesma *did not* start running at him before the

5

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A NEW TRIAL

1   second volley. After the declaration, he confirmed that Sesma *did not* start running

2   at him before the second volley. But in between those two statements, he told the

3   Court the exact opposite. The fact that he made true statements both before and

4   after his false declaration is strong evidence that this was a knowing lie which was

5   told for the purpose of increasing his chances of having judgment granted in his

6   favor on the motion for summary judgment that the Court was considering at that

7   time.

8        But the most important credibility issue pertains to Ornelas' self-serving

9   testimony at trial that at the time of the shooting, he perceived a metal pipe in one

10  of Sesma's hands before the first and second volleys. Ornelas admitted that

11  seconds after the shooting, he told his fellow officers that the object he saw in Mr.

12  Sesma's hand was either a pipe or a "large stick," and that he was trying to give

13  "honest, credible information" to his fellow officers. His statement just after the

14  shooting, before he had considered his possible liability, and before he had spoken

15  with an attorney, is the most probative information we have about what he actually

16  perceived at the time.

17       Defendants attempt to minimize the significance of Ornelas' post-shooting

18  statement by pointing to statements made several minutes before the shooting and

19  statements he made long after the incident. (Opposition at 15–16.) However, the

20  key issue in this case is Ornelas' perception at the moment he decided to use

21  deadly force, not his thoughts minutes earlier or days later. His contemporaneous

22  statement that the object could have been a stick provides the most reliable

23  indication of Ornelas' actual perception at the time he decided to use lethal force.

24  Moreover, Ornelas offered no explanation at trial for why he would make this

25  statement if he had been certain Sesma was wielding a metal pipe. The most

26  logical inference is that Ornelas, after consulting with legal representatives,

27  realized that his uncertainty about whether Sesma had a stick or metal pipe would

28

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A NEW TRIAL

1   undermine his justification for using deadly force. So, he altered his account in the

2   hopes of avoiding responsibility for his actions.

3           The credibility of Ornelas' trial testimony about the pipe is central to this

4   motion because Defendants made the pipe a cornerstone of their defense and the

5   jury's verdict relied in large part on their acceptance of Ornelas' testimony. In

6   considering whether to grant a new trial, this Court should independently assess the

7   credibility of that testimony. If the Court finds Ornelas' testimony about the pipe

8   lacks credibility, this would strongly support concluding that the jury's verdict was

9   contrary to the clear weight of the evidence.

10          **E.      Clarence Chapman's Opinion**

11          Clarence Chapman provided devastating testimony when he opined that

12  deadly force was probably not appropriate if Sesma never got his feet underneath

13  him to start running before the second volley. Defendants attempt to salvage this

14  damaging admission by claiming Chapman's testimony was "based on an

15  assumption of events *that never happened*." (Opposition at 12.) But their argument

16  fails for two reasons.

17          First, the premise of Mr. Galipo's question was taken word-for-word from

18  Ornelas testimony the day before that Sesma "didn't have a chance to get his feet

19  underneath him to start running" before the second volley. Defendants cannot

20  credibly claim that the testimony of their own client is a made up, hypothetical

21  fact. Second, as detailed above, Ornelas' MVARS video provides objective

22  confirmation of the factual premise of Mr. Galipo's question as it shows Sesma

23  attempting to rise but never achieving an upright position or getting his feet

24  underneath him to start running before the fatal second volley.

25          The significance of Chapman's testimony cannot be overstated. It is

26  extraordinarily rare for an expert witness to provide testimony that directly

27  undermines his own client's legal position. Yet that is precisely what happened

28  here—Defendants' own use-of-force expert effectively conceded that the second

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A NEW TRIAL

1  volley was inappropriate under the actual circumstances of this case. Defendants'

2  attempts to rewrite both the facts and their expert's testimony in their Opposition

3  are unavailing.

4         For all of these reasons, this Court should carefully weigh the evidence

5  presented at trial and find that the clear weight of the evidence contradicted the

6  jury's verdict regarding the second volley. The video evidence, Officer Ornelas'

7  own testimony, and the frame-by-frame analysis all establish that Mr. Sesma was

8  not advancing toward Officer Ornelas before the second volley, but was merely

9  attempting to rise from the ground. The evidence definitively shows that Sesma

10 was more than 25 feet away, was not "three seconds away" from reaching Ornelas,

11 and never got his feet underneath him to start running. Moreover, Officer Ornelas'

12 credibility was severely undermined by his contradictory statements about the

13 alleged pipe and his false declaration to this Court. Even Defendants' own use-of-

14 force expert effectively conceded that Ornelas' second volley was likely

15 inappropriate. When viewed in its totality, the clear weight of the evidence

16 establishes that Officer Ornelas' second volley of shots was objectively

17 unreasonable under the circumstances, and therefore the jury's verdict cannot

18 stand.

19 **IV.    DEFENSE COUNSEL'S TRIAL MISCONDUCT FURTHER**
20 **        JUSTIFIES A NEW TRIAL**

21         The clear weight of the evidence alone justifies a new trial, and the Court

22 need not reach the issue of attorney misconduct. However, defense counsel's

23 misconduct at trial provides independent grounds for granting a new trial under

24 Rule 59. Moreover, given how weak the evidence is in support of the jury's verdict

25 on the second volley, the Court has even more reason to find that defense counsel's

26 misconduct was prejudicial. *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1193

27 (9th Cir. 2002) (the "strength of the case" is one factor when evaluating the

28 likelihood of prejudice from improper attorney conduct)

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A NEW TRIAL

1    In their Opposition, Defendants fail to justify the multiple instances of

2  attorney misconduct that pervaded this trial. Their response attempts to minimize

3  or excuse four significant violations: (1) emphatic references to Officer Ornelas'

4  lack of prior shootings in opening and closing arguments; (2) repeated attempts to

5  elicit prohibited expert testimony on the ultimate issue of the reasonableness of the

6  shooting, in direct violation of the Court's order; (3) misuse of a demonstrative

7  exhibit by engaging in theatrical displays that served only to inflame the jury's

8  passions; and (4) improper statements during closing argument that

9  mischaracterized the law. Defendants' arguments on each point are addressed in

10  turn below.

11    First, Defendants' attempt to excuse their violation of well-established Ninth

12  Circuit precedent regarding an officer's prior shooting history is without merit. For

13  more than 30 years, it has been clearly established that an officer's lack of prior

14  shootings is inadmissible in excessive force cases. *Gates v. Rivera*, 993 F.2d 697

15  (9th Cir.1993). In his opening statement, defense counsel told the jury this incident

16  was "the first time in his entire career [Ornelas] had to" use deadly force; in his

17  closing argument, he emphasized to the jury again that Ornelas had "never shot

18  anyone in [his] ten years of being a California Highway Patrol officer." (ECF No.

19  163 at 175:23–25.) In each case, defense counsel used this character evidence to

20  persuade the jury that Ornelas was a good officer, who would only use deadly

21  force when absolutely necessary, which is precisely the type of argument that is

22  forbidden by the rules of evidence and long standing Ninth Circuit case law.

23    Defendants' claim that this violation should be excused because the

24  information came through attorney argument rather than testimony. But this

25  argument is specious. The prejudicial impact would be obvious if the roles were

26  reversed—if plaintiff's counsel had argued, without evidence, that Ornelas had five

27  prior shootings and that this dangerous officer needed to be taken off the streets,

28  such conduct would be considered outrageous and indefensible. The same standard

9

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A NEW TRIAL

1   must apply here. While attorneys deserve some latitude in making arguments, they

2   must still follow clearly established law. Attorney argument is not a loophole for

3   introducing inadmissible evidence and presenting such evidence through argument

4   rather than testimony does little to diminish its prejudicial impact.

5          Moreover, defense counsel's conduct is particularly egregious here because

6   he filed a motion in limine to exclude "prior complaints concerning job

7   performance, or prior disciplinary issues regarding Defendant Ornelas," because

8   "such character evidence is not admissible to prove conduct of a defendant." (Dkt.

9   73 at 6 (citing Fed. R. Evid. 404).) This motion was unopposed by Plaintiffs and

10  granted by the Court. Thus, defense counsel was acutely aware that character

11  evidence based on Ornelas' prior record was inadmissible and irrelevant to this

12  case. Indeed, defense counsel recognized the powerful impact such information has

13  on a jury—so much so that he took the time to draft a motion in limine. To then

14  turn around and deliberately present information about this being Ornelas' first

15  shooting, while attempting to hide behind the fact that it came through argument

16  rather than testimony, is the very definition of bad faith. This calculated strategy—

17  seeking to exclude all negative character evidence while knowingly introducing

18  positive character evidence through the back door—demonstrates that defense

19  counsel's violations were not mere oversight but rather a deliberate attempt to

20  circumvent both the rules of evidence and their own motion in limine.

21         Second, Defendants fail to respond to the substance of Plaintiffs' argument

22  that the trial was prejudiced by defense counsel's attempts to elicit testimony on

23  the ultimate issue from their expert Clarence Chapman. Plaintiffs pointed out in

24  their Motion that this conduct was clearly prejudicial because the court granted a

25  motion in limine on this precise topic, forbidding such questions. While

26  Defendants appear to concede that their questions violated the Court's motion in

27  limine ruling, they incorrectly argue that no harm occurred simply because no

28  testimony was permitted in response to the questions. This argument ignores one of

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A NEW TRIAL

the primary purposes of motions in limine: to prevent the prejudice that stems from merely asking an inappropriate question. Defendants clearly believed such questions were prejudicial when they filed their motion in limine to exclude them; their current position to the contrary is inexplicable. Plaintiffs' counsel carefully limited questioning of Mr. Clark to his evaluation of the case relative to POST standards, avoiding questions about the ultimate issue to be decided by the jury. Defendants offer no legitimate justification for their repeated violations of the Court's order.[2]

Third, Defendants' focus on Plaintiffs' lack of contemporaneous objections to defense counsel's theatrical use of the metal pipe. While Plaintiffs acknowledge that they agreed to the pipe's use as a demonstrative, they never agreed to defense counsel's inflammatory conduct, including repeatedly banging the pipe against the podium and brandishing it overhead in a striking position. These uses of the pipe occurred without warning and created immediate, irreversible prejudice. There was no evidence presented at trial that Sesma ever brandished the pipe above his head, and, as discussed above, the pipe was of very limited relevance given Ornelas' contemporaneous statement that he did not know Sesma was armed with a metal pipe at the time of the shooting. An objection to defense counsel's conduct at the time would have only called more attention to the issue and caused further prejudice.

Finally, in his last remarks to the jury during closing argument, defense counsel distorted the legal standard for when a threat is "immediate." By comparing it to a parent telling a child to go to their bedroom "immediately," counsel trivialized the stringent legal requirements for deadly force and invited the

---

[2] Defendants reference Mr. Klehm's declaration, which contains a long list of excerpts from Mr. Clark's testimony, but none of them are actually testimony on the ultimate issue of whether Ornelas' actions were reasonable under the Fourth Amendment or California Law.

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A NEW TRIAL

1  jury to apply a casual, everyday understanding of "immediate" instead of following

2  the Court's precise instructions.

3      As discussed in Plaintiff's Motion, the jury's mishandling of the verdict

4  form provides evidence that defense counsel's misconduct and improper arguments

5  influenced jury deliberations. The jury's disregard of the verdict form's explicit

6  instructions reveals their bias—they were so determined to blame Mr. Sesma that

7  they ignored the Court's directions and filled out the contributory negligence

8  section even after finding no negligence by Officer Ornelas, simply to ensure they

9  could declare Sesma at fault. This willingness to defy clear instructions just to

10  assign blame to Sesma strongly suggests the jury's verdict was driven by prejudice

11  rather than an objective evaluation of the evidence.

12      These instances of misconduct should not be viewed in isolation. Rather, the

13  Court should consider the above conduct as part of "the totality of circumstances"

14  in evaluating whether the trial was permeated with prejudice. *Hemmings v.*

15  *Tidyman's Inc*., 285 F.3d 1174, 1193 (9th Cir. 2002). Here, given that the

16  misconduct related to issues highly "relevan[t] to the real issues before the jury,"

17  and that the "strength of the case" supporting the jury's verdict on the second

18  volley was very weak, the above conduct prejudiced the proceeding and requires a

19  new trial. *Id.*

20  **V.    CONCLUSION**

21      For the reasons set forth above, the Court should grant Plaintiffs a new trial

22  on all three of Plaintiffs' claims, limited to the second volley. The jury's verdict

23  should be vacated because it is contrary to the clear weight of the evidence

24  presented at trial. A new trial is further justified because of several instances of

25  attorney misconduct throughout the trial.

26      In the alternative, for all the reasons detailed in their Motion and this reply,

27  the Court should enter judgment in Plaintiffs' favor under Rule 50(b) because

28

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A NEW TRIAL

Ornelas' second volley was unreasonable as a matter of law. Plaintiffs preserved this issue by making an oral Rule 50(a) motion during trial,

Dated: January 30, 2025                    LAW OFFICES OF DALE K. GALIPO

                                           /s/ *Cooper Alison-Mayne*
                                           Dale K. Galipo
                                           Cooper Alison-Mayne
                                           *Attorneys for Plaintiffs*

## **CERTIFICATION OF COMPLIANCE**

The undersigned, counsel of record for Plaintiffs, certify that this brief contains 3,978 words, which complies with the word limit of L.R. 11-6.1.

Dated: January 30, 2025                    /s/ *Cooper Alison-Mayne*
                                           Cooper Alison-Mayne
                                           *Attorneys for Plaintiffs*

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A NEW TRIAL